# EXHIBIT "B"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CERTIFIED POWER SYSTEMS, INC.)
)
VS. ) C.A. NO.: 05-066-ML
)
RHODE ISLAND STATE )
ENERGY STATUTORY TRUST )
2000, FPLE RHODE ISLAND )
STATE ENERGY, L.P. and )
FPLE RHODE ISLAND STATE )
ENERGY GP, INC. )
)
VS. )
)
CERTIFIED POWER SYSTEMS, INC.)
)
VS. )
)
ZAMPELL REFRACTORIES, INC. )

DEPOSITION OF PETER J. SCHWALJE, P.E., witness in the above-entitled cause, taken on behalf of the Defendants (FPLE), pursuant to notice, before Sally Brassard, CSR, a Notary Public in and for the State of Rhode Island and Providence Plantations, at the office of Edwards Angell Palmer & Dodge LLP, 2800 Financial Plaza, Providence, Rhode Island, on August 10, 2006, at 10:00 a.m.

Page 6

Q. I have marked a copy of your CV as FPL-30, I'll give you a copy of that.
(Defendant's Exhibit FPL-30 marked for ID.)
Q. If we can go to the second page where it says: Engineering Consultant for 30 years. Does that include both your time at Affiliated Engineering Laboratories and at Schwalje & Eaton?
A. Yes. It even includes a greater period. Schwalje & Eaton was incorporated in 1979 and my private practice goes back to 1975.
Q. Prior to Schwalje & Eaton, what was the nature of your practice?
A. It was an incorporated business.
Q. One thing I'm going to ask you to do, which is, maybe a minor point, but it really helps everybody. Even though it's very obvious where I'm going with my question, because lawyers are very predictable and obvious people, just wait till I'm done before you answer, because if you jump on the end of my question, it's hard on her and then we get kind of a messy record; okay?
A. We'll try our best.
Q. Well, I think you can. So, the thirty years of engineering consultant work on your resume

Page 7

includes time as a solo practitioner, time at Schwalje & Eaton and time at Affiliated Engineering Laboratories; is that correct?
A. Yes.
Q. Starting in the late '70s or mid-'70s rather?
A. Correct.
Q. Okay. And over that time, have you developed any particular, specialties in the engineering field?
A. Well, I limit my practice to the area of mechanical engineering and primarily machine design.
Q. Okay. Do you have any experience in fire prevention or fire safety?
A. Well, I have -- back in the days when I was working for Public Service Electric and Gas Company, I did. We maintain a corporate membership in NFPA. So, I receive their literature and read that.
Q. Other than reading information about fire prevention and safety topics, when you were at Public Service Electric and Gas Company in the early '70s, have you had any other formal training in fire prevention or safety topics?
A. I think you mischaracterized my testimony. When I was at Public Service Electric and Gas

Page 8

Company, that was part of my responsibilities in the field.
Q. Okay. And you worked there for one year; correct?
A. No, I worked as a union person for one year and I worked from '67 to '75, as an engineer.
Q. Okay. Please give me the years of service that you worked at Public Service Electric and Gas Company?
A. In 1966, I was working as a bargaining unit IBEW. I worked in the performance department and I worked on calibration of instruments; controls for boilers, turbines, et cetera.
After I graduated from Rutgers in '67, I went with them, full-time. I started, initially with them -- I was in generation; I worked in the maintenance department at Sewaren Generating Station. I was then transferred to their engineering division, I guess, after about a year.
And I worked in the engineering division from that period on up until 1975, when I left their employ. And my responsibilities, when I was in engineering, were in the area of gas turbines and combined cycle. I designed installation in field start-up of those facilities throughout the entire PS system.

Page 9

Q. So, please give me the years, start and end, that were part-time, at PSENG.
A. 1966. That was summer employment.
Q. And then your full-time employment?
A. I graduated on a Friday in May and started on Monday, 1967.
Q. Until when?
A. December 30 or thereabouts, of 1975.
Q. Okay. And while you were working at that entity, part-time, in 1966, and full-time from '66 to '75, what specific duties did you have, in the areas of fire safety or prevention?
A. Well, when I was in the field in the generation department, I was acting as a maintenance foreman and when activities involved potential for fire, that was part of your job responsibility, to institute the appropriate precautions to prevent the occurrence of a fire.
When I was working in the field, in the new facilities, I had overall project management control. I was responsible for assuring that work that was to be performed, primarily with interfacing with the existing infrastructure within the plants, was done with all aspects of the safety involved, including fire prevention.

