UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CERTIFIED POWER SYSTEMS, INC.)
)
VS. ) C.A. NO.: 05-066-ML
)
RHODE ISLAND STATE )
ENERGY STATUTORY TRUST )
2000, FPLE RHODE ISLAND )
STATE ENERGY, L.P. and )
FPLE RHODE ISLAND STATE )
ENERGY GP, INC. )
)
VS. )
)
CERTIFIED POWER SYSTEMS, INC.)
)
VS. )
)
ZAMPELL REFRACTORIES, INC. )

DEPOSITION OF THOMAS W. EAGAR, Sc.D., P.E., witness in the above-entitled cause, taken on behalf of the Defendants (FPLE), pursuant to notice, before Sally Brassard, CSR, a Notary Public in and for the State of Rhode Island and Providence Plantations, at the office of Edwards Angell Palmer & Dodge LLP, 2800 Financial Plaza, Providence, Rhode Island, on August 3, 2006, at 10:00 a.m.

APPEARANCES:

FOR ZAMPELL REFRACTORIES, INC.:
REALE & KALANDER, LTD.
BY JOSEPH J. REALE, JR., ESQUIRE

FOR ZAMPELL REFRACTORIES, INC.,:
ASQUITH, MAHONEY & ROBINSON
BY: JOHN R. MAHONEY, ESQUIRE

FOR FLORIDA POWER & LIGHT:
EDWARDS ANGELL PALMER & DODGE, LLP
BY: MARK W. FREEL, ESQUIRE

FOR CERTIFIED POWER SYSTEMS, INC.:
VISCONTI & BOREN, LTD.
BY JESSICA L. PAPAZIAN-ROSS, ESQUIRE

FOR SARGENT & LUNDY:
MECKLER BULGER & TILSON LLP
GEORGENE M. WILSON, ESQUIRE



I-N-D-E-X

DEPOSITION OF THOMAS W. EAGAR


Examination by Mr. Freel .......... 5
Examination by Ms. Wilson.......... 111
Examination by Ms. Papazian-Ross ...... 122
Examination by Mr. Freel .......... 133
Examination by Ms. Wilson.......... 139


E-X-H-I-B-I-T-S

| DEFENDANT'S NO. | DESCRIPTION | PAGE |
|---|---|---|
| FPL-23 | Resume Thomas W. Eagar as of 1/25/2006 | 6 |
| FPL-24 | List of cases/experience providing expert testimony | 6 |
| FPL-25 | Letter dated 7/11/06 to Asquith & Mahoney, LLP from Thomas W. Eagar along with Welding Handbook Eighth Edition - Volume 1 | 10 |
| FPL-26 | DVD of diferent tests performed | 24 |
| FPL-27 | Letter dated 7/11/06 to Tressler, Soderstrom, Maloney & Priess, Esqs. from Peter J. Schwalje | 61 |

REPORTERS NOTE: Exhibit FPL-26 was retained by Attorney Freel.



INFORMATION REQUESTED

| PAGE | LINE |
|---|---|
| 21 | 14 |
| 53 | 6 |
| 110 | 22 |



(DEPOSITION COMMENCED AT 10:18 A.M.)
THOMAS W. EAGAR,
having first been duly sworn by the Notary Public, testified as follows:
THE COURT REPORTER: Please state your full name and spell it for the record.
THE WITNESS: Thomas W. Eagar (E-a-g-a-r).
EXAMINATION BY MR. FREEL:
Q. Mr. Eagar, good morning. My name is Mark Freel and I represent various Florida Power & Light entities who are defendants in this case. You're appearing here today pursuant to an agreement of counsel for your deposition testimony; correct?
A. Yes, sir.
Q. Okay. And you have been engaged, I take it, to give testimony as an expert witness in this case on behalf of Zampell; correct?
A. Correct.
Q. I'm sure you've been deposed before. In fact, I see a very lengthy list of your prior experience so I won't go into too much detail about the ground rules. I'll just remind you that should you at any time not understand one of my questions, please say so; okay?
A. Yes, sir.

