**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CERTIFIED POWER SYSTEMS, INC.**<br>**Plaintiff,** | : | |
| **vs.** | : | **C.A. No. 05-066-ML** |
| **RHODE ISLAND STATE ENERGY STATUTORY TRUST 2000, FPLE RHODE ISLAND STATE ENERGY, L.P. and FPLE RHODE ISLAND STATE ENERGY GP, INC.**<br>**Defendants,** | : | |
| **vs.** | : | |
| **CERTIFIED POWER SYSTEMS, INC.**<br>**Defendant on Counterclaim/Third-Party Plaintiff** | : | |
| **vs.** | : | |
| **ZAMPELL REFRACTORIES, INC.**<br>**Third-Party Defendant/Fourth-Party Plaintiff,** | : | |
| **vs.** | : | |
| **SARGENT & LUNDY, LLC and PREMIER ENGINEERING SERVICES, INC.**<br>**Fourth-Party Defendant** | : | |

**PRETRIAL MEMORANDUM OF PLAINTIFF/COUNTERCLAIM DEFENDANT/THIRD-PARTY PLAINTIFF CERTIFIED POWER SYSTEMS, INC.**

## II. Legal Authorities

CPS entered into two (2) purchase orders with FPLE one dated September 1, 2004 which was the pre fire contract and the second purchase order dated December 15, 2004 which was the post fire contract. The fire occurred on December 3, 2004. Under the pre fire contract, the total purchase order was $2,881,328.00. There was extra work performed which was an additional $146,028.88 bringing the total contract price to the sum of $3,027,356.88. FPLE made a partial

payment on the contract leaving a balance owed of $2,095,186.20. On the post fire contract, the work was done on a time and material basis and the total material and labor hours equal the sum of $2,133,634.95. FPLE paid a significant portion of the post fire work leaving a balance owed of $9,427.32. The combined totals owed are $2,104,613.52.

In order to recover on a contract, a party has to prove that there was a mutual agreement between the parties and that the parties intended to be bound by the terms of the agreement. The manifestation of a mutual assent is evidenced by an offer or proposal and the acceptance of the terms by the other party. In order to have a valid contract, each party must have a full understanding of what is required of them under the terms of the contract. The elements required to form a valid contract are:

a. An offer;
b. An acceptance of that offer;
c. Consideration, that is some form of value given in exchange for the promise;
d. A mutual or reciprocal agreement; and
e. A mutual or reciprocal obligation.

See, Flanders & Medeiros, Inc. v. Bogosian, 868 F.Supp. 412 (D.R.I. 1994); Lamoureux v. Burrillville Racing Association, 91 R.I. 94, 161 A.2d 213 (1960); Smith v. Boyd, 553 A.2d 131 (R.I. 1989).

In this case, two (2) valid contracts were formed for the pre and post fire work performed by CPS. CPS performed all its work under the pre and post fire contracts in accordance with the plans and specifications. The defendant materially breached the contract by failing to pay CPS for the work performed. The underlying rationale in a breach of contract action is to put the innocent party in the position he, she or it would have been in had the contract been fully performed. See, National Chain Company v. Campbell, 487 A.2d 132, 135 (R.I. 1985). The case law on substantial performance is inapplicable to this case. This case is not to be looked at in a

window as to the percentage of work performed up to the time the fire occurred on December 3, 2004 because after the fire occurred, CT-1 was rebuilt to where it was prior to the fire and then the retrofit contract was continued until the work was fully completed. Thus, CPS did not substantially complete its work but fully completed its work on the pre and post fire contracts. When a contract has been fully completed, the contractor is entitled to full payment. See, Peloquin v. Arden Engineering Company, 104 R.I. 671, 248 A.2d 316 (1968). Nevertheless, even if substantial performance were an issue, CPS substantially performed its pre and post fire contracts. Whether a party has materially breached a contract by failing to pay and/or failing to comply with the obligations under the contract is a question of fact for the jury to decide. Whether a party has substantially completed and/or fully completed a contract is a question of fact for the jury to determine. See, Women's Development Corporation v. City of Central Falls, 764 A.2d 151, 158 (R.I. 2001).

