UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CERTIFIED POWER SYSTEMS, INC., Plaintiff | : | |
| v. | : | C.A. No. 05-066-ML |
| RHODE ISLAND STATE ENERGY STATUTORY TRUST 2000, FPLE RHODE ISLAND STATE ENERGY, L.P. and FPLE RHODE ISLAND STATE ENERGY GP, INC., Defendants | : | |
| v. | : | |
| CERTIFIED POWER SYSTEMS, INC., Defendant on Counterclaim/ Third-Party Plaintiff | : | |
| v. | : | |
| ZAMPELL REFRACTORIES, INC., Third-Party Defendant | : | |
| v. | : | |
| SARGENT & LUNDY, LLC and PREMIER ENGINEERING SERVICES, INC., Fourth-Party Defendants | : | |

**DEFENDANTS / COUNTER-PLAINTIFFS, RISE's PRETRIAL MEMORANDUM**

Pursuant to this Court's Pretrial Order, as amended, Defendants / Counter-Plaintiffs, Rhode Island State Energy Statutory Trust 2000, FPLE Rhode Island State Energy, L.P., and FPLE Rhode Island State Energy GP, Inc. (sometimes collectively, "RISE") hereby submit their Pretrial Memorandum.

## I. RISE'S STATEMENT OF THE CASE

This case arises out of a fire (the "Fire") that occurred at a power plant in Johnston, Rhode Island, owned and operated by RISE on December 3, 2004. The ultimate question is who bears responsibility for the Fire and for the substantial damage that it caused. The resolution of this question will also determine whether certain contractors performing services as of the time of the Fire are due any additional payments under the terms of their contracts.

The facts set forth below are based upon information gleaned during the course of discovery in this case, and are facts that RISE will be able to demonstrate through testimony and other evidence introduced at trial.

### A. Facts

Defendant Rhode Island State Energy Statutory Trust 2000 is the owner of a combined-cycle, gas-fired combustion turbine power plant (the "Plant") in Johnston, Rhode Island. The Plant is operated, pursuant to a lease agreement, by Defendant FPLE Rhode Island State Energy, L.P. The Plant was constructed between October 2000 and October 2002, and was commissioned into service in November 2002.

Sometime after the Plant commenced commercial operations in late 2002, RISE became aware of a problem with freezing on the exterior air inlet units during the winter months. The two combustion turbines ("CTs") are powered, in part, by airflow directed to them by two large air inlet units. These air inlet units are approximately forty-five feet (45') high and are up to fifty feet (50') across at the broadest sections. Air enters the air inlet units through a series of so-called "weather hoods" and then passes through a series of filters and other media on its way to the combustion turbines. The two air inlet units are constructed largely of thin-gauge carbon steel. As originally designed and constructed, those units had no exterior insulation or internal

temperature controls. Accordingly, during the winter months, condensation could form and freeze on the exterior of the units. In such instances, ice could sometimes be drawn into the strong airflow entering the units, ultimately causing shutdowns and other reliability problems in the operation of the Plant. RISE ultimately concluded that this issue had to be addressed in order to assure the ongoing efficient operation of the Plant.

After a period of study, in which Fourth-Party Defendant Sargent & Lundy, LLC ("S&L") served as a consulting architect and engineer, RISE concluded that the solution to the problem was to add glycol heating coils to the area immediately behind the weather hoods where air enters the inlet units. At the same time, it was determined that warming the air entering the inlet units would only eliminate freezing on the exterior if the temperature inside the air units could be maintained. This necessitated the installation of new insulation on the exterior of the air inlet unit structure. Thus, a system whereby exterior insulation would be installed across large sections of the exterior of the air inlet units became a necessary part of addressing the freezing problem.

In the summer of 2004, S&L issued a bid package for the proposed retrofit job, seeking proposals from potential contractors. The package included an accompanying set of job specifications. One of the recipients of this bid package, and a likely prospective general contractor for the job, was Plaintiff Certified Power Systems, Inc. ("CPS"), which was already performing certain other work for RISE at the Plant.

The S&L bid package made it clear that all bidders were responsible to:

> "carefully examine the site of the work and . . . conduct the necessary investigation to acquaint [themselves] thoroughly with all conditions under which the Work shall be performed."

CPS certainly had ample opportunity in advance of the submission of its bid to conduct thorough due diligence and to acquaint itself as necessary with any and all relevant site conditions, particularly in light of its ongoing and pre-existing presence at the site. Multiple representatives of CPS attended a pre-bid conference at the Plant on July 29, 2004. At that time, interested bidders were provided with additional information regarding the Plant and the anticipated scope of work. Among other things, representatives of RISE noted that the air inlet units contained certain flammable materials, including filters and media that would have to be protected during any welding or hot work. The S&L bid package also incorporated by reference a series of pre-existing drawings of the Plant and the air inlet units, including the various component parts thereof. Many of these drawings depicted the existence of flammable materials within the air inlet units, including a component known as the "evaporative cooling media" (the "Media" or the "ECM").

When the Plant was first designed, the air inlet units were configured and equipped with an evaporative cooling system. This system was located immediately behind two layers of air filters that were, in turn, immediately behind the weather hoods. (See Exhibit A.) After the initial air filters removed any particulate matter from air being drawn in toward the combustion turbines, the evaporative cooling system would allow the air to be cooled during summer months in a manner that would increase the efficiency and optimize the operation of the Plant. While such evaporative cooling systems are not standard in all such combustion turbine power plants across the country, they are common in certain climatic and geographical locations. When RISE first took over the Plant and began operation in 2002 and 2003, the evaporative cooling system was not employed, in part because of water quality issues, although the Media and other

components were already in place. Commencing in the summer of 2004, the evaporative cooling system was placed into service.

