EXHIBIT "A"

COPY

**THIELSCH ENGINEERING, INC.**
**195 FRANCES AVENUE**
**CRANSTON, RHODE ISLAND 02910**

**PRELIMINARY**

# CAUSE AND ORIGIN INVESTIGATION OF AIR INLET PLENUM INVOLVED IN A FIRE GAS TURBINE UNIT CT 101 FLORIDA POWER AND LIGHT COMPANY JOHNSTON, RHODE ISLAND

Ara Nalbandian, P.E.

Michael Cooney

Robert Basile, P.E.

January 18, 2005

Report No. 11346

THIELSCH ENGINEERING, INC., letters, inspection reports, analysis reports and engineering reports apply only to the specific materials, products, or processes tested, examined, surveyed, inspected or calculated; and are not necessarily indicative of the qualities of apparently identical or similar materials, products, or processes. The liability of THIELSCH ENGINEERING, INC., with respect to the services rendered, shall be limited to the amount of the consideration paid for such services, and shall not include any consequential damage.

## INTRODUCTION

On Friday, December 3, 2004, a fire occurred in the air inlet plenum for the Unit No. CT101 gas turbine at the Florida Power and Light facility in Johnston, Rhode Island. The incident occurred during a modification/repair project. Thielsch Engineering was requested to determine the cause and origin of the fire, investigate the damage associated with the fire, determine the suitability of the air inlet plenum for continued service, and if necessary, provide recommendations for repairs. This report covers the cause and origin investigation of this fire. The condition assessment and fitness for purpose evaluation of structural steel members involved in the fire are civered in Thielsch Engineering Report No. 11347.

## BACKGROUND INFORMATION

On December 3, 2004 a fire occurred in the air inlet plenum for gas turbine Unit CT101 of the Florida Power and Light, gas-fired combined-cycle facility in Johnston, Rhode Island. The air inlet plenum supplies air to the gas turbine for this unit. The air inlet plenum is approximately 45 ft. in height by approximately 50 ft. in width. Drawings of the plenum are provided in Appendix A. There are air filters and evaporative cooling media inside of the air inlet plenum. An Engineering Bulletin for the evaporative cooling media is provided in Appendix B. These materials were consumed during the fire. It should be noted that the evaporative cooling media used in this plenum was reported to have been Celdek®. The Engineering Bulletin, EB-OI-511, states that the Celdak® evaporative media should not be exposed to temperatures in excess of 350°F due to the danger of ignition.

An incident report prepared by Florida Power and Light is included in Appendix C. At the time of the fire, Unit CT101 was shut down for a modification to the plenum. Insulation was being added to the outside surface of the plenum wall. As part of the installation of the insulation, metal angle iron clips were being welded to the outside surface of the plenum wall. The plenum wall was fabricated predominantly from carbon steel sheet metal. However a narrow section (approximately 5 ft. in length) of the plenum was fabricated from 20 gage AISI Type 304L stainless steel sheet metal. Stainless steel sheet metal was used for the plenum wall in the evaporative cooling section for added corrosion protection due to frequent exposure to water during operation.

The fire initiated at the approximate time when an angle iron bracket was being welded to the stainless steel section of the air inlet plenum. The evaporative cooling media was located behind the stainless steel wall in this section. For a portion of the height of the stainless steel section, a stainless steel channel was located on the inside of the air plenum wall for positioning of the evaporative cooling media. Welding was not performed on the section of the air inlet plenum where the air filters were located.

Appendix D provides photographs that were taken by Florida Power and Light personnel after the fire in the air inlet plenum. Photographs of the air inlet plenum for Unit CT102 were also taken. Unit CT102 was not affected by the fire.

## DECEMBER, 2004 INSPECTION

Thielsch Engineering performed an inspection of the air inlet plenum for Unit CT101 on Wednesday, December 8, 2004.

Overall views of the air inlet plenum for Unit CT101 are provided in Figs. 1 and 2. These photographs illustrate the condition of the outside surface of the plenum wall on the side where the angle iron brackets were being welded to the outside surface of the plenum wall. The carbon steel and stainless steel sections of the plenum wall are identified for ease of reference in Fig. 1.

There were three angle iron clips welded to the stainless steel section of the plenum wall. These clips were identified by Thielsch Engineering personnel as C1, C2 and C3 from the bottom to the top of the wall. Overall views of the locations of C1 and C2 are shown in Fig. 3. Additional views of C1 are provided in Fig. 4. Discoloration and distortion were observed on the stainless steel plenum wall in the area surrounding C1. An additional overall view of C1 and C2 is shown in Fig. 5. Close-up views of C1, C2 and C3 are shown in Figs. 6, 7 and 8, respectively. Intermittent fillet welds were used to join the angle iron clips to the outside surface of the stainless steel plenum wall section. Excessive undercut and melting of the stainless steel base metal was evident in the welds associated with C1, C2 and C3.

As illustrated in Fig. 9, degradation of the external paint coating on the carbon steel sections of the air inlet plenum was observed in several areas, indicating that the temperature of the fire was sufficient to degrade this paint layer.

Intermittent fillet welds were also used to join the angle iron clips to the carbon steel portions of the plenum wall. Views of several of these clips and their associated welds are provided in Figs. 10, 11 and 12. The welds for these clips also exhibited excessive undercut in the plenum base metal and evidence of an excessive heat input during the welding process based upon the excessive melting of base metal.

The access doors to the inside of the air inlet plenum for Unit CT101 are shown in Fig. 13. Fig. 14 illustrates the distortion of the structural support steel for the evaporative cooling media on the inside of the air inlet plenum. Close-up views of the positioning channel for the evaporative cooling media on the air plenum side where the angle iron clips (for the insulation) were being welded are provided in Fig. 15. There was no evidence of melting or burn-through on this channel. The structural support steel for the circulating pump and motor associated with the evaporative cooling water is shown in Fig. 16. There was no evidence of melting or burn-through on the structural steel support.

