# EXHIBIT A

**C**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Rhode Island.
Thomas **DUNN**
v.
Ann **SHANNON**, Edward **Shannon**, Paul **Shannon**, Individually and d/b/a the **Shannon** Agency and Norfolk & Dedham Insurance Co.
**No. 99-2533.**

May 11, 2005.

*DECISION*

SILVERSTEIN, J.

***1** Before this Court for decision are two motions for summary judgment. The first motion is made by Ann **Shannon**, Edward **Shannon** and Paul **Shannon**, (collectively the **Shannons**). The **Shannons's** motion for summary judgment asks in the alternative for dismissal under Rule 12(b)(6) of the Rhode Island Rules of Civil Procedure. The second motion for summary judgment is made by Norfolk & Dedham Insurance Company (Norfolk).[FN1] The Plaintiff, Thomas **Dunn** (**Dunn**), filed a timely objection to both motions. Jurisdiction is pursuant to Rhode Island General Law § 8-2-14.

FN1. The **Shannons** and Norfolk collectively are hereinafter "Defendants."

*Facts and Travel*

In September 1983, Ann **Shannon** (Ann) and **Dunn** caused East Bay Insurance Ltd. (East Bay) to be incorporated.[FN2] Ann and **Dunn** were equal 50% shareholders of the company. The business, an insurance agency, operated out of a building located on Newport Avenue, Pawtucket, Rhode Island, that **Dunn** owned. In 1984, Ann's sons, Edward and Paul **Shannon**, became employees and officers of East Bay. According to **Dunn**, although he was not licensed to sell insurance, he made financial, managerial and marketing contributions as well as providing a building for East Bay's offices. In return, he received $1500 a week as well as company benefits. While **Dunn's** actual contributions to East Bay are disputed, it is agreed that the day-to-day business was run by Ann. **Dunn** essentially gave her an "open hand" to operate the business as she saw fit.

FN2. Since three of the Defendants have the family name of **Shannon**, first names will be used to avoid confusion.

In January 1989, Ann, in her capacity as president of East Bay, executed producer agreements (Producer Agreements) between East Bay and her sons, Edward and Paul. The Producer Agreements provided that commissions would be paid to Edward and Paul on all insurance contracts already placed or to be placed by them through East Bay. The Producer Agreements further provided that Edward and Paul would retain ownership of the expiration dates of said insurance policies. Expiration dates refer to the producer's right to solicit a renewal after the original policy has expired. Allegedly, from 1989 until 1995, Edward, Paul and Ann were paid commissions pursuant to the Producer Agreements. These agreements were entered into without **Dunn's** knowledge or consent, or were they referred to in the corporate minutes of East Bay.

Prior to entering into the Producer Agreements, Paul established the **Shannon** Agency, a sole proprietorship engaged in brokering insurance. Allegedly, for the first few years, the **Shannon** Agency did not have its own telephone number, checking account, financial records, state licenses or registrations. The **Shannon** Agency operated out of East Bay, which provided secretarial services, telephone listing, office equipment, company

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

vehicles and staff support. **Dunn** purports to have been totally ignorant that this arrangement between East Bay and the **Shannon** Agency existed.

Norfolk is an insurance carrier which used East Bay as its agent. Allegedly, Norfolk entered into separate agency agreements with the **Shannons** and the **Shannon** Agency. Purportedly, from 1989 to 1995, Norfolk paid commissions to the **Shannon** Agency, which were deposited into East Bay's checking account. The **Shannons** would then cause East Bay checks to be issued to them. The transactions were notated in the company ledger as commissions paid from East Bay. **Dunn** contends that this arrangement was an intentional and fraudulent attempt to divert assets from East Bay and that Norfolk acted in knowing concert with the **Shannons** to achieve this end.

*2 Sometime in 1993, Paul informed **Dunn** that his weekly salary would be deferred indefinitely because of cash flow problems. In 1994, Ann notified **Dunn** that his health insurance would be terminated. In 1995, Ann stopped East Bay's rent payments to **Dunn** for the office on Newport Avenue.

