A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CA NO 01-066-ML

CERTIFIED POWER SYSTEMS, INC.

vs.

RHODE ISLAND STATE ENERGY STATUTORY TRUST 2000, FPLE RHODE ISLAND STATE ENERGY GP, INC.

vs.

CERTIFIED POWER SYSTEMS, INC.

vs.

ZAMPELL REFRACTORIES, INC.

DEPOSITION OF MICHAEL COONEY, P.E., Senior Metallurgical Engineer, Thielsch Engineering, EXPERT WITNESS in the above-entitled cause, taken on behalf of the Plaintiff, CPS, pursuant to notice, before Patricia A. Quirk, A Notary Public in and for the State of Rhode Island, at the offices of ASQUITH & MAHONEY, 155 South Main Street, Providence, Rhode Island, on July 12, 2006 AT 10:30 a.m.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RHODE ISLAND 02915
(401) 437-3366



PRESENT:

FOR THE PLAINTIFF........**TRESSLER, SODERSTROM,**
(CPS & Counterclaim) **MALONEY & PRIESS**
BY: MARK R. VESPOLE, ESQUIRE

FOR THE DEFENDANT........**ASQUITH & MAHONEY**
(Zampell) BY: JOHN R. MAHONEY, ESQUIRE

FOR THE DEFENDANT.......**EDWARDS ANGELL PALMER**
(FPL) **& DODGE**
BY: MARK W. FREEL, ESQUIRE

FOR THE DEFENDANT.......**MECKLER BULGER &**
(Sargent & Lundy) **TILSON**
BY: GEORGENE M. WILSON, ESQUIRE

COPY



I N D E X


WITNESS
Page

MICHAEL COONEY, P.E.

EXAMINATION BY Mr. Vespole 04
EXAMINATION BY Mr. Mahoney 80


E X H I B I T S

**COONEY**


NO. DESCRIPTION Page

01 Photocopy of photograph...........59

02 Photocopy of photograph...........70


REPORTER'S NOTE:
(EXHIBITS INCLUDED WITH ORIGINAL TRANSCRIPT)



(DEPOSITION COMMENCED AT 10:36 a.m.)

MICHAEL COONEY

Being duly sworn, deposes and testifies as follows:

EXAMINATION BY MR. VESPOLE

Q. Good morning, Mr. Cooney, my name is Mark Vespole, and I'm an attorney representing a company called Certified Power Systems, which is a party to a case pending in the United States District Court here in Rhode Island, and today's proceeding is a part of that case, and you've been named as one of the experts on behalf of Florida Power and Light, or the Florida Power and Light entities, such as they are. And have you ever given a deposition before?

**A. Yes, I have.**

Q. On how many other occasions?

**A. Three other occasions.**

Q. Were those in a similar context to what you are doing here today as an expert witness in a case for which you did some investigation and gave an opinion to a lawyer?

**A. Yes, they were.**

Q. All right, I'm going to give you the Readers Digest version of the ground rules because you are probably a little bit familiar. One is if you

don't understand my question, tell me, and I'll repeat it so that you do. That's usually pretty easy, but sometimes I'm shocked. If you don't understand my question, please tell me; if you don't, we'll assume you understood it and the answer you gave was accurate and responsive. But you and I shouldn't talk at the same time because that creates havoc for the court reporter. So, if you would withhold your answer, even though you know what my question is, give me a chance to put out my entire question. Because this is kind of an informal setting, there's a tendency for us to have a conversation, which would be fine, but the court reporter doesn't get a complete question and answer, and I will try not to step on your answer with my next question as well.

Should anybody object to any of my questions, they will state an objection, and you should withhold your answer so the objection can be articulated, and in all likelihood you'll be able to continue your answer after the objection has been stated. As you know, when this is all finished, the court reporter makes a booklet, which is a verbatim record of everything said today, we



call it a transcript of your sworn testimony here today, the purpose of which would be to compare your testimony here today with testimony that you could conceivably give in the future on this case or maybe something that you said about this case in the past, and we could use any inconsistencies between your sworn testimony here today and any other time that you gave opinions or statements about this case to ask a judge or jury to disbelieve you on a particular issue or the entirety of your testimony. Do you understand that?

**A. Yes, I do.**

Q. And also all your answers have to be verbal. There can't be any gestures, nods of the head or anything else that we sometimes do in lieu of making a verbal answer. Do you have any questions before we get started?

**A. No, I do not.**

Q. I know you graduated from that wonderful institution in the Midwest in 1989, University of Notre Dame, was that in civil engineering?

**A. No, metallurgical engineering.**

Q. I don't think they had that in the '70s. Anyway,



all right, did you have any education beyond your degree at Notre Dame?

