UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CERTIFIED POWER SYSTEMS, INC.,<br>Plaintiff,<br><br>vs.<br><br>RHODE ISLAND STATE ENERGY STATUTORY TRUST 2000, FPLE RHODE ISLAND STATE ENERGY, L.P. and FPLE RHODE ISLAND STATE ENERGY GP, INC.,<br>Defendants,<br><br>vs.<br><br>CERTIFIED POWER SYSTEMS, INC.,<br>Defendant on Counterclaim/<br>Third-Party Plaintiff,<br><br>vs.<br><br>ZAMPELL REFRACTORIES, INC.,<br>Third-Party Defendant,<br><br>vs.<br><br>SARGENT & LUNDY, LLC and PREMIER ENGINEERING SERVICES, INC.,<br>Fourth-Party Defendants. | : | C.A. No. 05-066-ML |

**RISE DEFENDANTS' OPPOSITION TO CERTIFIED POWER SYSTEMS, INC.'S MOTION *IN LIMINE* TO PRECLUDE THE EXPERT TESTIMONY OF ARA NALBANDIAN**

Defendants Rhode Island State Energy Statutory Trust 2000, FPLE Rhode Island State Energy, L.P., and FPLE Rhode Island State Energy GP, Inc. hereby opposes Plaintiff Certified Power Systems, Inc.'s motion in limine to preclude the expert testimony of Ara Nalbandian, and submit the accompanying memorandum of law in support of their opposition.

RHODE ISLAND STATE ENERGY
STATUTORY TRUST 2000, FPLE
RHODE ISLAND STATE ENERGY, L.P. and
FPLE RHODE ISLAND STATE ENERGY GP, INC.

By their Attorneys,

/s/ Mark W. Freel

Mark W. Freel (#4003)
Armando E. Batastini (#6016)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on the 25th day of September, 2006, I caused a true copy of the within Opposition to be served on the following counsel of record:

Girard R. Visconti, Esq.
Jessica L. Papazian-Ross, Esq.
Visconti & Boren Ltd.
55 Dorrance Street
Providence, RI 02903

Mark Robert Vespole, Esq.
Theresa E. Mullen, Esq.
Tressler, Soderstrom, Maloney & Priess
744 Broad Street, Suite 1510
Newark, NJ 07102

John R. Mahoney, Esq.
Asquith & Mahoney, LLP
155 South Main Street
Providence, RI 02903

Joseph J. Reale, Jr., Esq.
Joseph J. Reale, Jr., Ltd.
30 Kennedy Plaza, Suite 400
Providence, RI 02903

Stephen B. Lang, Esq.
Higgins, Cavanagh & Cooney, LLP
123 Dyer Street
Providence, RI 02903

Janet R. Davis, Esq.
Andrew M. Hutchison, Esq.
Georgene M. Wilson, Esq.
Meckler Bulger & Tilson, LLP
123 North Wacker Drive, Suite 1800
Chicago, IL 60606

/s/ Mark W. Freel

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CERTIFIED POWER SYSTEMS, INC.,<br>Plaintiff, | : | |
| vs. | : | C.A. No. 05-066-ML |
| RHODE ISLAND STATE ENERGY STATUTORY TRUST 2000, FPLE RHODE ISLAND STATE ENERGY, L.P. and FPLE RHODE ISLAND STATE ENERGY GP, INC.,<br>Defendants, | : | |
| vs. | : | |
| CERTIFIED POWER SYSTEMS, INC.,<br>Defendant on Counterclaim/<br>Third-Party Plaintiff, | : | |
| vs. | : | |
| ZAMPELL REFRACTORIES, INC.,<br>Third-Party Defendant, | : | |
| vs. | : | |
| SARGENT & LUNDY, LLC and PREMIER ENGINEERING SERVICES, INC.,<br>Fourth-Party Defendants. | : | |

**RISE DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR OPPOSITION TO CERTIFIED POWER SYSTEMS, INC.'S MOTION *IN LIMINE* <u>TO PRECLUDE THE EXPERT TESTIMONY OF ARA NALBANDIAN</u>**

Defendants Rhode Island State Energy Statutory Trust 2000, FPLE Rhode Island State Energy, L.P., and FPLE Rhode Island State Energy GP, Inc. (sometimes collectively, "RISE") submit this memorandum of law in support of their opposition to Plaintiff Certified Power Systems, Inc.'s ("CPS") motion <u>in</u> <u>limine</u> to preclude the expert testimony of Ara Nalbandian.

