# A

**AFFILIATED ENGINEERING LABORATORIES, INC.**
*Engineering Consultants*

1101 Amboy Avenue
Edison, NJ 08837-2856

Phone: (732) 225-0360 Fax: (732) 417-0165

July 11, 2006

Tressler, Soderstrom, Maloney & Priess, Esqs.
744 Broad Street
Suite 1510
Newark, New Jersey 07102-3812

Attention: Mark Robert Vespole, Esq.

Re: Certified Power Systems vs. Rhode Island State Energy
Our File No. R-1657

Gentlemen:

In accordance with your request, the writer has reviewed file material pertinent to the above captioned matter. In addition, on 6/14-15/06 the writer traveled to the Florida Power & Light Company's generating facility in Johnston, Rhode Island, and inspected equipment located in the area involved in the subject accident. During this inspection various photographs were taken, selected copies of which are enclosed herewith for information and general reference.

The subject facility was designed originally by Black & Veitch and placed into commercial operation in or around 2000/2001time period. The facility was subsequently acquired by Florida Power & Light or one of their operating divisions, and was under their operational control at the time of the occurrence. The generating facility was a combined cycle type consisting of two gas turbines, known as combustion turbines Nos. 1 and 2 (abbreviated CT1 and CT2) and one main steam turbine. The plant had a nominal capacity of approximately 500 megawatts and normally operated during the day and evening hours, coming off line during the early morning hours.

Each of the combustion turbines obtained their combustion air through an inlet air conditioning system positioned atop the roof area of the building above the turbine deck. Each of the two air inlets had the basic shape of a rectangular box with air entering through two sides of the structure identified as the northern and eastern sides. The inlet structure measured

DEFENDANT'S EXHIBIT
FPL-28
8-10-06 SB

approximately 33 feet in width by 33 feet in depth by 38 feet in height and was fabricated from steel plate installed over a structural steel skeleton. Both the north and east inlet side walls of the unit were equipped with triangular-shaped rain hoods that extended outward from and across the inlet to limit entrance of rain into the system. The air that entered the inlet first passed through a paper type pre-filter that functioned to capture large foreign particles and then through a second or final filter designed to remove smaller contaminants. Downstream of the final filter an evaporative cooling system, consisting of two floor to ceiling and back-to-back evaporative cooling media units were installed. The evaporative cooling system was designed to operate in the warmer months of the year during periods of higher ambient air temperatures. The cooling media functioned by receiving water supplied via pumps, that cascaded the water over the media to utilize the latent heat of vaporization to produce a cooling effect on the entering air thus decreasing its temperature so as to increase the operational efficiency of the downstream combustion turbines.

After the plant was placed into operation, it was discovered that during wintertime operations a problem was occurring at the entrance to the inlet air system due to the accumulation of snow and ice. In order to solve this situation Florida Power retained Sargent & Lundy, an architectural/engineering firm, to design a system to remedy this problem. After consideration of several options Sargent & Lundy concluded that glycol heat exchangers should be installed in the air inlet ahead of the pre-filters to control the condition. Sargent & Lundy instituted the necessary engineering actions and prepared specifications for the design and erection of these heat exchanges. The specifications were then sent to several Sargent & Lundy selected contractors for construction bids. In July of 2004 prior to bid submittal, a pre-bid meeting was held at the plant site at which the requested bidders attended and were shown the site and allowed to observe the facility. Ultimately, in August 2004 a contract for the installation of the glycol system was let to Certified Power Systems (CPS). Actual fieldwork for the installation began on-site in or about October of 2004, with CPS performing the mechanical portions of the glycol heater job along with some other miscellaneous mechanical work in other areas of the plant. As a part of the glycol project, the specifications called for insulating the steel exterior of the inlet ducts to maintain temperature and limit condensation of the air passing through it. CPS subcontracted with a large and experienced insulation/refractory firm, Zampell, Inc., for the performance of this insulating work. The original Sargent & Lundy design called for the insulation to be a mineral wool however, prior to beginning fieldwork this material was changed to a rigid panel type insulation system. Zampell prepared a series of drawings that set out their proposed method of erection of the insulating panels with said drawings being provided to Sargent & Lundy for their review. Sargent & Lundy took no exception to the Zampell approach, with Zampell thereafter proceeding to install same pursuant to that layout. Zampell's initial work was performed on Unit 2, after which they started work on the inlet for CT1 proceeding with the work in an identical manner as that used for Unit 2.

