# C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CERTIFIED POWER SYSTEMS, INC.
Plaintiff,

VS. C.A. NO. 05-066-ML

RHODE ISLAND STATE ENERGY
STATUTORY TRUST 200, FPLE
RHODE ISLAND STATE ENERGY, LP,
and FPLE RHODE ISLAND
STATE ENERGY, GP, INC.,
Defendants,
VS.
CERTIFIED POWER SYSTEMS, INC.,
Defendant on Counterclaim/Third Party
Plaintiff,
VS.
ZAMPELL REFRACTORIES, INC.,
Third-Party Defendants/Fourth Party
Plaintiff,
VS.
SARGENT & LUNDY, LLC and
PREMIER ENGINEERING,
Fourth Party Defendants

DEPOSITION OF ARA NALBANDIAN, a witness in the above-entitled cause, taken on behalf of the DEFENDANT ZAMPELL, before Claudia J. Read, a Notary Public in and for the State of Rhode Island, at the offices of ASQUITH & MAHONEY, 155 South Main Street, Providence, Rhode Island on June 22, 2006 at 9:30 A.M.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RI 02915
(401) 437-3366



PRESENT:

FOR THE PLAINTIFF ..... TRESSLER, SODERSTROM,
MALONEY & PRIESS
744 BROAD STREET
SUITE 1510
NEWARK, NJ 07102
BY: MARK VESPOLE, ESQUIRE

FOR THE DEFENDANT ..... ASQUITH & MAHONEY
(ZAMPELL) 155 SOUTH MAIN STREET
PROVIDENCE, RI 02903
BY: JOHN R. MAHONEY, ESQUIRE
- AND -
JOSEPH REALE, ESQUIRE

FOR THE DEFENDANT ..... EDWARD ANGELL PALMER
(FPLE) & DODGE, LLP
2800 FINANCIAL PLAZA
PROVIDENCE, RI 02903
BY: MARK FREEL, ESQUIRE

FOR THE DEFENDANT ..... MECKLER, BULGER & TILSON
(FP-SARGENT & LUNDY) 123 NORTH WACKER DRIVE
CHICAGO, IL 60606
BY: JANET DAVIS, ESQUIRE

ALSO PRESENT: DAN SHULTZ, FPL GROUP



INDEX


WITNESS PAGE
ARA NALBANDIAN
Examination By Mr. Mahoney. . . . . 4
Examination By Mr. Vespole. . . . . 78


EXHIBITS


NO. DESCRIPTION PAGE
ZAMPELL'S
P Thielsch report (79pp) . . . . . . . . . 84
P-1 Color photographs (36pp) . . . . . . . . 84
**Q CV of Ara Nalbandian (4PP) . . . . . . . . 84**
**R Mr. Nalbandian's file (retained by Mr. Nalbandian). . . . . . . . . . . . . 107**

**S Drawing (1p) . . . . . . . . . . . . . . 110**

**T 12/21/05 report (3pp). . . . . . . . . . 135**

**U 12/16/04 report (2pp). . . . . . . . . . 135**




(DEPOSITION COMMENCED AT 9:40 A.M.)
ARA NALBANDIAN
Being duly sworn, deposes and testifies as follows:
THE REPORTER: State your full name for the record, please.
THE WITNESS: Aran Nalbandian.
EXAMINATION BY MR. MAHONEY
**Q. Mr. Nalbandian, you are a professional engineer; is that correct, sir?**
A. Yes.
**Q. What particular area is your speciality?**
A. Professional engineer in Rhode Island does not have a relative categorization that we have.
**Q. I see. In what particular area of engineering are you involved?**
A. Mechanical materials and metallurgy.
**Q. And you have been asked to investigate at least some aspects of the fire that occurred at Florida Power in Johnston on December 3, 2004; is that correct?**
A. Yes.
**Q. What particular subject matter are you applying your expertise to as it relates to the fire?**

COPY

Page 5

A. Basically investigation of the causation of the fire and the material properties that would render some information regarding the potential sources for the fire, as well as the occurrence of the fire.

**Q. So does your investigation include the welding process that was ongoing in and around December 3, 2004?**

A. It involves the welding that was done, yes.

**Q. And to that end, have you in your professional career been involved actually welding material?**

A. Yes. I have been involved in welding materials.

**Q. And your experience in that regard is from where? What were you doing at the time?**

A. I was working for Grinell Corporation starting 1966 until '86. And at Grinell, we had a lot of welding development for variety of systems, piping components, fabrication of equipment, development of welding for different purposes, and utilization of the welding processes in the production of the material components that Grinell fabricated or sold.

**Q. Were you a welder for Grinell?**

Page 6

A. No.

**Q. What involvement did you have in the welding development process at Grinell in the years that you were there?**

A. As a -- as an engineer responsible for product development, I was responsible for developing procedures, processes for welding piping components, including pipefitting, transmission pipe lines, and a variety of components that would require fabrication by welding.

**Q. All right. And prior to your years of work at Grinell, had you actually been a welder?**

A. I was a student at that time, no.

**Q. I see.**

A. Prior to Grinell, I was not.

**Q. Have you ever been employed for anyone wherein you actually were involved in welding yourself?**

A. No.

**Q. Have you ever welded yourself on any occasion?**

A. Yes, I have.

**Q. And where was that?**

A. At Grinell.

MR. FREEL: And Jack, if I could clarify just one thing. You know we're going to

Page 7

have a second expert.

MR. MAHONEY: I know.

MR. FREEL: Mr. Nalbandian is going to be our expert in the cause and origin opinions expressed in this report dated January 18, 2005. And at a subsequent time, we're going to have a second expert who is going to be our expert on the welding and welding safety procedures. There's going to be a supplemental report on that. I just want to clarify that.

