# EXHIBIT B

# ENGINEERING ASSOCIATE SERVICES

P.O. Box 5420
Wakefield RI 02880
TEL (401) 783-1591
FAX (801) 729-0611
eas302@aol.com

8/16/06

Asquith & Mahoney, LLP
155 South Main Street
Providence, Rhode Island 02903-7115

Attention: Mr. John R. Mahoney

Subject: Florida Power and Light vs. Certified Power System

Dear Mr. Mahoney

At your request I have performed a detailed review of all information forwarded to me concerning the Rhode Island State Energy Partners vs. Zampell Insulation, LLC claim No. P 103-040722-01. The key documents I used to arrive at my opinion are listed below; other supporting documents are listed on attachment A.

Key documents used to support opinion:

1. Deposition: Mr. Anthony Lunardini, S & L Project Manager, dated 6/07/06
2. Deposition: Mr. Joseph Lula, S & L Project Mechanical Engineer, dated 6/06/06
3. Deposition: Mr. Lyle Gastineau, S & L Field Engineer, dated 5/03/06
4. Minutes of weekly conference call dated 7/28/06, exhibit S&L #1
5. Minutes of pre-bid meeting dated 7/29/06, exhibit S&L #2
6. Drawing No. Z1002-0008, titled, "CPS @ FPLE Rhode Island Typical Insulation Subgirt Layout" , exhibit S&L #14
7. Letter No. RISEC-04-055T, with attachments and Installation Drawings, dated 10/26/04, exhibit S&L #17
8. Installation sketch by Mr. L Gastineau, dated 11/03/04, exhibit S&L #18
9. Letter No. RISEC-04-061T, Inlet Air Heater- Field Demo & Installation blank-off panel, dated 11/05/04, exhibit S&L #19
10. Job Description: Technical Field Advisor, dated 8/24/04, exhibit S&L #22
11. Siemens – Westinghouse Power Corporation FPLE – RISE, Multi-Stage static Intake Air Filter System, "Operation and Maintenance Instructions" , dated 9/28/01
12. Report, Thomas W. Eager, ScD., P.E., dated 7/11/06
13. National Fire Protection Code, NFPA 51B

Based upon my review I have made the following observations and I have formed the following opinions within a reasonable degree of engineering certainty.

1 S&L was hired by FL&L as their professional engineer at the Rhode Island State Energy site. S&L was responsible to protect the interest FP&L. As the professional engineer on site, it was S&L technical responsibility to insure that all work completed conformed to the code, specification and safety requirements. Even though S&L was not responsible for the construction activities at the plant it did not relieve them of the technical responsibility to insure that the construction was performed in a safe manner. Mr. Gastineau himself acknowledged that when he noted on his drawing of the Air Filter units (exhibit 18), stating, "GWC to protect paper filters during removal of six panels"

2 Mr. Joseph Lula, Project Mechanical Engineer confirmed that S&L had the ultimate safety responsibility when he testified during his deposition on 6/6/06 (page 77, line 19-24 and page 78, line 1-10.) In response to the question "who at S&L had ultimate responsibility for safety pertaining to the design? He stated "I would say each responsible individual would have knowledge of those areas that fell into their area of involvement"

3 Mr. Anthony Lunardini, Project Manager confirmed that S&L had the ultimate safety responsibility when he stated in his deposition on 6/7/06, (page 103, line 5-22), in response to the question, "Was it customary for the field engineers such as Mr. Gastineau working for Sargent & Lundy at the time to provide that type of information where there is a known hazard relative to hot work that, I guess is specified?" His answer to the question was "Yes".

4 Another examples of S&L responsibility is stated on exhibit S&L 22 which was written by S & L, dated 8/24/04, titled, "Technical Field Advisor Responsibilities", Item 1, which states "Monitor and track the contractor's construction schedule and assist when required to insure that the project goals are met" Item 3 " Monitoring the erection contractor's work regarding compliance with codes, standards, and contract." and Item 11, which states "Assist the client in monitoring the contractors Job Safety Plan"

5 The welding and safety measured required to protect against the fire hazard was discussed many times during the course of the project. Mr. Lyle Gastineau was well aware of the issue as he stated in his deposition on 5/3/06, (page 43 lines 13 to 24 and page 44 lines 1 to 6). On line 23, "Yes, I recognized the hazard"

6 Mr. Lyle Gastineau in his deposition on 5/3/06, (page 108 to 118), confirms that he was well aware of the need to protect the paper filters when cutting, welding and grinding was being done. He himself witnessed the wetting down of the paper filters and barriers that were put up so that sparks from the acetylene oxygen torch wouldn't ignite the filters when unit 2 was being worked on. He states, "There was a flame retardant barrier put behind the steel plate in front of the three filters……"

