# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CERTIFIED POWER SYSTEMS, :
INC. :
 :
vs. : C.A. NO. 05-066-ML
 :
RHODE ISLAND STATE ENERGY :
STATUTORY TRUST 200, FPLE :
RHODE ISLAND STATE ENERGY :
L.P. AND FPLE RHODE ISLAND :
STATE ENERGY GP, INC. :

vs. :

CERTIFIED POWER SYSTEMS, INC. :

vs. :

ZAMPELL REFRACTORIES, INC. :

DEPOSITION OF MICHAEL B. PLUNKETT produced, sworn and examined on September 6, 2006, at 12:00 P.M. on behalf of Defendant, Sargent & Lundy, before Linda S. Taylor, Notary Public, at the office of Asquith & Mahoney, LLP, 155 South Main Street, Providence, Rhode Island.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RHODE ISLAND 02915
(401)437-3366

RHODE ISLAND COURT REPORTING (401) 437-3366

I N D E X

| DEPONENT | PAGE |
|---|---|
| MICHAEL B. PLUNKETT | |
| EXAMINATION BY MS. DAVIS | 4 |
| EXAMINATION BY MR. BATASTINI | 71 |
| EXAMINATION BY MR. VESPOLE | 81 |
| RE-EXAMINATION BY MS. DAVIS | 83 |

E X H I B I T S

| EXHIBIT DESCRIPTION | PAGE |
|---|---|
| DEFENDANT'S (S&L) | |
| 1  REPORT OF M. PLUNKETT | 4 |
| 2  RESUME OF M. PLUNKETT | 4 |
| 3  PROJECT EXPERIENCE OF M. PLUNKETT | 4 |
| 4  RESUME SUMMARY OF M. PLUNKETT | 13 |

RHODE ISLAND COURT REPORTING (401) 437-3366

APPEARANCES
For the Plaintiff:
TRESSLER, SODERSTROM, MALONEY & PRIESS
744 Broad Street
Suite 1510
Newark, New Jersey 07102-3812
BY: MARK ROBERT VESPOLE, ESQ.
For the Defendant:
(Zampell)
ASQUITH & MAHONEY, LLP
155 South Main Street
Providence, Rhode Island 02903
BY: JOHN R. MAHONEY, ESQ.

(FPL/RISE)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, Rhode Island 02903
BY: ARMANDO E. BATASTINI, ESQ.

For the Fourth Party Defendant:
(Sargent & Lundy)
MECKLER, BULGER & TILSON, LLP
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
BY: JANET R. DAVIS, ESQ.

HIGGINS, CAVANAGH & COONEY
123 Dyer Street
Providence, Rhode Island 02903
BY: STEPHEN B. LANG, ESQ.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RHODE ISLAND 02915
(401)437-3366

RHODE ISLAND COURT REPORTING (401) 437-3366

Page 4

1   (DEFENDANT'S EXHIBIT 1 MARKED FOR
2   IDENTIFICATION)
3   (DEFENDANT'S EXHIBIT 2 MARKED FOR
4   IDENTIFICATION)
5   (DEFENDANT'S EXHIBIT 3 MARKED FOR
6   IDENTIFICATION)
7   (COMMENCED AT 1:00 P.M.)
8   MICHAEL B. PLUNKETT
9   Being duly sworn, deposes and testifies as follows:
10       THE REPORTER: Would you state your
11   full name for the record, please.
12       THE DEPONENT: Michael B. Plunkett.
13       EXAMINATION BY MS. DAVIS
14  Q. Mr. Plunkett, my name is Janet Davis. I represent
15     Sargent & Lundy in this case, and I'm going to be
16     asking you some questions.
17         Prior to the start of the deposition, we
18     marked as exhibits your report, resume, and a list
19     of project experience. Those are Plunkett 1, 2,
20     and 3 respectively, correct?
21  A. Correct.
22  Q. And Plunkett 1, your report dated August 16, '06,
23     is that only report which you have issued with
24     respect to this case?



1 (Pages 1 to 4)

Page 25

1  be associated with the project. It wasn't any
2  direction I was given in terms of looking at any
3  particular entity.
4  Q. And so did you look at and evaluate whether or not
5  there was any testimony or opinion that you would
6  have with respect to CPS, Certified Power Systems?
7  A. I'm not too sure I understand your question.
8  Q. I'll rephrase it. You indicate that you were
9  retained, you formulated your opinions, and that,
10 and as we see in your report, those relate to
11 Sargent & Lundy and Florida Power & Light; is that
12 correct?
13 A. That's correct.
14 Q. Did you not form any opinions with respect to CPS
15 or did you -- what did you look at with respect to
16 them, if anything?
17 A. I reviewed documents that CPS was obviously
18 referenced to and a number of other CPS documents,
19 but I didn't draw any conclusions as to CPS in
20 terms of my opinion.
21 Q. And my question is what's the reason for that?
22 A. Well, the reason is that after my review, I
23 concluded that Sargent & Lundy, they were the
24 project engineer on the project and they held the

Page 26

1  ultimate technical responsibility to ensure that
2  the project was done in a quality manner.
3  Q. I still don't think you've answered my question.
4  My question is do you not have any opinions about
5  CPS or were you not asked to give any opinions
6  about CPS or both?
7  A. After reviewing the documents, I have no
8  opinion about CPS.
9  Q. But you do understand from reviewing the documents
10 that CPS was to have the primary responsibility for
11 the means, method and manner of the work; is that
12 correct?
13      MR. MAHONEY: I object. You may
14 answer.
15 A. The purchase order states that, that you just
16 said.
17 Q. Which purchase order are you referring to?
18 A. I believe the purchase order Exhibit 27A.
19 Q. So you're talking about the Sargent & Lundy
20 purchase order, not the contract that CPS
21 ultimately had?
22 A. Yeah. I'm not referring to that at all.
23 Q. Did you review CPS's contract?
24 A. I probably have, but I can't remember the