Page 10

Q. And during that time, did you have any training in fire safety or prevention topics?
A. We had some internal programs within the company and that, but, as to a formal course work, at that point in time, I would say, no. As part of the course work in my master's program, it was touched upon briefly in, I believe, a safety engineering course that we had to take.
Q. Since you've been working as an engineer in private practice for the last thirty years, have you had any formal training in any fire safety and prevention topics?
A. I would say no.
Q. And have you had any professional experience working on fire safety or prevention topics during that thirty-year period?
A. I've had some. It's not been a big part of it. For example, I do a fair amount of work with machine tools and occasionally, there are fires that have occurred on machine tools that I've investigated. It was not primarily, for the fire cause and origin portion of it, but more or less, the mechanics of the equipment and how that may or may not have resulted in the fire.
Q. Since you've been in private engineering practice

Page 11

in the mid-1970s, have you ever been engaged by anyone to perform a fire cause or origin investigation?
A. No, I don't do that work.
Q. Have you ever testified as an expert witness in litigation before on any topics concerning fire safety or prevention?
A. I don't recall any testimony, no.
Q. Have you ever testified as an expert witness in litigation on any topics concerning regulations or standards promulgated by the NFPA?
A. Oh, yeah, all the time.
Q. And in what context?
A. NFPA publishes a plethora of standards. They have a number on machine tools. They have a number on electrical controls. They have, like in this particular case, some that are directed to fire code and welding and brazing, cutting, et cetera. So, they publish a lot of standards.
Q. But, that wasn't my question. My question was, when you have, in the past, testified as an expert witness in litigation, with regard to NFPA standards, what have the subjects of your testimony been?
A. It was primarily on the NFPA standards that

Page 12

had to do with machine control and machine safeguarding.
Q. So, in connection with your expertise in the areas of mechanical engineering and equipment design, you have testified before, about NFPA standards applicable to machine safeguards?
A. Right. That's primarily, NFPA79.
Q. And the NFPA section at issue in this case is 51B, regarding fire prevention during welding, cutting and other hot work; correct?
A. I wouldn't characterize it as being an issue. I would say that would be what is applicable.
Q. I understand. You mentioned it in your report; correct?
A. Yes, I do.
Q. Have you ever testified as an expert witness in litigation before regarding any aspect of that particular section of the NFPA?
A. Not to my recollection, no.
Q. Have you ever had any kind of formal training in the NFPA standards?
A. What do you mean by, "formal training"? For example, it's been part of course work in my master's degree where, you know, you're taught about what standards exist, et cetera. It's not a

Page 13

detailed formal course in an NFPA standard.
Q. And, I apologize, you used the words, "formal training," before. So, I thought we were on the same page on that term. Let me put it to you this way, then. I see that you got your master's in 1977.
A. Correct.
Q. So, since 1977, have you attended or participated in any seminars, continuing-ed programs, or professional training of any kind in which subjects related to NFPA standards were covered?
A. I would say, yes, but not the ones with respect to the fire.
Q. Not the ones with respect --
A. NFPA 1, I would say no, NFPA 79.
Q. So, the training or professional courses that you've had since 1977 that concern the NFPA, had to do with the Section 79, which relates to machine safeguarding issues, but not NFPA 51B; correct?
A. That would be correct. It's part of our licensing requirement. We have continuing education requirements, like you do for law, and periodically NFPA will offer a seminar where we will get continuing education requirements. I

think I have attended one or two of those over the last twenty years.
Q. So, this case is the first time in your career that you have expressed opinions as an expert witness in litigation concerning NFPA Section 51B?
A. That would be correct.
MR. FREEL: We probably aren't done with that. So, we'll just leave it out.
THE WITNESS: Sometimes, I have a tendency to walk away with the exhibits.
MR. FREEL: We won't let you do that.
Q. The cases that you've testified in before, in your career as an expert witness, were any of them cases that involved power plants?
A. Well, if I go back in history, when I was employed by Public Service, there was one case that involved a gas turbine case that was in litigation that I think I had a deposition on.
Q. But, that was in your capacity as an employee?
A. Right. It was during my tenure as an employee. Subsequent to that, yes.
Q. As an expert witness, you've testified in litigation involving power plants?
A. Correct.
Q. How often, approximately?