Page 54

Q. And didn't consider them relevant to the opinions you intend to express in this case at trial?
A. Well, without having reviewed them, I can't tell you if they're relevant, but I don't expect them to be relevant, how about that.
Q. In other words, you didn't ask to see them?
A. I did not ask to see them.
Q. And just in case there's no misunderstanding on this, that contract includes a rather large set of job specifications generated for this job by Sargent & Lundy, the architect and engineer. Have you ever reviewed those?
A. I have not on this case but I have been through such specifications in other utility and other types of construction projects, and they are a lot thicker than that one or two inches that you just kind of hinted at.
Q. Right.
A. But usually they fill volumes.
Q. But, in this case, you did not review those?
A. No, I did not.
Q. And don't for the moment consider them relevant to any opinions you intend to express?
A. No, I do not.
Q. Okay. I want to go back for a minute to the whole

Page 55

melt-through discussion we had. I'll particularly ask you to turn to the AWS definition of melt-through and the figure 27 that goes with it. I'd ask you if you could just answer a couple of questions for me about that.

First of all, the definition refers to visible root reinforcement. Can you please tell me what that term means. If it helps to use figure 27, that would be great.
A. If you look at figure 27, the melted region is the gray-shaded region. And melt-through -- well, let me backup. When you look at a piece of steel, the surface texture of the melted region is different than the unmelted region. So it's obvious to any -- by visual inspection, what metal had melted and what metal had not melted.

And, in fact, an inspector is usually looking for at least some melt-through but not excessive melt-through. In fact, if you go to things like the structural welding code, it will have specifications. If you don't have any melt-through, then it's going to be called -- and I may have included some of that -- well, I have complete joint penetration, okay, here, or complete joint penetration weld. I don't know

Page 56

that I -- well, if I included -- I didn't include incomplete joint penetration.

But, in general, you're trying to achieve complete joint penetration, which may be the reason that I included that page. You're trying to achieve that. It's a desirable quality. Usually incomplete joint penetration is considered a defect unless it was actually called out on the drawing. In fact, they would call it incomplete fusion, okay. And that is considered a defect. So, you really want to get some melt-through but you don't want excessive melt-through.

If it kind of is hanging through and you've got more than the equator hanging down, okay, that's an undesirable thing. That's the type of thing that causes burn-through where the metal gets spattered on the inside, but, you want some melt-through but not excessive melt-through.

If you look at figure 27, you'll see the types of -- I will call generally desirable quality welds. Specifically, if you look at E, you have a convex root surface, which is very desirable and you have a concave, which in some specifications, such as maybe in a bridge or something, would be actually considered undesirable. So, typically E

Page 57

is a very, very desirable shaped weld.
Q. What about B and D? On both B and D, you have a prominent bubble, if you will, on the back side of the weld where there's a joint between the two pieces of metal. Is that an acceptable or desirable outcome?
A. In this case, both of these are what we call flare bevel groove welds and they are acceptable in this geometry where you have this flare bevel and you have to fill the bevel. If you have everything set properly, you can control that because the flare bevel top geometry allows you to control that because you're melting that down.

You notice on both of those you had original material sticking up top and you melted it down, it sags down. Because of that, you can control that larger melt-through because of the top geometry, if you will.

In these others, you don't have that extra material on the top and so they showed smaller melt-through and you have to control it to a smaller melt-through than you do in B and D.
Q. The definition uses the term visible root reinforcement. Can you describe for me what that particular term means?

A. The root reinforcement is the positive drop-through past the bottom.
Q. So, for instance, in E, it's the concave root surface?
A. Right. And that is what we would call a positive root reinforcement because it extends beyond the thickness of the plate. F is a negative root reinforcement and is not always desirable because it actually makes a slightly weaker weld. But the strongest weld -- E, would be the strongest weld. So a little bit of melt-through is good.
Q. So given that on the illustration E, the back side surface is a flat surface and not a bevel like in B or D, is E the illustration that's most like what we have in this case?
A. Yes. Actually, it is the most like it. What we actually have in this case is sort of a composite between A and E because it is a fillet weld but the back side is all planar. So E is the best example of the expected melt-through. Although, we were making a fillet weld and not a groove weld.
Q. I understand. Do you have any opinions as to whether or not it's possible in a private



construction situation like this for parties by virtue of their contract language to alter in any way the applicability of NFPA or other industry standards?
A. That sounds like a legal question that I'm not sure I'm an expert to answer.
Q. But have you given any consideration to that in this case?
A. I know that NFPA 51B is the standard of care, the generally accepted standard of care, and actually has the force of law in the sense that it's called out by OSHA regulations. Can people alter things? I guess I'd have to have more details but, like I say, it sounds to me like a legal conclusion that I'm not prepared to offer an opinion on.
Q. Well, it may be but then you also just said that it is the force of law, which that may be a legal conclusion too. So, it's a fair question, I think. Let me just ask you this way: Have you ever worked on any cases or expressed any opinions in any cases where there was contract language that was in any way inconsistent with any NFPA standards that were applicable in the same case?
A. I can't remember it as an issue in any case.