In this case, CPS was never warned and/or told that the combustion turbine units CT-1 and CT-2 contained evaporative cooling media which was a flammable and hazardous substance if hot work is being performed on the exterior of the duct. As the owner of the plant, FPLE had a common law duty and a duty under the Occupation Safety & Health Administration ("OSHA") and the National Fire Protection Association ("NFPA"), to warn CPS of site specific flammable materials and potential fire hazards. These standards are incorporated into the General Laws. See, §23-28.2-21, §28-20-24(c)(d) and §23-28.1-2. Under OSHA, section 1910.252(a)(2)(xiii)(D) **management** shall "[a]dvise all contractors about flammable materials or hazardous conditions of which they may not be aware." (Emphasis added). Under NFPA section 51B entitled "Fire Prevention During Welding, Cutting and Other Hot Work" **management** designates the "permit authorizing individual" ("PAI") which is the person who authorizes the hot work to be performed. See, 3.3.5 of 51B. (Emphasis added). Under chapter 4

of 51B, management, that is FPLE, had the following responsibility under section 4.1.7: "Management shall advise all contractors about site specific flammable materials, hazardous processes or conditions, or other potential fire hazards."

The "permit authorizing individual" involved in the hot work permit issued on December 3, 2004 was Chuck Rowe who signed the hot work permit on behalf of FPLE. Chuck Rowe and/or Rick Crossley who performed the walkdown on behalf of FPLE was required under section 4.2.1 of NFPA 51B to "determine site specific flammable materials, hazardous processes or other potential fire hazards that are present or likely to be present in the work location." Under the "Hot Work Permit" section of NFPA 51B section 5.3.2 requires the "permit authorizing individual", that is an employee of FPLE, to verify that combustible materials within a thirty-five (35) foot radius are removed from the floor and that combustible material that cannot be removed be guarded against a fire with fire retardant covers or other protective shields. The "permit authorizing individual" was required to verify that if hot work was being done on one side of a wall that precautions were taken to prevent ignition of combustibles on the other side of the wall by either relocating the combustibles and/or maintaining a fire watch.

As the management and owner of the plant, FPLE had the statutory duty to warn CPS about the evaporative cooling media which was flammable and to verify that the evaporative cooling media had been relocated or shielded before a hot work permit was issued authorizing welding on the exterior of CT-1. As the "permit authorizing individual" under NFPA 51B, FPLE breached its duties and obligations in issuing the hot work permit on December 3, 2004. As a direct and proximate cause of FPLE failing to comply with NFPA 51B, the evaporative cooling media ignited on December 3, 2004 while Zampell was performing welding on the exterior of the duct.

The evaporative cooling media contained in CT-1 on December 3, 2004, CELdek, had a flammability rating of 350 degrees Fahrenheit. Zampell Refractories' expert witnesses are expected to testify regarding how welding of an angle iron clip to the stainless steel portion of the exterior of the CT-1 duct under normal welding conditions would create enough heat transfer to ignite evaporative cooling media located within an inch of the exterior duct. If normal welding conditions would result in ignition due to the flammability of the evaporative cooling media and the proximity to the exterior duct, it is irrelevant whether there was a melt-through or a burn-through as the media would have ignited even without those factors.

Not only did FPLE have a statutory duty to warn CPS of the hazardous and flammable materials at the time the hot work permit was issued on December 3, 2004, but FPLE as the owner of the plant had a common law duty to warn business invitees such as CPS of known hazards, dangerous conditions existing on the property and latent defects. See, Vandal v. The Conrad Manufacturing Company, 87 R.I. 112, 138 A.2d 816 (1958); Molinari v. Sinclair Refining Company, 111 R.I. 490, 304 A.2d 651 (R.I. 1973); Mariorenzi v. Joseph DiPonte, Inc., 114 R.I. 294, 333 A.2d 127 (1975); Mead v. Papa Razzi, 840 A.2d 1103 (R.I. 2004); Konar v. PFL Life Insurance Company, 840 A.2d 1115 (R.I. 2004); Massart v. Toys R Us, Inc., 708 A.2d 187 (R.I. 1998).