One primary component of the evaporative cooling system is a wall of Media that runs the full height and breadth of each of the air inlet units. The Media comes in panels that are approximately five feet (5') high and approximately eight inches (8") in depth. These panels are stacked two deep, for a total depth of approximately sixteen inches (16"). They extend from the floor of the air intake unit to the very top of the unit, for a total height of more than forty feet (40') and they extend from one sidewall of the air inlet unit to the other. When the evaporative cooling system is in operation, water is pumped up from the floor of the unit to the top and cascades down through this wall of Media on a continuous basis. As the water reaches the bottom, it is pumped up to the top and falls down through the Media once again. Thus, after the air passes through the two layers of filters, it then passes through this moistened Media, which is cooled to optimize power production. Beginning in the summer of 2004, the Plant began regular operation of this evaporative cooling system. It is placed in service seasonally each year, beginning in approximately May, and running through early October.

Effective September 1, 2004, CPS was awarded the prime contract for the air inlet glycol heating system project (the "Project") at the Plant. RISE issued a Purchase Order, which in turn incorporated various other documents that collectively constituted the contract (the "Contract") between RISE and CPS. The Contract included the S&L job specifications, as amended, and also incorporated certain General Conditions that had been included in S&L bid package. Those General Conditions provided, among other things, as follows:

> 4.1 [CPS] hereby represents that it has, by careful examination, satisfied itself as to the nature and location of the Work . . . the character, quality and quantity of the materials to be encountered both above and below ground, environmental conditions

> including weather, the character of equipment and facilities needed preliminary to and during the prosecution of the Work.
>
> 4.6 All loss or damage to [CPS] arising out of the Work or from the action of the elements, or from any unforeseen circumstance in the prosecution of the Work including inefficiencies or claims of inefficiencies, shall be sustained and borne by [CPS] at its own cost and expense.

In addition, the S&L job specifications, which were also incorporated by reference in the Contract, provided as follows:

> 103.1 Prior to performing any Work, in any part of the Project Site, . . . [CPS] shall make a thorough field check at the Project Site for the purposes of verifying existing conditions that may affect the Work. [CPS] shall include a thorough investigation of the potential interferences and difficulties that it may encounter in the proper and complete execution of the Work, . . .. [CPS] shall advise [RISE] immediately of the discovery of any conditions, . . . that may affect the timely and safe execution of the Work.
>
> 103.3 Should [CPS] fail to perform any of the obligations set forth above, [CPS'] later plea of ignorance of existing or foreseeable conditions which create difficulties or hindrances in the execution of the Work will not be considered as an excuse for any failure on the part of the Contractor to fulfill in every detail the requirements of the Contract nor will such a plea be acceptable as the basis of a claim for additional compensation.

Following execution of the Contract, CPS selected Third-Party Defendant Zampell Refractories, Inc. ("Zampell") to serve as a subcontractor for purposes of the installation of insulation on the exterior of the air inlet units. CPS issued a Purchase Order to Zampell on or about October 1, 2004. At or around the same time, CPS forwarded Zampell certain limited information from the S&L job specifications, including some rudimentary drawings in which S&L had indicated the locations on the air inlet units where exterior insulation would be added. However, it was Zampell's responsibility to devise a plan for the manner in which that insulation would physically be attached to the exterior of the structures. Zampell generated such drawings on or about November 1, 2004, and S&L subsequently approved those drawings.

Those drawings, however, did not in any way address how the attachment of the insulation to the exterior of the air inlet units would interface with certain stainless steel portions of the air inlet walls. Although substantial portions of the exterior walls of the air inlet units were constructed of carbon steel, as described above, each of the two air inlet units did have one section, corresponding with the location of the Evaporative Cooling Media inside, that was constructed of 1/8"-thick stainless steel. This stainless steel "transition panel" ran vertically up the exterior side of each unit, at the place where the Evaporative Cooler was located. Because of the flow of water through the Media when it was in operation, stainless steel was less susceptible to rust or corrosion than the carbon steel which comprised the remainder of the units. This stainless steel transition panel was approximately five feet (5') wide and was clearly visible from the exterior at all times prior to the Project. Nonetheless, it appears clear that when the installation of exterior insulation on the air inlet units began sometime in November, none of the vendors or contractors providing services to RISE had given adequate consideration to the fact that exterior welding would occur on the stainless steel transition panel, and that any such welding would therefore be a fraction of an inch away, at most, from the flammable Media on other side.

CPS claims that RISE failed to make it aware of the existence of the flammable ECM inside the units, and therefore claims that RISE is ultimately responsible for the chain of events leading to the Fire on December 3, 2004. However, this claim is entirely at odds with the contractual language set forth above, in which CPS assumed <u>sole</u> responsibility for verifying any and all relevant site conditions. This included a requirement that CPS make a thorough site investigation prior to performing any work to ensure that the work could be performed safely. CPS was also solely responsible for selecting and implementing its own construction means and

methods, and for supervising the work of its subcontractors. RISE had no responsibility under the Contract to manage, supervise or oversee CPS' work, or the work of its subcontractors.

In addition, evidence introduced at trial will demonstrate that CPS knew or should have known about the existence of the flammable Media inside the units through a variety of means, including the following:

- In the summer of 2004, even prior to the solicitation of bids on this Project, CPS employees, including supervisory employees, performed certain repair work for RISE inside the same air inlet unit that burned on December 3, 2004, and those CPS employees worked within inches of the flammable Evaporative Cooling Media. Those CPS employees were in direct proximity to that material, and could not avoid observing it. They were therefore under a direct duty of inquiry regarding the nature of that substance and how it would interact with their subsequent work.