An overall view of the positioning channel for the evaporative cooling media is provided in Fig. 17. The angle iron clips for the stainless steel section of the air inlet plenum were welded to the outside surface of the stainless steel wall underneath this channel. The location of the angle iron clips, C1, C2 and C3, on the stainless steel plenum wall are indicated in Figs. 17 and 18. The channel was removed to allow for examination of the inside surface of the plenum wall underneath the channel. Close-up views of C1 and C3 along the inside surface of the plenum wall after removal of the channel are shown in Figs. 19 and 20. Areas where the weld metal used for the angle iron clips on the outside surface of the plenum wall had burned through the base metal of the plenum wall were evident at both C1 and C3. The arrows in Figs. 19 and 20 indicate the areas of burn-through.

A section of the stainless steel shell around the angle iron clips that had been welded to the stainless steel section of the plenum wall, C1, C2 and C3, were removed from the air inlet plenum for laboratory examinations and testing. The cut line for each of these samples is shown in the photographs of the outside surface of the plenum wall in Fig. 21.

Views of the evaporative cooling media at one of the positioning channels inside of the air inlet plenum for Unit CT102 are provided in Fig. 22.

## LABORATORY EXAMINATIONS AND TESTING

As part of the cause and origin investigation of the fire, the channel was removed from the air inlet plenum for Unit CT101. The channel and the samples removed with the angle iron clips identified as C1, C2 and C3 were submitted to the Thielsch Engineering laboratory for examinations and testing. For the purpose of identification during the examination and testing, the channel was identified as Sample CH-1.

### Visual Examination

Overall views of Samples CH-1, C1, C2 and C3 are provided in Fig. 23. The top photograph shows the side of Sample CH-1 that would have directly contacted the inside surface of the plenum wall. The bottom photograph in Fig. 23 illustrates the condition of the side of Sample CH-1 that was facing the inside of the air inlet plenum. Close-up views illustrating the as-installed positioning of Samples C1, C2 and C3 relative to Sample CH-1 are provided in Figs. 24, 25 and 26.

Close-up views of the outside and inside surfaces of Sample C1 are shown in Figs. 27 and 28, respectively. The fillet welds used to join the angle iron clip to the outside surface of the stainless steel section of the plenum wall are shown. Excessive heat input was utilized to make these welds as indicated by excessive melting of the base metal (angle iron and stainless steel plenum) and excessive undercut at the toe of the fillet weld on the stainless steel plenum. The inside surface of Sample C1 further exhibited the use of excessive heat input during the welding process, based upon the presence of weld metal burn-through (indicated by arrows).

Close-up views of the outside and inside surfaces of Sample C2 showing the fillet welds used to join the angle iron clip to the outside surface of the stainless steel section of the plenum wall are shown in Figs. 29 through 31. As previously stated, excessive heat input was utilized to make these welds as evidenced by excessive melting of the base metal (angle iron and stainless steel plenum) and excessive undercut at the toe of the fillet weld on the stainless steel plenum. The inside surface of Sample C2 further exhibited the use of excessive heat input during the welding process based upon the presence of weld metal

burn-through (indicated by arrows). Soot/deposit had to be removed from the inside surface of the plenum wall to reveal the burn-through at location C2. The inside surface of the plenum wall where weld burn-through was observed was located underneath the positioning channel for the evaporative cooling media, Sample CH-1. Evidence of melting or excessive heat exposure to Sample CH-1 was not observed in the region where Sample C2 was located.

Close-up views of the outside and inside surfaces of Sample C3 showing the fillet welds used to join the angle iron clip to the outside surface of the stainless steel section of the plenum wall are shown in Figs. 32 through 34. As previously stated, excessive heat input was utilized to make these welds as evidenced by excessive melting of the base metal (angle iron and stainless steel plenum) and excessive undercut at the toe of the fillet weld on the stainless steel plenum. The inside surface of Sample C3 further exhibited the use of excessive heat input during the welding based upon the presence of weld metal burn-through (indicated by arrows). The burn-through at this location would have been the most critical of the three locations because Sample C3 was located above the positioning channel, Sample CH-1. The evaporative cooling media (which is flammable) would have been in direct contact with the inside surface of the stainless steel plenum wall where the burn-through occurred at the location of Sample C3.

**Optical Microscopy**

In order to examine the microstructure of the clip welds and the surrounding base metal, the following cross sections were removed from the samples received for metallurgical examination:

1. Cross section "A-A" was cut from Sample C1,
2. Cross section "B1-B1" was removed from Sample C2,
3. Cross section "B2-B2" was cut from Sample CH-1, and
4. Cross section "C-C" was removed from Sample C3.

Overall views of the sectioning performed on Samples C1, C2, C3 and CH-1are provided in Figs. 35 and 36.

All of the cross sections were mounted in bakelite and then surface ground, polished and etched to delineate the microstructure. The stainless steel portions were etched with ASTM Reagent No. 89 and the carbon steel sections were etched with a 2% Nital solution.

Cross Section "A-A"

An overall view of cross section "A-A" is shown at a magnification of 1X in Fig. 37. This cross section was taken through one of the fillet welds joining the C1 angle iron clip to the stainless steel section of the plenum wall.

A photomacrograph (10X) of cross section "A-A" is provided in Fig. 38. In this photograph, the carbon steel angle iron is located on top of the stainless steel plenum wall. The fillet weld joining the angle iron to the plenum wall had penetrated completely through (burned through) the stainless steel plenum wall. Severe underfill of the fillet weld metal was apparent as evidenced by the 0.043" thickness at the weld compared to the 0.122" thickness of the stainless steel plenum wall. The thickness of the carbon steel angle iron clip was approximately 0.109".