After an unsuccessful buy-out attempt, **Dunn** brought a receivership petition in the Superior Court in 1996, and William Delaney (Delaney) was appointed permanent receiver (Receiver). East Bay's assets and business were placed under the control of the Receiver, who authorized the **Shannons** to continue operating the insurance agency until the assets of the estate were sold. The Producer Agreements were not brought to Delaney's attention until sometime after the receivership had been initiated. In April 1997, **Dunn** purchased the East Bay assets from the receiver.

During the receivership, Delaney employed two agents to investigate, observe and examine the operations and files of East Bay. They discovered that blank broker of record letters had been placed in East Bay's customer files. The broker of record letters indicated that the **Shannon** Agency would be the customer's insurance agent. Some of the letters were already signed by the customer and some were queued to be sent with the customer's renewal.

Also during the receivership, it was discovered that files were deleted or missing. Specifically, a computer program, Agency One, was removed from the computers, and data was deleted. The hard copies containing a duplicate of the data were also missing. Upon inquiry by Delaney, the **Shannons** asserted that although the data was recorded on East Bay computers, the information therein was their property by virtue of the Producer Agreements.

After **Dunn** bought the assets, he realized that "the assets of East Bay had been unlawfully diminished and converted by Ann, Paul and Edward in concert with [Norfolk]." [FN3] **Dunn** contends that the value of East Bay's assets had been diminished by diverting commissions out of East Bay and manipulating the books so that expiration dates and customer information had been transferred to the **Shannon** Agency. He also contends that Norfolk knowingly conspired and aided the **Shannons** in stripping East Bay by assigning the agency identification numbers, acknowledging the Producer Agreements and advancing the **Shannons** commissions so that the **Shannon** Agency could move to a new office on Massasoit Avenue, East Providence, Rhode Island.

FN3. Paragraph 8, Plaintiff's Memorandum in Objection to the Motion for Summary Judgment. *See also,* Paragraph 8, First Amended Complaint. Although permission to amend the complaint for a second time was granted January 5, 2004, a second amended complaint was never filed with the Court. Because Rule 15 requires that the amended complaint be filed, the active complaint before the Court is the first amended complaint filed September 10, 1999.

**Dunn** filed this suit in May of 1999. The complaint consists of eight different claims including multiple breaches of fiduciary duty. In sum, **Dunn** alleges malfeasance both before and during the receivership. The wrongful acts that predate the receivership were basically (1) the allegedly unauthorized execution of the Producer Agreements; and (2) transfer of commissions and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

policies from East Bay to the **Shannons** individually or to the **Shannon** Agency. The wrongful acts that occurred during the receivership were basically (1) stripping and deleting computer files and software; and (2) removing files physically from East Bay. The fiduciary duty claims allege that the **Shannons** breached a fiduciary duty owed to " East Bay and **Dunn** as sole remaining 50% stockholder thereof." FN4

FN4. *See* First Amended Complaint, Count I, ¶¶ 18, 22, 23, 24; Count II, ¶ 14; Count III, ¶ 3; Count IV, ¶¶ 9, 10, 11; Count VII, ¶¶ 16, 24; Count VIII, ¶ 6.

*3 **Dunn** also seeks damages resulting from his purchase of the East Bay assets. He contends that as a result of the **Shannon's** wrongful acts during the receivership, he only received an "empty shell" rather than what he bargained for. The sale is evidenced by an Offer to Sell General Assets (Offer) signed by the receiver and **Dunn**.FN5 The Offer, which constitutes the written agreement between **Dunn** and the receiver, provided that:

FN5. The offer to purchase was presented to and accepted by the Court. The Court's approval of the sale is embodied in an order dated April 3, 1997.

The undersigned (the "Purchaser") does hereby offer to pay Forty-Three Thousand and 00/100 Dollars ($43,000) for all of your right, title and interest as Receiver, free and clear of liens and encumbrances of any kind, in and to the following assets of the aforedescribed Defendant (collectively, the "Assets"): the books and records of the Defendant of any kind and/or nature, customer lists, contracts of insurance, the Defendant's name 'East Bay Insurance, Ltd.,' the Defendant's telephone number, 401-434-8800, the Defendant's fax number, 401-434-1100, the Defendant's Post Office Box, wherever located, the Defendant's furniture, machinery and office equipments, located at 400 Massassoit Avenue, East Providence, Rhode Island (the "Premises") on the date hereof, excluding and excepting therefrom the Excluded Assets, as hereinafter defined. (Emphasis in original.)