**A. No, I didn't.**

Q. Could you tell me what your work experience is starting with your current job?

**A. I currently work with Thielsch Engineering in Cranston, Rhode Island, and I'm a senior metallurgical engineer with Thielsch Engineering. I've been with Thielsch since December of 1998. Prior to that I worked for Union Camp Pulp and Paper Corporation out of Lawrenceville, New Jersey. I worked there from May of 1998 until November of 1998, and I was a corrosion engineer in the research division of Union Camp Pulp and Paper. Prior to that I worked for Hoffmann, H-O-F-F-M-A-N-N, and Feige, F-E-I-G-E, in Brewster, New York, as a metallurgical engineer performing failure investigations, and I worked for them from August of 1989 until May of 1998. I'm sorry, that was my first job after graduating from Notre Dame.**

Q. Okay. So you had basically three jobs?

**A. Correct.**

Q. What was the business of Hoffmann and Feige?

**A. We performed metallurgical failure**



**investigations.**

Q. For whom typically?

**A. Predominantly the gas industry, the real estate industry. We did a lot of work for commercial buildings, for examining building service piping and mechanical systems associated with building systems from a metallurgical viewpoint.**

Q. And you said failure investigations, would that be failures in piping and related equipment?

**A. Predominantly metallurgical, piping, cooling water systems, pumps, tanks.**

Q. Failure, the word failure in engineering means a lot of different things. When you use the word failure in the context of, let's take your job at Hoffmann and Feige, what did that entail?

**A. It wasn't always failures, sometimes condition assessment, evaluation of a system in which metals were used. It could be a failure investigation or condition assessment to determine the current condition, life extension studies as well as failure investigations. A failure could be something that was broken or not working properly, we determine the reason for that failure and issue**

**Thielsch is examination of a component that is sent into our laboratory. We coordinate the testing regime that the component has to go through. We supervise the technicians doing the work, whether it's in house or whether we have to outsource it, and prepare a professional report presenting our findings and opinion on the issue.**
Q. Is there a certain percentage of your work related to litigation in a sense that you are hired by a law firm to give an expert opinion as opposed to just doing the investigation and perhaps getting involved in litigation or not?
**A. Me personally?**
Q. Yes.
**A. Yes.**
Q. And why don't you explain that for me?
**A. What percent?**
Q. Yes, what percent of your time is spent working specifically with litigation?
**A. Approximately ten percent for me personally.**
Q. How about for the firm as a whole?
**A. For our department, because our professional engineering department is the only department that does expert testimony and litigation work,**



**approximately 25 percent.**
Q. And the rest is engagements where you are hired by clients to do condition assessments or failure analysis?
**A. Sometimes they develop into litigation after the fact.**
Q. That's not initially why you are hired?
**A. Correct.**
Q. From your standpoint anyhow?
**A. Correct.**
Q. What are the other departments at Thielsch?
**A. We have a field service engineering division. They do work primarily in the utility industry and pulp and paper chemical processing industries. They do condition assessments, life-extension studies on various components associated with those industries. We have an environmental testing laboratory, biological testing, metallurgical laboratory, and that's -- they are all related to Thielsch. And we have other divisions that do separate functions from Thielsch Engineering, RISE Engineering is one of them, the largest department that does contract work, energy management audits.**
Q. Prior to this matter, which I guess you became



involved in in December of 2004, had you ever done any work for Thielsch or anyone else in which Florida Power and Light was involved?
**A. I have not.**
Q. Did the firm, as far as you know?
**A. The firm had done work for Florida Power and Light.**
Q. What's your understanding of what that work was, if any?
**A. I know we did several failure investigations of various components. I had no particular knowledge of the specifics of any of those investigations or projects.**
Q. How many people in the metallurgical engineering group, if that's a category that you use or not?
**A. In the professional engineering division?**
Q. Okay.
**A. We have metallurgical and mechanical engineers in our division.**
Q. So why don't you tell me about the whole division, how many engineers?
**A. We currently have four engineers, three would be metallurgical engineers, and one mechanical engineer.**



Q. And the mechanical engineer is Aaron Nalbandian, N-A-L-B-A-N-D-I-A-N, and you are one of the metallurgists, and I assume Florence Cone is as well.
**A. Yes.**
Q. In your -- well, strike that. Are you a member of any professional organizations?
**A. Yes, I am.**
Q. Which ones?
**A. The National Association of Corrosion Engineers, NASE; ASME, American Society for Mechanical Engineers, and the American Welding Society.**
Q. Do you have any professional designations?
**A. I'm a professional engineer.**
Q. In which states?
**A. In the State of Connecticut.**
Q. When did you obtain that designation?
**A. I took the examination in October of 2005.**
Q. Is that the first time that you have been a professional engineer?
**A. Yes.**
Q. Just out of curiosity, why Connecticut?
**A. It was the closest state that gave it in my --**