**Background**

Based upon the opinions of the many experts returned by the parties in this matter, and comments made by counsel at various times, RISE understood that it was undisputed that the subject fire on December 3, 2004 originated at the point of welding being conducted at that time by one of CPS' subcontractors. Specifically, Peter J. Schwalje, P.E., CPS's proposed expert regarding fire causation and welding procedures, opined that: "Based on the file review and equipment inspection, it is the writer's opinion that the subject fire arose as a result of the welding operation being performed on the air inlet southern wall through either contact with weld splatter or through conductive heat transfer to the evaporative cooling media." (Schwalje Expert Report at 6, attached hereto as Exh. A). Thomas W. Eager, the proposed welding expert for the welding subcontractor, Third-Party Defendant Zampell Refractories, Inc. ("Zampell"), has also conceded that the welding caused the fire:

> Q. But I take it that you acknowledge that the fire occurred at the RISE plant in Johnston on December 3rd, 2004 originated because of welding going on, on that day?
>
> A. I think that's most probable. I have not heard or read anything that suggests that there was another specific source. …. [F]rom my tests, if the media is as close as I saw it in the plenum … , then it would have ignited due to welding on the other side ….

(Eager Dep. at 28, an excerpted portion of which is attached hereto as Exh. B).

Because of the apparent lack of controversy on this point, and in order to streamline an already lengthy trial, RISE's preference would be not to present Mr. Nalbandian, of Thielsch Engineering ("Thielsch") as an expert on the cause and origin of the subject fire. Nalbandian's expert opinions are limited to the actual cause of the fire, i.e. welding, and do not address the legal cause of that fire, a subject of dispute between the parties on which RISE will present two other Thielsch experts, metallurgist Michael Cooney and welding expert Florence Cone.

Despite the evident lack of dispute on this point, CPS has nonetheless filed a motion in limine seeking to preclude the testimony of Nalbandian. CPS specifically objects to Nalbandian's opinion that welding being conducted by one of CPS' subcontractors caused the fire through ignition of the flammable evaporative cooling media ("ECM") located inside the structure. The relevant parts of that opinion are:

> The back side of clip C3 was in close proximity with the top of the evaporative cooling media. According to the incident report provided to Thielsch Engineering and a conversation with the insulation contractor, the C3 welds were performed approximately 10 to 20 minutes prior to the fire that was discovered at 9:04 a.m. on December 3, 2004.
>
> This investigation has shown that the fire that occurred in the air inlet plenum on December 3, 2004 was caused by the welding process which ignited the evaporative cooling media (which was consumed during the fire). The filter media was also burned during the fire and much of it was consumed. The visual examination of the damaged structure and components revealed that the fire had originated in the lower southeast section of the air inlet plenum where evaporative cooling media were installed and propagated from the southeast section to the north and upward to the second and third level.
>
> ****
>
> The ignition source for the fire was confirmed to have been molten metal generated by the welding of the insulation brackets to the outside surface of the stainless steel section of the plenum wall. The investigation confirmed that burn-through from welding of the stainless steel plenum wall at the Sample C3 level would have resulted in temperatures reaching at least 2800°F on the inside surface of the stainless steel plenum wall which was essentially in direct contact with the evaporative cooling media. The evaporative cooling media has an ignition temperature of approximately 350°F based upon literature of the material provided in Appendix B [of Thielsch's Expert Report].

(Thielsch Expert Report at 13-15, attached to CPS Memo in Supp. as Exh. A.)

Nalbandian's deposition testimony clarified his opinions and the bases for those opinions. Specifically, Nalbandian testified that the fire was caused by the proximity of welding at so-

called location "C3," which produced a temperature of 2600-2800°F on the opposite side of the stainless steel panel, to the ECM, which had an ignition temperature of 350°F. (See Nalbandian Dep. at pp. 17, 65-71 & 127, excerpted portion of which is attached hereto as Exh. C). Nalbandian's understanding of the ignition temperature of the ECM derives from the manufacturer specifications. (See id. at 17; Thielsch Expert Report at 2.)