The method employed by Zampell for the installation of the insulation consisted first of welding 2 inch x 2 inch x 5 inch long clip angles in a horizontal row on the outside steel skin of the air inlet with the individual clips spaced at 28 to 36 inch intervals. The parallel rows of clip angles would be installed at 4 foot spacings measured vertically upward from the base of the inlet. 2 inch x 2 inch x 1/8 inch thick carbon steel angle iron would then be positioned on the projecting legs of these clip angles and welded in position to create a series of subgirts. The angles forming the subgirts, were positioned with the horizontal leg of the angle irons resting upon the horizontally projecting legs of the clip angles with the vertical legs of the subgirt angle irons extending vertically downward therefrom. The insulation panels would be positioned against the side of the inlet with the top of each panel slid upward where it would be captured by the upper subgirt angle iron leg and the bottom of the panel then rested upon the top of the subgirt angle below. Additional pins, spot welded to the skin of the inlet, would pass through the panels and then be secured to the outboard side of the insulation panels to hold the panels in place. After the insulation had been placed and secured, sheet metal lagging was installed over the insulation and the subgirt structure with the lagging being screwed into the subgirts to create a weather and mechanical protection system over the insulation. This method for placement and securement of insulating panels is frequently encountered and is a simple and effective means of accomplishing the insulating task.

During the conduct of the work the plant remained under the control of Florida Power & Light and was actively on-line producing power throughout major portions the project. In addition to on-site Florida Power & Light management and operating personnel, Florida Power & Light retained an outside consultant, Mr. Edward Alarcon of the Premier Engineering Corp., to act as their construction or project manager. Further, Sargent & Lundy assigned a field engineer, Mr. Lyle Gastineau, to the site to act as a liaison between Sargent & Lundy and Florida Power to assist in the completion of the project. Florida Power & Light, however, maintained the ultimate control over the site and required that their operating procedures be followed by on-site contractors and vendors. Part of their procedural requirements mandated contractors to have a hot work permit whenever work that was to be conducted would create sparks or flame that could result in a fire. The welding work that created the girt system on the air inlets constituted a job activity that, under Florida Power & Light's procedures, mandated the utilization of a hot work permit. In order to obtain the permit the entity in charge of the work would obtain a blank pre-numbered permit from a supply located in the administration building of the plant. The permit would then be filled out outlining the work to be conducted after which a designated employee of Florida Power & Light would, accompanied by the group requesting the work, walk the site that was to be involved. If the preparations at the site were deemed satisfactory and in accord with the permit requirements, the Florida Power designee would sign the permit and return it to the administration building where it would be countersigned and then issued to the party requesting the permit, allowing the work to then proceed. The permits issued were time restricted with the valid operational times memorialized on the permit papers.

On the day of the occurrence, a hot work permit form was obtained from Florida Power & Light by CPS employee Mac Corcoran, who then filled it out for the work to be done. The filled out permit was returned to Florida Power & Light and Mr. C. Rowe, a Florida Power & Light management employee, gave it, and a series of other requested permits, to Mr. R. Crossly, another Florida Power & Light employee, who with Mr. Corcoran, walked the areas to be worked. After the walk-through, Mr. Crossly signed the permit and returned it to the control room, giving the permit to Mr. Rowe. The permit was signed by Mr. Rowe and stamped by Florida Power & Light's plant leader, George Burke. The completed and signed permit was returned to Mac Corcoran permitting the requested work to proceed.

The permit requested was to allow CPS's subcontractor Zampell to weld on the southern vertical wall of the CT1 air inlet system for the insulation of the girt support system. The south wall of the air inlet was primarily constructed of carbon steel, but contained an approximately 4 foot wide vertical stainless steel section, corresponding to the position of the internal evaporative cooling medium, interspaced in the wall between two carbon steel sections. The stainless section was designed to protect against potential corrosion arising from the water that was used with the evaporative cooling media. Clips for support of the girts were to be welded to the wall with clips being required to be welded on both the carbon steel and stainless steel surfaces. The welding was being done by a Zampell welder, Bruce Crossman, and consisted of first welding a horizontal line or row of clip irons to the side of the inlet after which the approximately 20 feet long angle irons that formed the subgirt would be positioned on and welded to the clips.

At approximately 9 A.M. on the day of the 12/3/04 occurrence, Mr. Crossman was engaged in welding a clip iron approximately three horizontal levels up from the base of the unit in or around the stainless steel portion of the inlet sidewall. As his work proceeded, a fire developed within the interior plenum of the air intake system apparently due to ignition of flammable elements of the evaporative cooling media. The fire spread throughout the inlet plenum, ultimately consuming all of the flammable elements of the evaporative cooling system, resulting in substantial damage to the structure of the inlet system and, until such time as repairs could be made, a forced outage of combustion turbine No. 1.