**Q. Mr. Freel, as he just did, indicates that you will be testifying with regard to cause and origin; you agree with that, that's your perception of your role?**

A. Yes.

**Q. In testifying about cause and origin, are you prepared to address any aspect of the welding procedure that was implemented at Florida Power & Light in Johnston?**

A. No. I will address the welded component that has been more or less the factual evidence that has been used in the evaluation of the cause and origin.

**Q. What factual evidence is that?**

Page 8

A. It is components that are part of the weld joint itself.

**Q. Okay. And that's examination of various samples of welding that were referenced to C-1, C-2 and C-3 in the Thielsch report, so-called?**

A. Correct.

**Q. Did you go to Florida Power in Johnston at sometime shortly after the fire occurred?**

A. Yes, I did.

**Q. Were you one of the people that was there on December 8, 2004?**

A. No. I was there after December 8th.

**Q. And when I make reference to it, just so that we're clear, I'm showing you a document dated January 18, 2005 that I am referencing as the Thielsch report. You are, no doubt, familiar with this document?**

A. Yes.

**Q. And you're one of the three people that signed the document, along with Mr. Cooney and Mr. Basile?**

A. Correct.

**Q. The report I'm referencing makes reference to a visit to the Johnston plant on Wednesday, December 8, 2004; you were not there on that**

Page 9

**occasion?**
A. No, I had -- I was out of town at that date.
**Q. Do you know who went to the Johnston plant on December 8th?**
A. Bob Basile and Mike Cooney.
**Q. When did you first go?**
A. I think it was day after.
**Q. The day after. So you think you were there on December 9th?**
A. 9th or 10th.
**Q. What did you do on that occasion?**
A. I had to go and visually examine the site as far as what was left after the incident. And I had visual examination, internal and external, of the structure.
**Q. So you had occasion to go into what I refer to as CT1?**
A. Yes.
**Q. The structure that burned?**
A. Yes.
**Q. And did you enter that from the northerly side? I think we were in agreement in the case that it was the southerly wall that was being welded upon at the time the fire took place?**

Page 10

A. Yes.
**Q. And did you make your way from what would be the northerly entrance to the opposite side or the southerly wall?**
A. Yes.
**Q. And how long did you remain inside CT1 on that occasion?**
A. I was there for about an hour-and-a-half or so. For couple of hours.
**Q. Who was with you?**
A. Bob Basile and a Florida Power employee to accompany me.
**Q. Do you know what his name or her name was?**
A. Off-hand, I don't remember. It was a gentleman from the office.
**Q. Did you take notes while you were in the structure?**
A. No.
**Q. Were any photographs taken?**
A. No, I did not take, but they were taken by my employees.
**Q. I see. And do you know --**
A. Bob Basile and Mike Cooney.
**Q. Is Bob Basile a professional engineer?**

Page 11

A. Yes.
**Q. And so he works at Thielsch?**
A. He used to.
**Q. Used to?**
A. Yes.
**Q. Where is he now?**
A. He's employed by another firm.
**Q. What is the name of the firm?**
A. I don't know. He's in the manufacturing business.
**Q. Do you know if he's in or out of Rhode Island?**
A. I believe he's in Rhode Island.
**Q. And you don't know where he lives?**
A. He lives in Smithfield.
**Q. I see. Is Michael Cooney still with Thielsch?**
A. Yes.
**Q. What is your position at Thielsch?**
A. I'm the vice president of engineering in the Professional Engineering group.
**Q. Has Thielsch done any work for Florida Power & Light at any time before December 3, 2004?**
A. I believe so.
**Q. Do you know what type of work Thielsch has done for Florida Power, you know, prior to this**

Page 12

**particular job?**
A. Florida Power, we have done consultant engineering work relative to the power plant problems that they've had.
**Q. And when we talk about or when I use the terminology "Florida Power," I'm not just referring to the Johnston plant, but is your answer regarding the Johnston plant that you have, that Thielsch has done work in connection with problems that have developed?**
A. No.
**Q. Okay. So you've done work for other Florida Power & Light entities beside the power plant in Johnston?**
A. I believe so.
**Q. When you say you "believe so," is that something that you're depending on information imparted to you by someone else from Thielsch, or is that something you have personal knowledge of?**
A. Basically I am relying on the type of work that we have done in the past by other members of Thielsch Engineering for Florida Power. We have instances where Florida Power work has been done by Thielsch Engineering.

Q. And then it indicates that the engineering bulletin, EB O1511 regarding CELdek, makes certain representation with regard to ignition temperatures; is that correct?
A. It says "temperature not to in excess of 350," yes.
Q. Who provided that engineering bulletin to you?
A. I believe it was provided by the plant.
Q. But do you know specifically the name of the individual?
A. No, I don't.
Q. Was that something that somebody from Thielsch asked about or was that something that was voluntarily produced by someone from Florida Power?
A. No. That was asked by one of the personnel from Thielsch Engineering.
Q. Now, going to the second paragraph, there is reference to the fact there was narrow section, approximately 5 feet in length of the plenum that was fabricated by what I'm referring to as stainless steel sheet metal; is that correct?
A. Correct.
Q. I just want to make sure I understand this. Would



that be five feet in width?
A. Correct.
Q. Were the rest of the -- and let's specifically refer to the southerly wall where welding was ongoing on the day of the fire, apparently. If we take the 50 feet in width, was the other 45 feet composed of carbon steel?
A. I believe so.
Q. You indicate that the stainless steel was there for corrosion protection due to frequent exposure to water; is that something that you discerned by simply observing the plenum, or was that information imparted to you by someone else?
A. That was observed by observation results and our knowledge of the material to be more corrosion resistant and that was the thing, that was the conclusion that we had subscribed to.
Q. Now, in the next paragraph it reads, "For a portion of the height of the stainless steel section, a stainless steel channel was located on the inside of the air plenum wall for positioning of the evaporative cooler media." That's a fact, that there was a stainless steel channel inside the plenum to position the evaporative cooler