7 Other examples of fire issues are documented in the project technical requirements, 18 and the "*Siemens-Westinghouse Multi-Stage static Intake Air Filter, Operation and Maintenance Instructions"* on page ix, *Safety Notes:* ***WARNING****: "Filter and cooler media are flammable. Before any welding or flame cutting (inside or outside) is done, all media must be isolated and protected from possible contact with heat, sparks or fire. If installed, evaporative cooler media can be protected by keeping it thoroughly wet."*

*"Welding should be performed only when appropriate fire protection equipment is immediately available. If installed, Evaporative Cooler Media must be completely wet with water".*

In fact Exhibit 18 was sent by Mr. Gastineau S & L Field Engineer to Mr. Lunardini, S&L Project Manager which is further evidence that S & L and their project personnel were well aware of the need to protect against fire hazard during the welding process.

8 The National Fire Protection Association (NFPA), section NFPA 51B, “Standard for Fire Prevention During Welding, Cutting, and Other Hot Work”, 2003 Edition, in Chapter 4 clearly states the responsibility of Management in subsection 4.1.6, “Management shall ensure that all individuals involved in the hot work operations, including contractors, are familiar with the provisions of this standard.” Subsection 4.1.7, “Management shall advise all contractors about site specific flammable material, hazardous processes or conditions, or other potential fire hazards.”

Under section 5.3 of the NFPA, “Hot Work Permit” in subsection 5.3.2, Item (3), “All combustibles shall be relocated at least 11 m (35 ft) in all directions from the work site and the following criteria also shall be met:” (a) “If relocation is impractical, combustibles shall be protected with fire-retardant covers or otherwise shielded with metal or fire-retardant guards or curtains.” Item(7) “ If hot work is done on one side of a wall, partition, ceiling, or roof, one of the following criteria shall be met:” (a) “Precautions shall be taken to prevent ignition of combustibles on the other side by relocating the combustibles.” (b) “If it is impractical to relocate combustibles, a fire watch shall be provided on the opposite from where the work is being performed.”

My expert opinion is:

1. S & L had the technical responsibility to insure that the project components were designed and safely installed. S & L did not take adequate measures to insure the welding of sub-girts was performed in a safe manner.

2. S & L was FPLE's engineer of record on the site and should have had full knowledge of all the codes and technical requirements, including the NFPA to complete their scope of work for FPLE. S & L did not follow the critical requirements of the NFPA and take precautions to prevent ignition of combustibles on the other side of the vessel wall.

3. S & L had full knowledge of the danger of welding on this project and acknowledged that fact several times during their depositions. S & L was negligent in their professional duty in not securing adequate safety measures to insure that some type of flame retardant barrier was used behind the steel plates to prevent the ignition of the evaporative media.

4. S & L and FPLE were deficient in failing to giving Zampell instructions as to the existence, location and the flammability of the evaporative cooling media that existed during the welding process. It was S & L's responsibility to insure that Zampell was made aware of any safety hazards that existed on the other side of the wall on which they were welding before welding begin.

5. S & L was negligent in their responsibility to fully comprehend the technical scope of the project since they admittedly acknowledged that they failed to recognize that the media inside the plenum was flammable. S & L was FPLE's engineer of record (Purchase Order 00-ENG-0822A, Section "design" Item 1) therefore it was their responsibility to understand all the technical and safety requirements on the project. It was not Zampell's responsibility to insure that suitable safety measures were taken to protect against a fire during the welding of sub-girts.

Very truly yours,

ENGINEERING ASSOCIATE SERVICES

M. B. Plunkett, P.E.
President

ATTACHMENT A

Additional documents which were use to arrive at my option were:

1. FireFact Investigation Report # 50-3093, dated 8/26/05
2. Interrogatories: Mr. Peter G. Holzapfel, dated 10/4/05
3. Interrogatories: Mr. Brian Flynn, dated 8/15/05
4. Interrogatories: Mr. Girard R. Visconti, dated 7/29/05
5. Nathaniel Johnson report dated 5/9/05
6. FPL Energy Projects Contractor Safety Requirements
7. Specification No. F-6102 Rev B dated 07/23/04
8. Regulatory status Of Dowfrost Fluid
9. Project Design Manual, RISE 092700-1
10. Johnson Fire Dept Incident Report, dated 01/27/05
11. Statement of Claim 7 counterclaim, dated 4/22/05
12. Narratives senior investigator Kevin M Murphy, dated 12/07/04
13. Repair Estimate, from Lisa Kuzel to Brian Flynn (CPS), 2/4/05
14. Thielsch Engineering Report, dated 1/18/05
15. Hot Work permit HWP#1587, dated 12/3/04
16. Daily Safety meeting , dated 10/04/04, 11/30/04, 12/7/04
17. Zampell Daily Activity Plans, from 10/12/04 to 12/17/04
18. Certified Power System Summary Interviews
19. Defendants' responses and objections to certified power systems first set of interrogatories.