Page 27

1  exact wording in the CPS contract now.
2  Q. So as you sit here today, you can't say what
3  obligation CPS had pursuant to its contract?
4  A. As I sit here today, I probably can't, no.
5  Q. Can you take a look at Exhibit Number 1 which is
6  your report dated August 16, '06. I think we've
7  established that --
8  A. Are you talking about this report here?
9  Q. Yes.
10 A. Okay.
11 Q. Here it is. Here's the marked one, Exhibit 1,
12 8/16/06. And I think we've previously established
13 that this is the only report that you have issued;
14 is that correct?
15 A. That's correct.
16 Q. On the first page of your report, you list the key
17 documents that you refer to and rely -- excuse
18 me -- that you relied on in arriving at your
19 opinion and then in Attachment A, there are other
20 documents which you identify as supporting
21 documents; is that correct?
22 A. Correct.
23 Q. Are there any documents other than those listed
24 either on page one of your report or Attachment A

Page 28

1  to your report upon which you are relying and
2  formulating your opinions in this case?
3  A. Yeah. I believe I didn't indicate the
4  Exhibit 27A here, the purchase order of Sargent &
5  Lundy.
6  Q. Maybe when we take a break, we'll get some copies
7  made of that and we'll come back to that.
8     The documents that you have listed, were these
9  documents given to you or documents that you
10 compiled on your own?
11 A. They were given to me.
12 Q. And from whom did you receive these documents?
13 A. From Jack Mahoney.
14 Q. And based upon the lists that you have, it appears
15 that you only reviewed the testimony of three
16 Sargent & Lundy witnesses; is that correct?
17 A. That's correct.
18 Q. And is that because those were the only ones that
19 Mr. Mahoney gave you?
20 A. I believe I was given some interrogatories,
21 but I believe that's the only -- to the best of my
22 recollection, those are the only three depositions
23 I reviewed.
24 Q. And in formulating your opinion about the roles of

Page 37

1  insulation was being installed on the exterior of
2  the inlet?
3  A. Well, I believe that the people responsible
4  for the project needed to heed to both warnings, a
5  warning put on this document and a warning put on
6  this document.
7  Q. When you say the people responsible for the
8  project, to whom are you referring?
9  A. Sargent & Lundy.
10 Q. You don't think CPS was responsible for the work
11 they were doing on the project?
12 A. I don't have an opinion of CPS at that time.
13 The documents I reviewed pointed me directly to
14 Sargent & Lundy's responsibility.
15 Q. And you haven't broadened your scope to look at
16 other documents available in this case to determine
17 anybody else's responsibility?
18 A. Again, I reviewed the documents associated
19 with my report, and from those documents I
20 concluded that Sargent & Lundy was neglect in their
21 responsibility.
22 Q. Let me go back to my earlier question then. Were
23 you requested in your retention with respect to
24 this case to provide opinions with respect to

Page 38

1  Sargent & Lundy? Was that your original task?
2  A. No.
3  Q. And yet the documents that you were given relate
4  basically to Sargent & Lundy; is that correct?
5  A. Not totally, no.
6  Q. So who else do they relate to?
7  A. Well, I'd have to go through one by one, but
8  there's narratives, there's specs, there's plans.
9  There's a number of reports.
10 Q. Let's talk about one of those reports for a second.
11 You just pointed with your pen to item number 12
12 which is the report of Dr. Eager. What in
13 Dr. Eager's report did you rely on in coming to
14 your opinions which you expressed in your report
15 which is Exhibit 1?
16 A. I'd have to look at his report.
17     MS. DAVIS: Okay. Could you do
18 that? We can wait until we take a break, Jack.
19 That's fine. We'll come back to Eager.
20 Q. So have we now covered everything that you were
21 looking at with respect to forming opinion number
22 one on page two of your report?
23 A. No. I believe that Exhibit 27A was something
24 I'm relying upon.

Page 39

1  Q. Okay. And as I said, we'll come back to that when
2  we have a chance to get a copy. We might want to
3  go through that in a little more detail.
4     Opinion number two relates to Mr. Lula's
5  testimony. Is there anything other than what you
6  refer to in number two upon which you're relying in
7  making this statement?
8  A. No. With Mr. Lula, pretty much what he said
9  in his testimony.
10 Q. So you're talking about the pages and lines you've
11 indicated?
12 A. Correct.
13 Q. We briefly talked about opinion number three when
14 we started with Mr. Lunardini's testimony. Is
15 there anything that you relied upon in formulating
16 opinion number three other than the testimony of
17 Mr. Lunardini as indicated by page and line number
18 in that number three?
19 A. Other than the 27A, his testimony, and for
20 all -- actually for all these, the ASME codes and
21 regulations that the plant was -- that Sargent &
22 Lundy was responsible to perform work under.
23 Q. Okay. We'll get to those in a minute then.
24     Number four. Number four refers to S&L 22

Page 40

1  which is a handwritten document by Mr. Lunardini;
2  is that correct -- I mean, by Mr. Gastineau?
3  A. I'm not too sure if it's handwritten. No, it
4  was a typewritten document.
5  Q. This is the one with 14 points entitled Technical
6  Field Advisor Responsibilities, correct?
7  A. Correct.
8  Q. Anything other than the points in that document
9  which are indicated in number four on which you
10 relied?
11 A. Again, that document leads me to the codes and
12 standards and regulations that the plant was -- the
13 plant and the project was to be built to.
14 Q. The end of number four indicates, Item 11 states,
15 "Assist the client in monitoring the contractor's
16 job safety plan."
17     Did you review the contractor's job safety
18 plan?
19 A. I can't recall.
20 Q. Okay. Nothing else with respect to number four
21 other than S&L 22?
22 A. That's correct. And, again, the codes and
23 standards.
24 Q. And when you say codes and standards, you're

Page 41

1   referring to specifically what?
2   A.  The ASME codes, National Fire Protection Code.
3   Primarily those.
4   Q.  Okay. Number five, you state, "The welding and
5   safety measured required." Did you mean measures
6   there? "The welding and safety measures required
7   to protect against the fire hazard was discussed
8   many times during the course of the project."
9   A.  Hm-mmm.
10  Q.  On what do you rely to make that statement?
11  A.  There were a number of areas within the
12  depositions of Mr. Gastineau, Mr. Lula, and
13  Mr. Lunardini that clearly represented that they
14  were well aware and they recognized the hazard.
15  Q.  And are you aware that there's considerable other
16  testimony about those discussions in this case
17  which you have not reviewed?
18          MR. MAHONEY: I object. You may
19  answer. You answer every question if you can.
20  A.  I'm not aware.
21  Q.  You don't know what anyone else in the case has
22  said about these discussions?
23  A.  No.
24  Q.  Number six, you refer to a point from