A. Not frequently. One, I know definitely. Perhaps, there was one other -- no, maybe there was two others.
MR. FREEL: Off the record.
(Discussion was held off the record.)
MR. FREEL: We'll go back on the record. We're getting faxed to us your list of prior deposition testimony. So, we'll come back to that later. But, in the meantime, we'll just keep plowing ahead on other subjects.
Q. I'm showing you your CV, again, FPL-30, and under Professional, on the first page, you list Member National Fire Protection Association?
A. Correct.
Q. Are you a current member?
A. Yes, the corporation is. We maintain a corporate membership.
Q. And what does that entail? What does Affiliated Engineering Laboratories have to do to maintain a current membership with NFPA?
A. Nothing extraordinary. You have to pay your dues, of course. You have a continual interest. That gives you access to their publications. It gives you access to their library, access to their personnel. There are two people within our firm



in total that do, cause and origin firework. So, they draw on their resources on that, also.
Q. And who are those two people?
A. Ritch Otterbein and Ken Garside.
Q. And have you consulted with either one of them in connection with your work on this case?
A. I have nothing to do with the cause and origin, here.
Q. I know, but I just want to know if you have consulted with either of them in connection with your work in this case?
A. No.
Q. Okay. Let me show you now, what I've marked as FPL-29.
(Defendant's Exhibit FPL-29 marked for ID.)
Q. Is this a list that you prepared, Mr. Schwalje?
A. Correct.
Q. And this is a list of the materials that you've reviewed, in connection with your work on this matter?
A. Correct.
Q. And is it up-to-date? In other words, does it reference everything that you have reviewed in connection with your work on this case, through



today?
A. Correct.
Q. How were you first engaged to perform services in this case?
A. My recollection is I received a phone call from Mr. Vespole.
Q. And do you recall the approximate time-frame of that?
A. Not too long ago. I would say, the end of April. I guess, May the 4th, I guess, would be the accurate date.
Q. Of 2006?
A. Correct.
Q. And what were you engaged to do?
A. My recollection of our conversation was that Mr. Vespole informed me he represented Certified Power Systems in a litigated matter, having pendency in Rhode Island, that involved a fire, which occurred within a combined cycle power plant; and asked if I would be willing to undertake a review of the materials that had been produced here, and perhaps, if necessary, offer opinion testimony with respect to responsibilities, duties, et cetera, of various parties in relation to the currents.

He had inquired about, if I had any power background, which I did, and I relayed that to him. And, any in combined cycle, and I did have that, at one of the first combined cycle plants in the country.
Q. So, is it your understanding that you've been engaged to express opinions concerning the duties and responsibilities of the various persons present at the Florida Power & Light Power Plant in Johnston, Rhode Island, on the day of the fire?
A. In part, and custom and practice within the power industry and how work relationships between parties, owners, et cetera, normally occur in a power plant.
Q. Had you ever testified as an expert witness before, in litigation, with regard to the duties and responsibilities of various parties, when welding is occurring?
A. I don't recall that I have, no.
Q. Have you ever testified as an expert witness in litigation before with regard to welding safety issues?
A. No, never been called upon to do that.
Q. Do you consider yourself an expert in the area of the duties and responsibilities of parties present



when welding is occurring?
A. I think I have adequate on-site, hands-on experience, in that particular area. I know how the procedures are carried out within the power industry. I'm familiar with the customs and practices within that industry. I've been involved intimately with initiating them and controlling them in the early part of my career. I believe, I've had adequate experience and knowledge of that.
Q. Well, separate and apart from your experience in the power plant industry, do you consider yourself to have expertise with regard to welding?
A. Well, I can weld, but I'm not a certified welder, for example. I don't purport to be an expert in the production of welds. You know, as to techniques, you know, different rod characteristics, et cetera, et cetera. You know, I'm an old carbon steel welder and that's about it. I wouldn't do anything fancy, but I do know how you would proceed to perform a welding operation, and how I would control that environment, because I've had to do it before.
Q. Prior to your private practice, as an engineer?
A. Sure.