Q. Okay.
A. So, I guess the answer is no. I can't think of anything right now.
Q. And, in this case, by virtue of the fact that you haven't asked to see and haven't read the standards in the contracts or the Sargent & Lundy specifications, you don't think they're relevant to the application of the NFPA standards you've called out; correct?
A. I have read part of Florence Cone's report and I know she's calling out some of those things but those were very general things that I don't think when you have a Hot Work Permit changed the duty on the parties, in my opinion, okay. They were very general things and they didn't get specifically down to who is supposed to know there is flammable media behind there. I certainly don't know how Zampell is supposed to know.
Q. Fair enough. You've answered my question. Let's talk a little bit then about some of the NFPA standards. The NFPA standards weren't included in your report so I took the liberty of making some copies of Mr. Schwalje's report and I understand it's not yours but it has the benefit of having the actual NFPA sections behind it. So I figured



we could use that for reference.
A. Okay. That's fine.
MR. FREEL: Why don't I get that marked as FPL-27.
(Defendant's Exhibit 27 marked for ID.)
THE WITNESS: In five or ten minutes when it's a good stopping point --
MR. FREEL: Let's do it right now.
(A short recess was taken.)
Q. BY MR. FREEL: So, you have FPL-27 in front of you and, as I said, my purpose in showing you this is not really to get you to comment too much on Mr. Schwalje's opinions at all. It was the easiest place this morning I could put a hand on a copy of some of the relevant NFPA sections.
So, first, let me ask you about the term Permit Authorizing Individual or PAI, as that is used in various places in the relevant sections of the NFPA. First, I'll refer you to section 3.3.5. That defines permit authorizing individual as the individual designated by management to authorize hot work; correct?
A. Yes.
Q. And then on the next page, section 3.3.5 says that the Permit Authorizing Individual is permitted to

procedures related to the Hot Work Permit that is the basis for your opinions concerning Florida Power & Light's responsibilities as well as "everyone's" responsibility, with reference to this particular job site?
A. Not just the Hot Work Permit because that starts with the permit authorizing individual. It goes back to management as well.
Q. And is that the management under the NFPA 51B?
A. That's my understanding, yes.
Q. And that management would be, in your opinion, Florida Power & Light?
A. That's what I've said in my report, yes.
Q. You also state on page 4 in the final paragraph -- actually the third sentence: The cause of this fire was the failure of Florida Power & Light and their engineers to recognize the hazard of welding near flammable media materials. When you say, their engineers, who specifically are you referring to?
A. That would be Sargent & Lundy. Well, actually, Sargent & Lundy and the engineers within Florida Power & Light.
Q. And the engineers within Florida Power & Light, would that include Mr. Rowe and Mr. Crossley and



the people involved with the Hot Work Permit or is there some other entity or engineers?
A. No, it's people within the management. I include the engineers within the management of this project. I don't remember Mr. Crossley being an engineer of any sort, okay, that I remember. Mr. Rowe, I haven't read his qualifications.
Q. And were you provided with any information or any depositions or documents other than identifying the engineers within Florida Power & Light?
A. No, I have -- I do not, other than I have Mr. Burke's name on the Hot Work Permit, I have not been provided with that information of who those people are.
Q. And Mr. Freel earlier was asking you about Mr. Alarcon.
A. I've heard about him, yes.
Q. And where did you hear about him from?
A. Mr. Mahoney explained to me that he was contracted by Florida Power & Light as a supervisor or, whatever, manager on this job.
Q. So he would be an FPL engineer for purposes of this opinion in your report; correct?
A. Yes, that's correct.
Q. And, as an FPL engineer, he would have



responsibility for recognizing and then disclosing the presence of the flammable material; is that correct?
MR. FREEL: Objection.
A. That's correct, yes.
Q. And if there had been disclosure at a prior point in time as Mr. Freel was asking you earlier of the presence of flammable material to Mr. Corcoran, would that have satisfied the -- strike that. If there had been identification to Mr. Corcoran that the evaporative cooling media was flammable, would that have satisfied the obligation of the engineers to then make that information known to the contractor?
MS. PAPAZIAN-ROSS: Objection.
MR. MAHONEY: Objection.
A. It might have. I'd have to know some more details and it actually also gets into, I think, questions that are not appropriate for me but for the finder of fact.
Q. And why are they not appropriate for you?
A. Because I'm not the finder of fact. I mean, I can tell you what I've read about, or haven't read in this case, about what one person said to someone else but I'm not the one to find fact as