Chuck Rowe, who authorized the hot work permit to issue on December 3, 2004, knew that the evaporative cooling media was flammable and knew that the operation and maintenance manual from Pneumafil Corporation warned that no welding should take place on the exterior of the air inlet duct unless the evaporative cooling media was removed and/or kept wet. Despite this knowledge, Chuck Rowe did not warn CPS of this hazard and/or require that the evaporative cooling media be removed and/or kept wet before the hot work permit was issued on December 3, 2004. No FPLE employee warned CPS of the safety hazards that existed when welding on the

exterior of CT-1 with the evaporative cooling media being located inside the closed structure. This failure by FPLE was a breach of its common law and statutory obligations as the owner of the power plant.

FPLE's defenses of setoff for monies owed on its counterclaim, liquidated damages for CPS's inability to complete the retrofit project by December 15, 2004 and its argument that the risk of loss was on CPS to repair the damage caused by the fire are arguments that cannot be sustained based on the contract language, the law and the circumstances. This court will interpret the words used in a contract as a matter of law and will determine if there is any ambiguity. If there is any ambiguity, it is a question of fact. If ambiguity exists, the language is construed against the drafter. See, Rotelli v. Catanzaro, 686 A.2d 91, 94 (R.I. 1996); Judd Realty, Inc. v. Tedesco, 400 A.2d 952, 955 (R.I. 1979). The language used in a contract is ambiguous when it is reasonably susceptible to more than one interpretation. See, Rubery v. Downing Corporation, 760 A.2d 945, 947 (R.I. 2000).

The risk of loss section contained in the General Conditions 59.0 is inapplicable to the facts of this case as this section is not an "All Risk Insurance Policy" and this section is not binding when the risk of loss occurred as a result of the owners' negligence. The fire that occurred on December 3, 2004 resulted from FPLE's negligence in failing to warn CPS that the evaporative cooling media existed, was flammable and that the manufacturer required that no welding could take place on the exterior of the duct unless the evaporative cooling media was removed and/or kept wet. The risk of loss provision does not apply due to the fact that the loss resulted from FPLE's negligence. See, The Hartford Insurance Company v. Riefolo Construction Company, Inc., 81 N.J. 514, 410 A.2d 658 (N.J. 1980).

There is also no defense to payment in this case due to lack of all the subcontractors signing lien waiver releases. CPS made a good faith attempt to obtain lien waivers but is

irrelevant as the lien period has long expired and the issue is moot. A lien has to be recorded within 120 days of furnishing labor or materials which improved the property. See, 34-28-1 *et seq*. of the General Laws. The lack of lien waivers was never presented at the time the fire occurred as a basis for non payment. Therefore, any such argument is waived. See, Keystone Elevator Company, Inc. v. Johnson & Wales University, 850 A.2d 912, 919 (R.I. 2004). As a general proposition, the law never requires a useless act to be done. See, Lititz Mutual Insurance Company v. Lengacher, 248 F.2d 850, 854 (7th Cir. 1957).

The defendants' claim for liquidated damages for CPS's inability to complete the retrofit project by December 15, 2004 is also an argument that cannot withstand legal scrutiny. The fire was an intervening event that made it impossible for CPS to complete the work on the retrofit project by December 15, 2004 as the structure was destroyed. See, Iannuccillo v. Material Sand and Stone Corporation, 713 A.2d 1234 (R.I. 1998); Krause v. Board of Trustees of the School of Crothersville, 70 N.E. 264 (Ind. 1904). Moreover, when there is a valid excuse for the contractor being unable to perform its work by the date indicated, the owner cannot enforce a liquidated damage provision, especially when the actions of the owner contributed to the inability of the contractor to perform on time. See, Robinson v. United States, 261 U.S. 486 (1923); E.B. Ludwig Steel Corporation v. C.J. Waddell Contractors, Inc., 534 So.2d 1364 (L.a. App. 5th Cir. 1989).

CPS also has a count for unjust enrichment relative to the work performed at the Johnston power plant. When a person performs services on behalf of another at the request of that person and the other party benefited from the services, plaintiff is entitled to recover the reasonable value of the work performed to avoid the other party being unjustly enriched. See, National Chain Company v. Campbell, 487 A.2d 132, 135 (R.I. 1985); Transnational Corp. v. Rodio & Ursillo, Ltd., 920 F.2d 1066, 1071 (1st Cir. 1990).