- At the aforementioned pre-bid conference on July 29, 2004, representatives of RISE and FPL specifically mentioned the presence of flammable materials inside the air inlet units, including the Media. Contractors were advised to take any and all necessary safety precautions.

- Twice during November 2004, in the weeks immediately preceding the Fire, CPS received drawings issued by S&L that contained a prominent warning that the "Filter and Cooler Media" inside the air inlet units was flammable. Those same documents instructed contractors to take any necessary remedial steps during welding or other hot work.

- Numerous other drawings generated by S&L and others during the course of this job contained safety warnings, advising contractors to take any and all necessary precautions.

- CPS reviewed, and had access to, numerous other drawings throughout the course of this job that specifically noted the presence of the Evaporative Cooling Media inside the air inlet units. For that reason, and based upon the Contract language referenced above, CPS had an affirmative duty to familiarize itself with that aspect of the site conditions. CPS employees had frequent and open access to a document room at the Plant for any and all information concerning the Plant and its component parts was readily available, and FPL witnesses will testify that CPS employees were frequently observed inside that document room accessing information.

By the end of November, all insulation on the exterior of the first of the two air inlet units (the unit associated with CT-2) had been completed without incident. A Zampell welder has testified that welding on the exterior of that unit did occur on the stainless steel transition panel, without any problems. That unit was in operation during welding, meaning that there would have been a strong airflow through the unit during welding on the exterior. Welding on the exterior of the second unit (CT-1) commenced shortly thereafter. On December 3, 2004, Zampell welders were working on the exterior of the air inlet unit for CT-1, approximately ten or twelve feet above the turbine deck surface, when a fire broke out inside the unit. Expert witnesses for FPL will testify that the Fire originated on the inside surface of the air inlet unit at a location where Zampell was welding on the exterior side of that wall. Representatives of the State Fire Marshal's office who investigated the Fire reached the same conclusion. There does not appear to be any dispute among the parties that this is the point of origin of the Fire. RISE therefore contends that CPS (including subcontractors for which they are responsible) proximately caused the fire by virtue of its failure to remove or isolate flammable materials located in close proximity to their welding, and by virtue of its failure to take any other appropriate remedial steps, consistent with its contractual and other obligations. Expert witnesses for FPL will also testify that the Zampell welder deviated from prudent welding practices common in the industry.

Prior to the welding on December 3, 2004, RISE and CPS participated in the issuance of a so-called "Hot Work Permit" which concerned the welding. This was a standard procedure required by RISE, and one that occurred numerous times every day during the course of this Project. Pursuant to that procedure, CPS would fill out the Hot Work Permit form, and would check off certain precautions that must be taken in order for that work to proceed. Whenever

welding was to occur, one of those precautions would be to "remove flammable materials." After that form had been filled out, a CPS representative and a RISE representative would walk the general areas where welding would occur. This process was largely to ensure that Plant operators understood where any and all such work was ongoing.

During the so-called "walk-down" on December 3, 2004, neither the CPS supervisory foreman present, nor the RISE employee present, specifically mentioned or referred to any flammable material inside the air inlet unit, including the ECM. However, the CPS supervisory foreman checked the section of the hot work permit form indicating that flammable materials had been removed. The RISE employee on duty with authority to authorize Hot Work Permits consequently executed that form when CPS presented it to him that morning based upon CPS's representation that flammable materials had been removed. Neither CPS nor its subcontractor were authorized to proceed with the hot work until or unless the precautions checked off by CPS on the Hot Work Permit form had been fully undertaken and accomplished. Accordingly, neither CPS nor Zampell were authorized to proceed with welding until flammable materials were removed. That step never occurred, and the Zampell welder ignited the flammable Media on the inside of the air inlet unit during his welding. In so doing, CPS and Zampell deviated from sound and prudent industry practices, from Contract language and procedures, and from precautions described in their own corporate safety manuals.

Based upon expert testimony and reports submitted to date on behalf of Zampell and CPS, RISE understands that those parties will claim that RISE had sole responsibility, pursuant to certain industry standards promulgated by the National Fire Protection Association ("NFPA") and other bodies, to authorize hot work at any such construction site. Accordingly, CPS and Zampell will also argue that as an extension of this authority, RISE had a duty to advise CPS of

the existence of any flammable materials of which CPS may not have otherwise been aware. First, RISE disputes that any such "industry standards" are admissible if they are in direct contravention of the clear and unambiguous terms of the Contract. Pursuant to the Contract, CPS had assumed the sole responsibility for:

a. its construction means and methods and for the work of its subcontractors;
b. familiarizing itself with all relevant site conditions;
c. making a thorough site investigation to verify existing conditions just prior to performing any work to ensure that the work could be performed safely;
d. the protection of the work and property; and
e. exercising safety precautions in the execution of its work.

RISE has submitted a motion in limine on this issue. Second, even assuming that certain evidence of NFPA and other codes and standards are deemed admissible by this Court, RISE will present its own expert testimony that RISE acted with consistent with those standards at all times, and that ultimately, CPS shared in any responsibility for the authorization of hot work and for the execution of hot work in a manner consistent with the limitations or precautions stated on the Hot Work Permit. In sum, CPS failed to remove flammable materials that it either knew, or should have known, were present inside the units.

As of the time of the fire, RISE had paid CPS approximately $800,000 of the funds originally due and payable under this $3 million Contract. Pursuant to clear set-off language in the Contract, RISE immediately ceased making any further payments. However, because one combustion turbine was completely out of service as a result of substantial damage caused by the Fire, it was imperative that RISE repair the damage and put that unit back into service as soon as possible. Given CPS' experience and overall knowledge of the site, and given the time that

would have to be invested in any new bidding and procurement process, RISE concluded that CPS was uniquely situated to perform any necessary repair work. Accordingly, RISE issued a Supplemental Purchase Order (the “Repair Contract”), under which CPS would perform the repair work on a time and materials basis. However, under the terms of that Repair Contract, RISE reserved all rights to hold CPS ultimately responsible for any damages or costs incurred as a result of the Fire, including the additional sums paid to CPS.