Diamond Pyramid (DPH) microhardness determinations were made as indicated. The corresponding Brinell hardness numbers ranged from to 187 BHN to 199 BHN in the stainless steel base metal, from 181 BHN to 192 BHN in the carbon steel angle iron and from 215 BHN to 226 BHN in the stainless steel weld metal. The hardness values in the stainless steel base metal indicate the sheet metal was furnished in the cold worked condition. The hardness values in the weld metal are typical for austenitic stainless steel weld metal. The hardness values of the angle iron were typical for structural carbon steel. Areas "$A_2$" through "$A_5$" were selected for examination at higher magnifications.

Area "$A_2$", Fig. 39, illustrates the condition at the toe of the fillet weld along the outside surface of the weld. The microstructure in the weld consisted primarily of dendritic austenite with a limited amount of free-ferrite. The heat-affected zone adjacent to the weld exhibited grain growth of the original austenite grains. The microstructure of the stainless steel base metal consisted of equiaxed austenite grains. These microstructures are typical

for an austenitic stainless steel such as AISI Type 304/304L stainless steel and stainless steel weld metal.

Area "$A_3$", Fig. 40, illustrates the condition along the inside surface of the stainless steel plenum at the weld. The microstructure consisted primarily of dendritic austenite grains with some ferrite grains distributed throughout the austenite matrix . This indicates that the weld metal had penetrated through the complete thickness of the stainless steel plenum during the welding process. The presence of re-solidified stainless steel weld metal along the inside surface of the plenum indicates that the temperature at this area on the inside surface of the plenum would have reached at least 2800°F during the welding process.

Areas "$A_4$" and "$A_5$" are shown in Figs. 41 and 42, respectively. Area "$A_4$" shows the microstructure of the stainless steel plenum away from the weld. The microstructure consisted of austenite grains with cold work, typical for a conventional austenitic stainless steel. The microstructure at area "$A_5$" consisted of ferrite and pearlite grains, typical for carbon steel.

Cross Section "B1-B1"

An overall view of cross section "B1-B1" is shown at a magnification of 1X in Fig. 43. This cross section was taken through one of the fillet welds joining the C2 angle iron clip to the stainless steel section of the plenum wall.

A photomacrograph (10X) of cross section "B1-B1" is provided in Fig. 44. In this photograph, the carbon steel angle iron is located on top of the stainless steel plenum wall. The fillet weld joining the angle iron to the plenum wall had penetrated completely through (burned through) the stainless steel plenum wall. Severe concavity of the fillet weld metal was apparent as evidenced by the 0.083" thickness at the weld compared to the 0.129" thickness of the stainless steel plenum wall. The thickness of the carbon steel angle iron clip was approximately 0.116".

Diamond Pyramid (DPH) microhardness determinations were made as indicated. The corresponding Brinell hardness numbers ranged from to 175 BHN to 192 BHN in the stainless steel base metal, from 160 BHN to 166 BHN in the carbon steel angle iron and was 207 BHN in the stainless steel weld metal. The hardness values in the base metal indicate the material was furnished in the cold worked condition. The hardness values in the weld metal are typical for austenitic stainless steel weld metal. The hardness values of the angle iron were typical of a structural carbon steel. Areas "$B1_2$" through "$B1_4$" were selected for examination at higher magnifications.

Area "$B1_2$", Fig. 45, illustrates the condition along the inside surface of the stainless steel plenum at the weld. The microstructure consisted primarily of dendritic austenite with some ferrite grains distributed throughout the austenitic matrix. This indicates that the weld metal had penetrated through the complete thickness of the stainless steel plenum during the welding process. The presence of re-solidified stainless steel weld metal along the inside surface of the plenum indicates that the temperature at this area on the inside surface of the plenum would have reached at least 2800°F during the welding process.

Areas "$B1_3$" and "$B1_4$" are shown in Figs. 46 and 47, respectively. Area "$B1_3$" shows the microstructure of the stainless steel plenum away from the weld. The microstructure consisted of cold worked austenite grains, typical for a conventional austenitic stainless steel. The microstructure at area "$B1_4$" consisted of ferrite and pearlite grains, typical for a carbon steel.

Cross Section "B2-B2"

An overall view of cross section "B2-B2" is shown at a magnification of 1X in Fig. 48. This cross section was cut through the channel that was used to position the evaporative cooling filters along the inside of the stainless steel section of the plenum wall. The outer surface is on the top and the inner surface is on the bottom of the photograph.

A photomacrograph (10X) of cross section "B2-B2" is provided in Fig. 49. The thickness of the channel measured 0.065". Evidence of overall damage or degradation was not observed in this cross section.

Diamond Pyramid (DPH) microhardness determinations were made as indicated. The corresponding Brinell hardness numbers ranged from 174 BHN to 181 BHN, typical for cold worked austenitic stainless steel material. Areas "$B2_2$" and "$B2_3$" were selected for examination at higher magnifications.

The microstructure at areas "$B2_2$" and "$B2_3$" are shown in Figs. 50 and 51, respectively. The microstructure at each of these areas consisted of cold worked austenite grains, typical for a conventional austenitic stainless steel. Evidence of microstructural degradation due to exposure to high temperatures was not observed.

Cross Section "C-C"

An overall view of cross section "C-C" is shown at a magnification of 1X in Fig. 52. This cross section was taken through one of the fillet welds joining the C3 angle iron clip to the stainless steel section of the plenum wall.

A photomacrograph (10X) of cross section "C-C" is provided in Fig. 53. In this photograph, the carbon steel angle iron is located on top of the stainless steel plenum wall. The fillet weld joining the angle iron to the plenum wall had penetrated completely through (burned through) the stainless steel plenum wall. The burn-through was evidenced by a 0.035" thick protrusion of weld metal on the inside surface of the stainless steel plenum. The wall thickness of the stainless steel plenum was measured at 0.123". The thickness of the carbon steel angle iron clip was approximately 0.120".