**Dunn** additionally claims that Norfolk aided and abetted the **Shannons** in their breach of their fiduciary duty to the plaintiff. Allegedly, this was accomplished by knowingly assigning agency numbers to the **Shannons** individually and paying commissions to the **Shannon** Agency, even though the **Shannons** were using East Bay's office space, client list, and insurance license. Additionally, **Dunn** accuses Norfolk of conspiring with the **Shannons** to divert the expiration dates.

**Dunn** requests a multitude of remedies both at law and in equity, including:
1. declaratory judgment on the validity of the Producer Agreements;
2. an accounting by the **Shannons**; return of all files, records, and documents; return of all expiration dates and files etc. pursuant to the Producer Agreements;
3. judgment against Norfolk for conspiracy and an order to pay the commissions over to **Dunn** as "the harmed stockholder and subsequent purchaser of all assets of East Bay";
4. injunction against the **Shannons** prohibiting them from further soliciting insurance coverage of any customers of East Bay whom the Defendants became acquainted with or whose identity they learned in the course of their employment or official capacity with East Bay; etc.

Prior to these motions for summary judgment, both the **Shannons** and Norfolk had moved to dismiss the case pursuant to Rule 12. They argued that the receiver, not **Dunn**, had standing to bring this suit. The Defendants also argued that even if **Dunn** had standing, this was properly a derivative suit and the requirements of Rule 23.1 had not been met. The motions were denied.

*Law of the Case*

As in their motion to dismiss, the Defendants argue that summary judgment is proper because, *inter alia,* **Dunn** lacks standing and he has not complied with the Rule 23.1 requirements for bringing a derivative

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

suit. To this, **Dunn** argues that the law of the case doctrine prohibits the Court from ruling in the Defendant's favor. This Court believes that **Dunn** is correct only in part. "Under law of the case doctrine, ordinarily, after a judge has decided an interlocutory matter in a pending suit, a second judge, confronted at a later stage of the suit with the same question in the identical manner, should refrain from disturbing the first ruling." FN6 *Polella v. Radiologic Leasing,* 769 A.2d 596, 599 (R.I.2001) (internal citations omitted). "The law of the case doctrine, however, should not be used to perpetuate a clearly erroneous earlier ruling." *Id.* Rather, the law of the case doctrine is "merely a practice that protects the ability of the court to build to its final judgment by cumulative rulings, with reconsideration or review postponed until after judgment is entered." *Teveira v. Soloman,* 528 A.2d 1105, 1108 (R.I.1987) (case properly dismissed by second trial justice because initial ruling on whether the action had been timely commenced was clearly erroneous); *see also McBride v. Leach (In re: Estate of Speight),* 739 A.2d 22, 232 (R . I.1999) (since the issue of whether a probate court could vacate and reissue its decree was essential to the jurisdiction of the Superior Court, it could not be avoided by the second justice on the basis of the law-of-the-case doctrine).

FN6. It is not a requirement that the first judge be different from the second judge. In *Paolella,* the same judge heard two different summary judgment motions. *Id.* at 598.

*4 **Dunn** correctly notes that the Defendants previously made a motion to dismiss for failure to state a claim based on lack of standing and **Dunn's** failure to properly plead a derivative suit. **Dunn** is also correct when he says that the facts presented by the Defendants are no different than when they made the first motion in 1999, and the law has not changed. As a general rule, this Court is bound not to disturb the initial order denying the motion to dismiss. Nevertheless, this Court believes that to permit its earlier ruling to control would perpetuate clear error regarding **Dunn's** standing to assert his claims against Defendants. "In the interest of judicial efficiency and economy and due to the importance of the issue involved to the ultimate disposition of the case, the doctrine of the law of the case must, in this instance, be subordinated in order to avoid the unnecessary expenditure of time and expense that would be incurred in hearing a case destined to fail due to its inherent procedural deformities anyway." *Taveira,* 528 A.2d at 1109.