17

**metallurgical engineering.**
Q. Rhode Island does not have a designation for metallurgical engineers?
**A. Yes.**
Q. General PE in Rhode Island, mechanical, civil, or structural?
**A. In Rhode Island they do have specific PE's for each discipline.**
Q. But not metallurgy?
**A. But not metallurgy.**
Q. Had you ever applied to become a PE, other than your application in Connecticut in 2005?
**A. No, I had not.**
Q. The three cases in which you have given depositions, are those the three cases, I guess, attached to your curriculum vitae, Dartmouth College, Caldwell Tanks, and National Fire Insurance?
**A. Yes.**
Q. I'm going to speak to you about what was the Dartmouth College case about?
**A. It involved stainless steel, specifically Type 316 stainless steel duct work used to vent chemical fumes from a laboratory, chemistry laboratory at**

18

**Dartmouth College. The duct work had failed prematurely as evidenced by leakage through joint locations in the duct work and determined to be faulty welds.**
Q. What exactly did you do in that case?
**A. We obtained two sections of stainless steel duct work which had exhibited evidence of leakage and performed metallurgical evaluations in our laboratory to determine the cause of the leakage for this stainless steel.**
Q. And did you write a report in that case?
**A. Yes, I did.**
Q. Your opinion was what?
**A. That the welds that were used to seal the stainless steel duct work, the pieces together, were not properly made, and they had cracks in them from an original installation which compromised the integrity of them and allowed leakage of fluids out of the duct work.**
Q. What kind of welds were those?
**A. They were fillet welds.**
Q. Were they structural?
**A. No.**
Q. They were just --

19

**A. No, sealed welds.**
Q. What was the problem with the welds, was it the way they were done, the rod or the mixture?
**A. The way in which they were done. It was lack of fusion.**
Q. Lack of fusion with the stainless steel duct?
**A. Correct. The weld did not properly fuse to the stainless steel duct work.**
Q. How did you do that, by destructive testing?
**A. Yes.**
Q. Which showed lack of fusion, I assume. What kind of analysis did you do to determine the absence of fusion?
**A. We used visual examination under a low-powered optical microscope, termed a stereoscope, to look at the areas of interest at magnification of 10 to 40X. Then we subsequently sectioned the areas of interest and mounted them to look at them at higher magnification under an optical microscope, to look at the structure of the metal associated with the areas of the welds on the duct work.**
Q. In your experience, welds like that, is that because not enough heat is applied or just improper welding technique?

20

MR. FREEL: Objection. You may answer.
**A. In this instance we didn't determine the cause of why.**
Q. Just that they had, and that was the end of it?
**A. Correct.**
Q. And that eventually became a lawsuit?
**A. Yes, it did.**
Q. You testified at a deposition?
**A. Yes.**
Q. Do you know what the outcome of the case was?
**A. I know they settled, but I don't know the outcome.**
Q. And were you testifying on behalf of Dartmouth College against the welding contractor?
**A. Yes.**
Q. Were there any other Defendants in the case besides the welding contractor that you can recall?
**A. There was one other Defendant. I don't recall their involvement, what their involvement was.**
Q. Was the opinion you gave in that case strictly with regard to the quality of the welding?
**A. To determine the cause of the failure.**
Q. But did it impact any other party to the case,

21

other than the welder in terms of any other contractor or --
**A. There was one other contractor involved, yes.**
Q. Was that a general contractor?
**A. I believe so. It was a very small case. I had no involvement with them up until the time of the deposition. I don't recall the name of the companies or their exact involvement.**
Q. Tell me about the Caldwell Tanks case, same explanation, roughly what you did in that case?
**A. We were hired to determine whether mill scale was present on the plate used to fabricate a water tank. Caldwell Tank was the manufacturer and the fabricator of the tank.**
Q. Okay, continue.
**A. I personally made a site visit to the location of the tank in Buzzards Bay, Massachusetts to examine the condition on-site, and I selected samples to be removed to be brought back into our laboratory to be examined for the presence of mill scale, and we determined there was mill scale on the surface of the tank.**
Q. On the --
**A. On the plate steel used to fabricate the tank.**

22

Q. And what was the problem that that caused?
**A. There was an issue of adherence of paint subsequently applied to the tank. The specification pertinent to the project had a specific surface quality that was required to allow proper adhesion of the paint to the steel substrate, so the owner of the tank, their inspectors were rejecting the tank based upon the presence of mill scale, and we were hired by Caldwell Tanks to render our opinion on whether or not there was mill scale, and we determined there was mill scale on the tanks.**
Q. Did that ripen into litigation at some point?
**A. Yes.**
Q. You gave a deposition in the case?
**A. Yes.**
Q. Did you do a written report?
**A. Yes.**
Q. And your report was critical of the tank manufacturer, I assume?
**A. Yes, it pointed out that there was mill scale, so, yes, I said the quality of the plate steel was not -- we were asked to render an opinion. Was there or was there not mill scale, not whether or**

23

**not that the condition of the mill scale was acceptable to any code or standard, and we determined there was mill scale left on the tank.**
Q. Was there any other parties to that case except Caldwell Tank and the manufacturer?
**A. Yes.**
Q. Who was that?
**A. The paint manufacturer, KTA Tator, I believe.**
Q. Did you or anyone else at Thielsch give an opinion relative to the paint manufacturer?
**A. No.**
Q. The last case on your list here, National Fire Insurance versus PPG, what was your involvement in that?
**A. That case is still pending. I gave my deposition this year in that case. It involved a fire and explosion in a chemical storage room, specifically calcium hypochlorite was being stored at a warehouse for a pool supplies distributor. We were asked to provide the -- to determine the origin of the fire, not the cause and origin, whether or not the fire started in a particular location in the storage room.**
Q. And what was your opinion in that case?