Nalbandian further testified to his understanding that the ECM extended above the channel and in proximity to the C3 weld location, based upon his field observations and observations of other Thielsch personnel, and upon a Pnuemofil drawing depicting the location and dimensions of the ECM. (Id. at 9, 103-06, 109-11). Other Thielsch personnel also confirmed the fact that the ECM extends upward out of, or at least to the top edge of, the "channel" that holds it in place, and therefore would have been in a position to be ignited by such welding on the opposite side of the thin-gauge stainless steel wall. (See Cooney Dep. at 34-35, an excerpted portion of which is attached hereto as Exh. D).

Nalbandian verified his conclusion regarding the origin of the fire through the use of burn patterns. Nalbandian determined the location from which the fire originated through observation and comparison of discoloration patterns on the exterior of unit CT-1. (Nalbandian Dep. at 126-27). That process led Nalbandian to conclude that the fire started in the southeast section of CT-1, in proximity to the C3 weld. (Id.)

Nalbandian has extensive background and experience in investigation of the cause and origin of fires. Nalbandian worked as an engineer for ITT Grinell Corporation for eighteen years until 1986. (Id. at 5). In that capacity, Nalbandian tested and evaluated the means with which to prevent and/or extinguish fires, including setting controlled fires to study those fires'

 PRV_836999_1/ABATASTINI

characteristics. (Id. at 95-96). Nalbandian's understanding of the cause of these fires was central to his analysis of how to prevent future fires. (Id.)

While working at Thielsch for the last twenty years, Nalbandian has conducted fire cause and origin investigations in a variety of contexts. With respect to litigation, Nalbandian has offered opinions regarding the cause and origin of fires in incinerator stacks, chemical processing equipment, skating rinks and police stations. (Id. at 94). Nalbandian also has extensive non-litigation experience regarding cause and origin investigation. Nalbandian was not asked about his relevant non-litigation experience at his deposition, but would testify to it at a trial.

Nalbandian is also a licensed professional engineer in Rhode Island, Connecticut, Florida, Kentucky, North Carolina, South Carolina and Texas. (Nalbandian CV, Ex. B CPS Memo in Supp. of Motion in Limine). This is the same professional licensure as Schwalje, CPS's proposed expert regarding the fire.

**Discussion**

When facing a proffer of expert testimony, the case of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591 (1993), and its progeny require a three-step analysis: (1) a determination whether the expert witness is qualified and has specialized knowledge that will "assist the trier of fact to understand the evidence or to determine a fact in issue," (2) a determination of whether the proposed subject matter of the expert opinion properly concerns "scientific, technical, or other specialized knowledge," and (3) the gatekeeper function of ascertaining whether the testimony is helpful to the trier of fact, *i.e.*, whether it rests on a reliable foundation and is relevant to the facts of the case. See Vadala v. Teledyne Indus., Inc., 44 F.3d 36, 39 (1st Cir. 1995); see also Daubert, 509 U.S. at 591 (characterizing the final step as one of "fit."). Of these three steps, CPS's challenge to Nalbandian's opinions focuses on the first step,

Nalbandian's qualifications, and on the third step, the foundation for his opinions.

With respect to expert qualifications, the court has broad discretionary powers in determining whether or not the proposed expert is qualified. See, e.g., Beacon Mutual Ins. Co. v. OneBeacon Ins. Group, 253 F. Supp.2d 221, 222 (D.R.I. 2003) (trial court has "considerable leeway" in determining the qualifications of experts). In this case, Nalbandian is abundantly qualified to opine regarding the cause and origin of the subject fire from his extensive professional experiences in fire science and cause and origin analysis, including eighteen years analyzing the causes of fires at ITT Grinnell and for the past twenty years offering both litigation and non-litigation expert consulting services regarding cause and origin. (See Nalbandian Dep. at 5, 94-96).

CPS takes the position that Nalbandian is not qualified to opine regarding the cause and origin of the subject fire for a variety of reasons. CPS maintains, without citation, that "the cause and origin of fires is not an engineering question." (CPS Memo in Supp. of Motion in Limine at 5). CPS further argues that Nalbandian lacks "the type of expertise that experts in cause and origin of fires typically have," and claims that Nalbandian is not a professional welder, "has not worked in the field of fire investigation" and "professes no expertise in the interpretation of burn patterns …." (Id. at 5-6).