Hot work permits are developed for the purpose of establishing a control over operations that utilize flames or produce sparks in an effort to prevent initiation of fires. There are many different forms of hot work permits established by different operating entities, with a common characteristic among them being a requirement that authorization be secured before equipment capable of igniting combustible material is used outside of normal work areas. The regulations of the National Fire Protection Association offers specific requirements for Hot Work Operations with same being set out in NFPA 1, The Uniform Fire Code, Chapter 41 and in NFPA 51-B, the Standard for Fire Prevention During Welding, Cutting and Other Hot Work. NFPA 1 Chapter 41 of NFPA 1 state, in part:

41.1.1 *Hot work shall comply with NFPA 51B, Standard for Fire Prevention During Welding, Cutting and Other Hot Work, and this chapter.*

**41.2 Responsibility for Hot Work.**

**41.2.1* Management.** *Management shall be responsible for the safe operation of hot work activity [51B:2.1].*

**41.2.1.2** *Management shall designate a permit authorizing individual (PAI), [51B:2.1.2]*
**41.2.1.5** *Management shall advise all contractors about site-specific flammable materials, hazardous processes, or other potential fire hazards. [51B:2.1.5]*

**41.2.2 Permit Authorizing Individual (PAI).** *In conjunction with the management, the PAI shall be responsible for the safe operation of hot work activities. [51B:2.2]*

**41.2.2.1** *The PAI shall determine site-specific flammable materials, hazardous processes or other potential fire hazards present or likely to be present in the work location [51B:2.2.1]*

**41.3.3.1*** *Before hot work operations begin in a non-designated location, a written hot work permit by the permit authorizing individual (PAI) shall be required. [51B:3.3.1]*

**41.3.3.2** *Before a hot work permit is issued, the following conditions shall be verified by the PAI. [51B:3.3.2]*

**41.3.3.2.2** *Where combustible materials, such as paper, clippings, wood shavings, or textile fibers, are on the floor, the floor shall be swept clean for a radius of 35 ft. (11m). Combustible floors (except wood on concrete) shall be kept wet, be covered with damp sand, or be protected by non-combustible or fire-retardant shields. Where floors have been wet down, personnel operating arc welding or cutting equipment shall be protected from possible shock. [51B:3.3.2(b)]*

41.3.3.2.7 *If hot work is to be done on a wall, partition, ceiling or roof, precautions shall be taken to prevent ignition of combustibles on the other side by relocating combustibles. If it is impractical to relocate combustibles, a fire watch on the opposite side from the work shall be provided. [51B:3.3.2(g)]*

> **41.3.3.2.9** *Hot work that is performed on pipes or other metal that is in contact with combustible walls, partitions, ceilings, roofs or other combustibles shall not be undertaken if this work is close enough to cause ignition by conduction. [51B:3.3.2(i)]*
>
> **41.3.3.4*** *The area shall be inspected by the PAI at least once per day while the hot work permit is in effect to ensure that it is a fire-safe area. [51B:3.3.4]*

Requirements are further set out in NFPA 51 which states, in part:

> **1.1 Scope.**
>
> **1.1.1*** *This standard shall cover provisions to prevent loss of life and property from fire or explosion as a result of hot work.*
> **1.2 Purpose.** *This standard shall provide guidance for persons, including outside contractors and property managers, who manage, supervise, and perform hot work.*
>
> **3.1 General.** *The definitions contained in this chapter shall apply to the terms used in this standard. Where terms are not included, common usage of the terms shall apply.*
>
> **3.3 General Definitions.**
>
> **3.3.3 Management.** *For the purpose of hot work, all persons, including owners, contractors, educators, and so on, who are responsible for hot work operations.*
>
> **3.3.4 Permit.** *A document issued by the authority having jurisdiction for the purpose of authorizing performance of a specified activity. [1:3.3]*
>
> **3.3.5* Permit Authorizing Individual (PAI).** *The individual designated by management to authorize hot work.*
>
> **4.1* Management.** *Management or a designated agent shall be responsible for the safe operations of hot work activity.*
>
> **4.1.2** *Management shall designate a permit authorizing individual (PAI).*
>
> **4.1.7** *Management shall advise all contractors about site-specific flammable materials, hazardous processes or conditions, or other potential fire hazards.*

4.2 · **Permit Authorizing Individual (PAI)** . *In conjunction with management, the PAI shall be responsible for the safe operation of hot work activities.*

4.2.1 *The PAI shall determine site-specific flammable materials, hazardous processes, or other potential fire hazards that are present or likely to be present in the work location.*

5.3.1* *Before hot work operations begin in a non-designated location, a written hot work permit by the permit authorizing individual (PAI) shall be required.*

5.3.2 *Before a hot work permit is issued, the following conditions shall be verified by the PAI:*