media in place?
A. Yes.
Q. Was the composition of the channel for the evaporative cooler media, otherwise described as stainless steel, was it the same composition as the southerly wall which is also referenced as stainless steel?
A. They are consistent with the same chemistry, yes.
Q. Okay. Now, this particular stainless steel southerly wall we've now discussed has a 5-foot width? In other words, there's 5 feet of stainless steel and 45 feet of carbon steel, correct?
A. Correct.
Q. On the inside of the plenum is there 5 feet of stainless steel evaporative cooler media frame parallel to the stainless steel wall?
A. No.
Q. Okay. On the inside of the plenum, from your investigation, was there any evaporative cooler media that was flush up against the inside of the stainless steel wall?
A. Relatively flush, being in a very proximate



close relationship with the inside surface.
Q. Okay. Let me see if I can articulate this well. I'm not confident I will, but let me give it a shot. Do you know, it wasn't just one big piece of evaporative cooler media inside, there were actually pieces of evaporative cooler media; is that correct to say?
A. Correct.
Q. Do you know what the dimensions of the various evaporative cooler media were?
A. Packs, in shapes about 6-inch thick, 12-inch width, and maybe about 5-feet high, so they were stacked up to next to each other across from one side of south wall to the north wall.
Q. All right. And how many -- so would you be able to do this for me? Would you be able to draw, based on your observation, the actual evaporative cooler media and the channel as it abuts the inside of the southerly wall?
A. I guess an illustration of the photograph is going to be a little more descriptive.
Q. All right.
A. On page -- Figure 14. You see a strip, black strip, right in the middle of the right

the southerly stainless steel wall, correct?
A. That's basically the condition of the stacking where that inner plenum is stacked up with the evaporating cooling medium, abutting to the outside surface.
**Q. Right. But what I'm getting at, just for clarification, is that the factual -- the facts as set out this in this report, whether they're accurate or not, suggest that at the area where the C-3 weld occurred, there was evaporative cooler media abutting the inside of that stainless steel southerly wall?**
A. It was very close proximity of that weld joint.
**Q. And since we know that the channel in which the evaporative cooler media was located in this location had ended because we know C-3 was above the channel, correct?**
A. Yes.
**Q. It would follow that factually a determination was made one way or another that the evaporative cooler media extended above the channel, abutting the inside of the stainless steel wall?**
A. It was understood that that will be in the close proximity of the evaporative cooling media



that will be ignited by the heat.
**Q. All right. But this sentence, and you may or may not have been the one -- let me ask you, to your knowledge, I know it's a long report, did you compose this particular sentence we're talking about right now?**
A. Well, composition I don't recall, but the understanding was it is close proximity abutting to that area where the media was placed.
**Q. All right. And I just want to -- it's not argumentative as much -- from my standpoint -- as it is clarification. Whoever wrote the sentence that is contained in this report -- and you correct me if I misconstrue the import of this. The C-3 weld was the most important of the three weld samples that were taken; is that correct?**
A. At least relative to the --
**Q. Fire?**
A. Fire, yes.
**Q. And we're not concerned with quality of welds here as much as we are concerned about the fire, so with that in mind, how the fire started, of the three sample welds, C-1, C-2, and C-3, we're really concerned about C-3?**



A. Correct.
**Q. And for purposes of C-3, the belief is that it was the process of making that weld that caused the fire to start?**
A. Yes.
**Q. But the factual predicate for that determination was, as indicated in the last sentence, that, "The evaporative cooler media would have been in direct contact with the inside surface of the stainless steel plenum wall"?**
A. Yes.
**Q. That's how the sentence reads?**
A. Yes.
**Q. And you don't have facts at your disposal that counter that conclusion, that is to say that the media material actually was in direct contact with the inside of the southerly plenum wall?**
A. It was very close proximity. If there is any space, which is probably small amount, but it will be very close proximity to the inside surface of the southern wall.
**Q. So that are you saying that -- let me take that back. You tell me. C-3 caused the fire, obviously due to the weld, due to what factual**



**circumstances?**
A. The amount of the heat input, which sort of reflects the condition of the material as welded, would generate enough heat to cause the ignition and combustion and burning of the material media.
**Q. Okay. My understanding from the CELdek's material, and it's referenced, I think, on page 2 of your report. Well, I'm not sure it is page 2, but at some point in your report, it is fair to say you make mention of the CELdek literature; is that correct?**
A. Yes.
**Q. I'll find it. Yes, it is on page 2. The CELdek literature indicates that, "CELdek evaporative media should not be exposed to temperatures in excess of 350 degrees Farenheit due to the danger of ignition"?**
A. Correct.
**Q. Now, you're indicating that molten material may have made contact with the evaporative cooler media?**
A. The molten material, which is basically depicted on Figure 53 -- 52, 53, 54, shows the extent of the weld material which has protruded

Page 69

the boundary of the sheet metal that raises the temperatures in that close vicinity of the medium where amount of temperature, which reaches to 2400 or 1800, it will cause kindling and ignition of a material which is susceptible for burning before 350.

**Q. Now, did you or anyone else at Thielsch investigate what internal temperatures, that is to say on the inside portion of the stainless steel would reach when welding took place in a proper fashion?**

A. All depends how much heat input he has and how well he does as far as the speed. It is very difficult to foretell what temperatures would reach, given the type of the welding that is being done.