Page 42

1   Mr. Gastineau's deposition testimony. This all
2   relates to the paper filters, correct?
3   A.  That's correct.
4   Q.  And the paper filters don't have anything to do
5   with the fire as we understand in this case, do
6   they?
7   A.  I don't understand your question there.
8   Q.  What do the paper filters have to do with the fire
9   in this case?
10  A.  Well, it was the -- they were -- I believe
11  they were a part of the insulation that was burned.
12          MS. DAVIS: I think you should read
13  that question and answer back, please.
14          (LAST QUESTION AND ANSWER READ)
15  Q.  And that's your answer?
16  A.  Yes.
17  Q.  You believe that paper filters are part of the
18  insulation?
19  A.  No. I believe they were part of the
20  components that burned.
21  Q.  But is it your understanding the paper filters were
22  ignited and that was the beginning of this fire?
23  A.  In terms of the details of how the fire
24  actually started, that's up for speculation,

Page 43

1   basically. The fire started basically because of
2   the welding and there was no protection of the heat
3   transfer through the outer component and, because
4   there was no protection, then the extreme heat
5   caused the fire. Whether the -- what caught fire
6   first is, in my opinion, up for speculation.
7   Q.  I think we'll leave that and move on.
8           Number seven. Anything other than what you've
9   referred to here that you relied on in coming to
10  number seven?
11  A.  Only that a number of people were well aware
12  of Item 18 which is the manual which was sent to a
13  number of people at Sargent & Lundy.
14  Q.  And you have no idea if this information was also
15  sent to CPS and/or Zampell, do you?
16  A.  I'd have to look at -- yeah. It looks like
17  Item 18 was also distributed to three people at
18  CPS.
19  Q.  We're talking about Item 18. We're again back at
20  Mr. Gastineau's sketch of November 3, '04.
21          What I was actually referring to, and I
22  apologize if my question wasn't clear, is what
23  follows that where you talk about the Siemens -
24  Westinghouse Multi-Stage static intake air filter.

Page 44

1   A.  Yes.
2   Q.  Which has, based on your quote, a clear warning
3   that the filter and cooling media are flammable?
4   A.  That's correct.
5   Q.  And upon what do you base the fact that Sargent &
6   Lundy had this document?
7   A.  Well, I'll have to find it first. Do you know
8   what exhibit it is?
9   Q.  I don't know that that is an exhibit.
10          MS. DAVIS: Off the record.
11          (OFF THE RECORD)
12  A.  I'd have to look at the document, the front
13  page document to see who is on distribution for
14  that, but I believe Mr. Gastineau, Mr. Lunardini
15  was definitely on distribution for it.
16  Q.  But you don't know if CPS also received or reviewed
17  that document?
18  A.  I'd have to look for the document to find that
19  out.
20  Q.  I'll see if we can find that for you.
21          Anything else other than Exhibit 18 and the
22  notes that you have from the Siemens - Westinghouse
23  manual that you relied on in your statements in
24  number seven?

Page 45

1  A. Other than the information that I've already
2  given you.
3  Q. Which is what?
4  A. Standard codes and records, the ASME code, the
5  National Fire Protection Code, the purchase order
6  for the document, state codes and regulations.
7  Q. Okay. Number eight is the last item in terms of
8  your observations and opinions, and then you go on
9  to have your expert opinion. We'll ask you what
10 the difference is on that in a second. But number
11 eight isn't really an opinion, is it? It's just
12 quotes from the NFPA?
13 A. That's correct.
14 Q. Okay. What's the difference between one through
15 eight on pages two and three of your report and one
16 through five on your report because you say the
17 first are observations and opinions and then you
18 say you have five expert opinions?
19 A. Well, the one through eight are the documents,
20 the primary documents, primary documents I relied
21 upon to draw my opinions from.
22 Q. So those aren't really opinions; those are
23 observations about the documents, and then you go
24 on to give your opinions?

Page 46

1  A. Yeah. Observations and quotes directly from
2  documents, yes.
3  Q. Okay. Let's go on then to the next page of your
4  report which list your five opinions. Starting
5  with number one, anything we haven't already
6  discussed upon which you relied in forming number
7  one?
8        MR. VESPOLE: Object to the form of
9  the question. You can answer, certainly.
10 A. Again, not to repeat myself, but Sargent &
11 Lundy had the professional responsibility to ensure
12 that the design was properly done, including the
13 quality verification of their design, and they
14 should have relied upon the codes and regulations
15 that the plant was being designed to.
16 Q. And when you say properly done, are you talking
17 about design or are you talking about the completed
18 work?
19 A. When I speak of design, I'm speaking about the
20 total. The design doesn't end when Sargent & Lundy
21 put something on the paper. The design ends when
22 the project is completed, when the welds are
23 completed, when the job is completely completed
24 where Sargent & Lundy can verify the quality -- can

Page 47

1  verify the quality finished product.
2        MS. DAVIS: Move to strike as
3  nonresponsive.
4  Q. When you say that the job was properly done, are
5  you talking about the finished product?
6  A. I'm talking about the finished product, yes.
7  Q. And even though Sargent & Lundy's contract says
8  they were not responsible for the means, method and
9  manner of construction, you still feel that they
10 were the responsible for the job being done safely?
11       MR. MAHONEY: Objection.
12 A. I believe -- I take exception to the fact that
13 you're saying that because I believe that Sargent &
14 Lundy did have the responsibility under the
15 contract and under their professional obligation to
16 ensure that the product got performed in a safe
17 manner.
18 Q. Are you saying that this could not be done safely
19 under the design as it was tendered to the
20 contractor?
21 A. I don't understand your question. Give me
22 that one again.
23       MS. DAVIS: Can you read it back,
24 please.