Q. So your expertise in the area of welding operations, dates back to the '70s; is that fair to say?
A. That's fair to say.
Q. Since going into private engineering practice in the mid-1970s, have you had any practical hands-on experience with welding operations?
A. As I said, I do welding, myself, at the shop.
Q. Other than that, have you had any hands-on experience with welding operations since 1975?
A. No, if I have something that requires a certified welder or something with a code stamp, that's all done outside, in a fab shop.
Q. So, is it fair to say that your experience in how welding operations are managed within the power plant industry, dates back to the mid-1970s?
A. I think it would be fair to say my experience with how it was done in the power industry is because I worked in the industry for seven years and I was responsible for it.
Q. Between 1966 and 1975; right?
A. '67 to '75. I wasn't responsible-charge in '66.
Q. And that's your last experience with welding, as it may occur, within the power plant industry?



A. That would be fair.
Q. So, you were engaged in this case to express opinions regarding the duties and responsibilities of the various parties present during welding that occurred at the power plant in Johnston, Rhode Island on December 3rd, 2004; correct?
A. In part, correct.
Q. And what other areas were you engaged to express opinions in?
A. The normal practices that would occur in that environment, which may lead to assumption or an assignment of a responsibility, what codes and standards would be directly applicable to those operations.
Q. And what specific expertise do you have with regard to what codes and standards are applicable to welding, in that context?
A. Well, I'm a graduate engineer in mechanical engineering. I have a master of science degree. I also have field experience there. I'm familiar with the codes and standards and I know which ones to pull out and look at, for a specific operation. It is quite clear which codes and standards are applicable to this. This requires no specialized expertise to determine this.

A. It also appeared in numerous exhibits.
Q. Okay. Fair enough. Have you ever reviewed the Certified Power Systems Safety Manual that we previously marked as FPL-3?
A. That was attached to the exhibits, the deposition of CPS personnel.
Q. Okay. So, you did.
A. That's why I have five big volumes here. The exhibits are more than the transcripts.
Q. Okay. What, if anything, did you see during your site visit on June 14th and 15th that was ultimately relevant to any of the opinions you've expressed in your letter, dated July 11th?
A. That's rather a broad question. I guess the first and foremost would be that the actual physical position of equipment fairly well comported with the drawings that I had seen. For example, the access door locations, their positions relative to the different filter media. The relative position of the evaporative cooling media as to its interface with the wall structure. The arrangement of the paper filters, the primary and secondaries that were upstream of those.
It gave me an opportunity to visually look at the evaporative cooling media itself and to make



an assessment in my own mind if something would be so patently obvious to me that it might be flammable or not. So, I could draw a conclusion in my own mind as to that. It helped me define the basic work areas that were to be involved and the work that was in the scope of the Sargent & Lundy work where the glycol system, which was the primary work activity conducted in that area was located relative to these other portions of the machine or the inlet.
It gave me an appreciation of the size of the inlets themselves, a rough idea of the lagging that went on. The basic assessment at a workmanship level that was done to effect its installation.
Q. You say, in your report, at page 8 --
A. Bear with me here a second.
Q. First full paragraph. That there was no visual indication on the media itself that would suggest its flammability propensity. Do you see that?
A. Where?
Q. First full paragraph, starting with the word, further.
A. Okay.
Q. There was no visual indication on the media itself



that would suggest its flammability propensity.
A. That's correct.
Q. And is that based upon the visual inspection that you were able to make on the occasion on June 14th and 15th when you visited the plant?
A. Correct.
Q. So, when you visually observed the media in the two air inlet units at the plant on June 14th and 15th, you did not believe that you saw anything that would indicate that that material was flammable?
A. Well, you dropped the antecedent to that sentence. The media that it refers to in that sentence, the antecedent to that is the evaporative cooling media.
Q. Well, that's what I thought we were talking about.
A. Okay. Well, because we've been running with different type medias, the primary and secondary filters also can be called a media. But, what I'm referring to here is the evaporative cooling media.
Q. That's what I thought.
A. Just so we're on the same wavelength here, that would be correct, there was nothing there that would indicate to me, by merely looking at