to whether they did or not.
Q. And you haven't read Mr. Corcoran's deposition; correct?
A. That's correct.
Q. And you haven't read the deposition of any of the Sargent & Lundy witnesses; correct?
A. That's correct.
Q. And you haven't read the deposition, other than Mr. Crossley's, of any of the other Florida Power & Light witnesses; is that correct?
A. That's correct.
Q. And you have not read Mr. Alarcon's deposition; correct?
A. That's correct.
Q. So you really don't know what information was imparted to Mr. Corcoran, do you?
MR. MAHONEY: Objection.
A. That's a fair statement. That has not been part of my investigation. My investigation has been solely on this Hot Work Permit and how it was -- how all that -- and the quality of the welds.
Q. And, if I understand your prior testimony correctly -- and I just want to make sure I do; assuming, again, that Mr. Corcoran was informed and knew about the presence of the evaporative

cooling media and its flammability, and he just forgot, he would share in the responsibility or the issues related to the Hot Work Permit, because he did not fulfill his responsibility to remove the flammable material to take the proper safety precautions?
MS. PAPAZIAN-ROSS: Objection.
A. Yes. As I've said earlier today, anyone who had that knowledge and forgot about it is responsible. That was in that whole chain of command.
Q. And I just want to clarify for you -- for myself, pardon me, I want to clarify for myself the chain of command that you are referring to. The chain of command that you're referring to, I believe, is what's identified in 51B, NFPA 51B; correct?
A. Correct. Although you can go beyond that to, did Mr. Corcoran communicate to the operator? Actually, that's part of 51B. So, that's fine, that's fine. It's a 51B chain of command.
Q. Okay. So that's the management, meaning, FPL's people and the permit authorizing individual and all of your prior testimony concerning how the communication would flow from top down to the people actually conducting the walk-through of



the -- for the issuance of the Hot Work Permit; correct?
A. All the way down to the operator. It goes from the management down to the operator who actually is doing the welding. However --
Q. Thank you, sir.
A. I'm going to move to strike, but --
Q. Thank you, sir. You've answered my question.
MR. MAHONEY: He can finish his answer.
A. My addition is Sargent & Lundy's engineers were spec-ing (sic) this job as contractors to Florida Power & Light and I told you before that I include them as part of Florida Power & Light engineers here.
Q. Did you have -- other than the fact that Sargent & Lundy were the engineers for the job, did you read or review the contract between Florida Power & Light and Sargent & Lundy?
A. No.
Q. Did you review or obtain any information -- strike that. Did you review the designated work authorization or any of the other materials concerning the scope of Sargent Lundy's responsibilities with reference to what Florida Power & Light asked them to do? In other words,



their contractual responsibilities.
A. No, I have not gotten into the contracts.
Q. And you didn't review the Sargent & Lundy specifications; correct?
A. The only thing I reviewed is this SL1036 and 1044, which came from Sargent & Lundy that had the warning about the flammability on it.
Q. And that was the Sargent & Lundy -- I forget the numbers.
MS. WILSON: What numbers -- can we go off the record.
(Discussion was held off the record.)
Q. But the Sargent & Lundy documents that you reviewed were the transmittals from Sargent & Lundy to the field of certain documents; correct?
A. Yes.
Q. And it was strictly those transmittals and the drawings that were transmitted that were the ones that contained the warning concerning the flammability of the evaporative cooling media; correct?
A. Yes.
Q. And you've not been asked to give any opinions, if I understand correctly, concerning the scope of contractual responsibility that Sargent & Lundy



had for this job in terms of being the consulting engineers?
A. Nothing beyond what I've already testified to. I'm not sure if I interpreted that question correctly, but I have not been asked to look at anything beyond what I've talked about today; that they were asked to do specifications and things like that.
Q. And you testified earlier that you had been sent Mr. Crossman's deposition but you had never received it?
A. That's my understanding.
Q. That's your understanding.
A. Because since I didn't receive it, I can't tell you when I would have received it.
Q. Right, correct, but my question is, are you planning to do any more work on this job or on this particular project?
A. I would bet Mr. Mahoney will get me a copy of Mr. Crossman's deposition, among others, at some point in time if this doesn't settle.
Q. And -- but at this point in time, you do not intend to do any additional work?
A. I have no intent to do any further laboratory tests. I might prepare exhibits preparatory to