Premier Engineering Services, Inc. ("Premier"), though its principal, Edward Alarcon ("Alarcon"), was hired by FPLE as a consultant for the retrofit project. While a formal contract was drafted, it was never finalized or executed by Alarcon on behalf of Premier, and was considered a draft by Alarcon. Therefore, the exact status of Premier and Alarcon on the jobsite is not established by written contract. Premier and Alarcon were acting as agents of FPLE and therefore their knowledge regarding the nature of the evaporative cooling media and the fact that welding was to be performed on the exterior of the air inlet duct must be imputed to FPLE. Moreover, any negligence on the part of Premier/Alarcon must be attributed to FPLE.

In Powers v. Coccia, 861 A.2d 466 (R.I. 2004) the court set forth the requirements under Rhode Island law for finding a principal responsible for the actions of an agent. All of the factors delineated are clearly present in the Premier/Alarcon/FPLE relationship:

> To prove an agency relationship, the following facts must be found: "(1) a manifestation by the principal that the agent will act for him, (2) acceptance by the agent of the undertaking, and (3) an agreement between the parties that the principal will be in control of the undertaking." Norton v. Boyle, 767 A.2d 668, 672 (R.I. 2001) (quoting Lawrence v. Anheuser-Busch, Inc., 523 A.2d 864, 867 (R.I. 1987)). *Id.* at 470

See also, Toledo v. Van Waters-Rogers, Inc., 92 F.Supp.2d 44 (D.R.I. 2000).

The testimony of Alarcon makes it clear that he considered himself as a temporary contract employee of FPLE, and that he followed the FPLE mandated procedures. FPLE had to be consulted in order for Alarcon to perform his work.

Even if the unsigned agreement were relevant to the FPLE/Premier relationship, its reference to Premier as an independent contractor would not be dispositive of the issue. A party cannot rely on the mere fact that a document designates a party as an 'independent contractor," the dispositive factor is the element of control. In Butler v. McDonald's Corp., 110 F.Supp.2d 62 (D.R.I., 2000), the court held:

> The strongest evidence put forward by defendant that an agency relationship does not exist is the franchise license agreement itself, which explicitly states that no agency has been created thereby. However, a party cannot simply rely on statements in an agreement to establish or deny agency. [R]ather, an agency relationship is essentially determined by examining whether there is a right of control of one party over another. [F]urther, defendant offers an affidavit from its Senior Corporate Attorney stating on behalf of defendant that defendant does not own, operate, or have a right to control the franchise restaurant. *Id.* at 67

In proving an agency relationship, the key factors are whether the principal had the right to control the work of the agent and whether the agent acted primarily for the benefit of the principal. See, Butler v. McDonald's Corp., 110 F.Supp.2d 62, 66 (D.R.I. 2000).

In this case, it is clear that Premier's actions were controlled by FPLE and that he considered himself to be acting under FPLE's control. All parties considered Premier/Alarcon to be acting as an agent of FPLE and not an independent contractor. Alarcon himself believed that he was a contract employee of FPLE. Moreover, if Alarcon wanted to issue directive work orders he had to go through FPLE. The evidence supports that Alarcon considered himself to be controlled by FPLE.

Even if Alarcon was deemed to be an independent contractor and not an agent of FPLE, his actions must still be attributed to FPLE. Even where a party is acting as an independent contractor, the principal is still responsible for its actions where the principal has a non-delegable duty to act where the activity is inherently dangerous or when special precautions need to be taken. When there is a duty imposed by an ordinance, statute or regulation for the protection of the public, an owner cannot escape liability by delegating the work to an independent contractor. When there is a non-delegable duty, the owner is liable for injuries resulting from the negligence of the independent contractor. See, Webbier v. Thoroughbred Racing Protective Bureau, Inc., 105 R.I. 605, 254 A.2d 285 (1969); Blount v. Fong, 48 R.I. 453, 138 A. 52 (1927).