Any and all necessary repairs were ultimately accomplished, and FPL paid CPS approximately $2.3 million pursuant to the terms of the Repair Contract. The unit was returned to service January 31, 2005. The unit was out of service for another twelve (12) days in the spring of 2005 for additional repair work that could not be accomplished during the winter months. Under the terms of the Contract, CPS was responsible for liquidated damages, in the amount of $10,000 per day, if it failed to achieve “mechanical completion,” as that term is defined in the Contract, by December 15, 2004. Based upon CPS’ own scheduling documents, and the status of the work as of December 3, 2004, RISE submits that CPS would have never completed the project on schedule, even in the absence of the Fire. Therefore, RISE is entitled to liquidated damages commencing on December 16, 2004, and continuing through January 31, 2005. RISE is also entitled to liquidated damages for the additional period in the spring when additional repair work had to be performed, for a total of fifty-seven (57) days.

In addition, RISE paid a variety of other vendors and suppliers (including CPS and other subcontractors who performed services on the Repair Contract) a total of approximately $4.7 million to repair all of the damage caused by the Fire. These damages are summarized in the schedule attached hereto as Exhibit B, a copy of which has been previously made available to all

other counsel. Consistent with the foregoing, FPL and RISE anticipate claiming the following damages at trial, consistent with the allegations in their Counterclaim against CPS:

| | | |
|---|---|---|
| Fire Demolition, Repairs and Restoration | $ | 4,706,910.03 |
| Liquidated Damages (57 days @ $10,000 per day) | | 570,000.00 |
| Lien Payment Made to Subcontractor Hennigan | | 152,102.81 |
| Lien Payment Made to Subcontractor Safway | | 90,000.00 |
| Sub Total | $ | 5,519,012.84 |
| Less: Contract Funds Withheld from CPS | | (2,070,021.50) |
| **Remaining Net Damages** | **$** | **3,448,991.34** |

Thus, RISE is seeking relief from payment of the remaining approximately $2.1 million allegedly due and owing on the Contract, based on the aforementioned set-off language and based upon CPS' independent breaches of the Contract, and is also seeking recovery of its net damages in the amount of approximately $3.4 million pursuant to its Counterclaim.

**B. Witnesses**

RISE currently anticipates presenting testimony on its behalf at trial from the following lay witnesses. Expert witnesses who are expected to testify on behalf of RISE are described below, in section IV.

**1. Pete Holzapfel**

Mr. Holzapfel is the current General Manager at the Plant. He has been employed by RISE affiliates for approximately twenty-six (26) years, and transferred to Rhode Island to work at the Plant in 2004. Mr. Holzapfel is expected to testify concerning the history and background of RISE's acquisition of the Plant; RISE's original identification of the air inlet freezing issue described above; RISE's subsequent efforts to address that issue; the general nature, configuration and operation of this type of power plant; the retention of various vendors and subcontractors to assist RISE in connection with the air inlet freezing project; his experience with CPS and its subcontractors in that regard; his involvement in the construction process throughout 2004; the events leading up to the Fire on December 3, 2004; his involvement in the

post-Fire investigation; RISE's compensatory and other damages in this action; and his observations throughout the relevant time period, consistent with his prior deposition testimony.

**2. Walt Smith**

Mr. Smith is currently employed by a RISE affiliate, and serves as the General Manager of a power plant in South Carolina. He was employed at the Plant in Rhode Island in 2004. Mr. Smith is expected to testify concerning the status of the Plant upon his arrival; the general nature, configuration and operation of this type of power plant; his involvement in efforts to address the inlet freeze issue described above; the retention of various vendors and subcontractors to assist RISE in that effort; his experience with CPS and its subcontractors in that regard; his involvement in the construction process throughout 2004; the events leading up to the fire on December 3, 2004; his involvement in the post-Fire investigation; and his observations throughout the relevant time period, consistent with his prior deposition testimony.

**3. Jonathan Bain**

Mr. Bain is a current employee of RISE and has worked at the Plant since approximately 2004. Mr. Bain currently serves as the Operations Leader at the Plant, and previously served as the Maintenance Coordinator and as a Staff Engineer. Mr. Bain is expected to testify concerning the status of the Plant upon his arrival; the general nature, configuration and operation of this type of power plant; his involvement in efforts to address the inlet freeze issue described above; the retention of various vendors and subcontractors to assist RISE in that effort; his experience with CPS and its subcontractors in that regard; his specific observations of CPS employees in the field at various times throughout 2004; his involvement in the construction process throughout 2004; the events leading up to the Fire on December 3, 2004; his involvement in the post-Fire

investigation; and his observations throughout the relevant time period, consistent with his prior deposition testimony.

**4. <u>Ed Alarcon</u>**

Mr. Alarcon previously served as the principal of Fourth-Party Defendant Premier Engineering Services, Inc. ("Premier"). RISE engaged Premier and Mr. Alarcon in 2004 to provide certain services, as an independent contractor, in connection with FPL's efforts to address the inlet freeze issue at the Plant. Specifically, Mr. Alarcon and Premier served as RISE's on-site representative, acting as a liaison between CPS, the general contractor, and various Plant personnel and other resources, consistent with Mr. Alarcon's prior deposition testimony. Mr. Alarcon currently resides in Texas, and is therefore unavailable to testify at trial. Premier is a debtor in a bankruptcy proceeding pending in Texas.