Diamond Pyramid (DPH) microhardness determinations were made as indicated. The corresponding Brinell hardness numbers ranged from 198 BHN to 213 BHN in the stainless steel base metal, from 171 BHN to 198 BHN in the carbon steel angle iron and from 172 BHN to 201 BHN in the stainless steel weld metal. The hardness values in the base metal indicate the material was produced in the fully annealed condition. The hardness values in the weld metal are typical for austenitic stainless steel weld metal. The hardness values in the angle iron were typical of a structural carbon steel. Areas "$C_2$" through "$C_5$" were selected for examination at higher magnification.

Area "$C_2$", Fig. 54, illustrates the condition at the toe of the fillet weld along the outside surface of the weld. The microstructure in the weld consisted primarily of dendritic austenite grains with some ferrite grains distributed throughout the austenite matrix. The heat-affected zone adjacent to the weld exhibited grain growth of the original austenite grains. The microstructure of the stainless steel base metal consisted of equiaxed austenite grains. These microstructures are typical for an annealed austenitic stainless steel such as Type 304/304L stainless steel and stainless steel weld metal.

Area "$C_3$", Fig. 55, illustrates the condition along the inside surface of the stainless steel plenum at the weld. The microstructure consisted primarily of dendritic austenite grains with some ferrite grains distributed throughout the austenite matrix indicating that the weld metal had penetrated through the complete thickness of the stainless steel plenum during the welding process. The presence of re-solidified stainless steel weld metal along the inside surface of the plenum indicates that the temperature at this area on the inside surface of the plenum would have reached at least 2800°F during the welding process.

Areas "$C_4$" and "$C_5$" are shown in Figs. 56 and 57, respectively. Area "$C_4$" shows the microstructure of the stainless steel plenum away from the weld. The microstructure consisted of cold worked austenite grains, typical for a conventional austenitic stainless steel. The microstructure at area "$C_5$" consisted of ferrite and pearlite grains, typical for a carbon steel.

**Chemical Analysis**

Chemical analyses were performed on sections of the stainless steel plenum wall from Samples C1 and CH-1. The results are provided below:

| Element | Sample C1 | Sample CH-1 | AISI Type 304L Stainless Steel |
|---|---|---|---|
| C | 0.034% | 0.021% | 0.035 max. % |
| Mn | 1.62 | 1.78 | 2.0, max. |
| P | 0.024 | 0.026 | 0.040, max. |
| S | 0.002 | 0.007 | 0.030, max. |

| Element | Sample C1 | Sample CH-1 | AISI Type 304L Stainless Steel |
|---|---|---|---|
| Si | 0.32 | 0.36 | 0.75, max. |
| Ni | 8.1 | 8.2 | 8.0 - 13.0 |
| Cr | 19.40 | 19.8 | 18.0 - 20.0 |

The results of this analysis showed that the plenum wall had a chemical composition consistent with the requirements of AISI Type 304L stainless steel.

## DISCUSSION

Several conditions must exist for a fire to occur:

1. Combustible fuel must be present.
2. An oxidizer (such as oxygen in air) must be available in sufficient quantity.
3. Energy as some means of ignition (e.g. heat) must be applied.
4. The fuel and oxidizer must interact in a self-sustaining reaction.

Fire is an exothermic reaction that proceeds at such a rate that it generates detectable heat and light. Two types of fire are flaming and glowing. The first is a gaseous combustion in which both the fuel and oxidizer are gases. The second involves the surface of a solid fuel with a gaseous oxidizer (usually the oxygen in air).

During the on-site investigation, the visual examination of the air inlet plenum revealed several insulation bracket welds on the south wall of the inlet plenum, both in the stainless steel and carbon steel sections that had penetrated through the wall. The three insulation clip (bracket) welds on the stainless steel evaporative cooler media section located at three different elevations had penetrated through the stainless steel wall. The welds associated with the three subject clips in the evaporative cooling section evidenced weld metal or re-solidified base metal on the inside surface of the stainless steel plenum wall.

The lower clip welds associated with clip C1, located adjacent to the channel that holds the evaporative wetted media in place, were completed on November 30, 2004 by the insulation contractor. The welds associated with clip C2, were located approximately 4 ft. above clip C1, and were behind the channel that holds the wetted media in place. It was completed on December 3, 2004. The third set of clip welds, those associated with clip C3, were located approximately 4 ft. above clip C2 and approximately 2" above the channel that holds the wetted media in place. This weld was also completed on December 3, 2004. The back side of clip C3 was in close proximity with the top of the evaporative cooling media. According to the incident report provided to Thielsch Engineering and a conversation with the insulation contractor, the C3 welds were performed approximately 10 to 20 minutes prior to the fire that was discovered at 9:04 am on December 3, 2004.

This investigation has shown that the fire that occurred in the air inlet plenum on December 3, 2004 was caused by the welding process which ignited the evaporative cooling media (which was consumed during the fire). The filter media was also burned during the fire and much of it was consumed. The visual examination of the damaged structure and components revealed that the fire had originated in the lower southeast section of the air inlet plenum where the evaporative cooling media were installed and propagated from the southeast section to the north and upward to the second and third level.

As stated above, the first requirement for a fire to occur is the presence of a combustible material. The only combustible materials that were known to be present in the air inlet plenum were the evaporative cooling media and the air filters. Therefore, one of these two components would have been the initial combustible material that was ignited during this incident.

During operation, when cooling of the inlet air is required, the evaporative cooling media are wetted with water to cool the inlet air through evaporative cooling. At the time of the incident, Unit CT101 was turned off and the evaporative cooling media were dry.

Air was present inside the air inlet plenum for Unit CT101 at the time of the fire, therefore the oxidizer present for the combustion process would have been oxygen in the air.