*Rule (12)(b)(6) Standard*

A Rule 12(b)(6) motion to dismiss will be granted only when it is clear beyond a reasonable doubt that the plaintiff would not be entitled to relief from the defendant under any set of facts that could be proven in support of the plaintiff's claim. *Ellis v. Rhode Island Public Transit Auth.,* 586 A.2d 1055, 1057 (R.I.1991). In considering a motion to dismiss under this rule, the motion justice must look no further than the complaint, assume the truth of all the allegations therein and resolve any doubts in the plaintiff's favor. *Thompson v. Thompson,* 495 A.2d 678, 680 (R.I.1985). Where a shareholder's action is actually a derivative action on behalf of his corporation and his complaint discloses no compliance with Rule 23.1, dismissal of the complaint is proper. *Giuliano v. Pastina,* 793 A.2d 1035, 1037 (R.I.2003).

*Complaint Asserts Claims That Are Derivative Rather Than Individual*

The primary issue before the Court is whether this suit is derivative or individual in nature. The Defendants argue that the complaint appears to plead a derivative suit, but does not comply with Rule 23.1. **Dunn** counters that he does not have to comply with Rule 23.1 because he is asserting his individual claims. Whether or not a suit is derivative in nature is a question for the court. *Dowling v. Narragansett Capital Corporation,* 735 F.Supp. 1105, 1113 (D.R.I.1990).

A shareholder derivative suit "permits an individual shareholder to bring suit to enforce a corporate cause of action against officers, directors and third parties." *Kamen v. Kemper Fin. Servs, Inc.,* 500

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

U.S. 90, 95 (1991). The federal district court sitting in Rhode Island has succinctly articulated the standard that the court should employ when determining whether a suit is derivative or direct in nature:

"The general rule is that an action to redress an injury to a corporation must be brought as a derivative suit and may not be maintained by shareholders acting in their individual capacities. However, if the injury in question is one sustained by the shareholders, directly, they may sue on their own behalf. In determining whether a particular claim is derivative or personal, the Court must consider the nature of the harm inflicted and the nature of the rights violated. Where the injury is personalized to a shareholder and flows from a violation of rights inherent in the ownership of stock, suit may be brought by the shareholders. On the other hand, where the injury is to the corporation and only affects the shareholders incidentally, the action is derivative." *Id.*

***5** In other words, a shareholder cannot "arrogate unto themselves choses in action which belong to the firm." *Id.* The rule applies equally to corporations with only two shareholders. *See In re Dein Host, Inc.,* 835 F.2d 402, 496 (1st Cir.1987) (holding that a 49% shareholder of a company with only three shareholders could not bring suit individually if the harm was to the company and noting in dicta that this would be the case even if there was only a sole shareholder). Furthermore, " [i]n cases where the corporation sustains the injury, the fact that the shareholders may have indirectly suffered individual losses in the form of a diminution in the value of their stock does not entitled them to bring the action in their own names. " *Dowling,* 735 A.2d at 1113.

A court's inquiry focuses on the nature of the claim asserted and is not bound by the designation employed by the plaintiff. *Moran v.. Household Int'l, Inc.,* 490 A.2d 1059, 1069-70 (Del. Ch.1985). FN7 To sustain an individual action, the complaint must allege either "an injury which is separate and distinct from that suffered by other shareholders or a wrong involving a contractual right of a shareholder, such as the right to vote or to assert majority control, which exists independently of any right of the corporation." *Id.* (internal citations omitted). However, if the complaint demonstrates both a derivative and an individual cause of action, then the plaintiff can proceed with the individual action. *Lawton v. Nyman,* 327 F.3d 30, 50 (1st Cir.2003).

FN7. Delaware law and its interpretation by Delaware Courts are acknowledged in Rhode Island as appropriate sources of legal analysis and corporate jurisprudence in the absence of controlling Rhode Island precedent. *See Bove v. Community Hotel Corp. of Newport, R.I.,* 249 A.2d 89, 93 (R.I.1969).