24

**A. We determined that there was not enough evidence to give an opinion one way or another where the fire had started.**
Q. Were you involved in that case by yourself or did you have somebody else from Thielsch involved?
**A. By myself.**
Q. And you were hired by whom in that case?
**A. By Namco, by their attorneys, Clausen Miller.**
Q. Namco is a -- what kind of company?
**A. Pool supplies retailer.**
Q. Was that the distributor?
**A. Yes.**
Q. What was the purpose of, as far as you understand it, for determining the origin or the location of the fire?
**A. The product, the calcium hypochlorite was reacting, and in the process of being disposed of by a contractor at the time of the fire and explosion, was being placed into 55-gallon steel drums, and there was other product outside the drums in pallets and packaged in plastic packaging surrounded by cardboard. We were hired to determine whether or not the fire specifically started inside the steel drums or outside the steel**

**drums by examining the steel drums that were associated with the incident.**

**Q.** Okay. Is there a reason why, in your eight or so years at Thielsch, that you only became involved in litigation in the last couple of years?

**A. No, I've been involved in other ones, but just have not been deposed.**

**Q.** In the eight years at Thielsch, how many cases would you estimate you've rendered written reports or opinions in matters that were in litigation, approximately?

**A. Approximately 25.**

**Q.** Three per year, roughly?

**A. Yes.**

**Q.** When you worked for Hoffmann and Feige, did any of your failure investigation or condition assessment involve fires or explosions?

**A. No.**

**Q.** How about your work at Union Camp, did any of that involve fires or explosions?

**A. No.**

**Q.** How many of your cases at Thielsch, other than the Namco case, involved fires or explosions?

**A. Two others that I can recall.**



**Q.** Were those fires or explosions? Sometimes they are I guess --

**A. Both cases involved both fires and explosions.**

**Q.** Fires resulting from explosions?

**A. Yes.**

**Q.** Were those chemical explosions or gas line explosions?

**A. No.**

**Q.** What kind of explosions?

**A. One involved a -- it was a reactor at a chemical processing plant. That was a rubber-lined steel vessel used to react acids, and it was -- the repair was being done on the steel, welding repairs by a contractor, and there was a fire and explosion that occurred during that repair of the front in which the rubber in the vessel burned and a subsequent explosion occurred.**

**Q.** Okay, and the other case?

**A. It involved -- it was another chemical processing plant. It was a reaction. It was a problem with the reaction in which there was an explosion in a reactor vessel and subsequent fire after the explosion.**

**Q.** Do you consider yourself an expert with regard to



the cause and origin of the fires?

**A. Yes.**

**Q.** Are you giving an opinion in this case with regard to the cause and origin of the fire at the RISEC plant?

**A. Yes.**

**Q.** You are. Okay. Do you consider yourself an expert in welding?

**A. No, not in all of welding aspects, interpretation of microstructures associated with welding and determining defective conditions based upon examination of a weld, but, yes, not in terms of a, for lack of at better term, proper welding practices and standards.**

**Q.** To your knowledge, are you giving opinions in this case with regard to welding, expert opinions?

**A. No, I am not.**

**Q.** That would be Bob Basile and/or Florence Cone?

**A. Florence Cone, I believe, is rendering an opinion on that.**

MR. FREEL: I think he is giving opinions about metallurgical analysis, as reflected in this report, as it may relate to the welding issues, but not the welding practices themselves.



I want to make that clear.

MR. VESPOLE: That's fine.

**Q.** How is it that you became involved in this matter, the December 3, 2004 fire at the Florida Power and Light power plant in Johnston, Rhode Island?

**A. Bob Basile, who was an engineer in Thielsch's professional engineering division at the time, was assigned the project, and he asked me to come along with him to assist him in performing the cause and origin and also carrying through the metallurgical evaluation of any samples that may have been selected as part of an evidence associated with the failure. I made my first visit on December 8th of 2004 to the Florida Power and Light site in Johnston, Rhode Island to investigate the incident which occurred on December 3rd, 2004 in unit CT 101.**

**Q.** How long had Bob Basile been at Thielsch, as far as you know?

**A. At the time of the investigation?**

**Q.** Right.

**A. Approximately two-and-a-half years.**

**Q.** Had you worked with him before?

**A. Yes, I had.**

**drums by examining the steel drums that were associated with the incident.**

Q. Okay. Is there a reason why, in your eight or so years at Thielsch, that you only became involved in litigation in the last couple of years?