None of these statements is legally or factually accurate. Courts have qualified persons with a wide range of backgrounds and practical experiences as experts regarding the cause and origins of fires, including engineers and persons without formal training in fire investigation. See, e.g., Dillon Companies, Inc. v. Hussmann Corp., No. 03-1493, 2006 WL 148271, at * 6-7 (10th Cir. June 20, 2006) (civil engineer qualified to opine regarding origin of fire despite not being licensed as a professional engineer based upon practical experience including testing and

design of fire suppression systems and field experience in cause and origin analysis); U.S. Fidelity & Guar. Co. v. First State Bank and Trust Co., 941 F. Supp. 101, 102 (E.D. Mo. 1996) (expert qualified due to extensive practical experience in fire investigation despite the lack of advanced education or training); Mickelson v. Homeland Ins. Co. of America, 132 F. Supp. 670, 673 n.3 (D. Minn. 1955) (police officer had sufficient expertise from professional experience investigating suspicious fires); Nationwide Ins. Co. v. Square D Co., 570 So.2d 406, 408 (Fla. Ct. App. 1990) (electrical engineer with forty years experience with fire cause and origin qualified); Davis v. Marathon Oil Co., 330 N.E.2d 312, 317 (Ill. Ct. App. 1975), *reversed on other grounds*, 356 N.E.2d 93 (Ill. 1976) (witness qualified as expert due to twenty-five years of field experience despite having taken no relevant course work); Ruth v. O'Neill, 66 N.W.2d 44, 49 (Iowa 1954) (chemical engineer qualified an fire causation expert due to years of specialization and practical experience); Plains Transport of Kansas, Inc. v. King, 578 P.2d 1095, 1099-1100 (Kan. 1978) (engineer qualified in fire reconstruction due to professional experience). In fact, CPS's proposed expert regarding the fire, Peter Schwalje, P.E., is an engineer who lacks any background in fire investigation.

CPS's statements that Nalbandian "has not worked in the field of fire investigation" and "professes no expertise in the interpretation of burn patterns" are equally inaccurate. As described above, Nalbandian has investigated the cause and origin of multiple fires, including the use of burn pattern analysis as part of those investigations. (See Nalbandian Dep. at 94). CPS also chides Nalbandian because he is not a professional welder. But Nalbandian is not expressing an opinion regarding whether the Zampell welds were in accordance with accepted industry practices or standards. (See id. at 80). In fact, the only relevance that welding has to Nalbandian's opinion is that the welding was the heat source that caused the fire. Nevertheless,

CPS' argument is misleading. While true that Nalbandian has never worked in a professional capacity as a welder, he knows how to weld and directly supervised welders while at ITT Grinnell. (Id. at 5-6).

CPS also claims that Nalbandian's opinions lack sufficient foundation. On that score, CPS claims Nalbandian "does not opine in terms of burn patterns or similar observations that would be relied upon by a cause and origin expert." (CPS Memo in Supp. of Motion in Limine at 7). CPS further argues that "the only item that he points to as evidence that the C3 weld caused the fire is the fact that smoke was seen coming from the plenum about 10 to 20 minutes after the C3 weld was completed." (Id.)

CPS's position on this point is demonstrably untrue. As described above, Nalbandian's opinions are grounded in his and his Thielsch colleagues' field observations at the Rhode Island State Energy Center, his understanding of the proximity of the welding to the ECM based upon manufacturer's specifications and his observations, his understanding of the heat produced by the welding and the ignition temperature of the ECM, and his observation and analysis of burn patterns on the exterior of CT-1. (See Nalbandian Dep. at 9, 17, 65-71, 103-06, 109-11, 126-27). In fact, CPS's argument contradicts itself – maintaining that Nalbandian lacks expertise regarding burn pattern analysis on the one hand, (CPS Memo in Supp. of Motion in Limine at 5), while inconsistently claiming that Nalbandian is not relying on burn pattern evidence on the other. (Id. at 7). And, CPS's disclosed trial expert does not dispute Nalbandian's expert conclusions regarding the cause and origin of the fire. (See Schwalje Expert Report at 6).

CPS also argues that Nalbandian's opinion is not admissible because he lacks knowledge whether the ECM extended above its channel or not, claiming that the location of the ECM is "central" to his expert opinion. (CPS Memo in Supp. of Motion in Limine at 8). But

Nalbandian's opinion is not so limited -- rather, Nalbandian testified that the welding would have started the fire whether the ECM extended past the channel or not. (See Nalbandian Dep. at 120-21).