> *(1) The hot work equipment to be used shall be in satisfactory operating condition and in good repair.*
> *(2) Where combustible materials, such as paper clippings, wood shavings, or textile fibers, are on the floor, the floor shall be swept clean for a radius of 11M (35 ft.) and the following criteria also shall be met:*
>> *(a) Combustible floors (except wood on concrete) shall be kept wet, covered with damp sand, or protected by non-combustible or fire-retardant shields.*
>
> *(7) If hot work is done on one side of a wall, partition, ceiling, or roof, one of the following criteria shall be met:*
>> *(a) Precautions shall be taken to prevent ignition of combustibles on the other side by relocating the combustibles.*
>> *(b) If it is impractical to relocate combustibles, a fire watch shall be provided on the side opposite from where the work is being performed.*

5.3.4* *The area shall be inspected by the PAI at least once per day while the hot work permit is in effect to ensure that it is a fire-safe area.*

A.3.3.5 **Permit Authorizing Individual (PAI).** *The PAI is permitted to be, among others, the supervisor, foreperson, property owner or representative, or health and safety administrator. The PAI cannot be the hot work operator, except as permitted in Chapter 6. The PAI is aware of the fire hazards involved and is familiar with the provisions of this standard.*

A fair reading of the NFPA regulations reveal multiple parties to have duties and responsibilities with respect to hot work activity. The regulations also establish the grantor of

the hot work permit and the entity designating the permit authorizing individual (PAI), to have the responsibility for advising all contractors about site-specific flammable material. The evaporative cooling media would be one such site-specific flammable material and as Florida Power & Light was the issuer of the permit and appointed the PAI, it would be their responsibility to have advised the contractor of the presence of these materials in the proposed work area. Depending upon the specific agreements between Florida Power & Light and Sargent & Lundy and Premier Engineering, Alarcon's company, this responsibility may have been shared with them.

It has not been established to any reasonable degree of certainty that either CPS or Zampell were advised of the flammable nature of the evaporative cooling media. There was an appreciation by CPS and Zampell due to an advisement by both Sargent & Lundy personnel and Alarcon that the pre-filters were of paper composition and posed a fire threat if exposed to flame or weld sparks. Consequently, when work was performed by CPS or Zampell in that area, appropriate safeguarding steps were taken. CPS conducted no work activity about the evaporative cooling media that would have alerted them to the flammability characteristics of the medium. Further, there was no visual indication on the media itself that would suggest its flammability propensity. In fact, numerous Florida Power & Light personnel were unaware that the evaporative cooling media was combustible and/or that it was installed in close proximity to the inlet duct walls where it might be exposed to conductive heat transfer.

Based on the file review and equipment inspection, it is the writer's opinion that the subject fire arose as the result of the welding operation being performed on the air inlet southern wall through either contact with weld splatter or through conductive heat transfer to the evaporative cooling media. It is the writer's further opinion that this circumstance occurred through Florida Power & Light's failure to advise CPS of the presence of the flammable material in the area for which Florida Power & Light authorized a hot work permit. The responsibility to identify and notify of the presence of the flammable material was that of Florida Power & Light under provisions of applicable standards as well as by industry custom and practice. In the writer's opinion, it would be unreasonable to have expected or relied upon CPS to discover the presence of the flammable material within the inlet plenum and to have expected them to institute some action to protect it against its subsequent exposure to heat sources.

Florida Power & Light was in control of the facility and, with their agents, was responsible for the design and overall supervision of the project. If the evaporative cooling media was deemed to be in danger of becoming ignited during the field implementation of the project, in the writer's opinion, these entities had a duty and responsibility to bring that potential condition to the attention of the contractor(s) retained to effect the project. In the writer's opinion, CPS performed the necessary actions to ensure that the area about the site to be welded was clean of combustible material and after its inspection by Florida Power & Light's PAI and

the issuance of the hot work permit to them, they would be free to begin the welding operation and have no need or reason to conduct any additional site evaluation or inspection.

It is the writer's concluding opinion that CPS properly and adequately discharged its responsibility to assure proper isolation of the area that was to be subjected to welding and that they complied with the requirements established for the site work under Florida Power & Light's procedures. In the writer's opinion, CPS had no responsibility to have discovered the presence of the flammable evaporative cooling media within the inlet through either drawing research or facility inspection. In the writer's opinion, Florida Power & Light and its representative Premier Engineering and Sargent & Lundy should have made bidders for the job aware of site-specific flammable materials as they did with the paper pre-filters, so that the bidders could develop a method to protect the material and/or remove it prior to welding and also to have allowed the bidders to include the added cost to effect these actions in their bid price. In the writer's opinion when CPS completed the walk through with Florida Power & Light's PAI and received the subsequently issued hot work permit it had a justifiable expectation that the planned welding operation could proceed without danger to plant equipment or personnel.

Should you require further information or discussion, kindly contact the writer.

Very truly yours,

Peter J. Schwalje, P.E.
Engineering Consultant

PJS/pkd/afp/pcf