**Q. Would there -- would it be anticipated that if welding was done, regardless of how high the welding temperature was or regardless of what type of welding unit was used, that there would be an increase in temperature on the other side of the wall where the welding took place?**

A. It will be a temperature differential, yes.

**Q. All right. And in this particular case, you don't**

Page 70

**need a temperature of 2400 degrees to ignite the evaporative cooler media. CELdek, as I understand it, forewarns that a temperature in excess of 350 may cause an igniting of the material?**

A. Correct.

**Q. So that at no time did Thielsch do any type of testing to discern what the temperature would be on the inside of the wall, using the very same welding apparatus that was used at the time of the fire, set at the very same settings?**

A. No. I said I wasn't asked to sort of render any welding related matters except the causation as far as dealing with the amount of heat generated from the burn-through and what will be the consequences of burn-through at a temperature which will cause ignition of closely placed combustible material.

**Q. Okay. And at C-3, was every burn-through as likely to cause the fire? In other words, there were three burn-throughs, if I understand it, at C-3?**

A. Yes.

**Q. Any one or all of which could have resulted in causing the increased heat to the estimated 2400**

Page 71

**level, which would have ignited the evaporative cooler media?**

A. Yes.

**Q. Now, was there any molten material that actually dripped on to evaporative cooler media from your standpoint? Or are we just talking about heat that was generated due to burn-through?**

A. I can't tell from the photographs because once you have molten metal and if it is drips and some of the remainder that solidifies and acquires this form as it is shown on Figure 53, it will be consistent with the notion that once you have a burn-through, you have the potential also to drip or segregate some of the material from the molten metal that may go dropping from that configuration.

**Q. Okay. So you can have dripping of molten material from a burn-through, you can also have it from a blow-through?**

A. Sometimes you do.

**Q. And you can have what I refer to as "spattering," molten material that kind of spatters into the interior of the location where the welding is being done, with a burn-through as well as a**

Page 72

**blow-through?**

A. Well, there are many circumstances where you have splatters for a variety of reasons.

**Q. And are there any of those reasons under conditions where the welding is being done properly?**

A. I don't know.

**Q. Did you get involved at all in your analysis in looking at any rules, regulations that apply to removal of flammable material when welding?**

A. There are basic industry practices that you take precautions in order to alleviate fires during the welding process that should be taken care of.

**Q. Do you know what any of those specific regulations are?**

A. Well, again, those are some of the areas which I wasn't asked to sort of address.

**Q. All right. Do you have an opinion or have you formulated one in your investigation and analysis of this fire as to whether the fire would have occurred had the evaporative cooling media material been isolated or moistened prior to the welding?**

A. Yes. I believe so, yes.
**Q. You personally were not involved in that work?**
A. I may have been in the type of the work that we do because when a project comes in, usually one of the engineers is asked to sort of assist in getting the project done. I may have done it myself with Helmet, and other engineers might have done it also.
**Q. But whether you did, in fact, participate in a prior project involving Thielsch and Florida Power is something you don't know, don't remember?**
A. I don't recall.
**Q. But you do know that Thielsch was involved with Florida Power in the past; do you know how many different projects they've been involved in together other than this particular fire?**
A. I don't know exactly how many times, but we have had occasion to work for Florida Power.
**Q. To your knowledge, did Thielsch have any occasion to do any work in connection with the Johnston plant before this fire?**
A. I don't believe so.
**Q. And this would be Juno, Florida that Thielsch would have been dealing with?**



A. Florida Power has a lot of plants.
MR. MAHONEY: All right. There may be some other questions.
(MR. MAHONEY ABSENTS HIMSELF FROM DEPOSITION)
(OFF THE RECORD)
MR. VESPOLE: Mr. Nalbandian, my name is Mark Vespole, and I represent CPS. I do have a few questions.
EXAMINATION BY MR. VESPOLE
**Q. Do you have your report in front of you?**
A. Yes.
**Q. And do you have a copy of your CV that I can mark as an exhibit?**
A. No, I don't have it.
MR. MAHONEY: I'll have a copy made of it.
**Q. Are you an expert in mechanical engineering?**
A. I am a mechanical engineer by graduating in that respect, yes.
**Q. So you consider yourself an expert in mechanical engineering?**
A. I'm a mechanic engineer, expert?
**Q. That's my question.**
A. All engineers are professional engineers.



Expert is just another definition to something that engineers can use it for different reasons. I don't know what you mean by "expert."
**Q. Well, you understand that you're an expert witness in this case?**
A. Yes.
**Q. So I'll ask my question again, do you consider yourself an expert in mechanical engineering?**
A. Certain aspects, yes.
**Q. Do you consider yourself an expert in the cause and origin of fires?**
A. Yes.
**Q. Are there any other areas in which you consider yourself an expert?**
A. It all depends.
**Q. Any that you can think of other than mechanical engineer and cause and origin of fires?**
A. It all depends. If it was all within my capability of being expert, then I can call it. Otherwise, I wouldn't render myself an expert in anything that comes along.
**Q. Do you consider yourself an expert in welding?**
A. I have certain knowledge about welding, yes.
**Q. So do I, but I wouldn't consider myself an expert.**



**Do you consider yourself an expert in welding?**
A. No. I don't consider myself expert in welding to the degree that experts have different areas of interest, and I'm not here to further an opinion on welding aspects.
**Q. Have you ever given an expert opinion or qualified as an expert with regard to welding prior to this case or apart from this case?**
A. I don't recall if there was any issues as far as expertise in welding.
**Q. But none that you recall?**
A. There may have been certain cases where I have rendered opinion in the integrity of the unit as being welded.
**Q. Do you remember ever qualifying as an expert witness testifying in court on the issue of welding?**
A. I don't recall if there was any issue of that question.
**Q. Have you ever qualified as an expert witness with regard to the cause and origin of fires?**
A. I don't recall if there has been any issue about that either.
**Q. Have you ever, prior to this case, given an**