Page 48

1        (LAST QUESTION READ)
2  A. I'm saying that if Sargent & Lundy had to
3  perform their professional duties in the manners of
4  the codes and regulations, then this design would
5  have been properly done, correct. And I'm saying
6  that both the codes and standards that they had
7  available to them and their purchase order that
8  they had available to them made it clear that they
9  were responsible for the design integrity of the
10 full design, and that means not only the design,
11 but the final product. And they had the
12 responsibility for the quality verification of that
13 design.
14 Q. Well, again, I move to strike your answer as
15 nonresponsive. But as long as you're talking about
16 it, why don't we take a break and let you take a
17 look at Exhibit 27, and I'm going to ask you when
18 we come back to tell me what in that document
19 supports what you just said.
20 A. Sure.
21       (RECESS TAKEN)
22 Q. Mr. Plunkett, before the break, I asked you to
23 refer to the items in Sargent & Lundy Exhibit
24 Number 27A on which you were relying for the

Page 49

1  obligations which you say that Sargent & Lundy had
2  in your report with respect to safety.
3  A. That's correct.
4  Q. And could you tell us what portion of the report --
5  of the Exhibit 27A that you're referring to?
6  A. Under the standard terms and conditions, page
7  two, Item 7.1, which states -- would you like me to
8  read it?
9  Q. Is this in the original agreement between Florida
10 Power & Light or the work authorization for this
11 particular project?
12 A. I believe it's the change order number one of
13 the purchase order.
14 Q. Okay.
15 A. Would you like me to read it?
16 Q. Yes, please.
17 A. "The supplier shall perform work under this
18 contract in accordance with standard of care,
19 skills and diligent consisting with: One, the
20 recognized and sound industry practices,
21 procedures, and techniques; two, all amicable laws
22 and regulations; three, the specification documents
23 and procedures applicable to the work; four, degree
24 of knowledge, skill, and judgments customarily

Page 50

1  exercised by professional firms with respect to the
2  service of similar nature; and five, be suitable
3  for the use intended."
4  Q. And what else in that document do you believe gives
5  Sargent & Lundy the responsibility for safety, safe
6  performance of their work?
7  A. Under page five under the quality assurance
8  title, it states that, "The engineer will define
9  the critical attributes during procurement,
10 manufacturing, and construction to ensure the
11 quality of a final product."
12    And on page one under scope of work, the
13 second page, second sentence says, "Engineering
14 services to be provided will be designed,
15 procurement assistance, quality assurance, and
16 quality verification, project management and
17 construction management."
18    And under the title, Design, item one. The
19 second sentence says, "The engineer is expected to
20 be the engineer of record on the project and will
21 be responsible for verification of the proposed
22 design, will remedy the CT high inlet differential
23 pressure problem under design conditions."
24    On page two, last paragraph, second sentence,

Page 51

1  "The engineer will verify the design conditions to
2  be modeled and work with both model contractors to
3  ensure consistency and compliance to the design
4  basis documents."
5     On page four, last paragraph, "The engineering
6  field management shall represent the engineer and
7  shall be a duly authorized agent of the engineer."
8     I believe that's all of them.
9     MR. MAHONEY: Excuse me. Agent of
10 the engineer? Read that again.
11 A. "The engineering field management shall
12 represent the engineer and shall be a duly
13 authorized agent of the engineer."
14 Q. Thank you for going through and finding those.
15    Tell me which of those say that Sargent &
16 Lundy is responsible for the means, method or
17 manner of the work?
18    MR. MAHONEY: Objection.
19 A. All of the items.
20 Q. And which of those indicate to you that Sargent &
21 Lundy was responsible for the safe performance of
22 the work by the contractor?
23 A. All of the items.
24    MR. MAHONEY: I object. Go ahead.

Page 52

1  Q. And is it your opinion that industry custom and
2  practice, which I believe in the first item you
3  discussed which was the standard of care, that it
4  is the standard practice in the industry for the
5  design engineer to be responsible for the safe
6  performance of the contractor of work on a power
7  plant?
8     MR. MAHONEY: Objection.
9  A. It is the responsibility of the project
10 engineer, in this case Sargent & Lundy, to ensure
11 that their design and the constructability of that
12 design is done in accordance with all the codes and
13 the regulations.
14 Q. And I'd like to ask you again, and I'd like an
15 answer if I can get one this time, as to whether or
16 not you have an opinion that the design as prepared
17 by Sargent & Lundy was not -- that it was not
18 possible to construct in a safe manner?
19    MR. MAHONEY: Objection.
20 A. Of course, it was. Of course, it was. It was
21 designed and could have been constructed in a safe
22 manner if Sargent & Lundy had performed their duty
23 and assured that safety measures were taken during
24 the welding process.

Page 53

1  Q. What safety measures in your opinion should have
2     been taken during the welding process?
3  A. They should have isolated the combustible
4     material from the heat course.
5  Q. And what combustible material do you believe should
6     have been isolated at the time the welding was
7     taking place right before the fire?
8  A. I believe in all the documents, they refer to
9     the evaporative cooling material. I don't really
10    know exactly what the material is made of, but it
11    was a combustible material that was in back of the
12    pressure vessel wall or the vessel wall that needed
13    to be isolated from the heat source.
14 Q. So you have an opinion that this material should
15    have been removed, but you don't really know what
16    it was?
17 A. If I look at the documents. In terms of the
18    actual makeup of the material?
19 Q. You just said you didn't know what it was.
20 A. It's been called the evaporative medium.
21 Q. And that's what you're saying should have been
22    removed?
23 A. Yes.
24 Q. Anything else with respect to opinion number one on

Page 54

1     the last page of your report?
2  A. No. I believe we covered it.
3  Q. Is there anything -- we're going to get into the
4     codes a little bit. So I know for number two,
5     you're talking about the codes. But anything, any
6     documents other than the codes on which you're
7     relying for number two?
8  A. No, other than being the architect engineer
9     and the engineer of record, they should well have
10    had knowledge of the National Fire Protection Code
11    and they should have had knowledge to isolate the
12    heat source from the insulation.
13 Q. Now, in number three -- earlier in your testimony,
14    you talked about removing the material. In number
15    three, you talk about a flame retardant barrier.
16       Based upon your review of the design, the
17    original design of this system, what type of flame
18    retardant barrier could have been inserted to
19    prevent the ignition?
20 A. There are a number of flame retardant barriers
21    used to isolate heat source in the industry.
22 Q. And what of those could have been used in this
23    application to construct a barrier between the heat
24    source and the evaporative cooling media?