that, you would know whether it was flammable or not.
Q. And, when you say in your report that there's no visual indication on the media itself that would suggest its flammability, you're referring to your own visual inspection of it on June 14th and 15th of 2006; correct?
A. Correct.
Q. And why do you say that when you looked at it there was no indication that it was flammable?
A. Well, for example, if one were to look at the primary or the secondary media, the first filtering elements, it's quite obvious their of a paper construction. They deflect. They look like paper, they feel like paper. If you go to the evaporative cooling media, it's almost a rigid structure. It has a stiffness to it. It almost has like a porcelain or bake-like feel to it. It has an indication of being relatively solid and not flexible. Just by looking at it, you would not say that this is flammable.
Q. I take it that you became familiar, through a review of documents, with the specific portion of this project or scope of work that involved the installation of insulation on the exterior of the

# AFFILIATED ENGINEERING LABORATORIES, INC.

*Engineering Consultants*

1101 Amboy Avenue
Edison, NJ 08837-2856

Phone: (732) 225-0360 Fax: (732) 417-0165


DEFENDANT'S EXHIBIT
FPL-30
8-10-06 SB

**Resume:** **PETER J. SCHWALJE**

**Education:**

Bachelor of Science - Mechanical Engineering
Rutgers University (1967)

Master of Science - Industrial Health & Safety Engineering
New Jersey Institute of Technology (1977)

Various Continuing Education Programs in Machine Safeguarding, OSHA Regulations and CNC Programming

Various Courses in Biological Sciences & Chemistry

**Professional:**

Professional Engineer License #20906 New Jersey
Professional Engineer License #052132 New York
Professional Engineer License #39321 Florida
Professional Engineer License #M-29183 California
Professional Engineer License #22892 South Carolina
Member American Society of Mechanical Engineers
Member National Safety Council
Member American Society of Safety Engineers
Member National Fire Protection Association
Member The Industrial Advisory Board - Rutgers University College of Engineering

**Publications:** ASME Paper on Design and Construction of Prototype Power Plant

**Professional Experience:**

**Robert D. Bristol, General Contractors**, Brookfield, CT
General construction work (2 years)

**Public Service Electric and Gas Company** (1 year)
Bargaining Unit Technician in Performance Department, Linden Generating Station

Assisted Grade I Technicians in evaluation, calibration and services of power plant instrumentation and controls.

**Public Service Electric and Gas Company**, Newark, NJ (8 years)
Senior Engineer in Engineering & Construction Department
Design & Construction of Power Plants and Related Equipment,
Equipment Maintenance

**Pratt Institute**, Brooklyn, New York (3 years)
Assistant Professor - Department of Mechanical Engineering

**Engineering Consultant** (30 years)
Representative Work:

Designed machines for cutting and shaping rigid urethane foam
Designed material handling systems
Designed door and seal system for high temperature autoclave
Designed lifting equipment for pleasure craft removal and maintenance
Designed hydraulic and chemical systems for municipal pool
Designed control facilities for process control systems
Designed facilities for storage and removal of chemicals and hazardous wastes
Designed customized mixing and agitation equipment for laboratory sample preparation procedures
Performed independent design reviews of new equipment including operating systems, controls and manuals
Performed independent review of instruction manuals and warning placards of foreign manufactured equipment prior to importation and marketing in the USA
Designed mixing and blending equipment systems for powdered compounds
Prepared site plans and facilities layouts
Designed and constructed models and prototypes of machinery and facilities
Designed customized fixtures for machining operations
Performed stress analysis for high pressure pre-heaters and pressure vessels
Performed kinematic analysis for high speed cut-off knives
Performed evaluations and oversaw rebuilds of sheet and flexographic printing presses
Served as consultant to attorneys and insurance carriers in litigation matters