When work is inherently dangerous, the owner who employs the independent contractor to do the work which involves a special danger may be subject to liability if the independent contractor fails to take reasonable precautions to avoid such danger. The employer, which in this case is the owner FPLE, must know or have reason to know of the inherently dangerous nature of the work being performed. When there is inherently dangerous work being performed, the employer/owner cannot escape liability for injuries resulting from the work performed by the independent contractor unless special precautions were taken to avoid such injury. See, Ballet Fabrics, Inc. v. Four Dee Realty Company, Inc., 112 R.I. 612, 314 A.2d 1 (1974); Blount v. Fong, 48 R.I. 453, 138 A. 52 (1927); Sroka v. Halliday, 39 R.I. 119, 97 A. 965 (1916); Restatement (Second) of Torts, §427 (1965). Moreover, when an independent contractor is hired to do work where there is a peculiar risk of harm that may result based on the environment and/or conditions, the employer/owner, in this case FPLE, is liable if special precautions are not taken by the independent contractor even when the contract required the independent contractor to take such precautions. See, Ballet Fabrics, Inc. v. Four Dee Realty Company, Inc., 112 R.I. 612, 314 A.2d 1 (1974); Restatement (Second) of Torts, §416 (1965).

As the owner and operator of a power plant, FPLE had a non-delegable duty to maintain a safe job site. Therefore, regardless of Alarcon's designation as an employee or independent contractor, FPLE must be held responsible for the actions or inactions of Alarcon. Furthermore, FPLE had an obligation to make sure necessary precautions were taken to avoid a known danger that was inherent in the nature of the work being performed. This obligation cannot be contracted away and it was FPLE's responsibility to make sure that special precautions were taken. In this case, FPLE had an operation and maintenance manual that prohibited welding on the exterior air duct unless the evaporative cooling media was removed and/or kept wet. FPLE allowed welding to take place on the exterior of the air inlet duct without the evaporative cooling media being

removed and without it being kept wet in violation of the manufacturer's warning which was a safety hazard. The failure to adhere to these safety measures was the proximate cause of the fire that occurred on December 3, 2004. But for the evaporative cooling media not being removed or kept wet, the fire would not have occurred on December 3, 2004 when the welding took place.

While it is the position of CPS that the accident in question was solely the fault of FPLE, if the jury finds that CPS was negligent and is liable to FPLE then the jury must determine if Zampell Refractories, Sargent & Lundy and Premier Engineering are joint tortfeasors and if so, the pro rata share of liability of each party. Under the joint tortfeasor statute, a joint tortfeasor means that two (2) or more persons are jointly or severally liable in tort for the same loss. In order to be liable in tort, each party's negligence must have contributed to the loss. The statute requires that the parties engage in a common wrong. Whether a common wrong has been established depends on whether the timing of the alleged tortious behavior was such that each party had the opportunity to guard against the other's negligence. See, Wilson v. Krasnoff, 560 A.2d 335, 340 (R.I. 1989); Hawkins v. Gadoury, 713 A.2d 799, 802 (R.I. 1998).

In addition to a claim for contribution, CPS has also filed a claim for indemnification against Zampell Refractories. The claim for indemnity is based on equitable indemnification. In this case, if CPS is found to be vicariously liable for the acts of Zampell Refractories under its duty to supervise the work of a subcontractor and the jury finds that the welding being performed by Zampell Refractories caused the fire that occurred on December 3, 2004, then CPS will be seeking indemnification if it is found liable for the acts of Zampell Refractories. Indemnification based on equitable principles allows a person exposed to liability based on the wrongful acts of another to seek recovery against that person. The equitable right to indemnity has been defined as follows: "A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to

indemnity from the other, unless the payer is barred by the wrongful nature of his conduct." See, Silvia v. Home Indemnity Co., 416 A.2d 664, 666 (1980); Helgerson v. Mammoth Mart, Inc., 114 R.I. 438, 335 A.2d 339 (1975). The elements required to prove indemnification are as follows:

1. The party seeking indemnity must be liable to a third party;
2. The prospective indemnitor must be liable to the third party;
3. As between the prospective indemnitee and indemnitor, the obligation ought to be discharged by the indemnitor.

See, Muldowney v. Weatherking Products, Inc., 509 A.2d 441, 443 (R.I. 1986).