RISE has already designated sections of Mr. Alarcon's deposition testimony to be presented into evidence at trial. It includes testimony regarding his role as an independent contractor on behalf of RISE throughout the course of construction at the Plant in 2004; his interaction with CPS and its subcontractors; his participation in a pre-bid conference on or about July 29, 2004; his other interaction with CPS and its subcontractors during the pre-bid phase and thereafter; his own observations of the ongoing progress of work during the subject Project; his efforts to bring the presence of certain flammable materials to the attention of CPS and/or its subcontractors; the events leading up to the Fire on December 3, 2004; and his other general involvement in relevant events, consistent with his prior deposition testimony.

**5. <u>Chuck Rowe</u>**

Mr. Rowe is a current RISE employee and has worked at the Plant in Rhode Island since approximately 2001. Mr. Rowe was serving as a control room operator on December 3, 2004,

the day of the Fire. In that capacity, Mr. Rowe signed the subject Hot Work Permit. Mr. Rowe is expected to testify generally regarding his knowledge of the Plant, its component parts and its operation; his duties and responsibilities during 2004; his involvement in the issuance of the subject Hot Work Permit; and his other involvement in and observations of the subject construction at the Plant throughout 2004.

**6. "Mac" Corcoran**

Mr. Corcoran is a former employee of CPS who was present at the Plant throughout work on the subject project in 2004, and whom RISE believes was generally familiar with the Plant as a result of his frequent work there at various times prior to the subject fire. Mr. Corcoran is now deceased. Accordingly, FPL reserves the right to cross-designate portions of his prior deposition testimony to be submitted into evidence at trial.

**7. Kevin Murphy, State Fire Marshal's Office**

RISE reserves the right to present testimony from Mr. Murphy, an employee of the Rhode Island State Fire Marshal's office, and reserves the right to seek the admission of his report concerning the subject Fire into evidence. Mr. Murphy would be expected to testify consistent with his prior deposition testimony. However, even in the absence of live testimony, RISE submits that Mr. Murphy's prior written report is admissible pursuant to Fed.R.Evid. 803(8) & 1005.

**8. Sargent & Lundy ("S&L")**

RISE currently anticipates that S&L will present testimony at trial through several of its own witnesses, including Lyle Gastineau, Anthony Lunardini, Joe Lula and Chuck Nelson, all of whom were deposed. However, in the event that S&L does not present any or all of these

witnesses for live testimony at trial, RISE reserves the right to cross-designate certain portions of their prior deposition testimony to be submitted into evidence.

## II. LEGAL ARGUMENT

### A. Pretrial Legal Issues

In addition to the substantive legal arguments to be made at trial, RISE anticipates legal argument on certain pretrial issues. Those issues have already been briefed in pretrial motions in limine filed by RISE on or about August 29, 2006. To the extent that those issues remain unresolved at time of trial, RISE hereby incorporates by reference the arguments made in all such pretrial motions. RISE also reserves the right to seek jury instructions, if appropriate, consistent with the arguments made in connection with those motions, or in any objections to pretrial motions made by other parties.

### B. Trial Issues

#### 1. CPS' Claims Against RISE

In its Complaint, CPS alleges two counts against RISE. First, CPS alleges that RISE has breached the terms of the Contract by failing to fully compensate it for work performed. Second, CPS alleges a claim against RISE for unjust enrichment.

##### a. CPS' Breach of Contract Claim Against RISE

In order to prove a breach of contract claim against RISE, CPS must show the existence of a contract, RISE's breach of the contract, and resulting foreseeable damages to CPS. See Hercules, Inc. v. United States, 516 U.S. 417, 431 (1996) (citing Restatement (Second) of Contracts §§ 346, 347, 351 (1979); 5 A. Corbin, Contracts §§ 997, 1001, 1002 (1964)). CPS alleges that RISE owes it approximately $2.1 million representing the unpaid portion of RISE's obligations under the Contract.

A variety of contractual provisions, however, preclude CPS from prevailing on this claim. CPS failed to meet a number of preconditions to RISE's acceptance of the work and to any obligation by RISE to make any remaining payments. First, the terms of the Contract placed the risk of loss upon CPS for damage to its work prior to acceptance by RISE. Article 59 of the General Conditions states:

> 59.1 Title to all or any part of the Work[1] shall pass to [RISE] upon Acceptance.[2] . . .
>
> 59.2 [CPS] shall bear all risk of loss or damage of any kind to any and all Work, including risk of loss or damage for all materials and equipment furnished to [RISE], until completion of such Work by [CPS] and Acceptance thereof by [RISE] . . ..
>
> 59.3 After any loss or damage for which [CPS] shall have the risk of loss or damage, [CPS] shall, with due diligence and dispatch, repair or replace all lost or damaged items with items of like kind and quality conforming to the requirements of this Contract at no expense to [RISE].

Under the above-referenced provisions, RISE must first accept CPS' work before any risk of loss shifts to RISE. No such acceptance occurred here because the Fire substantially damaged much of CT-1 prior to substantial completion and prior to any of the requisite testing taking place. (See footnote 2, supra.)

---

[1] Under Article 1.21 of the Contract, "Work" is defined as "any and all labor, supervision, services, materials, goods, consumables, equipment, reports, evaluations, engineering, delivery, erection, construction, testing, tools, drawings, manuals, documents, and all other necessary activities for the execution and time completion of [CPS'] obligations under this Contract."

[2] Article 1 of the Supplementary Conditions specifically defines "Acceptance" as occurring when:

> a. All systems and components have been cleaned tested, flushed, and restored complete and capable of safe operation in accordance with the contract and design documents;
> b. The system performance test has been satisfactorily completed;
> c. All work contained in the contract and drawings including punch list items has been completed without defects to the satisfaction of the Purchaser;
> d. All as-built drawing (piping sketches, red-lined electrical drawings, etc.) and instruction manuals have been provided to [RISE];
> e. All construction and commissioning documentation has been assembled and turned over to [RISE].