The ignition source for the fire was confirmed to have been molten metal generated by the welding of the insulation brackets to the outside surface of the stainless steel section of the plenum wall. This investigation confirmed that burn-through from welding of the stainless steel plenum wall at the Sample C3 level would have resulted in temperatures reaching at least 2800°F on the inside surface of the stainless steel plenum wall which was essentially in direct contact with the evaporative cooling media. The evaporative cooling media has an ignition temperature of approximately 350°F based upon literature of the material provided in Appendix B. The only other possible sources of ignition would have been the motor heater for the cooling water pump or wires for the lighting inside the air inlet plenum. Visual evidence of arcing associated with either of these components was not observed. The circuit breaker for the cooling water pump motor was switched off at the time of the fire. As such, it could not have provided the ignition source.

It was reported that black smoke was observed billowing from the air inlet plenum prior to the start of a flaming fire. This is consistent with the burning of a solid combustible material such as paper. A smoldering fire occurs first with exposure of the combustible material to the ignition source in the presence of an oxidizer. Pyrolysis occurs on solid combustible materials. It involves breakdown of a solid material to ash and gas vapors. If the gas vapors are flammable, a flaming fire will ensue once the temperature, flammable vapor concentration and oxidizer concentrations reach the proper levels.

## CONCLUSIONS

The fire that occurred in the air inlet plenum for Unit CT101 at the Florida Power and Light plant in Johnston, Rhode Island on Friday, December 3, 2004, was caused by the welding of insulation brackets to the outside surface of the evaporative cooling section (stainless steel) of the plenum wall. The welding process used was shielded-metal arc welding (SMAW) with welding rods consistent with AWS Specification SFA 5.5, E309L. The weld

metal burned through the stainless steel sheet metal of the plenum wall and allowed molten metal at a temperature of at least 2800°F to contact the evaporative cooling media on the inside of the air inlet plenum. Burning and subsequent ignition of the evaporative cooling media occurred. The air filters also burned as a consequence of the initial fire associated with the evaporative cooling media.

EXHIBIT "B"

THIELSCH ENGINEERING, INC.

# ARA NALBANDIAN, P.E.

## CURRICULUM VITAE

### EDUCATION

- M. S. - University of Rhode Island (Industrial Management) - 1969
- B. S. - University of Rhode Island (Mechanical Engineering) - 1964

### INDUSTRIAL EMPLOYMENT

- Vice President - Mechanical Engineering - Thielsch Engineering, Inc. - 1998 - Present
- Manager - Mechanical Engineering - Thielsch Engineering, Inc. - 1986 - 1997.
- Manager - Pipe Fitting Products Section - Research, Development & Engineering Division, - ITT Grinnell Corporation, Providence, RI - 1973 - 1986

  Manager - Unit Heaters - Research, Development and Engineering Division - ITT Grinnell Corporation, Providence, RI - 1973 - 1979
- Section Manager - Pipe Fitting Products Section - Research, Development & Engineering Division, - ITT Grinnell Corporation, Providence, RI - 1970 - 1973
- Group Leader Wrought Pipe Fitting Products Section - Research, Development & Engineering Division, - ITT Grinnell Corporation, Providence, RI - 1968 - 1970
- Project Engineer Wrought Pipe Fitting Products Section - Research, Development & Engineering Division, - Grinnell Corporation, Providence, RI - 1966 - 1968
- Plant Engineer - UNIROYAL, Providence, RI - 1965 - 1966

### INDUSTRIAL EXPERIENCE

Over thirty years of industrial employment, the responsibilities included planning, organizing, directing and controlling research product development activities of piping products and special components utilized in oil or gas transmission pipelines, chemical and petrochemical plants systems, nuclear and fossil fuel power plants, water treatment and transmission and distribution systems, fire protection systems, and treatment plants.

Other responsibilities included supervising of engineering personnel, qualification testing and approval of piping system components, material selection, welding, pipe joining process development and manufacturing technologies, forming, shaping, casting, and heat treatments of steels, welding, metallic and non-metallic products.

Actively participated and served on major committees in various Standard and Code writing organizations, including those of the American National Standards Institute, the Manufacturers Standardization Society for Valves and Fittings, the American Society for Mechanical Engineers, the American Waterworks Association and the Welding Research Council. He is familiar with ASME/ANSI Piping Codes, ASME Boiler and Pressure Vessel Codes, Federal, Military, Navy and Coast Guard Standards, National Fire Code and NFPA Standards, British, French, German, ISO and Japanese Standards.

Extensive experience in failure analysis and materials examination related to recovery boilers, power boilers, pressure vessels, headers, heater condensers, chillers, heat exchangers, steam and gas turbines, pumps, compressors, expanders, valves, cement kilns, Yankee dryers, paper machine dryer rolls, crank shafts, gears, materials including ferrous, non-ferrous metals, plastics, elastomers and ceramics. He has served as a consultant to many industries, including power plants, pulp and paper mills, chemical and petrochemical plants, refineries, mining industry, steel mills and various manufacturing plants in the United States, Canada, Mexico, Latin America, Europe, Middle East, Asia, and Australia.