In the case at bar, **Dunn's** complaint alleges that the **Shannons** usurped a corporate opportunity. The corporate opportunity doctrine "prohibits a corporate fiduciary from diverting a business opportunity away from the corporation and taking it for himself or herself." *Teixeira & Co., Inc., v. Teixeira,* 699 A.2d 1383, 1386-87 (R.I.1997). "To successfully state a claim then [under the doctrine of corporate opportunity], a plaintiff must demonstrate that the defendant was a corporate fiduciary and that he or she diverted a corporate opportunity." *Id.* Corporate fiduciaries include officers, directors and shareholders in a closely held corporation. *Id.* The mechanism for remedying a violation of the corporate opportunity doctrine is through a derivative suit. *In re Big Wheel Holding Co., Cox v. Hess,* 214 B.R. 945, 951-52 (D.Del.1997). This is because diversion of assets and usurpation of corporate opportunities result in an injury to the corporation. *See Teixeira,* 699 A.2d at 1386 ("We explained, 'A person holding those offices may not divert to himself opportunities which in justice belong to the *corporation* he serves. ") (Emphasis added); *Albany Plattsburgh United Corp. v. Bell,* 763 N.Y.S.2d 119, 122-23 (2003) (where plaintiff alleged diversion of assets by wrongfully entering into agreements and usurpation of corporate opportunities, the complaint plead a wrong to the corporation and not to the shareholder individually); *see also Bogosian v. Woloohojian,* 167 F.Supp.2d 491, 501-02 (D.R.I.2001) (where sister-shareholder usurped a corporate opportunity

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of a three shareholder corporation, "[i]t is clear that [brother-shareholder] could have brought a stockholder's derivative suit against [sister-shareholder] even without [second brother-shareholder's] concurrence).

*6 It is clear that **Dunn** is asserting a corporate injury. Arguably, by entering into the Producer Agreements, the **Shannons** usurped corporate opportunities from East Bay. As stated above, usurpation of corporate opportunities give rise to a derivative claim. Moreover, the complaint is replete with allegations that the Defendants (1) converted the "property of East Bay"; (2) breached a fiduciary duty to East Bay; (3) East Bay's value was diminished; and (4) the complaint asks for judgment in favor of East Bay and **Dunn** as a shareholder. Any injury arising from the alleged wrongful acts would create a cause of action in the corporation, not in **Dunn**. *See Albany,* 763 N.Y.S.2d at 122 (affirming a lower court's dismissal of an individual suit brought against a corporation and noting that the complaint itself speaks of diverting and converting "Norpco's" assets). Furthermore, **Dunn** has not demonstrated that he has suffered a wrong involving his contractual rights as shareholder that exists independently of the corporation's right. Therefore, the breach of fiduciary duty claims against the **Shannons** assert a derivative claim for the benefit of the corporation.

This conclusion applies equally to the claims against Norfolk for aiding, abetting and conspiracy. The general rule regarding shareholder suits against third parties is that the shareholder does not have an individual right of action against a third person for damages to the corporation arising out of either contract or tort law. *In re Dein Host, Inc.,* 835 F.2d at 405-06. The Federal Court of Appeals for the First Circuit explained the rationale behind the rule as follows:
"The rule is a salutary one: if a shareholder, dissatisfied with the dealings entered into between his corporation and a third party, automatically possessed a personal right of action against the third party, then corporations would be paralyzed. They could rarely act except upon unanimous consent. Business affairs would slow to a crawl, and the courts, confronted with a bewildering myriad of shareholder claims, would be as busy as a colony of centipedes with athlete's foot. Not surprisingly, the law is to the contrary. As Justice Holmes once stated, '[a] leading purpose of [the corporation code] is to interpose a nonconductor, through which in matters of contract it is impossible to see the men behind.' *Donnell v. Herring-Hall-Marvin Safe Co.,* 208 U.S. 267, 273 (1808)."

One court has even held that the general rule applies even where the wrongful act by the third party is intended to injure the shareholder. *Glyptis v. Mobil Oil Corp.,* 1982 U.S. Dist. LEXIS 16362 at *5-6 (Mich.1982). In light of the case law cited above, this Court holds that the claims against Norfolk are also derivative in nature.

### ***Dunn** Has Not Properly Plead a Derivative Suit*

Because it is established that **Dunn's** claims are actually derivative in nature, the next inquiry must be whether his complaint complied with the requirements of Rule 23.1, which provides that:
*7 "In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members and the reasons for the plaintiff's failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interest of the shareholders or members similarly situated in enforcing the right of the corporation or association.
"

It is clear that **Dunn's** complaint is defective under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rule 23.1. It is not verified other than by being signed by his lawyer; he has not asserted that he can adequately represent the shareholders as a class; and there is no particularized pleading as to demand made on the board of directors or futility.[FN8]

> FN8. Attached to **Dunn's** Supplemental Memorandum in Support of his Objection to Summary Judgment is a signed, notarized document entitled Affirmation and Verification, dated October 7, 2004. In the Affirmation and Verification document, **Dunn** swears that the complaint and all attachments, memoranda and amendments are true and accurate. The Affirmation and Verification document is not attached to any of the amended complaints on file and follows nearly five years after the filing of the last amended complaint.