A. **No, I've been involved in other ones, but just have not been deposed.**

Q. In the eight years at Thielsch, how many cases would you estimate you've rendered written reports or opinions in matters that were in litigation, approximately?

A. **Approximately 25.**

Q. Three per year, roughly?

A. **Yes.**

Q. When you worked for Hoffmann and Feige, did any of your failure investigation or condition assessment involve fires or explosions?

A. **No.**

Q. How about your work at Union Camp, did any of that involve fires or explosions?

A. **No.**

Q. How many of your cases at Thielsch, other than the Namco case, involved fires or explosions?

A. **Two others that I can recall.**



Q. Were those fires or explosions? Sometimes they are I guess --

A. **Both cases involved both fires and explosions.**

Q. Fires resulting from explosions?

A. **Yes.**

Q. Were those chemical explosions or gas line explosions?

A. **No.**

Q. What kind of explosions?

A. **One involved a -- it was a reactor at a chemical processing plant. That was a rubber-lined steel vessel used to react acids, and it was -- the repair was being done on the steel, welding repairs by a contractor, and there was a fire and explosion that occurred during that repair of the front in which the rubber in the vessel burned and a subsequent explosion occurred.**

Q. Okay, and the other case?

A. **It involved -- it was another chemical processing plant. It was a reaction. It was a problem with the reaction in which there was an explosion in a reactor vessel and subsequent fire after the explosion.**

Q. Do you consider yourself an expert with regard to



the cause and origin of the fires?

A. **Yes.**

Q. Are you giving an opinion in this case with regard to the cause and origin of the fire at the RISEC plant?

A. **Yes.**

Q. You are. Okay. Do you consider yourself an expert in welding?

A. **No, not in all of welding aspects, interpretation of microstructures associated with welding and determining defective conditions based upon examination of a weld, but, yes, not in terms of a, for lack of at better term, proper welding practices and standards.**

Q. To your knowledge, are you giving opinions in this case with regard to welding, expert opinions?

A. **No, I am not.**

Q. That would be Bob Basile and/or Florence Cone?

A. **Florence Cone, I believe, is rendering an opinion on that.**

MR. FREEL: I think he is giving opinions about metallurgical analysis, as reflected in this report, as it may relate to the welding issues, but not the welding practices themselves.



I want to make that clear.

MR. VESPOLE: That's fine.

Q. How is it that you became involved in this matter, the December 3, 2004 fire at the Florida Power and Light power plant in Johnston, Rhode Island?

A. **Bob Basile, who was an engineer in Thielsch's professional engineering division at the time, was assigned the project, and he asked me to come along with him to assist him in performing the cause and origin and also carrying through the metallurgical evaluation of any samples that may have been selected as part of an evidence associated with the failure. I made my first visit on December 8th of 2004 to the Florida Power and Light site in Johnston, Rhode Island to investigate the incident which occurred on December 3rd, 2004 in unit CT 101.**

Q. How long had Bob Basile been at Thielsch, as far as you know?

A. **At the time of the investigation?**

Q. Right.

A. **Approximately two-and-a-half years.**

Q. Had you worked with him before?

A. **Yes, I had.**

33

been consumed during the fire and/or cleaned up, some clean up had been done prior to our initial visit. We went into unit CT 102 to observe the condition of the cooling media in that unit, and physically saw the cooling media was stacked in panels two high, each five feet in height, and the top-most panel, you could physically see it extended to the top of the stainless steel channel right where CT -- where C3 would have been located, and there was a stainless steel cap, header cap, that was clamped onto the media at that location. We measured from the, what would have been the -- there was a clamp that connected the top edge, top edge of the bottom section of the cooling media and the bottom edge of the top section, a horizontal clamp that joined them together for stability, and we measured from approximately the center location of that clamp, it was approximately four inches wide, up 60 inches because the panels were indicated to have been five feet in height, and 60 inches from that point, which would have been the bottom of the top panel of the cooling media, extended two inches above the top of the stainless steel channel. So that indicated to us that the

34

cooling media would have extended above the stainless steel channel, which would mean you would have had only the stainless steel outer wall between, between the cooling media. It had no additional barrier between the outer stainless wall and the cooling media. It was just a stainless steel wall, and the cooling media would have been immediately adjacent to it.

Q. Did you actually observe, in the CT 2 unit, that the media ran above the channel?

A. No, we could not get the header portion of -- the module could not be disassembled when we were there. We did not physically see the media above it because this header material covers the cooling media in the portion that extends above the channel.