While Nalbandian did testify early in his deposition that he did not know the specific location of the ECM, it is clear that Nalbandian was answering these questions from his own firsthand knowledge of the pre-fire location of the ECM, and his later testimony clarified his position regarding the position of the ECM:

> Q. Does direct contact mean that the cooler media would have to extend beyond the top of the stainless steel channel?
>
> A. To the extent it was very close to the area of C-3.
>
> Q. So the answer is yes, it did extend beyond the top of the stainless steel channel?
>
> A. It was very close to that C-3 area. How far it extended; half inch, one inch, yes.
>
> ****
>
> Q. So it's clear, nobody from Thielsch Engineering saw that evaporative cooling media extended beyond the top of the stainless steel channel?
>
> A. It was burnt by the time we got there.
>
> ****
>
> Q. What's the factual basis for the statement in the report that the evaporative cooling media would have been in direct contact with the inside surface of the stainless steel plenum where the burn-through occurred at the location of sample C-3?
>
> A. I think that the drawing and specification were the basis for it.

(Id. at 102, 103, 105). CPS selectively cites only Nalbandian's early testimony regarding his personal knowledge, but omits his later testimony where he made clear that he understood that

the ECM extended past the end of the channel. Additionally, other Thielsch personnel confirmed the position of the ECM above the channel. (Cooney Dep. at 34-35).

CPS further attacks Nalbandian's opinions on the basis that those opinions are not to a reasonable degree of scientific certainty. (CPS Memo in Supp. of Motion in Limine at 9). The basis for CPS's argument is that no one from Thielsch can testify to the location of the ECM relative to the C3 weld. (Id.) As shown above, this position wholly ignores Nalbandian's and Cooney's testimony on that point. CPS also claims that opinions by Cooney are not to a reasonable degree of certainty, but fails to demonstrate how these alleged shortcomings in Cooney's opinions affect Nalbandian's expert conclusion. (See id.). Rather, as CPS concedes, Nalbandian states his expert opinions with "high confidence." (See id.).

## **Conclusion**

In sum, Nalbandian is qualified to render opinions regarding the cause and origin of the subject fire, and these opinions have sufficient foundation to be admissible at trial. To the extent that CPS takes issue with certain of Nalbandian's qualifications or opinions, these issues go to the weight to be accorded Nalbandian's testimony by the jury, and not that testimony's admissibility. See Beacon Mut. Ins. Co., 253 F. Supp. 2d at 223 ("The ultimate credibility determination as to the testimony's accorded weight are the jury's province"). CPS's motion in limine seeking to exclude Nalbandian's testimony should therefore be denied.

RHODE ISLAND STATE ENERGY
STATUTORY TRUST 2000, FPLE
RHODE ISLAND STATE ENERGY, L.P. and
FPLE RHODE ISLAND STATE ENERGY GP, INC.

By their Attorneys,

/s/ Mark W. Freel

Mark W. Freel (#4003)
Armando E. Batastini (#6016)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on the 25th day of September, 2006, I caused a true copy of the within Memorandum of Law to be served on the following counsel of record:

Girard R. Visconti, Esq.
Jessica L. Papazian-Ross, Esq.
Visconti & Boren Ltd.
55 Dorrance Street
Providence, RI 02903

Mark Robert Vespole, Esq.
Theresa E. Mullen, Esq.
Tressler, Soderstrom, Maloney & Priess
744 Broad Street, Suite 1510
Newark, NJ 07102

John R. Mahoney, Esq.
Asquith & Mahoney, LLP
155 South Main Street
Providence, RI 02903

Joseph J. Reale, Jr., Esq.
Joseph J. Reale, Jr., Ltd.
30 Kennedy Plaza, Suite 400
Providence, RI 02903

Stephen B. Lang, Esq.
Higgins, Cavanagh & Cooney, LLP
123 Dyer Street
Providence, RI 02903

Janet R. Davis, Esq.
Andrew M. Hutchison, Esq.
Georgene M. Wilson, Esq.
Meckler Bulger & Tilson, LLP
123 North Wacker Drive, Suite 1800
Chicago, IL 60606

/s/ Mark W. Freel