A. Right.

**Q. Tell me about the case in which you testified or which you gave expert opinion in July 1999, Jamaica Public Service versus AIU Insurance Company?**

A. That was boiler explosion and fire.

**Q. And what was the opinion that you gave with regard to that?**

A. I testified to the extent what was the causation of the explosion, the fire.

**Q. Do you remember what that was?**

A. Yes.

**Q. What?**

A. It was basically the result of a failure of a boiler component that caused the explosion and the fire.

**Q. What component was that?**

A. Mud drum, connection to the tube.

**Q. And what kind of plant was that located in?**

A. It was power plant in Jamaica.

**Q. Now, your experience in your 20 years at Grinell involved pipefitting products?**

A. Yes.

**Q. It involved boilers as well?**



A. Well, if they were using pipefitting, piping, and boiler components. Whatever piping was used, we were involved in it. So if they used pipefitting in a boiler environment, we were involved in it.

**Q. Did any of your -- strike that. Did any of the cases in which you gave an opinion as to the cause and origin of a fire, prior to this case, involve something other than the cause and origin of a fire related to a boiler and piping equipment?**

A. Yes.

**Q. Tell me what those were?**

A. There was incinerator stack fires. There was some heaters that has been utilized for dispensing waters. There have been other incidents where you have chemical process equipment that has caused fires and ice rinks which have caught on fire and police stations which have caught on fire. I investigated all of those.

**Q. When did you consider that you first became an expert with regard to the cause and origin of fires?**

A. After many years of experiencing the fire protection that we have pursued at Grinell. We



had basically fire protection at Grinell. It was part of the sprinkler system, suppression of the fires. That's where it started.

**Q. But when you worked at Grinell, you didn't do any work with regard to the investigation of the cause and orgin of a fire, did you?**

A. No. We set fires in order to suppress it. So cause and origin started when we start testing and evaluating the consequences of the fire and how the fire suppression is basically controlled.

**Q. My question is while you were at Grinell, did you investigate the cause and origin of any fires?**

A. It was the fires that we had set in order to investigate what would be the causes of the fire suppression will be coming.

**Q. Okay. So that you did not investigate specifically the cause and origin of fires, you investigated the suppression of fires?**

A. Cause of and origin of -- knowing the origin of the fire, we had the way of generating the causes in order to contain the fire. My expertise started from cause and origin of fire fighting from Grinell days.

**Q. But let me ask you this, if you intentionally set**



**the fires while you were at Grinell, there wouldn't have been any issue as to what the cause and origin, would there?**

A. Yes, there would be by virtue of knowing what will be the causes of the fire which will be basically set up to cause the fire. That is the cause of the fire, and then you have the suppression which means that you are basically knowing, you know, exactly what the cause of the fire is to begin with, rather than investigating to find the cause of the fires.

**Q. All right. Did you take any specific classes or seminars or training with regard to the cause and origin of fires?**

A. No.

**Q. And when in your 20-year work history at Grinell did you become an expert with regard to the investigation of the cause and origin of fires; first 5 years there, 10 years down the road?**

A. It was basically ongoing process of learning as you go along to know what is more to learn and more development to come about.

**Q. In which of the six or seven or five or six different job titles listed on your resume,**

**report is that the evaporative cooling media extended above the carbon steel channel on the inside of the air inlet plenum.**

A. It is in the close proximity of the C-3.

**Q. That wasn't my question. Close proximity could be a foot away, depending upon what your standards are. I'm asking you if it's a factual predicate of this report, Exhibit P, that the evaporative cooling media that existed in the CT unit that caught fire actually extended above the carbon steel channel on the inside of the plenum before the fire?**

MR. FREEL: Has it been established that the channel was made of carbon steel? That's the one thing I'm not sure has been said today. I think you're adding that. I don't know.

MR. SHULTZ: You guys use the terms interchangeably.

MR. VESPOLE: I don't.

MR. FREEL: I'm going to object on that basis. If you want to fix that, I have to object on that basis. I'm not sure that's clear.

**Q. What's the channel that the evaporative cooling**



**media sits in made out of?**

A. Stainless steel.

**Q. It's made out of stainless steel?**

A. Yes.

**Q. I thought it was made out of carbon steel. I apologize. I thought I had read that someplace. Is it a factual predicate of the report that's been marked Exhibit P that prior to the fire, the evaporative cooling media and the unit that burned extended beyond the stainless steel channel on the inside of the plenum?**

A. The verbiage that we have said is in direct contact on the inside surface.

**Q. Does direct contact mean that the cooler media would have had to extend beyond the top of the stainless steel channel?**

A. To the extent it was very close to the area of C-3.

**Q. So the answer is yes, it did extend beyond the top of the stainless steel channel?**

A. It was very close to that C-3 area. How far it extended; half inch, one inch, yes.

**Q. What is the basis for that, did somebody observe that?**



A. No. It's not our observation. This is a combustion that occurred at that location where the potential for ignition with substantiated intimate contact with the heated surface will cause the fire.

**Q. Okay. So it's clear, nobody from Thielsch Engineering saw that evaporative cooler media extended beyond the top of the stainless steel channel?**

A. It was burnt by the time we got there.

**Q. So nobody saw it at Thielsch; is that right? Can we start with that, nobody at Thielsch saw where the evaporative cooling media sat relative to that channel after the fire?**

A. There was none to be seen.

**Q. Okay. Did anyone tell you or anybody else at Thielsch that they knew that the evaporative cooling media extended above the top of the stainless steel channel inside the plenum that burned?**

A. There is no information based otherwise, just presence of evaporated cooling was in that location. That's what we knew.