Page 55

1  A. Any flame retarding material thick enough to
2     be able to be put between the heat source and the
3     insulation that would have isolated the heat could
4     have been used, and there are a number of heat
5     retardant materials that are used in the industry.
6  Q. I'm going to have her read back your answer and I
7     want to know what you're talking about when you say
8     insulation. Can you read it back, please?
9        (LAST ANSWER READ)
10 Q. What are you talking about when you say insulation?
11 A. The evaporative cooler medium that actually
12    caught fire.
13 Q. Okay. So is it your understanding that's
14    insulation in some way?
15 A. Sure. It's insulation, yeah.
16 Q. What is it insulating?
17 A. Both insulate heat, sound.
18 Q. Okay. Going back to what you said here, flame
19    retardant barrier. You said there are a number in
20    the industry. What flame retardant barrier is
21    available that could have been inserted in this
22    application to have prevented the ignition?
23 A. Offhand, I don't know all of the flame
24    retardant barriers they use in the industry. There

Page 56

1     are a number of them that have been and being used.
2  Q. And what is the thinnest of those that you know?
3  A. I can't answer that right now. It's a
4     function of the heat transfer coefficient of a
5     material in terms of, you know, its heat
6     retardness. So it can be almost any thickness just
7     based on its heat transfer coefficient.
8  Q. Okay. Well, Mr. Plunkett, I'm sure Mr. Mahoney is
9     going to get upset with me at some point soon for
10    arguing with you, but I'm not quite there yet.
11       You have said in one of your opinions that
12    some type of flame retardant barrier should have
13    been used?
14 A. Yes.
15 Q. What flame retardant barrier was available that
16    would have worked in this application?
17 A. Any material that has a heat transfer
18    coefficient low enough such that heat cannot
19    penetrate from one side of the barrier to the
20    other. I do not know exactly offhand what flame
21    retardant materials they're using on power plants,
22    but --
23 Q. And neither do I. But you're the expert, and
24    that's why I'm asking you the question and you

## Page 57

1  won't tell me what they are. I mean, are we
2  talking about a foam? Are we talking some sort of
3  blanket? What are the possibilities? Because what
4  I'm trying to get at is what is the thickness of
5  what flame retardant barrier you envision could
6  work in this application?
7  A. Well, again, it depends upon the heat transfer
8  coefficient of the material being used.
9  Q. And you haven't examined that?
10  A. I haven't examined that, no. But, typically,
11  a flame retardant material that's used to isolate
12  can be anything from, like you say, a blanket to
13  any sort of material that has a heat transfer
14  coefficient that will not allow or that will not
15  allow heat transfer across the barrier. It can be
16  almost any thickness has a function of -- it's a
17  function of the heat transfer coefficient of that
18  material.
19  Q. And any thickness meaning less than an eighth of an
20  inch?
21  A. It depends on the heat transfer coefficient.
22  Q. All right. You have an opinion that some type of
23  flame retardant barrier should have been used, but
24  you don't know what it could have been and you

## Page 58

1  haven't analyzed that?
2  A. I haven't analyzed exactly what type of
3  barrier they should have used, no. And typically
4  in the power plant business, they use a number of
5  barriers to isolate heat from a source.
6  Q. But as you sit here today, you can't tell me what
7  of those that are used might have worked in this
8  instance?
9  A. As I sit here today, I can't tell you that,
10  no.
11  Q. And is that something you anticipate being able to
12  tell us by the time you testify at trial?
13  A. I could. Sure.
14      MS. DAVIS: Well, if you're going
15  to amend, Mr. Mahoney, I'd appreciate hearing
16  about it before the trial.
17  Q. Number four. Is there anything that you are
18  relying on to form number four that we have not
19  already discussed?
20  A. Basically, just the depositions that I
21  reviewed.
22  Q. And based upon the testimony that you reviewed
23  which admittedly is three depositions of the, I
24  don't know how many, 15 to 20 that were taken in

## Page 59

1  this case, do you have an understanding that S&L
2  and FPLE were giving Zampell instructions directly?
3  A. To my knowledge, they did not.
4  Q. Then how can you make the statement that you have
5  in number four that, "S&L and FPLE were deficient
6  in failing to give Zampell instructions," et
7  cetera?
8  A. Because I see no evidence that I reviewed that
9  shows me that S&L or Florida Power gave Zampell
10  those instructions and informed them that there was
11  flammable material.
12  Q. Zampell was subcontractor to CPS on this project;
13  is that correct?
14  A. That's correct.
15  Q. And isn't it normal industry practice that the
16  instructions to the subcontractor would go through
17  the general work contractor?
18  A. Not necessarily. Sargent & Lundy was the
19  engineer on site. It was their total
20  responsibility for -- to assure that their design
21  was not only properly designed, but properly
22  installed. So I take exception to that.
23      Sargent & Lundy had a field service engineer
24  on site. Sargent & Lundy was the engineer of

## Page 60

1  record. It was definitely Sargent & Lundy's
2  responsibility to inform not only the general
3  contractor but Zampell of the flammable material
4  that they well knew.
5  Q. Just how would you have had them give this
6  instruction to Zampell?
7  A. Well, they indicated on their drawings. They
8  made the first step in terms of indicating on their
9  drawings, that Mr. Gastineau wrote on the drawings,
10  but he failed to follow it up to ensure that, you
11  know, the flammable material wasn't isolated.
12  Q. And in your view, CPS had no responsibility in
13  seeing that their subcontractor performed the work
14  in a safe manner?
15  A. I have no opinion about CPS. My definite
16  opinion is directed towards the professional
17  engineer on site.
18  Q. I get that part of it. So if CPS had the drawings
19  with the warnings on them, that doesn't make you
20  think anything -- strike that.
21      Even though assuming that CPS had those
22  drawings and they were the ones who were directing
23  the work of their subcontractor, you still think
24  that S&L and FPLE should have told Zampell directly