If the December 3, 2004 fire is determined to have been caused by Zampell's negligent welding but CPS is found to be liable to FPLE because of the contractual relationship, then CPS is clearly entitled to reimbursement from Zampell. If CPS is entitled to common law indemnification from Zampell, then it is also entitled to recovery of its attorney's fees. In Re Marderosian, 186 B.R. 341, 347 (Bkrtcy.D.R.I 1995).

At the time of trial, CPS will be challenging both the qualifications and the substance of the opinions of FPLE's three proposed engineering experts from Thielsch Engineering, Ara Nalbandian, Michael Cooney & Florence Cone. Specifically, under Rule 702 of the Federal Rules of Evidence, CPS intends to challenge the qualifications of Ara Nalbandian and Michael Cooney to give opinions with regard to the cause and origin of the December 3, 2004 fire at FPLE's Johnston, RI plant because of their lack of education, training and experience with regard to investigations of the cause and origin of fires. CPS also intends to challenge the qualifications of Florence Cone to give opinions with regard to the issue of welding and welding safety because of her lack of education, training and experience with regard to welding. CPS further intends to challenge the opinions expressed by Nalbandian, Cooney & Cone on the issue of causation, because they have been unable to provide such opinions based upon reasonable probability.

DaVinci Creations, Inc. v. Nu-Frame Co., Inc., 418 A.2d 851, 854 (R.I. 1980). It is CPS's intention to challenge these witnesses at a hearing outside the presence of the jury in accordance with Rule 104(a) of the Federal Rules of Evidence at the time the expert witnesses are offered by FPLE at trial. Cipollone v. Yale Indus. Prod., Inc., 202 F.3d 376, 380 (1st Cir.2000). CPS reserves its right to similarly challenge the qualifications and opinions of the proposed engineering expert on behalf of Sargent & Lundy, David Dusenberry, whose report and opinions have not been provided as of the time of the preparation of this pretrial memorandum.

Plaintiff/Third-Party Counterclaim Defendant,
CERTIFIED POWER SYSTEMS, INC.
By its Attorneys,

/s/ Jessica L. Papazian-Ross
Jessica L. Papazian-Ross, Esq. (#3905)
***Visconti & Boren Ltd.***
55 Dorrance Street
Providence, RI 02903
Tel. No. (401) 331-3800
Fax No. (401) 421-9302
JLPR@visontilaw.com

**Pro hac vice counsel**
Mark Robert Vespole
Tressler, Soderstrom, Maloney & Priess
74 4 Broad Street, Suite 1510
Newark, NJ 07102
Tel. No. (973) 848-2900
Fax No. (973)623-0405

*CERTIFICATION OF SERVICE*

The undersigned hereby certifies that this document has been filed electronically on this 31st day of August, 2006 and is available for viewing and downloading to the ECF registered counsel of record:

**Via Electronic Service/ECF:**

**Armando E. Batastini**
abatastini@eapdlaw.com rjil@eapdlaw.com

**Janet R. Davis**
janet.davis@mbtlaw.com

**Mark W. Freel**
Mfreel@eapdlaw.com

**John R. Mahoney**
JackMahoney@amplawllp.com

**Matthew Thomas Oliverio**
mto@om-rilaw.com

**Joseph John Reale, Jr**
reale@conversent.net

**Stephen B. Lang**
slang@hcc-law.com

The undersigned hereby certifies that on this 31st day of August, 2006 a true copy of the within document was forwarded via U.S. Mail, postage pre-paid, to the following counsel of record:

**Via U.S. Mail, postage pre-paid:**

**Georgene M. Wilson**
**Andrew M. Hutchison**
Meckler Bulger & Tilson LLP
Suite 1800
123 North Wacker Drive
Chicago, IL 60606

**Mark Robert Vespole**
**Theresa E. Mullen**
Tressler Soderstrom Maloney & Priess
744 Broad St.
Suite 1510
Newark, NJ 07102

/s/ Jessica L. Papazian-Ross
Jessica L. Papazian-Ross (#3905)
***Visconti & Boren Ltd.***
55 Dorrance Street
Providence, RI 02903
Tel. No. (401) 331-3800
Fax No. (401) 421-9302
jlpr@viscontilaw.com