As noted above, Section 59.3 explicitly requires CPS to accept "the risk of loss or damage" for its work prior to acceptance or completion, and to "repair or replace all lost or damaged items with items of like kind and quality conforming to the requirements of this Contract at no expense to [RISE]." In addition, CPS was obligated to protect the surrounding structures and property from damage and to repair any such damaged property. Articles 19 and 21 of the Contract provide:

> 19.3 [CPS] shall preserve, protect and prevent loss or damage to all . . . structures and utilities on or adjacent to the Jobsite . . .. [CPS] shall be responsible for damage to any such areas . . . including without limitation damage arising from the performance of the Work through operation of equipment . . .. All costs in connection with any repairs or restoration necessary or required by reason of any such damage . . . shall be borne by [CPS].
>
> * * *
>
> 21.1 [CPS] shall be solely responsible for the safety and health of its personnel and Subcontractors engaged in the execution of the Work, as well as for the protection of the improvements being erected and property of itself, . . .

CPS not only failed to complete its work, it failed to repair lost or damaged items at its own expense, and failed to "be responsible" for the damage resulting from the fire. Having failed to meet these preconditions, CPS is not entitled to payment under the Contract.

Lastly, under Article 34 of the Contract[3], RISE is entitled to offset any amounts due to it from CPS, for any damages caused by CPS' failure to meet the above-referenced preconditions,

[3] Article 34 provides:

> [RISE] may withhold any payment or portion thereof to protect it from loss on account of [CPS'] failure to comply with the provisions of this Contract, including but not limited to:
>
> 34.1.1 Defective Work not remedied;
> 34.1.2 Claims filed;
> 34.1.3 Reasonable doubt as to the ability of Supplier to make payments properly and immediately to Subcontractors for material or labor;
> 34.1.4 Damage to another Contractor;
> 34.1.5 Reasonable indication that the amount invoiced exceeds the value of the Work completed during the invoiced period;
> 34.1.6 Failure to provide a timely response to a reasonable request for supporting data regarding invoiced amounts; and
> 34.1.7 Damage to [RISE]-provided equipment, materials and tools.

or for any other reason, against any amount otherwise payable by RISE to CPS under the Contract. Under the provisions of Article 34, RISE has claimed as a set-off the sum that CPS now alleges it is due. By withholding such sums, RISE has not breached the Contract; rather, RISE has simply exercised one of its Contract rights as the costs RISE has incurred in repairing the equipment damaged by the fire far exceeds the $2 million damages that CPS claims it is due.

**b. CPS' Unjust Enrichment Claim Against RISE**

In order to prove a claim for unjust enrichment, CPS must show that it conferred a benefit on RISE, that RISE appreciated the benefit, and the RISE accepted the benefit under circumstances such that it would be unjust to allow it to retain the benefit. See R&B Electric Co., Inc. v. AMCO Constr. Co., Inc., 471 A.2d 1351, 1355-56 (R.I. 1984). A claim for unjust enrichment is equitable in nature. United Lending Corp. v. City of Providence, 827 A.2d 626, 632 (R.I. 2003); Seekins v. King, 17 A.2d 869, 871 (R.I. 1941). "It is well established that equity will not entertain jurisdiction where there is an adequate remedy at law." Cicchetti v. Anderson, 155 A.2d 64, 66 (R.I. 1959); see also Heastan v. Heastan, 40 A.2d 720, (R.I. 1944); First Nat. Bank of Shreveport v. Randall, 38 A. 1055 (R.I. 1897) ("the office of equity is to supplement, and not to supplant, the law. Hence, when the remedy at law is adequate, equity does not need to interpose."); Zannini v. Arboretum Dev., No. C.A. NO. 83-1201, 1988 WL 1017288, at *3 (R.I. Super. Ct. July 7, 1988).

Here, money damages would be sufficient to make CPS whole. Thus, CPS has an adequate remedy at law for its alleged damages and should not be entitled to bring an equitable

---

***

34.3 [RISE] shall be entitled at all times to set-off any amount due from [CPS] or its affiliates, to [RISE] against any amount payable by [RISE] to [CPS].



PRV_832298_1/MFREEL

claim for unjust enrichment. More importantly, CPS cannot prove that RISE has realized a benefit under the circumstances. For reasons set forth above, RISE had no choice but to enter into the Repair Contract with CPS. Under the Repair Contract, RISE paid CPS $2.3 million to repair the damage that CPS itself was responsible for causing. RISE's total repair costs were approximately $4.5 million. Thus, to date, the cost of repairing the damage caused by the Fire is far in excess of the approximately $2.1 million that CPS claims is due under the Contract. As such, no benefit has accrued to RISE.

**2. <u>RISE's Breach of Contract Claims Against CPS.</u>**

Count I of RISE's Counterclaim asserts a claim against CPS for breach of contract. Specifically, CPS breached the Contract by, among other things, failing to take adequate measures to assess the work site before it permitted its subcontractor to begin welding; by failing to bear the cost and expense of repairing the damage caused by the fire; by failing to replace the destroyed work; and by failing to perform its work skillfully, carefully, diligently, and in a workmanlike manner.