## PROFESSIONAL REGISTRATION

- Registered Professional Engineer and Land Surveyor, Rhode Island
- Registered Professional Engineer, Connecticut
- Registered Professional Engineer, Florida
- Registered Professional Engineer, Kentucky
- Registered Professional Engineer, North Carolina
- Registered Professional Engineer, South Carolina
- Registered Professional Engineer, Texas

## AWARDS

1973 - Young Engineer of the Year - RI

## MEMBERSHIP IN PROFESSIONAL SOCIETIES

- American Society of Mechanical Engineers - (Member)
- National Society of Professional Engineers - (Member)
- Rhode Island Society of Professional Engineers - (Member)
- Providence Engineering Society - (Member)

## CODES AND STANDARDS

- ANSI/ASME B16 Main Committee on Valves and Fittings
- ANSI/ASME B16 Sub-Committee A - (Past Chairman)
- ANSI/ASME B16 Sub-Committee B - (Past Member)
- ANSI/ASME B16 Sub-Committee C - (Past Member)
- ANSI/ASME B31. Main Committee - (Alternate Member) On General Interest Review Group

MANUFACTURERS STANDARDIZATION SOCIETY FOR VALVES AND FITTINGS

- Committee 102 - Cast Iron Flanges and Flanged - (Past Chairman)
- Committee 104 - Ductile Iron Flanges and Fittings - (Past Member)
- Committee 108 - Cast Iron Threaded Fittings - (Past Member)
- Committee 204 - Non Ferrous Threaded Fitting - (Past Member)
- Committee 205 - Solder Joint Fittings - (Past Member)

AMERICAN WATER WORKS ASSOCIATION

- ANSI A21 Main Committee - Cast Iron Pipe & Fittings
- Pipe Subcommittee 1 - (Past Member)
- Joints for Pipe & Fitting - Subcommittee 2 - (Past Member)
- Fittings Subcommittee 3 - (Past Member)

LECTURES

Seminar for Piping Materials and Technology for Korean Overseas Contractors - June 9, 1982 - Seoul, Korea.

(a) "Specification/Standards and Equivalents of Pipe System"

(b) Piping Technology for Contractors

United Associates of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of USA and Canada - 30th Annual Instructor Training Program, Perdue University, W. Lafayette, Indiana, August 6 - 12, 1983.

(a) Product Development - new products for grooved-end pipe for sprinkler piping system

(b) Installation of grooved-end piping components

Society for Machinery Failure Prevention Technology - MFPT 49th Technical Program, April 18 - 20, 1995; Virginia Beach, Virginia

- Life Extension Considerations in Failure, Failure Prevention and Repairs

**CASES IN WHICH ARA NALBANDIAN HAS PROVIDED DEPOSITION OR TRIAL TESTIMONY**
**1996 TO 2004**

| Project No. | Trial Date | Case Name | Courthouse Location | Attorney Name | Law Firm and Address |
|---|---|---|---|---|---|
| 160145 | 11/11/1996 | Refuse Fuel Inc. et al. Vs.<br>National Union Fire Insurance Co., et al. | US District Court<br>Boston, MA | Thomas Maffei | Choati, Hall & Stewart<br>53 State Street<br>Boston, MA 02109 |
| 120181 | 3/27/1997 | John Baker, et al. Vs.<br>Mercantile Construction Co., Inc. | Suffolk Superior Court<br>Boston, MA | Brian J. Mone | Mone, D'Ambrose & Haynen<br>529 Pearl Street<br>Brockton, MA 02401 |
| 160067 | 8/28/1998 | Navigators Ins. Co. Vs.<br>Travelers Ins. Co. | Arbitration | Margaret Fahey | Clausen Miller PC<br>10 South LaSalle Street<br>Chicago, IL 60603 |
| 190135 | 7/21/1999 | Jamaica Public Service Co. Ltd. Vs.<br>AIU Ins. Co., et al. | Supreme Court of<br>The State of New York<br>County of New York | J. Mezzacappa | Mound, Cotton & Wollan<br>One Battery Park Plaza<br>New York, NY 10043 |
| 190139 | 11/3/1999 | State of Rhode Island Vs.<br>Susan and Paul Carlson | Washington County Court<br>Wakefield, RI | R. Bramley | Haronion, Paquin, Bramley &<br>Harrenger<br>190 Commerce Drive<br>Warwick, RI 02886 |
| 190231 | 1/28/2002 | Joseph Soltesz Vs.<br>John Miller | New Haven Count Court<br>New Haven, Connecticut | P. von Kuhn | Coyne, von Kuhn, Brady &<br>Fries<br>9999 Oronoque Lane<br>Stratford, CT 06614 |
| 110004/<br>60020014 | 9/6/2002 | Maxner Co. v. Crisha Creations | Providence, RI | C. Redihan | Kiernan, Plunkett & Redihan<br>Remington Building<br>91 Friendship Street<br>Providence, RI 02903 |
| 60020005 | 10/13/2002 | Northwestern Hospital<br>Milwakee Valves | Chicago, IL | K. Baer | Clausen Miller<br>10 South LaSalle Street<br>Chicago, IL 60603 |
| 60030086 | 02/26/03 | Lanco Mfg. Corp., Harris Paint<br>vs. Jomar International | San Juan, Puerto Rico | Raymond M.<br>Perez Brayfield | P.O. Box 195285<br>San Juan, P.R. 00929-5285 |

EXHIBIT "C"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CERTIFIED POWER SYSTEMS, INC.
Plaintiff,

VS. C.A. NO. 05-066-ML

RHODE ISLAND STATE ENERGY STATUTORY TRUST 200, FPLE RHODE ISLAND STATE ENERGY, LP, and FPLE RHODE ISLAND STATE ENERGY, GP, INC.,
Defendants,

VS.

CERTIFIED POWER SYSTEMS, INC.,
Defendant on Counterclaim/Third Party Plaintiff,

VS.

ZAMPELL REFRACTORIES, INC.,
Third-Party Defendants/Fourth Party Plaintiff,

VS.

SARGENT & LUNDY, LLC and PREMIER ENGINEERING,
Fourth Party Defendants

DEPOSITION OF ARA NALBANDIAN, a witness in the above-entitled cause, taken on behalf of the DEFENDANT ZAMPELL, before Claudia J. Read, a Notary Public in and for the State of Rhode Island, at the offices of ASQUITH & MAHONEY, 155 South Main Street, Providence, Rhode Island on June 22, 2006 at 9:30 A.M.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RI 02915
(401) 437-3366

COPY

(DEPOSITION COMMENCED AT 9:40 A.M.)