Recognizing that it would be impossible to make a demand on the East Bay board of directors-or individual(s) vested with the power of board of directors-now that the corporation is dissolved, this Court invited further briefing on the issue of futility.[FN9] After reviewing the legal briefs submitted to the Court by the parties as well as conducting independent research on the matter, this Court is satisfied that the demand requirement is not excused in this case. Rhode Island strictly adheres to the demand requirement. Even if "demand ultimately proves futile, the plain language of the rule requires that a plaintiff demonstrate that all avenues of redress are foreclosed before a derivative suit may be brought." *Hendrick v. Hendrick,* 755 A.2d 784, 794 (R.I.2000). **Dunn's** complaint does not present any basis upon which the Court can find that a demand on the board or the receiver was attempted. Therefore, the claims arising from alleged pre-receivership malfeasance by the **Shannons** are properly dismissed for lack of compliance with the requirements for bringing a derivative suit under Rule 23.1. *Giuliano,* 793 A.2d at 1037; *Hendrick,* 755 A.2d at 794.

> FN9. G.L. § 7-1.2-1701 provides that closed corporations may assign to one or more shareholders or other individuals any or all of the powers normally vested in the board of directors. East Bay's articles of incorporation are not in evidence before the Court.

Furthermore, **Dunn's** claims are foreclosed by the terms of the Offer to buy East Bay's assets. The Offer specifically excluded from the sale:

"Choses in action not customarily available in the trade or industry in connection with the continued business operations of the Defendant, and any and all claims of any kind or nature of the Receiver or the Receivership Estate of Defendant against any current or former stockholder, officer, director, employee, or other insider of the defendant, including but not limited to any and all claims against any such parties for breach of fiduciary duties...."

***8** The specific and unambiguous language included in the sale agreement conclusively establishes that **Dunn** does not have standing to bring his claims against the **Shannons**.

*__Dunn__ Lacks Privity of Contract with the __Shannons__ Regarding the Sale of the Receivership Estate*

Many of **Dunn's** claims arise out of his purchase of the East Bay assets from the receiver. In simple terms, he alleges that he did not receive that which he had bargained for. He believed that he was buying an operational company containing all the assets, both tangible and intangible, that existed prior to the receivership. Instead, **Dunn** alleges that only an "empty shell," a company stripped of valuable data, computerized information and expiration dates, was delivered.

The sale is evidenced by the Offer signed by the Receiver and **Dunn**.[FN10] The four corners of the Offer reveal that the seller was William Delaney qua receiver of East Bay. Because there is no privity of contract between the **Shannons** and **Dunn** , it is clear beyond all doubt that the **Dunn** would not be entitled to relief from the Defendants under any set of facts that could be proven in support of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the plaintiff's claim. *Ellis,* 586 A.2d at 1057.

> FN10. The Offer was presented to and accepted by the Court. The Court's approval of the sale is embodied in an order dated April 3, 1997.

In this case, the Offer constitutes the contract for the sale of East Bay's assets. The Offer unambiguously and clearly identifies the seller as Delaney in his capacity as receiver. "Whether a contract's terms are ambiguous is a question of law. A contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation." *Garden City Treatment Center, Inc. v. Coordinated Health Partners, Inc.,* 852 A.2d 535, 543 (R.I.2004) (citations omitted). If the court fails to find ambiguity, then the "intention of the parties must govern if that intention can be clearly inferred from the writing and if it can be fairly carried out in a manner consistent with settled rules of law." *Westinghouse Broadcasting Co., v. Dial Media, Inc.,* 410 A.2d 986, 991 (R.I.1980). In the case at bar, there is no ambiguity as to who the parties to the contract are. Consequently, **Dunn's** claims against the **Shannons** based on the allegations that he did not receive what he bargained for when he purchased the receivership estate from Delaney, must be dismissed. It is clear that the Plaintiff would not be entitled to relief from the **Shannons** under any set of facts that could be proven in support of **Dunn's** claim because the **Shannons** were not party to Offer.