Q. Did you measure the evaporative cooler sections?

A. What dimensions?

Q. The height.

A. We measured where the -- we measured the height of the -- the cooling media itself?

Q. Right.

A. There was no sections removed. We couldn't physically remove any -- we measured in place. We

35

measured from what would have been the bottom of the top section of the evaporative cooler media, of the cell deck, 60 inches up. There were reported to have been five-foot high panels to determine how far it would have extended. The cooling media clearly extended to the very top of the channel. You could physically see that. You could physically see that the cooling media came up to the very top. At that point, the very top of the stainless steel channel section, the cooling media came up to the top of. At that point, the header material, the header cap, the bottom edge of that, it's a -- more stainless steel metal that's formed over, it start rights at the top of that stainless steel channel. So, clearly the evaporative cooler media extended up to the very top of the C channel. Beyond that the evaporative cooler media was covered by the header cap. We couldn't physically see the evaporative cooler media above that.

Q. Does it run above?

A. It runs all the way to the top of that module another nine inches.

Q. You lost me.

A. There are three levels.

36

Q. Right.

A. Okay, there.

Q. To the floors?

A. Right.

Q. I'm talking about C1, C2 and C3, that was the lower level, right?

A. Yes.

Q. That's the one where you made the observation -- strike that. Where did you make the observations in the CT 2 that you were referring where you saw the header cap?

A. On the bottom level.

Q. Did the header cap at that location sit above the plane of the top of the channel or was it right at the top?

A. It started right at the plane of the channel and then extended above it nine inches.

Q. It's nine inches high?

A. Yes.

Q. What's the purpose of the header cap, as far as you know?

A. I'm not an expert on the manufacturing and fabricating of evaporative cooling sections, but I believe it to be to encase -- it was a header pipe

portion would be the same thickness as the flange?
A. **On CT 102.**
Q. CT 2?
A. **Yes.**
Q. You couldn't see the thickness of the back portion?
A. **Correct.**
Q. And what did you do -- is it fair to say that you were only at the Johnston plant on two occasions, December 8th and December 10th, or were you there more than that?
A. **No, I went back a third time approximately two weeks ago.**
Q. What did you see two weeks ago?
A. **To reconfirm my physical observations from December 8th of 2004, I performed a visual examination on both CT 101 and CT 102.**
MR. FREEL: It was June 29th for the record.
MR. VESPOLE: That was the day that Florence Cone and Mr. Dusenberry went?
MR. FREEL: Correct. I got to stay up late again.
Q. So, when you went on December 10th, if I'm clear, that had nothing to do with the cause and origin of



the fire. That was related to the structural investigation of the framing members of the plenum?
A. **Yes.**
Q. At some point in time, you did some work back at your lab relative to the weld samples, CT 1, 2 and 3?
A. **Yes.**
Q. Who cut out those samples?
A. **FP and L personnel, I believe. Jonathan Bain was one, there was more than one person that did it, Jonathan Bain was one of them.**
Q. And did he cut out what you directed him to cut out?
A. **Yes.**
Q. Was it Jonathan Bain who removed the channels, which you could see the stainless steel behind it in CT 1?
A. **Yes, he was one of the persons.**
Q. You don't remember anybody else?
A. **There was somebody else, and I don't remember his name.**
Q. Was Walt Smith one of the people who was involved with you in your meetings or inspections?
A. **I don't recall.**



Q. By the way, did Pete Holzapfel accompany you on your inspections as well?
A. **For a portion.**
Q. Was Jonathan Bain there for the entire inspection on December 8th?
A. **He wasn't at the unit the whole time, no.**
Q. Were the weld samples taken on December 8th?
A. **Yes.**
Q. Why did you choose those three particular weld samples?
A. **Based upon our physical observations of the heat tint on the outside surface of the stainless steel wall, and we physically -- and the presence of a combustible material being on the other side, the evaporative cooler media, and we physically saw what we believed to be at the time burn through due to those, the welds, the clip welds, on the stainless steel portion of the 101 unit.**
Q. When you met with the Florida Power and Light folks before you made your physical inspection, had they told you any of their opinions with regard to where the fire started?
A. **I don't recall them.**
Q. What is burn through?



A. **In welding, especially in a fillet weld, it's when the weld metal burns through the metal on which you are not supposed to have significant penetration into. Actually, I started with describing a fillet weld, a fillet weld is when the weld metal is only occupying the thickness of one of the metals that you are joining. It's typically done as a lap weld in which one piece of metal is resting on top of another piece of metal, and you are only welding to fill the thickness of one of the parent metals. On burn through, you are actually penetrating through the other metal to the backside of that piece of metal.**
Q. By parent metal you mean base metal?
A. **Correct.**
Q. So it's your understanding, in a properly-performed fillet weld, the back of the base metal should not become molten?
A. **Correct.**
Q. And does that opinion depend upon the thickness of the base metal?
A. **No, you should not burn through it. You should adjust your welding parameters based upon the thickness of the metals you are welding.**