**Q. Well, how do you know, for example, that the**



**evaporative cooling media didn't end 2 or 3 inches below the top of the channel?**

A. There is no otherwise information that said so.

**Q. Well, there is no information one way or the other, is there?**

A. There is information that the evaporative cooling media --

**Q. -- above the top of the channel?**

A. In that channel area, yes.

**Q. I'm not talking about in the channel area. I'm talking above the top of the channel. What information is there that the evaporative cooling media extended above the top of the channel?**

A. It was in that area where the evaporative cooling supposed to be, according to drawings and specifications.

**Q. Is there a drawing and specification which shows that the evaporative cooling media extends above the top of the stainless steel channel?**

A. There is one that tells you all the location where it is supposed to be.

MR. FREEL: Can I have a second? I'm really going to try to help, okay?

MR. VESPOLE: Right.

(OFF THE RECORD)
**Q. I'll ask another question. What's the factual basis for the statement in the report that the evaporative cooling media would have been in direct contact with the inside surface of the stainless steel plenum where the burn-through occurred at the location of sample C-3?**
A. I think the drawing and specifications were the basis for it.
**Q. Do you have that drawing attached as an exhibit?**
A. I don't know if I do. I'll check.
**Q. If it wasn't a drawing that is attached to your report, what drawing would it be?**
A. There are other drawings in addition to some of the drawings which are provided in the drawing of the plan in Appendix A.
**Q. Can you identify by Figure or specific Appendix page or page of Appendix A which one you're talking about?**
A. It will be the first drawing in addition to additional information that may be on file from the drawings that we have, the detail of this configuration.
**Q. Let me start with this question, is there a**



**drawing which is in Appendix A or anywhere as part of your report which has been marked Zampell P which shows that the evaporative cooling media extend beyond the stainless steel channel?**
A. There weren't any drawings that depict that detail aspect of it in the report.
**Q. You think there is a drawing someplace else that does that?**
A. There are specifications on the drawing that will give more information regards to the location of the evaporative operating cooling media.
MR. FREEL: Are those ones that you brought with you today?
THE WITNESS: Yes.
MR. FREEL: I wanted to help on that because you asked to have him bring some file materials.
MR. VESPOLE: Yes.
**Q. Well, maybe we'll do that now as a preface to moving along with this. Did you bring your file with you today?**
A. Yes.
**Q. And can you just get it out so we can see what it is.**



A. Yes.
MR. VESPOLE: Mark this Zampell R.
MR. FREEL: The whole thing?
MR. VESPOLE: Yes.
MR. FREEL: Just for the record, that does not include everything that my law firm has ever sent to Thielsch. I'm just telling you.
I've sent them over almost every deposition transcript in the case, except for the very most recent ones, and a lot of other documents that aren't necessarily in that file. As I understand it, you can ask the witness, his report is sort of his working file.
MR. VESPOLE: Okay.
(ZAMPELL'S EXHIBIT R MARKED FOR IDENTIFICATION)
**Q. Mr. Nalbandian, we've marked as what you've produced as your file folder on the outside as an exhibit, Zampell R; is that correct?**
A. Yes.
**Q. Now, inside this file, there are five 8-1/2 by 11 inch manila folders, of which the first four appear to have titles and the last one appears to be blank, with no writing on it?**
A. Okay. We'll mark as photographs.



MR. FREEL: He was asking you a question. The answer, I think probably, was yes.
**Q. You want to mark the blank manila folder "photographs," that's fine. There are five manila folders and now all of them are marked, correct?**
A. Yes.
**Q. The first folder says "FPL, FP&L Johnston, RI (RISEC, Edwards & Angell)"; is that correct?**
A. Yes.
**Q. And the next one says "NEMA"?**
A. Yes.
**Q. And the next one says "FPL RISEC Drawings"?**
A. Yes.
**Q. The next folder says "FPL RISEC Deposition Exhibits"?**
A. Yes.
**Q. And then the last manilla folder is the one you just wrote "Photos" on which looks like 10 or 15 photographs or more?**
A. Right.
**Q. Is this the entirety of your file?**
A. This is part of the file. That does not include all the depositions and additional information that was provided to us.

Page 109

**Q. Okay. Well, we'll get to this file in a minute, but does the file contain drawings which you believe show that the evaporative cooling media in the CT unit that burned extended above the top of the stainless steel channel?**

A. I don't know whether the drawings over here or in addition to the drawings that may have on the other exhibits can also substantiate that condition of installation.

**Q. Okay. Do you want to look? Do you know if there is one that you brought with you today that shows that?**

A. Here is one that shows you all the way up from the bottom to the top.

**Q. From the bottom to the top of what?**

A. The second level.

MS. DAVIS: Can you identify it?

MR. VESPOLE: I will in a second. I'm trying to figure out where it's from or what it is.

MR. SHULTZ: Title block cut off of it?

MR. VESPOLE: It is.

MR. FREEL: And there may have

Page 110

been a Bates number at one point, too. If there was, it's also cut off.

MR. SHULTZ: I think it's a pneumafil drawing.

**Q. Why don't you look and see if there are any other drawings?**

A. Is this not adequate?

MR. FREEL: Look and see if there are more.

MR. VESPOLE: I'm going to have copies of this one made. Off the record.