Page 61

1   to do something different than they did?
2   A.  Yes. Sargent & Lundy is a hierarchy at the
3   site in terms of their design. It is their design.
4   It is their professional responsibility. That's
5   the hierarchy.
6   Q.  You realize that the whole original air inlet
7   system is not their design, though, correct?
8   A.  I understand that. I understand it was their
9   responsibility under the contract to perform the
10  design and assure the quality product of the
11  modification.
12  Q.  In your review of the materials which you were
13  provided, did you come to have any understanding
14  regarding the hot work permit system that was
15  employed on this site?
16  A.  I reviewed documents referring to the hot work
17  permit, yes.
18  Q.  And what is your understanding based upon the
19  documents which you reviewed of S&L's role in the
20  hot work permit process?
21  A.  Well, given the fact that S&L was the engineer
22  on site, it was their responsibility to ensure that
23  their design, again, was properly installed and it
24  was their responsibility in my opinion to ensure

Page 62

1   that the hot work permit was -- at least they
2   reviewed the hot work permit and they followed up
3   with the hot work permit associated with the
4   knowledge that they had of a flammable material.
5   Q.  So it doesn't make any difference to you that
6   Florida Power & Light didn't see fit to have
7   Sargent & Lundy involved in the hot work permit;
8   you think they should have inserted themselves into
9   that process?
10          MR. MAHONEY: Objection.
11  A.  Well, of course, because Sargent & Lundy was
12  Florida Power & Light, as far as I'm concerned.
13  They were their representative on site.
14  Q.  What was Ed Alarcon?
15  A.  Say that again?
16  Q.  What was Ed Alarcon?
17  A.  I have no opinion about that, no.
18  Q.  Okay. Moving on to number five. Is there any
19  additional item we have not previously discussed on
20  which you base your opinion in number five?
21  A.  No. Again, nothing other than we've covered.
22  Q.  Okay. What I'd like to do now is to go into the
23  codes that you rely on and have testified about
24  indirectly. Do you want to take a break before we

Page 63

1   do that?
2   A.  No. We can go ahead.
3          MR. LANG: Can we take about a 10
4   second break and I just want to see you.
5          (RECESS)
6   Q.  Mr. Plunkett, just back to number three, your
7   opinion number three for a moment. On what were
8   you relying when you gave your opinion in number
9   three that some type of flame retardant barrier
10  should have been used behind the steel plates?
11  A.  Primarily, two things; the testimony of
12  Sargent & Lundy and the response of Sargent & Lundy
13  in reference to marking up documents referring to
14  the flammable material. And in addition to that,
15  the National Fire Protection Code.
16  Q.  But there's nothing in any of those documents that
17  indicates that there's a flame retardant barrier
18  that could specifically work in this situation, is
19  there?
20  A.  Of course, there is.
21  Q.  What?
22  A.  The National Fire Protection Code says a
23  particular barrier should be put between the heat
24  source and flammable material.

Page 64

1   Q.  Show me in NFPA where it says what flammable
2   barrier would work in this situation?
3   A.  The codes do not specify what material you
4   should use. The codes specify that you have to
5   meet a requirement. You have to supply a flame
6   retardant material. Codes do not say you have to
7   use this item or that item. Codes just say you
8   need to put a flame retardant material to isolate
9   the heat source from a flammable material.
10  Q.  And at the time you prepared this report, you did
11  not have knowledge of any flame retardant barrier
12  specifically that would have worked in this
13  situation to prevent this fire?
14  A.  There are a number of flame retardant
15  materials used in the industry. If you'd like me
16  to look at those, I'd be happy to.
17  Q.  I'm not the one that's giving you your scope of
18  work. I'm asking you if at the time you wrote this
19  report you knew of some flame retardant barrier
20  that could have been inserted in this situation to
21  prevent the fire?
22  A.  At the time I wrote the report, I knew there
23  was a number of flame retardant materials being
24  used on power plants. As to a specific one that

### Page 65

1 could be used in this instant, no.
2 Q. Thank you. Codes, I think that you first referred
3 to ASME?
4 A. Correct.
5 Q. What portions of ASME are you referring to and why
6 are they relevant?
7 A. ASME Section 8 and ASME Section 3.
8 Q. Let's start in order with Section 3. What is
9 Section 3 about and what it its relevance to your
10 opinions in this case?
11 A. Well, Section 3 is a design code that gives
12 specific rules for designing, installing, and
13 constructing power plant components for nuclear
14 power plants.
15 Q. And you just said nuclear power plants?
16 A. Right.
17 Q. This is not a nuclear power plant.
18 A. I understand that, but there are regulations
19 within there that are being used on power plants.
20 Q. Maybe we better back up. What does ASME stand for?
21 A. Society of Mechanical Engineers.
22 Q. And Section 3 is the -- is there a title to
23 Section 3?
24 A. Yeah. I don't know the exact title. It's

### Page 66

1 basically design and fabrication rules for nuclear
2 power plants, but there are some design rules that
3 are used in fossil power plants within that code.
4 Q. And which ones are those?
5 A. I would have to look at the sections of the
6 code.
7 Q. Well, that's why --
8 A. The ASME Section 3 code is four volumes thick.
9 Q. All right. Well, first of all, let's see in your
10 report. I don't believe that there's a specific
11 reference to ASME, am I correct?
12 A. That's correct.
13 Q. So that would explain to you why I do not have ASME
14 Section 3 in front of me because you did not
15 indicate you're relying on it. Since I don't, I'm
16 asking you to tell me what portions of Section 3 of
17 ASME which you already indicated relate to nuclear
18 power plants you feel are applicable to this
19 project?
20 A. I would have to go back and look at those.
21 Primarily, ASME Section 8 refers to fossil power
22 plants.
23 Q. And what portions of Section 8 of ASME are you
24 relying on to form your opinions in this case?

### Page 67

1 A. Again, I'd have to go back and look at
2 Section 8 and look at those specific areas within
3 the code. Again, Section 8 is about seven or eight
4 volumes thick.
5 Q. I'm going to reserve my right to re-question you on
6 any codes upon which you're now saying you're
7 relying that were not referenced in your report
8 because obviously we can't be prepared to address
9 those.
10     So start with ASME. So there's nothing
11 further about -- more specific about Section 8 of
12 ASME which you can tell us today that you relied
13 upon in forming your opinions?
14 A. Not as of today, no.
15 Q. Now, with respect to the NFPA you have indicated in
16 your report specifically on page one, you indicate
17 in Item 13, NFPA 51B, and I believe that you quote
18 from that on page three of your report in item
19 number eight; is that correct?
20 A. That's correct.
21 Q. Are there any portions of the NFPA upon which you
22 are relying other than those listed here?
23 A. Primarily, those are the sections of the NFPA
24 that I relied upon.