**a. <u>CPS Breached the Contract by Failing to Take Adequate Measures to Assess and Protect the Work Site Prior to Welding</u>**

CPS breached the Contract by failing to take adequate measures to assess the work site before it permitted Zampell to conduct its welding operations. As set forth above, CPS was in sole control of the means and methods for performing its work and expressly warranted that it had made itself familiar with all relevant site conditions. Moreover, CPS was required to make a thorough site investigation to verify existing site conditions just prior to performing any work to ensure that the work could be performed safely. Finally, CPS was obligated to protect its work and the surrounding property and was responsible for implementing the necessary safety precautions in the execution of its work. CPS claims now that it was not aware of the existence

of the flammable Media in the vicinity of the welding. Thus, CPS has breached the above-referenced portions of the Contract by permitting Zampell to commence welding in direct proximity to the Media without taking adequate precautions to prevent the fire.

**b. CPS Breached Its Contractual Obligations by Failing to Bear the Cost and Expense of Repairing the Damage Caused by the Fire**

In addition, CPS breached its contractual obligations by failing to bear the cost and expense of repairing the damage caused by the fire. As previously noted, Article 59.2 of the Contract provided that CPS was to "bear all risk of loss or damage of any kind to any and all Work" prior to acceptance by RISE. Moreover, under Article 59.3, CPS agreed to diligently "dispatch, repair or replace all lost or damaged items with items of like kind and quality . . . at no expense to [RISE]." CPS further agreed, under Article 21.1 to "be solely responsible . . . for the protection of the improvements being erected and the property of itself." It was also responsible for preventing "loss or damage to all . . . structures and utilities on or adjacent to the Jobsite." (See Contract, Art. 19.3.) Specifically, CPS agreed that it would be responsible for damage to any such areas, including damage arising from the performance of its work, and that any and all costs associated with any such repairs would be borne by CPS alone. CPS breached all of the above-referenced provisions of the Contract.

**c. CPS Breached Its Contractual Obligations by Failing to Perform Its Work in a Skillful, Careful, Diligent and Workmanlike Manner**

Lastly, CPS is in breach of its contractual obligation to perform its work in a workman-like manner. Indeed, "there is implied in every contract for work or services a duty to perform it skillfully, carefully, and diligently and in a workmanlike manner" and the negligent failure to do so constitutes a breach of contract. Davis v. New England Pest Control Co., 576 A.2d 1240, 1242 (R.I. 1990); accord Nat. Chain Co. v. Campbell, 487 A.2d 132, 136 (R.I. 1985). Moreover,

"in situations in which [a] contractor's performance is worthless and the work has to be redone completely . . . the contractor is liable for the cost to the owner of having the job redone." Nat. Chain Co., 487 A.2d at 135.

Here, as noted above, there is more than sufficient evidence to show that CPS failed to take adequate precautions and failed to properly assess the work site prior to permitting Zampell to begin the welding project. Thus, having failed to perform in a workmanlike manner, CPS has breached the Contract. In addition, because CPS failed to perform its responsibilities diligently and carefully, by fully assessing the job site and taking proper safety precautions, much of its work had to be completely redone. Thus, under general principles of contract law, CPS is liable for the cost of repairing the work it had previously performed.

**d. CPS' Breach is Not Excused by Issuance of the Hot Work Permit**

CPS' breach of its clear contractual commitment to be familiar with the job site conditions and to perform its work safely is not excused by RISE's issuance of the Hot Work Permit. The Hot Work Permit submitted by CPS for welding on the inlet walls was approved, but specifically required CPS to remove all flammable materials prior to welding. CPS failed to follow this direction, resulting in the fire. Moreover, this failure occurred in a context in which CPS: (1) was solely responsible for the means and methods for performing its work; (2) represented that it was familiar with the job site conditions; (3) was obligated to make a thorough field check at the site to verify any existing conditions that could affect its work; and (4) was obligated to perform its work in a safe manner. RISE's issuance of the Hot Work Permit does not alter CPS' obligations under the Contract, nor does it change the circumstances surrounding CPS' breach of those obligations.

#### e. CPS' Breach is Not Excused By RISE's Failure to Notify It of the Location, Composition and Flammability of the Media

It is no defense to CPS' breach of contract that RISE failed to notify CPS of the location, composition or flammability of the Media. As discussed above, the Contract did not place any responsibility on RISE to warn CPS of conditions at the site, or to manage its work. CPS had a clear contractual duty, and more than an ample opportunity, to familiarize itself with the work site. CPS received numerous documents specifically referencing the existence of the flammable Media inside the air inlet units, and was specifically notified by RISE at the pre-bid conference on July 29, 2004 of the presence of the flammable Media inside the units. As such, CPS knew or should have known of the existence of the Media. Finally, the Contract clearly provides that "a plea of ignorance" by CPS "of existing or foreseeable conditions … will not be considered as an excuse for any failure on the part of the Contractor to fulfill in every detail the requirements of the Contract nor will such a plea be acceptable as the basis of a claim for additional compensation."

### 3. RISE's Negligence Claim Against CPS

CPS was negligent by failing to perform its work in a skillful, careful, diligent and workmanlike manner. An action for negligence can be maintained against a general contractor when the plaintiff can show that the contractor breached a duty of care owed to the plaintiff and that this breach proximately caused an injury, resulting in actual damages. See Lutz Eng'g Co., Inc. v. Indus. Louvers, Inc., 585 A.2d 631, 635 (R.I. 1991). Indeed, "implied in every contract for work or services [is] a duty to perform it skillfully, carefully, and diligently and in a workman-like manner" and the negligent failure to do so may give rise to not only a breach of contract, but a tort as well. Davis, 576 A.2d at 1242; accord Schock v. United States, 56 F.

Supp.2d 185, 191 (D.R.I. 1999); In re Newport Offshore, Ltd., 155 B.R. 616, 619 (Bankr. R.I. 1993); Nat. Chain Co., 487 A.2d at 136.