ARA NALBANDIAN

Being duly sworn, deposes and testifies as follows:

THE REPORTER: State your full name for the record, please.

THE WITNESS: Aran Nalbandian.

EXAMINATION BY MR. MAHONEY

**Q. Mr. Nalbandian, you are a professional engineer; is that correct, sir?**

A. Yes.

**Q. What particular area is your speciality?**

A. Professional engineer in Rhode Island does not have a relative categorization that we have.

**Q. I see. In what particular area of engineering are you involved?**

A. Mechanical materials and metallurgy.

**Q. And you have been asked to investigate at least some aspects of the fire that occurred at Florida Power in Johnston on December 3, 2004; is that correct?**

A. Yes.

**Q. What particular subject matter are you applying your expertise to as it relates to the fire?**

A. Basically investigation of the causation of the fire and the material properties that would render some information regarding the potential sources for the fire, as well as the occurrence of the fire.

**Q. So does your investigation include the welding process that was ongoing in and around December 3, 2004?**

A. It involves the welding that was done, yes.

**Q. And to that end, have you in your professional career been involved actually welding material?**

A. Yes. I have been involved in welding materials.

**Q. And your experience in that regard is from where? What were you doing at the time?**

A. I was working for Grinell Corporation starting 1966 until '86. And at Grinell, we had a lot of welding development for variety of systems, piping components, fabrication of equipment, development of welding for different purposes, and utilization of the welding processes in the production of the material components that Grinell fabricated or sold.

**Q. Were you a welder for Grinell?**

A. No.

**Q. What involvement did you have in the welding development process at Grinell in the years that you were there?**

A. As a -- as an engineer responsible for product development, I was responsible for developing procedures, processes for welding piping components, including pipefitting, transmission pipe lines, and a variety of components that would require fabrication by welding.

**Q. All right. And prior to your years of work at Grinell, had you actually been a welder?**

A. I was a student at that time, no.

**Q. I see.**

A. Prior to Grinell, I was not.

**Q. Have you ever been employed for anyone wherein you actually were involved in welding yourself?**

A. No.

**Q. Have you ever welded yourself on any occasion?**

A. Yes, I have.

**Q. And where was that?**

A. At Grinell.

MR. FREEL: And Jack, if I could clarify just one thing. You know we're going to

the stainless steel section, a stainless steel channel was located on the inside of the air plenum wall for positioning of the evaporative cooling media"; is that correct?

A. Correct.

Q. But, you do know or you do not know whether there was any evaporative cooling media material on the day of the fire that would have been abutting or flush up against the stainless steel section of the southerly wall?

A. The channel is between the wall and the material.

Q. I know that. What I'm asking you is is there any -- is there any, to your knowledge, any evaporative cooler media that would not been flush up against a channel, would have been flush up against the stainless steel wall?

A. I don't know.

Q. Let's talk about C-1, 2, and 3. Were those areas of stainless steel wall that were actually removed and taken to Thielsch?

A. Yes.

Q. And did those three cuts, if you will, C-1, 2, and 3 include areas of welding?

far right side where there's an additional whitish color?

A. I believe so, yes.

Q. I see. And the darkish color here, this is the channel; is that right?

A. Correct.

Q. So the channel, I'm highlighting in pen just the outside edges of the stainless steel evaporative cooler media channel, correct?

A. Correct.

Q. So if the stainless steel wall is about 5 feet, the channel is about, what did you say, 15 inches?

A. 15 inches.

Q. And no media material would go beyond the 15-inch width, I take it?

A. Correct.

Q. And whether any evaporative cooler media extended above the height of the channel, you don't know?

A. No.

Q. All right. Going back to C-1, what would be the best figure or photograph for you to refer to on the inside of the plenum to depict -- strike that. Do you have an opinion concerning whether there was a blow-through at C-1?

A. Correct.
Q. And for purposes of C-3, the belief is that it was the process of making that weld that caused the fire to start?
A. Yes.
Q. But the factual predicate for that determination was, as indicated in the last sentence, that, "The evaporative cooler media would have been in direct contact with the inside surface of the stainless steel plenum wall"?
A. Yes.
Q. That's how the sentence reads?
A. Yes.
Q. And you don't have facts at your disposal that counter that conclusion, that is to say that the media material actually was in direct contact with the inside of the southerly plenum wall?
A. It was very close proximity. If there is any space, which is probably small amount, but it will be very close proximity to the inside surface of the southern wall.
Q. So that are you saying that -- let me take that back. You tell me. C-3 caused the fire, obviously due to the weld, due to what factual

**circumstances?**

A. The amount of the heat input, which sort of reflects the condition of the material as welded, would generate enough heat to cause the ignition and combustion and burning of the material media.

**Q. Okay. My understanding from the CELdek's material, and it's referenced, I think, on page 2 of your report. Well, I'm not sure it is page 2, but at some point in your report, it is fair to say you make mention of the CELdek literature; is that correct?**

A. Yes.

**Q. I'll find it. Yes, it is on page 2. The CELdek literature indicates that, "CELdek evaporative media should not be exposed to temperatures in excess of 350 degrees Farenheit due to the danger of ignition"?**

A. Correct.

**Q. Now, you're indicating that molten material may have made contact with the evaporative cooler media?**

A. The molten material, which is basically depicted on Figure 53 -- 52, 53, 54, shows the extent of the weld material which has protruded

the boundary of the sheet metal that raises the temperatures in that close vicinity of the medium where amount of temperature, which reaches to 2400 or 1800, it will cause kindling and ignition of a material which is susceptible for burning before 350.

**Q. Now, did you or anyone else at Thielsch investigate what internal temperatures, that is to say on the inside portion of the stainless steel would reach when welding took place in a proper fashion?**

A. All depends how much heat input he has and how well he does as far as the speed. It is very difficult to foretell what temperatures would reach, given the type of the welding that is being done.