*Norfolk is Entitled to Judgment as a Matter of Law*

**Dunn's** claims against Norfolk fail for lack of standing. However, in the name of judicial efficiency, this Court will address the merits of **Dunn's** claims so that they do not have to be re-litigated at a later time. The following facts are undisputed. Norfolk is a Massachusetts insurance company authorized to transact business in Massachusetts and Rhode Island. Norfolk adheres to the American Agency System whereby the customers of the agency, in this case the East Bay or the **Shannon** Agency, belong to the agency and not the insurance company. Under this system the insurance agent is not an employee of the Norfolk, but rather operates as an independent businessman soliciting business on its own behalf.

*9 In 1991, Ann was assigned to Norfolk by Commonwealth Automobile Reinsurers (CAR). CAR is an unincorporated association of insurance carriers that is responsible for carrying out the mandate of a Massachusetts statute that provides access to car insurance to applicants who have been unable to obtain insurance through the method by which car insurance is voluntarily made available. Mass.G.L. c. 175 § 113H(A). Under this statutory framework, Norfolk was appointed a "Servicing Carrier" and Ann was assigned to Norfolk as an " Exclusive Representative Producer." Norfolk provided Ann a producer code upon her appointment by CAR. This lasted until July 2001, when Ann obtained an agency contract with Premier Insurance. Consequently, her assignment to Norfolk was terminated.

**Dunn** does not dispute knowing about the arrangement between Norfolk and the **Shannons**. He also agrees that the policies that Ann wrote pursuant to CAR were her property. Finally, **Dunn** agrees that Ann had the right to solicit insureds and that the insureds had the sole right to choose its agents, which supports Norfolk's position that it did nothing wrong when it acknowledged the broker of record letters.

Rather, **Dunn** alleges that Norfolk had "direct involvement" with the **Shannons** because it advanced them $25,000 to move their office. **Dunn** also claims that Norfolk enabled the **Shannons** to effect a "wholesale transfer of assets from East Bay to the **Shannon** Agency." Finally, **Dunn** states that since Norfolk knew of the acrimonious relationship between **Dunn** and the **Shannons**, Norfolk had an obligation of "due diligence." Viewing these allegations and attached exhibits in a light most favorable to **Dunn**, they do not show how Norfolk can be held liable to **Dunn**.

**Dunn** submits no law, and his legal brief mentions no theory, upon which Norfolk owes **Dunn** a duty. **Dunn** does not explain how Norfolk acted wrongly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in paying commissions to the **Shannon** Agency or Ann for policies written pursuant to CAR. Furthermore, **Dunn** has not demonstrated how any of Norfolk's activities give rise to a legal claim. In sum, **Dunn** does no more than reassert the bald allegations of his complaint. This is insufficient to withstand a motion for summary judgment. *Grande v. Almac's Inc.*, 623 A.2d 971, 971 (R.I.1993).

Confoundedly, **Dunn** himself states that, "the issue really is whether [the expiration dates] are the assets of the **Shannons** or of East Bay." This question does not implicate Norfolk in any way. In fact, it supports granting summary judgment as to Norfolk because if it is unclear who owned the policies, then surely Norfolk did not act maliciously in writing commission checks to the **Shannon** Agency.

*Conlusions*

Based on the evidence submitted to the Court and the reasons stated herein, the Defendants' motions for summary judgment and dismissal for failure to state a claim are granted. **Dunn's** complaint alleges a corporate injury to East Bay, not to himself individually. The complaint does not comply with the requirements of Rule 23.1 regarding shareholder derivative suits and, therefore, the complaint must be dismissed as a matter of law. The breach of contract claim fails for lack of contractual privity with the Defendants. Lastly, the claims against Norfolk fail because **Dunn** has not demonstrated that there are material issues of fact or that Norfolk is not entitled to judgment as a matter of law. Order to enter consistent with the holdings herein.

R.I.Super.,2005.
Dunn v. Shannon
Not Reported in A.2d, 2005 WL 1125315 (R.I.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.