Q. Any other parameters you need to consider to adjust the welding machine, the setting on the welding machine, besides the thickness of the base metal?
A. **Yes.**
Q. It depends on what welding wire you are using, I assume?
A. **Yes, the thickness of the welding wire, the speed at which you are welding.**
Q. Do you know the thickness of the welding wire that was used here?
A. **No, I don't recall.**
Q. Does burn through affect or have an impact upon the structural integrity of a weld?
A. **It can.**
Q. How?
A. **Well, if you are burning into a base metal that you don't want to, you can create weld defects in that base metal that you don't want to.**
Q. So, when you brought C1, C2 and C3 samples back to your lab, what did you do to test them?
A. **Our report, in which describes the entire process that it went through, you physically visually examine them under a stereoscope, took photographic -- provided photographic documentation**



**of all the conditions we observed, performed optical microscopy to determine the microstructural condition of the weld associated with C1, C2 and C3. We also took a section out of the channel to determine, at the location adjacent to C2, to determine if there was any evidence of excessive heat exposure to the channel at the C2 location.**
Q. Was there?
A. **No, there was no change in the microstructure to indicate that there was any effect on the C channel due to the welding.**
Q. And what was -- what conclusions did you reach based upon the results of your optical microscopy?
A. **It's described in our report.**
Q. You can tell me.
MR. FREEL: Go ahead.
A. **That at the location, C3, there was burn through on all the stainless -- the clip locations C1, C2, C3, and at location C3 there was burn through where the stainless steel channel would not have extended beyond and would have allowed the effects of the welding to contact the flammable material, evaporative cooler media, which is in close proximity to the -- extremely close proximity**



**to the welding, the effects of the welding process, and the burn through, which caused heat to penetrate through the entire thickness of the stainless steel wall, was a condition where you had a source of ignition, you let a source of ignition to come in extremely close proximity to a flammable material; namely, the evaporative cooler media, the cell deck.**
(RECESS TAKEN AT 12:00 p.m.)
(COONEY EXHIBIT 1 MARKED)
Q. Mr. Cooney, I'm going to put an exhibit in front of you we've marked as Cooney 1. It also has the designation of FPL002839 on it. Can you tell me what that is?
A. **That is a higher magnification representation of Figure 53 from Thielsch Engineering report 11346.**
Q. Mr. Freel produced for us yesterday a similar exhibit that has a different Bates Stamp Number FPL002840. It's my understanding from my conversation off the record that actually these two, 2839 and 2840 Bates stamps show the same thing?
A. **Yes, they do.**



Q. Why don't you look at Cooney 1, and I'll look at the other one. Why don't you tell me what it is that this particular enhancement of the Figure 53 depicts?
A. **Okay, the bottom horizontal white strip represents the stainless steel plenum wall for the Unit CT 101, and in the, approximately the center you see a different, a metal that has a different structure than the on the ends of that white strip, that center area that has a different structure represents weld metal that has burned through the stainless steel plenum wall to the inside surface and actually extended approximately 35 thousands of an inch beyond the inside surface of the stainless steel plenum wall.**
Q. As a layperson looking at this photograph, it looks like the grain of the photograph on the right, far right and far left, is different from the grain of that kind of irregular surface in the middle of the photograph?
A. **Yes, at this magnification you couldn't see the size of the grains relative to each other, so the weld metal, which is in the center of the photograph, has a courser or larger grain structure**

**don't have an opinion.**

Q. Do you have an opinion as to whether or not, if the weld at C3, as depicted in Cooney 1, was done without burn through, the evaporative cooling media would have been ignited?

**A. If there wasn't burn through, you would have -- if it hadn't completely burned through, it depends on the depth of the penetration, you may have had too deep of a penetration, and you still could have caused the fire in that location, because the temperature can, if the evaporative cooler media was directly in contact with that, the temperature could have reached above 350 in the metal, and we would not have seen any evidence of it in the actual structure of the metal. You could have heat-affected zones, you have temperature exposure where there's no change in the structure of the metal, and there's no way for us to tell, and below a certain temperature you are not going to get any change in the structure of the metal, but it would be above 350 degrees, which is the ignition temperature of the cell deck.**

Q. Well, do you know if the backside of the stainless steel portion of the plenum would get more than 350



degrees if a weld was done properly?

**A. If a weld was done properly, it would not.**

Q. The backside would have not have gotten to more than 350 degrees?

**A. It should not have, no.**

Q. And you are saying that as your expert opinion in this case?

**A. I haven't done an analysis to calculate that. It should not have.**

Q. At Mr. Nalbandian's deposition he testified that the evaporative cooling media was in close proximity to the backside of the C3 weld, would you agree with that?

**A. Yes, I would.**

Q. He went on to say he couldn't say exactly where it was, whether it was immediately adjacent to, below it or to the side of it, he wasn't sure of that but he just knew it was in close enough proximity that the burn through may have caused the fire. Do you know, with any greater specificity, where the evaporative cooling media was relative to the C3 weld?