(OFF THE RECORD)

(ZAMPELL'S EXHIBIT S MARKED FOR IDENTIFICATION)

**Q. Mr. Nalbandian, have you finished?**

A. This is the only drawings that depicts that condition of installation.

**Q. So the only drawing is the exhibit we've marked as Zampell S; is that correct?**

A. Yes.

**Q. And is it your understanding or your opinion, based upon reviewing this drawing, that the evaporative cooling media extended above the stainless steel channel on the inside of the plenum prior to the fire?**

Page 111

A. Yes.

**Q. Why don't you show me on this drawing, maybe you can make some marks, how it is you come to that conclusion?**

A. Four stacks, so it's got to be way up here.

**Q. Does the drawing show the channel?**

A. No.

**Q. Does the drawing show the evaporative cooling media?**

A. Yes.

**Q. Do you know if the evaporative cooling media was installed in accordance with the details shown on this drawing?**

A. I presume that would be the case.

**Q. That's a presumption, you don't know for a fact?**

A. That basically the installation instructions done the way that I take it as being a condition that existed prior to the incident.

**Q. Well, what's the unit that burned, CT1?**

A. Yes.

**Q. And CT2, do you know if CT2 was designed to the same specifications as CT1?**

A. I don't know, but I assume it will be identical.

Page 112

**Q. So is your opinion that if CT1 was designed to the same specifications as CT2, that both of them would be designed in accordance with this exhibit, Zampell S?**

A. The design is what the design is. I don't know how the fabrication is going to be otherwise what is depicted over here.

**Q. Well, would you make the same presumption for CT1 that you made for CT2, which was that it was built or fabricated in accordance with that drawing that we've marked as Zampell S?**

A. Yes. I would make the same reference.

**Q. When you made any of your site inspections, the one a couple of years ago and the one just a couple of weeks ago, did you happen to notice whether or not the evaporative cooling media in the CT unit that did not burn did, in fact, have the media extend above the stainless steel channel?**

A. I did not really look. Last time I was there, it was just cursory visual examination; nothing more than in and out type of a situation as far as the No. 2 is concerned.

**Q. Is it your testimony here today that this drawing,**

Page 117

Q. You would agree with me that there's no reference to those conversation specifically in any of the Thielsch report, is there?
A. No. The opinions are rendered by the statements that they have incorporated in the report.
Q. Would it have been Thielsch Engineering's practice for Mr. Cooney and/or Mr. Basile to have made written notes of any conversations or relevant information about the cause and origin of a fire that was going to be the subject of an opinion that made its way into a report like this?
A. Well, they were basically looking at the metallurgical aspect of it. In addition, they may have asked questions, they may have written down some notes, but the content of their knowledge is expressed in the report.
Q. The statements in the report about the fact that the evaporative cooling media was above the top of the channel, are those statements that were written by Mr. Cooney or by Mr. Basile and not yourself?
A. I just don't recall who had made the statement as such, but I would subscribe that we all had the

Page 118

same understanding that was basically stated in the report.
Q. But your understanding was based upon what Mr. Cooney and Mr. Basile told you about their conversations with plant personnel at the time of their inspection?
A. Plus the information, we have the exhibit that shows the extent of the location, yes.
Q. Exhibit Zampell 20?
A. Yes.
MR. FREEL: "S," you keep calling it "20."
Q. Anyway, do you know if Mr. Cooney or Mr. Basile verified whether or not either of the CT units were actually fabricated consistent with this Zampell S drawing?
A. Since there were none left, I don't know if they could have been able to verify anything.
Q. Well, could they have verified the other CT unit that didn't burn down was fabricated in accordance with this drawing?
A. I don't know.
Q. Okay. When welding is done properly, does the base metal become molten?

Page 119

A. Certain sections it should.
Q. Well, would you agree that certain sections would have to become molten so that the weld wire mixes with the base metal; isn't that the whole purpose of welding?
A. Yes.
Q. What is it that distinguishes the difference between a proper weld in which the welding wire mixes with the base metal and a situation which you've described as burn-through where you claim that there's excessive heating?
A. Yes.
Q. What's the difference?
A. Difference is one has molten metal through the sheet metal that it has gone through; whereas the other one is only a section of the base metal substrate is fused to the contacting material which is being welded to.
Q. So if I understand it, it's your opinion that base metal, that the thickness of the stainless steel that was involved in this case, that if a weld was done properly, there should not be any evidence of any molten metal on the reverse side of the stainless steel?

Page 120

A. If you don't burn through, you should not see.
Q. That's not my question. My question to you is if a weld is done properly on the gauge of stainless steel that was part of the evaporative cooling system in this case, if welding is done properly, are you telling me that there wouldn't be any evidence of molten metal on the opposite side of the stainless steel?
A. What is opposite side?
Q. The inside.
A. Should not be.
Q. That's your opinion?
A. Based on what you're describing.
Q. That's what I'm asking you to do. Mr. Nalbandian, if for some reason evaporative cooling media did not extend above the top of the evaporative channel, would your opinion be any different about the cause and origin of the fire?
A. Under circumstances, if there's a combustible in the vicinity where you have potential in excess of 350 temperature environment, you have potential for combustion.
Q. That wasn't my question. My question was if you assumed that the evaporative cooling media did not

**extend above the top of the stainless steel channel, would that change your opinion about the cause and origin of the fire?**

MR. FREEL: Objection. You may answer.

A. It may not change the relationship between the burn-through and the combustion.

**Q. That would not change?**

A. No.

**Q. So it would still be your opinion that this burn-through was the cause and origin of the fire even if the evaporative cooling media was not 1/16 inch away from the point of burn-through?**

A. Yes.

**Q. And how close would the evaporative cooling media have to be from the point of burn-through in order for your opinion to continue to be that the burn-through was the cause and origin of the combustion of the media?**

A. At the position where the temperature of the media is less than 350.

**Q. Do you know where that is, what the distance would have to be?**

A. No. It depends on relationship of the



temperatures.