### Page 68

1 Q. And is it your interpretation of the NFPA sections
2 which you have cited here that management includes
3 Sargent & Lundy?
4 A. Absolutely.
5 Q. Based on what?
6 A. Based upon they were the project engineer on
7 site and they were representing Florida Power &
8 Light. They were the professional engineer
9 responsible for --
10 Q. Mr. Plunkett, I understand that.
11     MR. MAHONEY: Even though you
12 understand, let him finish.
13     MS. DAVIS: Jack, he doesn't need
14 to say that any more.
15     MR. MAHONEY: No. Let him finish.
16 What were you going to say?
17 A. Sargent & Lundy was the professional engineer
18 on site, and under the purchase order and the
19 professional regulations and codes they were
20 ultimately responsible for their modification and
21 that included the installation of their design.
22 Q. Let me ask you my question again. What in NFPA
23 tells you that Sargent & Lundy is management under
24 this section which you've cited?

Page 69

1   A. The National Fire Protection Code doesn't
2   define who is management, who isn't management. I
3   mean, if you go back to the ASME codes, I'm sure
4   that you'll find words to that effect, but the
5   National Fire Protection Code just gives rules and
6   regulations associated with fire protection. They
7   don't define who is management, who is not
8   management.
9   Q. Okay. Any other portions of the NFPA upon which
10   you're relying?
11   A. I don't believe so.
12   Q. What professional regulations are you referring to?
13   A. Where are you referring to?
14   Q. I'm referring to your prior answer where you said
15   that what makes Sargent & Lundy management is
16   professional regulations and codes. You've also
17   mentioned professional regulations and codes
18   earlier. So I want to know what professional
19   regulations you're talking about.
20   A. Again, ASME, Society of Mechanical Engineers,
21   and the National Fire Protection Code.
22   Q. The NFPA is a professional regulation in your view?
23   A. NFPA is a code very similar to the Society of
24   Mechanical Engineers. It's a document that's

Page 70

1   written that defines how power plants are to be
2   designed, built, and constructed. The National
3   Fire Protection Code is a code or regulation that
4   defines its rules and regulations for fire
5   protection.
6   Q. Any other professional regulations and codes on
7   which you're relying in forming your opinions?
8   A. I don't believe so.
9   Q. Now, you also said earlier in one of your answers
10   that you looked or not necessarily you looked at,
11   but in evaluating the responsibility of Sargent &
12   Lundy, that state codes and regulations would
13   apply. What state codes and regulations are you
14   referring to?
15   A. Where did I say that?
16   Q. You said that when we were talking about the bases
17   for your observations one through eight, and it
18   was -- specifically, it was when we got down
19   towards the end of page two of your report.
20   A. I believe I referred to the state regulations
21   when I was referring to Item 7.1 of the terms and
22   conditions.
23   Q. Well, that's not when you said it, but that's
24   really irrelevant. The question is are there any

Page 71

1   state codes or regulations on which you relied in
2   forming your opinions in this case?
3   A. Could you state that again, please?
4       MS. DAVIS: Could you read it back,
5   please.
6       (LAST QUESTION READ)
7   A. No, there are no others. There are no state
8   codes that I'm relying upon.
9       MS. DAVIS: Thank you. That's all
10   I have.
11       EXAMINATION BY MR. BATASTINI
12   Q. I just want to make sure we're all on the same
13   page. Mr. Plunkett, my name is Armand Batastini.
14   I represent FPL/RISE entities.
15       Am I to understand the only documents you
16   reviewed are those listed within your report?
17   A. I believe so, yes.
18   Q. So it's the documents you listed on page one and
19   then the additional documents listed on
20   Attachment A?
21   A. There could be others that weren't included in
22   there, but I'm pretty sure those are the bulk of
23   the documents that I relied upon for my opinion. I
24   mean, there may be -- there was a lot of documents

Page 72

1   that I looked at, but primarily what I did is I
2   isolated those documents that I really relied upon
3   to arrive at my opinion and that's pretty much what
4   I stated in my report. There could be other
5   documents that I did review that I didn't list
6   there.
7   Q. Let me work on that a little bit. You still have
8   those documents in your possession?
9   A. Yes.
10   Q. Did you maintain a list of all the documents you
11   received relative to your assignment in this
12   matter?
13   A. I have a list of all the documents I received,
14   yes.
15   Q. Have you taken the time to compare that list with
16   the documents listed in your report to see if this
17   is an exhaustive list of all documents you reviewed
18   or not?
19   A. Well, to answer that, again, I had a number of
20   documents I reviewed. I isolated those documents.
21   After reviewing those documents, I isolated those
22   documents that I used to form my opinion. Those
23   are defined in my opinion report. There could well
24   be others that I reviewed that's not listed in

18 (Pages 69 to 72)

Page 77

1  Lundy was the engineer of record.
2  Q. What I'm driving at, sir, is you're not offering
3     any opinions regarding the respective
4     responsibilities of other parties in this suit?
5  A. No, I'm not.
6  Q. You haven't formed an opinion one way or another on
7     that point?
8  A. That's correct.
9  Q. Now, you've also testified today that you've
10    consulted with NFPA 51B relative to your opinions
11    in this case?
12 A. That's correct.
13 Q. What training or experience do you have relative to
14    NFPA 51B?
15 A. Well, generally, throughout the years I've
16    been involved in fire protection systems in terms
17    of, you know, designing supporting systems, fire
18    protection systems. On my current DOE assignments,
19    I was responsible for reviewing the fire protection
20    code in reference to the design of the
21    vitrification facility in Richland, Washington for
22    DOE.
23       So over the course of my experience, I've had
24    the responsibility to review those codes and to

Page 78

1  assure that the engineer that was designing fire
2  protection systems was designing within the code
3  regulations.
4  Q. So your experience with 51B comes in the context of
5     your work as a design professional?
6  A. Correct.
7  Q. You haven't looked at 51B from the context of
8     welding responsibilities?
9  A. No.
10 Q. You also talked about hot work permit procedures in
11    this case. Are you offering any opinions relative
12    to hot work permits in this case?
13 A. No.
14 Q. I'd like to focus for a minute on your opinion, I
15    want to make sure I'm talking about the right
16    opinion, regarding the use of a flame retardant
17    barrier. I believe it's your third expert opinion.
18 A. Yes.
19 Q. And you talked about a heat transfer coefficient
20    relative to the use of that flame retardant
21    barrier.
22 A. Right.
23 Q. Do you know what heat transfer coefficient would be
24    the correct coefficient to use with respect to this