Here, CPS breached the duty it owed to RISE to conduct its work carefully and safely when it failed to make itself familiar with the work site, failed to take proper safety precautions prior to permitting Zampell to conduct its welding, and failed to supervise the work of its subcontractors. CPS' breach of these duties was the proximate cause of the Fire, and RISE suffered damages as set forth herein.

In addition, a general contractor may be held liable for the negligence of its subcontractors when it has explicitly assumed the duty to supervise the subcontractors. East Coast Collision & Restoration, Inc. v. Allyn, 742 A.2d 273, 276 (R.I. 1999); see Pastorelli v. Associated Eng'rs, Inc., 176 F. Supp. 159, 165-66 (D.R.I. 1959). Here, CPS has explicitly assumed a duty to supervise its subcontractors pursuant to Article 12 of the Contract. Thus, by failing to prevent Zampell from welding at improperly high temperatures in close proximity to the Media, CPS failed to adequately supervise Zampell and is liable for Zampell's negligent acts.

**4. RISE's Damages**

Lastly, RISE must present sufficient evidence of damages to permit it to recover under its breach of contract and negligence claims. "Damages must be proven with a reasonable degree of certainty, and the plaintiff must establish reasonably precise figures, and cannot rely on speculation." In re Newport Offshore, Ltd., 155 B.R. at 620. RISE's damages consist of the amounts it has expended to repair the damage caused by the Fire, as set forth in Exhibit B. In addition, pursuant to Article 9.2 of the Supplementary Conditions for this Project, RISE is entitled to $10,000 per day in liquidated damages for CPS' failure to complete the work on a timely basis. This amounts to a total of $570,000 for fifty-seven (57) days.

## III. EXHIBITS

RISE reserves the right to seek the admission into evidence of all documents identified in the schedule attached hereto as Exhibit C. The parties have agreed to work in good faith to combine all of their lists of potential exhibits into one consolidated list of joint exhibits by September 6. Except as noted in RISE's motion in limine concerning subsequent remedial measures, RISE does not believe that there are any objections to the authenticity or admissibility of any documents to be submitted into evidence by the parties. In addition, RISE reserves the right to seek the admission into evidence of certain physical evidence from the Fire in the possession of its experts, which all parties and their experts have previously examined, and certain demonstrative exhibits and illustrations, which will be shown to all other counsel reasonably in advance of trial.

## IV. EXPERT WITNESSES

RISE currently anticipates presenting expert testimony at trial from three (3) witnesses associated with the firm of Thielsch Engineering, Inc. ("Thielsch") of Cranston, Rhode Island. Those witnesses are Ara Nalbandian, Michael Cooney and Florence Cone. Mr. Nalbandian is currently expected to testify regarding the cause and origin of the subject Fire, consistent with the Thielsch report dated January 18, 2005, and consistent with his prior deposition testimony. In the event that there is no dispute at trial among the parties regarding the point of origin of the Fire, and the fact that it originated at the location of the Zampell welding occurring on December 3, 2004, then FPL would not present trial testimony from Mr. Nalbandian.

Mr. Cooney is expected to testify regarding Thielsch's metallurgical analysis of certain evidence collected at the Fire, consistent with the Thielsch report dated January 18, 2005, and consistent with his prior deposition testimony. Mr. Cooney is also expected to testify generally

regarding the collection and analysis of evidence from the Fire, and the configuration of various critical components within the air inlet units at that time. His testimony will support Thielsch's ultimate conclusion that the Fire was caused, in material part, by "burn-through" or "melt-through" caused by improper welding techniques and procedures employed by Zampell welders.

Finally, Ms. Cone is expected to testify consistent with the Thielsch report dated July 24, 2006, and with her prior deposition testimony. In sum, Ms. Cone is expected to testify that the Zampell welders, and their supervisors associated with CPS, diverted from sound industry practices and procedures, and from applicable Contract standards, in conducting their welding on December 3, 2004, thereby proximately causing the Fire and related damages. Ms. Cone will also respond to opinions expressed by Zampell's expert, Thomas Eagan, and CPS' expert, Peter Schwalje.

## V. JURY INSTRUCTIONS

RISE's proposed jury instructions will be filed separately.

## VI. LENGTH OF TRIAL

RISE currently anticipates that this trial will take at lease ten (10) trial days.

RHODE ISLAND STATE ENERGY STATUTORY TRUST 2000, FPLE RHODE ISLAND STATE ENERGY, L.P. and FPLE RHODE ISLAND STATE ENERGY GP, INC.

By their Attorneys,

/s/ Mark W. Freel

Mark W. Freel (#4003)
Armando E. Batastini (#6016)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (Fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of August, 2006, I caused a true copy of the within Pretrial Memorandum to be served via U.S. First Class Mail on the following counsel of record:

Jessica L. Papazian-Ross, Esq.
Visconti & Boren Ltd.
55 Dorrance Street
Providence, RI 02903

Mark Robert Vespole, Esq.
Theresa E. Mullen, Esq.
Tressler, Soderstrom, Maloney & Priess
744 Broad Street, Suite 1510
Newark, NJ 07102

John R. Mahoney, Esq.
Asquith & Mahoney, LLP
155 South Main Street, 2nd Floor
Providence, RI 02903

Joseph J. Reale, Jr., Esq.
Joseph J. Reale, Jr., Ltd.
30 Kennedy Plaza, Suite 400
Providence, RI 02903

Janet Davis, Esq.
Meckler Bulger & Tilson LLP
123 North Wacker Drive
Suite 1800
Chicago, IL 60606

Matthew Oliverio, Esq.
55 Dorrance Street, Suite 400
Providence, RI 02903

Stephen B. Lang, Esq.
Higgins, Cavanagh & Cooney, LLP
123 Dyer Street
Providence, RI 02903

/s/ Mark W. Freel