**Q. Would there -- would it be anticipated that if welding was done, regardless of how high the welding temperature was or regardless of what type of welding unit was used, that there would be an increase in temperature on the other side of the wall where the welding took place?**

A. It will be a temperature differential, yes.

**Q. All right. And in this particular case, you don't**

There was one in the Federal Court in Rhode Island, but it's so many years ago I can't even remember when.

**Q. Were any of the cases in which you testified in court, as far as you recall, cases in which you were giving an opinion regarding cause and origin of a fire?**

A. They were different issues than the fire.

**Q. So there were no cases that you can recall in which you've testified in court about the cause and origin of a fire?**

A. Not in the courts.

**Q. Were there any cases in which you testified in court in which you gave an opinion regarding an issue pertaining to welding?**

A. I don't recall.

**Q. Were there any cases in which you testified in court in which you gave an opinion that involved expertise in the field of mechanical engineering?**

A. Mechanical engineering is involved in every aspect of the product, so it should be part of the expertise that I possess.

**Q. I understand that. My question is do you recall if any of the cases in which you testified were**

the fires while you were at Grinell, there wouldn't have been any issue as to what the cause and origin, would there?

A. Yes, there would be by virtue of knowing what will be the causes of the fire which will be basically set up to cause the fire. That is the cause of the fire, and then you have the suppression which means that you are basically knowing, you know, exactly what the cause of the fire is to begin with, rather than investigating to find the cause of the fires.

Q. All right. Did you take any specific classes or seminars or training with regard to the cause and origin of fires?

A. No.

Q. And when in your 20-year work history at Grinell did you become an expert with regard to the investigation of the cause and origin of fires; first 5 years there, 10 years down the road?

A. It was basically ongoing process of learning as you go along to know what is more to learn and more development to come about.

Q. In which of the six or seven or five or six different job titles listed on your resume,

**Q. Okay. Well, we'll get to this file in a minute, but does the file contain drawings which you believe show that the evaporative cooling media in the CT unit that burned extended above the top of the stainless steel channel?**

A. I don't know whether the drawings over here or in addition to the drawings that may have on the other exhibits can also substantiate that condition of installation.

**Q. Okay. Do you want to look? Do you know if there is one that you brought with you today that shows that?**

A. Here is one that shows you all the way up from the bottom to the top.

**Q. From the bottom to the top of what?**

A. The second level.

MS. DAVIS: Can you identify it?

MR. VESPOLE: I will in a second. I'm trying to figure out where it's from or what it is.

MR. SHULTZ: Title block cut off of it?

MR. VESPOLE: It is.

MR. FREEL: And there may have

been a Bates number at one point, too. If there was, it's also cut off.

MR. SHULTZ: I think it's a pneumafil drawing.

**Q. Why don't you look and see if there are any other drawings?**

A. Is this not adequate?

MR. FREEL: Look and see if there are more.

MR. VESPOLE: I'm going to have copies of this one made. Off the record.

(OFF THE RECORD)

(ZAMPELL'S EXHIBIT S MARKED FOR IDENTIFICATION)

**Q. Mr. Nalbandian, have you finished?**

A. This is the only drawings that depicts that condition of installation.

**Q. So the only drawing is the exhibit we've marked as Zampell S; is that correct?**

A. Yes.

**Q. And is it your understanding or your opinion, based upon reviewing this drawing, that the evaporative cooling media extended above the stainless steel channel on the inside of the plenum prior to the fire?**

A. Yes.
Q. Why don't you show me on this drawing, maybe you can make some marks, how it is you come to that conclusion?
A. Four stacks, so it's got to be way up here.
Q. Does the drawing show the channel?
A. No.
Q. Does the drawing show the evaporative cooling media?
A. Yes.
Q. Do you know if the evaporative cooling media was installed in accordance with the details shown on this drawing?
A. I presume that would be the case.
Q. That's a presumption, you don't know for a fact?
A. That basically the installation instructions done the way that I take it as being a condition that existed prior to the incident.
Q. Well, what's the unit that burned, CT1?
A. Yes.
Q. And CT2, do you know if CT2 was designed to the same specifications as CT1?
A. I don't know, but I assume it will be identical.

EXHIBIT "D"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**CA NO 01-066-ML**

CERTIFIED POWER SYSTEMS, INC.

vs.

RHODE ISLAND STATE ENERGY STATUTORY TRUST 2000, FPLE RHODE ISLAND STATE ENERGY GP, INC.

vs.

CERTIFIED POWER SYSTEMS, INC.

vs.

ZAMPELL REFRACTORIES, INC.

DEPOSITION OF **MICHAEL COONEY, P.E.**, Senior Metallurgical Engineer, Thielsch Engineering, **EXPERT WITNESS** in the above-entitled cause, taken on behalf of the Plaintiff, CPS, pursuant to notice, before Patricia A. Quirk, A Notary Public in and for the State of Rhode Island, at the offices of ASQUITH & MAHONEY, 155 South Main Street, Providence, Rhode Island, on July 12, 2006 AT 10:30 a.m.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RHODE ISLAND 02915
(401) 437-3366

ORIGINAL

Q. You could have a situation where there was a professionally-done weld, a good weld, the weld did the job, there was no blow through, there was no structural evidence of deformity, and yet the temperature may have reached as high as 500 degrees on the inside of this stainless steel wall?

MR. FREEL: Objection. You may answer.

A. That could have happened. You have to define how -- yes, that could have happened.

Q. Now, your area of expertise, I assume, does not address in any way, shape or form, regulations that relate to removal of flammable material in the event of welding?

A. Correct, it's not.

MR. MAHONEY: That's all I have.

(DEPOSITION ADJOURNED AT 1:06 p.m.)