MR. FREEL: Objection to the form.

You can answer.



**A. Height wise I know that the cooling media extended up to the top of the C channel, so at a minimum, that the evaporative cooler media, the very top of the evaporative cooler media would have been immediately adjacent to the very bottom weld associated with C3, right there because we could not see in back of the -- beyond the cap, the header cap, as to how far up the evaporative cooler media extended, but based upon the information of the size of the panels and dimensional measurements as to how far that would have extended, it indicated it would have extended even beyond that, but at a minimum, the evaporative cooler media, we physically saw extended to the very top of the C channel, we could see that.**

Q. If the evaporative cooling media just extended to the top of the C cap, in your opinion, would the conditions shown in Cooney 1 from the C3 weld have caused ignition of the evaporative cooling media?

**A. One of the welds associated with C3, yes.**

Q. That's your expert opinion in this case?

**A. Yes.**

Q. Can you tell me what you reviewed before coming to your deposition here today?



**A. I reviewed Thielsch Engineering report 11346, the drawing, Exhibit B, and photographs which I took on June 29, 2006 at FP and L.**

Q. May I see those photographs?

**A. Sure, 35 millimeter, and these are several digital photographs.**

MR. FREEL: Off the record.

(OFF THE RECORD)

Q. You have a series of four sheets of two photographs, digital photographs each; is that correct, that you just handed to me from your file?

**A. Yes.**

Q. Were those taken on June 29, 2006?

**A. Yes.**

Q. Were those of CT 1 or CT 2?

**A. These are of CT 1.**

Q. The CT that was involved in the fire?

**A. Yes.**

Q. Do you know if those photographs depict -- that's the evaporative cooler section, is it not?

**A. Yes.**

Q. Do you know if those photographs depict the conditions that existed on or before the fire on December 3, 2004?

Q. Not extending above the channel?
A. **Yes.**
Q. And what would prevent you from seeing media material, if any, that extended above the channel, the header?
A. **The header, yes.**
Q. So, what mathematical calculations did you undertake to satisfy yourself that media material would have extended above the channel?
A. **We measured from the -- what would have been the bottom of the top panel of media.**
Q. Okay, if I may stop you. That would be -- there would be two panels of media material, each five feet high?
A. **Correct.**
Q. One sitting on the other?
A. **Yes.**
Q. And would there be any space in between the two?
A. **It was indicated to us, no, it would have been directly contacted.**
Q. So are you assuming the height of those two pieces, one on top of the other, would be 120 inches?
A. **Yes.**
Q. Okay, so, I'm sorry, you were explaining. Go



ahead.
A. **We measured from the middle of the bracket which joined the top and bottom panels of the cell deck, up 60 inches, which would have been the height of the top cell deck panel at the -- the outer stainless steel wall, and 60 inches extends two inches above the top of the C channel into the header.**
Q. I see.
A. **Or you could physically see that the cell deck material extended up to the top of the C channel.**
Q. All right, this was probably clear in there, but it's -- there was a portion of it I didn't follow. I'm understanding that there are two panels of media material, one on top of the other, each five feet high, correct?
A. **Correct.**
Q. And that would be 120 inches?
A. **Yes.**
Q. And you were advised that there wouldn't be space between the two panels?
A. **Correct.**
Q. And would there be some type of bracket located at the top of the first panel that would affix the two



together?
A. **It was a clamp.**
Q. You measured from the clamp, a distance of 60 inches which would be the height of the second panel?
A. **Correct.**
Q. And that 60-inch height took you above what would have been the top of the channel?
A. **Correct.**
Q. And did you indicate earlier about two inches above the channel?
A. **Yes.**
Q. I see. Just another area. You've indicated that there was evidence of burn through and that the burn through was in all three samples, C1, C2 and C3?
A. **Yes.**
Q. The burn through in C1 and C2, you do not believe had anything to do with the fire because this was adjacent to the channel itself and there was no evidence of penetration of the channel?
A. **At C2, yes. C1 it was also indicated at the time to us that the C1 weld was made several days before the incident.**



Q. That's an additional reason?
A. **Yes.**
Q. But C3 was above the channel, correct?
A. **Correct.**
Q. And when you say burn through, does that mean that hot molten material at the time of the C3 welds was actually contacting the exposed media material?
A. **Yes.**
Q. And would the temperature have been, if I read your report correctly, approximately 2,800 degrees?
A. **Yes.**
Q. And you indicated that if the welding material entered the base material, but not to the extent of causing what is referred to as a blow through, you still may have generated temperatures in excess of 350 degrees on the evaporative cooler media side?
A. **It's possible.**
Q. All right, but here's my question; if you have a weld in that situation, and if you are not an expert in this area, just let me know this, if you had a weld that the weld material entered the base material, but did not create a blow through, are you of the opinion that that would be an improper weld?