**Q. Okay. Well, do you accept the fact that in situations in which there was burn-through similar to that shown in C-3 and there was carbon steel between the welding and the evaporative cooling media, that there wasn't enough heat to ignite the evaporative cooling media?**

A. You mean the stainless steel channel.

**Q. I'm sorry. I'll say the question over again. Would you agree with me that in those welds that were similar to C-3, that is C-1 and C-2 in which there was burn-through, but the stainless steel channel was in between the burn-through and the evaporative cooling media, that there wasn't enough heat to ignite the evaporative cooling media?**

MR. FREEL: Objection. You may answer.

**Q. You agree with that?**

A. If there is no heat to above 350, you will not have that potential condition for ignition.

**Q. So it is your opinion that when the welder welded C-1 and C-2 that there wasn't 350 degrees of heat generated on the other side of the stainless steel**



**channel to ignite the media?**

A. Apparently it wasn't.

**Q. I just have a few more questions. If you can go to your report, which has been marked as Exhibit P, and go to Figure 17; do you see that?**

A. Yes.

**Q. There's a piece of steel framing in the right of the photograph, to the right of the ladder; do you see that?**

A. All the way to the edge?

**Q. Yes.**

A. Yes.

**Q. There's a horizontal and what appears to be a connected vertical member?**

MR. FREEL: Be better, Mark, if you came over here. I want to be sure that you're both talking about the same thing.

**Q. I'm talking about in my photograph, this member here, the vertical member and the one that appears to be horizontal?**

A. I don't know whether there's a diagonal member on the right side. After it has been basically bent out of shape, I don't know which component it is.



**Q. You see what I'm talking about though, right?**

A. You're talking about this darker membrane?

**Q. I'll show you on my copy which looks a little bit different. I'm talking about what appears to be this member here, that is a member, and the horizontal member that appears to be butt up against it; do you see that now?**

A. Yes.

**Q. Do you know what that framing is?**

A. No, I don't recall.

**Q. That's fine. And going to Figure 18, the top photograph on Figure 18?**

A. Yes.

**Q. Exhibit P; do you see that?**

A. Yes.

**Q. There's a piece of what appears to be a piece of framing with bolts through it. It's horizontal to the top of the channel; do you see that?**

A. Yes.

**Q. Do you know what that is?**

A. No.

**Q. Do you know if that framing has anything to do with the evaporative cooling media?**

A. I don't know.

**Q. And in Figure 21, top photograph?**
A. Yes.
**Q. Do you know what happened to the perpendicular part of the angle clip that seems to be missing from the top photograph, but is present in the other two photographs of C-2 and C-1?**
A. With the angle?
**Q. Well, if you look at the two bottom photographs, C-2 and C-1, you can see the two sides of the angle clip, do you not?**
A. Yes.
**Q. But in the top photograph of C-3, you don't see the two sides, you only see one, I think, unless I'm visually challenged?**
A. Frankly, you know, visually challenged is sometimes when you look at it, oblique, that view takes you to horizontal. I can't tell from this view either.
**Q. You can't tell from this view that one of the angle pieces for the angle clip in C-3 is not in that photograph?**
A. It appears as if there is a line rather than a angle like you see in the lower photographs, that's true.



**Q. Okay. Do you know if and why that piece is missing?**
A. I don't know.
MR. VESPOLE: Off the record.
(OFF THE RECORD)
**Q. On page 13 of your report in the second paragraph, the last sentence, there's the following statement. I'll read it. It says, "The visual examination of the damaged structure and components reveal that the fire had originated in the southeast section of the air inlet plenum where the evaporative cooling media were installed and propagated from the southeast section to the north and upward, the second and third level"; do you see that sentence that I read?**
A. In the second paragraph, the last three lines.
**Q. Actually, it's the last four lines, but yes. Five lines to be exact.**
A. Yes.
**Q. Who made the visual examination of the damaged structure and components to lead to that conclusion?**
A. Both Mike, Bob Basile, and myself.
**Q. Okay. What was it about the visual examination**



**that lead you to the conclusion as stated in that passage we just read?**
A. Basically, when you look at the profile on the external surface, you can see discoloration on the surface on the outside that shows relative areas of discoloration on the stainless steel where the effectiveness of the heat can show different tints. And that gives you a location where the discoloration would be related to the location of the fire which had originated and expanded from there on.
**Q. How was it determined for the purpose of inclusion of this report that the temperature in the area of the inside surface of the plenum would have reached at least 2800 degrees during the welding process?**
A. Well, basically, that relates to the melting of the metal; that it is generally, if it is molten, the temperature of molten stainless steel would be 2650 to 2800, 2750 degrees.
**Q. The temperature at which stainless steel becomes molten?**
A. Molten metal, yes.
**Q. What is the temperature at which welding metal**



**mixes with the base metal in order to do a proper weld?**
A. Basically, you melt it.
**Q. What's the temperature?**
A. That would be basically 2600, 2700 degrees.
**Q. The same, isn't it?**
A. Yes.
**Q. Are you familiar with a report dated December 16, 2004, that Mr. Basile sent to Peter Holzapfel?**
A. I believe I have read it, yes.
**Q. And in that -- I didn't bring an extra copy with me. You don't happen to have a copy in front of you? Do you have a copy in your file; do you know?**
A. I don't believe so.
MR. FREEL: What is the date, Mark?
MR. VESPOLE: December 16, 2004. Two pages.
MS. DAVIS: I have Jack's, but his is marked up, too.
MR. FREEL: December 16, 2004. I'll let him look, but I don't think it's in here.
MR. VESPOLE: We're going to put a