Page 79

1  matter?
2  A. I'd have to look at the heat source. It's a
3     function of what the heat source was. It's a
4     function of the distance from the steel plate to
5     the fire -- the flammable material, and I'd have to
6     look at the actual steel. So, no, I do not know.
7     I'd have to look at a lot of parameters to do that
8     analysis.
9  Q. And that's not an analysis you've done to date?
10 A. I haven't done that analysis to date, no.
11 Q. It was not an analysis that was requested of you
12    with respect to your assignment?
13 A. No.
14 Q. Do you know what the temperature of the subject
15    welding was?
16 A. I reviewed it. I can't recall the
17    temperature.
18 Q. Do you know the thickness of the steel on which the
19    welding was being conducted?
20 A. I can't recall those details.
21 Q. Okay. With respect to your opinion that a flame
22    retardant barrier would have been effective in
23    preventing this fire, I think that's your
24    opinion --

Page 80

1  A. Hm-mmm.
2  Q. -- did you take into account whether the weld was
3     properly performed or not?
4  A. No. I'm not a welding expert.
5  Q. Is it possible that had the weld not been properly
6     performed so that there was burn through or blow
7     through on that weld, this flame retardant barrier
8     might not have been effective in preventing that
9     fire?
10       MR. MAHONEY: Objection.
11 A. No, I don't believe so. As a mechanical
12    engineer, not necessarily a welding expert at all,
13    but as a mechanical engineer, you know, it's pretty
14    clear to me from what I reviewed that blow through
15    or no blow through had no consideration in terms of
16    this accident. Primarily, it was if there was a
17    fire protection -- if there was a fire retardant
18    material in between these barriers, the fire would
19    not have started.
20 Q. What's your basis for that?
21 A. Well, it's not an expert opinion, by any
22    means. I've been working as a mechanical engineer
23    for 30 years. So my opinion is just based upon my
24    knowledge of welding and my knowledge of heat

Page 81

1 transfer. But you should leave that to a welding
2 expert.
3 Q. Let me make sure I understand what you're saying,
4 Mr. Plunkett. You're not offering an opinion
5 regarding the efficacy of this flame retardant
6 barrier if, in fact, burn through or blow through
7 occurred?
8 A. That's correct. In my opinion, if the flame
9 retardant material was used, it would have
10 prevented this fire.
11 Q. That's not quite what you just said. Let's try it
12 one more time.
13 A. Okay.
14 Q. Have you taken any analysis of the efficacy of the
15 flame retardant barrier if burn through or blow
16 through occurred at the weld?
17 A. No, I haven't.
18    MR. BATASTINI: Okay. Thank you.
19 That's all I have.
20    MR. VESPOLE: I have a few
21 questions.
22    EXAMINATION BY MR. VESPOLE
23 Q. Why does the American Society of Mechanical
24 Engineers code apply to Sargent & Lundy in this

Page 82

1 case?
2 A. Well, to design any design, any power plant,
3 you're going to go back to ASME. It's the rules
4 and regulations for building a fossil power plant.
5 Section 8 gives you all of the rules and
6 regulations in reference to design manufacturing
7 and inspection of power plants. That's the rule.
8 That's the design rule everyone uses for power
9 plants.
10 Q. Is that an industry standard for design engineers?
11 A. Yes.
12 Q. Is the NFPA an industry standard?
13 A. Yes.
14 Q. That applies to engineers, as far as you know?
15 A. Yes.
16 Q. Contractors?
17 A. It applies to everyone that's involved in one
18 way or another in that entity, of course.
19 Q. Owners of power plants?
20 A. Yes.
21 Q. By the way, I apologize for being so rude. My name
22 is Mark Vespole and I represent Certified Power
23 Systems.
24 A. I think we met before.

Page 83

1 Q. I think we have.
2    Do you have an opinion as to whether or not it
3 would have been effective for the evaporative
4 cooling media to be removed as opposed to have a
5 barrier placed in between it and the heat source?
6 A. Again, you're asking me questions associated
7 with a detail analysis that would have to be
8 performed, but, again, my opinion, you know, would
9 be that either one would have worked.
10    MR. VESPOLE: I have no other
11 questions. Thank you.
12    MS. DAVIS: I do have a followup.
13    RE-EXAMINATION BY MS. DAVIS
14 Q. We didn't go back to Dr. Eager's report. I asked
15 you to tell me what portions of Dr. Eager's report
16 listed as number 12 on Exhibit 1 in terms of the
17 documents on which you relied, what portions of
18 Dr. Eager's report did you rely on?
19 A. I'd have to look at his report.
20    (RECESS TAKEN)
21    MS. DAVIS: Back on the record.
22 Q. Mr. Plunkett, at my request, you have taken a look
23 at Dr. Eager's report which is identified on
24 page one of your report as one of the key documents

Page 84

1 used to support your opinion and you have gone
2 through and noted three portions of his report upon
3 which you relied and formed your opinions. Could
4 you for the record read those portions upon which
5 you relied and tell us the significance that those
6 had to you in forming your opinions?
7 A. Item 4 on page two, "Given Mr. Crossley's lack
8 of knowledge of the media material as a fire
9 hazard, it was impossible for either CPS or Zampell
10 to know that hazard material was flammable."
11    And on page four under summary, second
12 sentence, "The cause of the fire was a failure of
13 Florida Power & Light and their engineers to
14 recognize the hazard of welding near the flammable
15 media materials."
16    And a couple of sentences down (as read),
17 "Given that Mr. Crossley stated repeatedly that he
18 did not know that the media was flammable and he
19 did not know anyone at Florida Power & Light who
20 was aware of the hazard, it was distinguished that
21 Florida Power & Light to suggest that CPS and
22 Zampell should have greater knowledge than Florida
23 Power & Light and does not either Florida Power &
24 Light or their engineers."