# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CERTIFIED POWER SYSTEMS, INC. :
vs. : C.A. NO. 05-066-ML
RHODE ISLAND STATE ENERGY STATUTORY TRUST 200, FPLE RHODE ISLAND STATE ENERGY L.P. AND FPLE RHODE ISLAND STATE ENERGY GP, INC. :
vs. :
CERTIFIED POWER SYSTEMS, INC. :
vs. :
ZAMPELL REFRACTORIES, INC. :

DEPOSITION OF MICHAEL B. PLUNKETT produced, sworn and examined on September 6, 2006, at 12:00 P.M. on behalf of Defendant, Sargent & Lundy, before Linda S. Taylor, Notary Public, at the office of Asquith & Mahoney, LLP, 155 South Main Street, Providence, Rhode Island.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RHODE ISLAND 02915
(401)437-3366



APPEARANCES

For the Plaintiff:
TRESSLER, SODERSTROM, MALONEY & PRIESS
744 Broad Street
Suite 1510
Newark, New Jersey 07102-3812
BY: MARK ROBERT VESPOLE, ESQ.

For the Defendant:
(Zampell)
ASQUITH & MAHONEY, LLP
155 South Main Street
Providence, Rhode Island 02903
BY: JOHN R. MAHONEY, ESQ.

(FPL/RISE)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, Rhode Island 02903
BY: ARMANDO E. BATASTINI, ESQ.

For the Fourth Party Defendant:
(Sargent & Lundy)
MECKLER, BULGER & TILSON, LLP
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
BY: JANET R. DAVIS, ESQ.

HIGGINS, CAVANAGH & COONEY
123 Dyer Street
Providence, Rhode Island 02903
BY: STEPHEN B. LANG, ESQ.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RHODE ISLAND 02915
(401)437-3366



INDEX


| DEPONENT | PAGE |
|---|---|
| MICHAEL B. PLUNKETT | |
| EXAMINATION BY MS. DAVIS | 4 |
| EXAMINATION BY MR. BATASTINI | 71 |
| EXAMINATION BY MR. VESPOLE | 81 |
| RE-EXAMINATION BY MS. DAVIS | 83 |


EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| DEFENDANT'S (S&L) | | |
| 1 | REPORT OF M. PLUNKETT | 4 |
| 2 | RESUME OF M. PLUNKETT | 4 |
| 3 | PROJECT EXPERIENCE OF M. PLUNKETT | 4 |
| 4 | RESUME SUMMARY OF M. PLUNKETT | 13 |






(DEFENDANT'S EXHIBIT 1 MARKED FOR IDENTIFICATION)
(DEFENDANT'S EXHIBIT 2 MARKED FOR IDENTIFICATION)
(DEFENDANT'S EXHIBIT 3 MARKED FOR IDENTIFICATION)
(COMMENCED AT 1:00 P.M.)
MICHAEL B. PLUNKETT
Being duly sworn, deposes and testifies as follows:
THE REPORTER: Would you state your full name for the record, please.
THE DEPONENT: Michael B. Plunkett.
EXAMINATION BY MS. DAVIS
**Q. Mr. Plunkett, my name is Janet Davis. I represent Sargent & Lundy in this case, and I'm going to be asking you some questions.**
**Prior to the start of the deposition, we marked as exhibits your report, resume, and a list of project experience. Those are Plunkett 1, 2, and 3 respectively, correct?**
A. Correct.
**Q. And Plunkett 1, your report dated August 16, '06, is that only report which you have issued with respect to this case?**

COPY

Page 25

be associated with the project. It wasn't any direction I was given in terms of looking at any particular entity.

**Q. And so did you look at and evaluate whether or not there was any testimony or opinion that you would have with respect to CPS, Certified Power Systems?**

A. I'm not too sure I understand your question.

**Q. I'll rephrase it. You indicate that you were retained, you formulated your opinions, and that, and as we see in your report, those relate to Sargent & Lundy and Florida Power & Light; is that correct?**

A. That's correct.

**Q. Did you not form any opinions with respect to CPS or did you -- what did you look at with respect to them, if anything?**

A. I reviewed documents that CPS was obviously referenced to and a number of other CPS documents, but I didn't draw any conclusions as to CPS in terms of my opinion.

**Q. And my question is what's the reason for that?**

A. Well, the reason is that after my review, I concluded that Sargent & Lundy, they were the project engineer on the project and they held the

Page 26

ultimate technical responsibility to ensure that the project was done in a quality manner.

**Q. I still don't think you've answered my question. My question is do you not have any opinions about CPS or were you not asked to give any opinions about CPS or both?**

A. After reviewing the documents, I have no opinion about CPS.

**Q. But you do understand from reviewing the documents that CPS was to have the primary responsibility for the means, method and manner of the work; is that correct?**

MR. MAHONEY: I object. You may answer.

A. The purchase order states that, that you just said.

**Q. Which purchase order are you referring to?**

A. I believe the purchase order Exhibit 27A.

**Q. So you're talking about the Sargent & Lundy purchase order, not the contract that CPS ultimately had?**

A. Yeah. I'm not referring to that at all.

**Q. Did you review CPS's contract?**

A. I probably have, but I can't remember the

Page 27

exact wording in the CPS contract now.

**Q. So as you sit here today, you can't say what obligation CPS had pursuant to its contract?**

A. As I sit here today, I probably can't, no.

**Q. Can you take a look at Exhibit Number 1 which is your report dated August 16, '06. I think we've established that --**

A. Are you talking about this report here?

**Q. Yes.**

A. Okay.

**Q. Here it is. Here's the marked one, Exhibit 1, 8/16/06. And I think we've previously established that this is the only report that you have issued; is that correct?**

A. That's correct.

**Q. On the first page of your report, you list the key documents that you refer to and rely -- excuse me -- that you relied on in arriving at your opinion and then in Attachment A, there are other documents which you identify as supporting documents; is that correct?**

A. Correct.

**Q. Are there any documents other than those listed either on page one of your report or Attachment A**

Page 28

**to your report upon which you are relying and formulating your opinions in this case?**

A. Yeah. I believe I didn't indicate the Exhibit 27A here, the purchase order of Sargent & Lundy.

**Q. Maybe when we take a break, we'll get some copies made of that and we'll come back to that.**

**The documents that you have listed, were these documents given to you or documents that you compiled on your own?**

A. They were given to me.

**Q. And from whom did you receive these documents?**

A. From Jack Mahoney.

**Q. And based upon the lists that you have, it appears that you only reviewed the testimony of three Sargent & Lundy witnesses; is that correct?**

A. That's correct.

**Q. And is that because those were the only ones that Mr. Mahoney gave you?**

A. I believe I was given some interrogatories, but I believe that's the only -- to the best of my recollection, those are the only three depositions I reviewed.

**Q. And in formulating your opinion about the roles of**

Page 37

insulation was being installed on the exterior of the inlet?
A. Well, I believe that the people responsible for the project needed to heed to both warnings, a warning put on this document and a warning put on this document.
Q. When you say the people responsible for the project, to whom are you referring?
A. Sargent & Lundy.
Q. You don't think CPS was responsible for the work they were doing on the project?
A. I don't have an opinion of CPS at that time. The documents I reviewed pointed me directly to Sargent & Lundy's responsibility.
Q. And you haven't broadened your scope to look at other documents available in this case to determine anybody else's responsibility?
A. Again, I reviewed the documents associated with my report, and from those documents I concluded that Sargent & Lundy was neglect in their responsibility.
Q. Let me go back to my earlier question then. Were you requested in your retention with respect to this case to provide opinions with respect to

Page 38

Sargent & Lundy? Was that your original task?
A. No.
Q. And yet the documents that you were given relate basically to Sargent & Lundy; is that correct?
A. Not totally, no.
Q. So who else do they relate to?
A. Well, I'd have to go through one by one, but there's narratives, there's specs, there's plans. There's a number of reports.
Q. Let's talk about one of those reports for a second. You just pointed with your pen to item number 12 which is the report of Dr. Eager. What in Dr. Eager's report did you rely on in coming to your opinions which you expressed in your report which is Exhibit 1?
A. I'd have to look at his report.
MS. DAVIS: Okay. Could you do that? We can wait until we take a break, Jack. That's fine. We'll come back to Eager.
Q. So have we now covered everything that you were looking at with respect to forming opinion number one on page two of your report?
A. No. I believe that Exhibit 27A was something I'm relying upon.

Page 39

Q. Okay. And as I said, we'll come back to that when we have a chance to get a copy. We might want to go through that in a little more detail.
Opinion number two relates to Mr. Lula's testimony. Is there anything other than what you refer to in number two upon which you're relying in making this statement?
A. No. With Mr. Lula, pretty much what he said in his testimony.
Q. So you're talking about the pages and lines you've indicated?
A. Correct.
Q. We briefly talked about opinion number three when we started with Mr. Lunardini's testimony. Is there anything that you relied upon in formulating opinion number three other than the testimony of Mr. Lunardini as indicated by page and line number in that number three?
A. Other than the 27A, his testimony, and for all -- actually for all these, the ASME codes and regulations that the plant was -- that Sargent & Lundy was responsible to perform work under.
Q. Okay. We'll get to those in a minute then.
Number four. Number four refers to S&L 22

Page 40

which is a handwritten document by Mr. Lunardini; is that correct -- I mean, by Mr. Gastineau?
A. I'm not too sure if it's handwritten. No, it was a typewritten document.
Q. This is the one with 14 points entitled Technical Field Advisor Responsibilities, correct?
A. Correct.
Q. Anything other than the points in that document which are indicated in number four on which you relied?
A. Again, that document leads me to the codes and standards and regulations that the plant was -- the plant and the project was to be built to.
Q. The end of number four indicates, Item 11 states, "Assist the client in monitoring the contractor's job safety plan."
Did you review the contractor's job safety plan?
A. I can't recall.
Q. Okay. Nothing else with respect to number four other than S&L 22?
A. That's correct. And, again, the codes and standards.
Q. And when you say codes and standards, you're

Page 41

**referring to specifically what?**
A. The ASME codes, National Fire Protection Code. Primarily those.
**Q. Okay. Number five, you state, "The welding and safety measured required." Did you mean measures there? "The welding and safety measures required to protect against the fire hazard was discussed many times during the course of the project."**
A. Hm-mmm.
**Q. On what do you rely to make that statement?**
A. There were a number of areas within the depositions of Mr. Gastineau, Mr. Lula, and Mr. Lunardini that clearly represented that they were well aware and they recognized the hazard.
**Q. And are you aware that there's considerable other testimony about those discussions in this case which you have not reviewed?**
MR. MAHONEY: I object. You may answer. You answer every question if you can.
A. I'm not aware.
**Q. You don't know what anyone else in the case has said about these discussions?**
A. No.
**Q. Number six, you refer to a point from**

Page 42

**Mr. Gastineau's deposition testimony. This all relates to the paper filters, correct?**
A. That's correct.
**Q. And the paper filters don't have anything to do with the fire as we understand in this case, do they?**
A. I don't understand your question there.
**Q. What do the paper filters have to do with the fire in this case?**
A. Well, it was the -- they were -- I believe they were a part of the insulation that was burned.
MS. DAVIS: I think you should read that question and answer back, please.
(LAST QUESTION AND ANSWER READ)
**Q. And that's your answer?**
A. Yes.
**Q. You believe that paper filters are part of the insulation?**
A. No. I believe they were part of the components that burned.
**Q. But is it your understanding the paper filters were ignited and that was the beginning of this fire?**
A. In terms of the details of how the fire actually started, that's up for speculation,

Page 43

basically. The fire started basically because of the welding and there was no protection of the heat transfer through the outer component and, because there was no protection, then the extreme heat caused the fire. Whether the -- what caught fire first is, in my opinion, up for speculation.
**Q. I think we'll leave that and move on.**
**Number seven. Anything other than what you've referred to here that you relied on in coming to number seven?**
A. Only that a number of people were well aware of Item 18 which is the manual which was sent to a number of people at Sargent & Lundy.
**Q. And you have no idea if this information was also sent to CPS and/or Zampell, do you?**
A. I'd have to look at -- yeah. It looks like Item 18 was also distributed to three people at CPS.
**Q. We're talking about Item 18. We're again back at Mr. Gastineau's sketch of November 3, '04.**
**What I was actually referring to, and I apologize if my question wasn't clear, is what follows that where you talk about the Siemens - Westinghouse Multi-Stage static intake air filter.**

Page 44

A. Yes.
**Q. Which has, based on your quote, a clear warning that the filter and cooling media are flammable?**
A. That's correct.
**Q. And upon what do you base the fact that Sargent & Lundy had this document?**
A. Well, I'll have to find it first. Do you know what exhibit it is?
**Q. I don't know that that is an exhibit.**
MS. DAVIS: Off the record.
(OFF THE RECORD)
A. I'd have to look at the document, the front page document to see who is on distribution for that, but I believe Mr. Gastineau, Mr. Lunardini was definitely on distribution for it.
**Q. But you don't know if CPS also received or reviewed that document?**
A. I'd have to look for the document to find that out.
**Q. I'll see if we can find that for you.**
**Anything else other than Exhibit 18 and the notes that you have from the Siemens - Westinghouse manual that you relied on in your statements in number seven?**

A. Other than the information that I've already given you.
**Q. Which is what?**
A. Standard codes and records, the ASME code, the National Fire Protection Code, the purchase order for the document, state codes and regulations.
**Q. Okay. Number eight is the last item in terms of your observations and opinions, and then you go on to have your expert opinion. We'll ask you what the difference is on that in a second. But number eight isn't really an opinion, is it? It's just quotes from the NFPA?**
A. That's correct.
**Q. Okay. What's the difference between one through eight on pages two and three of your report and one through five on your report because you say the first are observations and opinions and then you say you have five expert opinions?**
A. Well, the one through eight are the documents, the primary documents, primary documents I relied upon to draw my opinions from.
**Q. So those aren't really opinions; those are observations about the documents, and then you go on to give your opinions?**



A. Yeah. Observations and quotes directly from documents, yes.
**Q. Okay. Let's go on then to the next page of your report which list your five opinions. Starting with number one, anything we haven't already discussed upon which you relied in forming number one?**
MR. VESPOLE: Object to the form of the question. You can answer, certainly.
A. Again, not to repeat myself, but Sargent & Lundy had the professional responsibility to ensure that the design was properly done, including the quality verification of their design, and they should have relied upon the codes and regulations that the plant was being designed to.
**Q. And when you say properly done, are you talking about design or are you talking about the completed work?**
A. When I speak of design, I'm speaking about the total. The design doesn't end when Sargent & Lundy put something on the paper. The design ends when the project is completed, when the welds are completed, when the job is completely completed where Sargent & Lundy can verify the quality -- can



verify the quality finished product.
MS. DAVIS: Move to strike as nonresponsive.
**Q. When you say that the job was properly done, are you talking about the finished product?**
A. I'm talking about the finished product, yes.
**Q. And even though Sargent & Lundy's contract says they were not responsible for the means, method and manner of construction, you still feel that they were the responsible for the job being done safely?**
MR. MAHONEY: Objection.
A. I believe -- I take exception to the fact that you're saying that because I believe that Sargent & Lundy did have the responsibility under the contract and under their professional obligation to ensure that the product got performed in a safe manner.
**Q. Are you saying that this could not be done safely under the design as it was tendered to the contractor?**
A. I don't understand your question. Give me that one again.
MS. DAVIS: Can you read it back, please.



(LAST QUESTION READ)
A. I'm saying that if Sargent & Lundy had to perform their professional duties in the manners of the codes and regulations, then this design would have been properly done, correct. And I'm saying that both the codes and standards that they had available to them and their purchase order that they had available to them made it clear that they were responsible for the design integrity of the full design, and that means not only the design, but the final product. And they had the responsibility for the quality verification of that design.
**Q. Well, again, I move to strike your answer as nonresponsive. But as long as you're talking about it, why don't we take a break and let you take a look at Exhibit 27, and I'm going to ask you when we come back to tell me what in that document supports what you just said.**
A. Sure.
(RECESS TAKEN)
**Q. Mr. Plunkett, before the break, I asked you to refer to the items in Sargent & Lundy Exhibit Number 27A on which you were relying for the**

Page 49

**obligations which you say that Sargent & Lundy had in your report with respect to safety.**
A. That's correct.
**Q. And could you tell us what portion of the report -- of the Exhibit 27A that you're referring to?**
A. Under the standard terms and conditions, page two, Item 7.1, which states -- would you like me to read it?
**Q. Is this in the original agreement between Florida Power & Light or the work authorization for this particular project?**
A. I believe it's the change order number one of the purchase order.
**Q. Okay.**
A. Would you like me to read it?
**Q. Yes, please.**
A. "The supplier shall perform work under this contract in accordance with standard of care, skills and diligent consisting with: One, the recognized and sound industry practices, procedures, and techniques; two, all amicable laws and regulations; three, the specification documents and procedures applicable to the work; four, degree of knowledge, skill, and judgments customarily

Page 50

exercised by professional firms with respect to the service of similar nature; and five, be suitable for the use intended."
**Q. And what else in that document do you believe gives Sargent & Lundy the responsibility for safety, safe performance of their work?**
A. Under page five under the quality assurance title, it states that, "The engineer will define the critical attributes during procurement, manufacturing, and construction to ensure the quality of a final product."
And on page one under scope of work, the second page, second sentence says, "Engineering services to be provided will be designed, procurement assistance, quality assurance, and quality verification, project management and construction management."
And under the title, Design, item one. The second sentence says, "The engineer is expected to be the engineer of record on the project and will be responsible for verification of the proposed design, will remedy the CT high inlet differential pressure problem under design conditions."
On page two, last paragraph, second sentence,

Page 51

"The engineer will verify the design conditions to be modeled and work with both model contractors to ensure consistency and compliance to the design basis documents."
On page four, last paragraph, "The engineering field management shall represent the engineer and shall be a duly authorized agent of the engineer."
I believe that's all of them.
MR. MAHONEY: Excuse me. Agent of the engineer? Read that again.
A. "The engineering field management shall represent the engineer and shall be a duly authorized agent of the engineer."
**Q. Thank you for going through and finding those.**
**Tell me which of those say that Sargent & Lundy is responsible for the means, method or manner of the work?**
MR. MAHONEY: Objection.
A. All of the items.
**Q. And which of those indicate to you that Sargent & Lundy was responsible for the safe performance of the work by the contractor?**
A. All of the items.
MR. MAHONEY: I object. Go ahead.

Page 52

**Q. And is it your opinion that industry custom and practice, which I believe in the first item you discussed which was the standard of care, that it is the standard practice in the industry for the design engineer to be responsible for the safe performance of the contractor of work on a power plant?**
MR. MAHONEY: Objection.
A. It is the responsibility of the project engineer, in this case Sargent & Lundy, to ensure that their design and the constructability of that design is done in accordance with all the codes and the regulations.
**Q. And I'd like to ask you again, and I'd like an answer if I can get one this time, as to whether or not you have an opinion that the design as prepared by Sargent & Lundy was not -- that it was not possible to construct in a safe manner?**
MR. MAHONEY: Objection.
A. Of course, it was. Of course, it was. It was designed and could have been constructed in a safe manner if Sargent & Lundy had performed their duty and assured that safety measures were taken during the welding process.

**Q. What safety measures in your opinion should have been taken during the welding process?**
A. They should have isolated the combustible material from the heat course.
**Q. And what combustible material do you believe should have been isolated at the time the welding was taking place right before the fire?**
A. I believe in all the documents, they refer to the evaporative cooling material. I don't really know exactly what the material is made of, but it was a combustible material that was in back of the pressure vessel wall or the vessel wall that needed to be isolated from the heat source.
**Q. So you have an opinion that this material should have been removed, but you don't really know what it was?**
A. If I look at the documents. In terms of the actual makeup of the material?
**Q. You just said you didn't know what it was.**
A. It's been called the evaporative medium.
**Q. And that's what you're saying should have been removed?**
A. Yes.
**Q. Anything else with respect to opinion number one on**



**the last page of your report?**
A. No. I believe we covered it.
**Q. Is there anything -- we're going to get into the codes a little bit. So I know for number two, you're talking about the codes. But anything, any documents other than the codes on which you're relying for number two?**
A. No, other than being the architect engineer and the engineer of record, they should well have had knowledge of the National Fire Protection Code and they should have had knowledge to isolate the heat source from the insulation.
**Q. Now, in number three -- earlier in your testimony, you talked about removing the material. In number three, you talk about a flame retardant barrier.**
**Based upon your review of the design, the original design of this system, what type of flame retardant barrier could have been inserted to prevent the ignition?**
A. There are a number of flame retardant barriers used to isolate heat source in the industry.
**Q. And what of those could have been used in this application to construct a barrier between the heat source and the evaporative cooling media?**



A. Any flame retarding material thick enough to be able to be put between the heat source and the insulation that would have isolated the heat could have been used, and there are a number of heat retardant materials that are used in the industry.
**Q. I'm going to have her read back your answer and I want to know what you're talking about when you say insulation. Can you read it back, please?**
**(LAST ANSWER READ)**
**Q. What are you talking about when you say insulation?**
A. The evaporative cooler medium that actually caught fire.
**Q. Okay. So is it your understanding that's insulation in some way?**
A. Sure. It's insulation, yeah.
**Q. What is it insulating?**
A. Both insulate heat, sound.
**Q. Okay. Going back to what you said here, flame retardant barrier. You said there are a number in the industry. What flame retardant barrier is available that could have been inserted in this application to have prevented the ignition?**
A. Offhand, I don't know all of the flame retardant barriers they use in the industry. There



are a number of them that have been and being used.
**Q. And what is the thinnest of those that you know?**
A. I can't answer that right now. It's a function of the heat transfer coefficient of a material in terms of, you know, its heat retardness. So it can be almost any thickness just based on its heat transfer coefficient.
**Q. Okay. Well, Mr. Plunkett, I'm sure Mr. Mahoney is going to get upset with me at some point soon for arguing with you, but I'm not quite there yet.**
**You have said in one of your opinions that some type of flame retardant barrier should have been used?**
A. Yes.
**Q. What flame retardant barrier was available that would have worked in this application?**
A. Any material that has a heat transfer coefficient low enough such that heat cannot penetrate from one side of the barrier to the other. I do not know exactly offhand what flame retardant materials they're using on power plants, but --
**Q. And neither do I. But you're the expert, and that's why I'm asking you the question and you**

**won't tell me what they are. I mean, are we talking about a foam? Are we talking some sort of blanket? What are the possibilities? Because what I'm trying to get at is what is the thickness of what flame retardant barrier you envision could work in this application?**

A. Well, again, it depends upon the heat transfer coefficient of the material being used.

**Q. And you haven't examined that?**

A. I haven't examined that, no. But, typically, a flame retardant material that's used to isolate can be anything from, like you say, a blanket to any sort of material that has a heat transfer coefficient that will not allow or that will not allow heat transfer across the barrier. It can be almost any thickness has a function of -- it's a function of the heat transfer coefficient of that material.

**Q. And any thickness meaning less than an eighth of an inch?**

A. It depends on the heat transfer coefficient.

**Q. All right. You have an opinion that some type of flame retardant barrier should have been used, but you don't know what it could have been and you**



**haven't analyzed that?**

A. I haven't analyzed exactly what type of barrier they should have used, no. And typically in the power plant business, they use a number of barriers to isolate heat from a source.

**Q. But as you sit here today, you can't tell me what of those that are used might have worked in this instance?**

A. As I sit here today, I can't tell you that, no.

**Q. And is that something you anticipate being able to tell us by the time you testify at trial?**

A. I could. Sure.

MS. DAVIS: Well, if you're going to amend, Mr. Mahoney, I'd appreciate hearing about it before the trial.

**Q. Number four. Is there anything that you are relying on to form number four that we have not already discussed?**

A. Basically, just the depositions that I reviewed.

**Q. And based upon the testimony that you reviewed which admittedly is three depositions of the, I don't know how many, 15 to 20 that were taken in**



**this case, do you have an understanding that S&L and FPLE were giving Zampell instructions directly?**

A. To my knowledge, they did not.

**Q. Then how can you make the statement that you have in number four that, "S&L and FPLE were deficient in failing to give Zampell instructions," et cetera?**

A. Because I see no evidence that I reviewed that shows me that S&L or Florida Power gave Zampell those instructions and informed them that there was flammable material.

**Q. Zampell was subcontractor to CPS on this project; is that correct?**

A. That's correct.

**Q. And isn't it normal industry practice that the instructions to the subcontractor would go through the general work contractor?**

A. Not necessarily. Sargent & Lundy was the engineer on site. It was their total responsibility for -- to assure that their design was not only properly designed, but properly installed. So I take exception to that.

Sargent & Lundy had a field service engineer on site. Sargent & Lundy was the engineer of



record. It was definitely Sargent & Lundy's responsibility to inform not only the general contractor but Zampell of the flammable material that they well knew.

**Q. Just how would you have had them give this instruction to Zampell?**

A. Well, they indicated on their drawings. They made the first step in terms of indicating on their drawings, that Mr. Gastineau wrote on the drawings, but he failed to follow it up to ensure that, you know, the flammable material wasn't isolated.

**Q. And in your view, CPS had no responsibility in seeing that their subcontractor performed the work in a safe manner?**

A. I have no opinion about CPS. My definite opinion is directed towards the professional engineer on site.

**Q. I get that part of it. So if CPS had the drawings with the warnings on them, that doesn't make you think anything -- strike that.**

**Even though assuming that CPS had those drawings and they were the ones who were directing the work of their subcontractor, you still think that S&L and FPLE should have told Zampell directly**

Page 61

**to do something different than they did?**
A. Yes. Sargent & Lundy is a hierarchy at the site in terms of their design. It is their design. It is their professional responsibility. That's the hierarchy.
**Q. You realize that the whole original air inlet system is not their design, though, correct?**
A. I understand that. I understand it was their responsibility under the contract to perform the design and assure the quality product of the modification.
**Q. In your review of the materials which you were provided, did you come to have any understanding regarding the hot work permit system that was employed on this site?**
A. I reviewed documents referring to the hot work permit, yes.
**Q. And what is your understanding based upon the documents which you reviewed of S&L's role in the hot work permit process?**
A. Well, given the fact that S&L was the engineer on site, it was their responsibility to ensure that their design, again, was properly installed and it was their responsibility in my opinion to ensure

Page 62

that the hot work permit was -- at least they reviewed the hot work permit and they followed up with the hot work permit associated with the knowledge that they had of a flammable material.
**Q. So it doesn't make any difference to you that Florida Power & Light didn't see fit to have Sargent & Lundy involved in the hot work permit; you think they should have inserted themselves into that process?**
MR. MAHONEY: Objection.
A. Well, of course, because Sargent & Lundy was Florida Power & Light, as far as I'm concerned. They were their representative on site.
**Q. What was Ed Alarcon?**
A. Say that again?
**Q. What was Ed Alarcon?**
A. I have no opinion about that, no.
**Q. Okay. Moving on to number five. Is there any additional item we have not previously discussed on which you base your opinion in number five?**
A. No. Again, nothing other than we've covered.
**Q. Okay. What I'd like to do now is to go into the codes that you rely on and have testified about indirectly. Do you want to take a break before we**

Page 63

**do that?**
A. No. We can go ahead.
MR. LANG: Can we take about a 10 second break and I just want to see you.
(RECESS)
**Q. Mr. Plunkett, just back to number three, your opinion number three for a moment. On what were you relying when you gave your opinion in number three that some type of flame retardant barrier should have been used behind the steel plates?**
A. Primarily, two things; the testimony of Sargent & Lundy and the response of Sargent & Lundy in reference to marking up documents referring to the flammable material. And in addition to that, the National Fire Protection Code.
**Q. But there's nothing in any of those documents that indicates that there's a flame retardant barrier that could specifically work in this situation, is there?**
A. Of course, there is.
**Q. What?**
A. The National Fire Protection Code says a particular barrier should be put between the heat source and flammable material.

Page 64

**Q. Show me in NFPA where it says what flammable barrier would work in this situation?**
A. The codes do not specify what material you should use. The codes specify that you have to meet a requirement. You have to supply a flame retardant material. Codes do not say you have to use this item or that item. Codes just say you need to put a flame retardant material to isolate the heat source from a flammable material.
**Q. And at the time you prepared this report, you did not have knowledge of any flame retardant barrier specifically that would have worked in this situation to prevent this fire?**
A. There are a number of flame retardant materials used in the industry. If you'd like me to look at those, I'd be happy to.
**Q. I'm not the one that's giving you your scope of work. I'm asking you if at the time you wrote this report you knew of some flame retardant barrier that could have been inserted in this situation to prevent the fire?**
A. At the time I wrote the report, I knew there was a number of flame retardant materials being used on power plants. As to a specific one that

Page 65

could be used in this instant, no.
**Q. Thank you. Codes, I think that you first referred to ASME?**
A. Correct.
**Q. What portions of ASME are you referring to and why are they relevant?**
A. ASME Section 8 and ASME Section 3.
**Q. Let's start in order with Section 3. What is Section 3 about and what it its relevance to your opinions in this case?**
A. Well, Section 3 is a design code that gives specific rules for designing, installing, and constructing power plant components for nuclear power plants.
**Q. And you just said nuclear power plants?**
A. Right.
**Q. This is not a nuclear power plant.**
A. I understand that, but there are regulations within there that are being used on power plants.
**Q. Maybe we better back up. What does ASME stand for?**
A. Society of Mechanical Engineers.
**Q. And Section 3 is the -- is there a title to Section 3?**
A. Yeah. I don't know the exact title. It's

Page 66

basically design and fabrication rules for nuclear power plants, but there are some design rules that are used in fossil power plants within that code.
**Q. And which ones are those?**
A. I would have to look at the sections of the code.
**Q. Well, that's why --**
A. The ASME Section 3 code is four volumes thick.
**Q. All right. Well, first of all, let's see in your report. I don't believe that there's a specific reference to ASME, am I correct?**
A. That's correct.
**Q. So that would explain to you why I do not have ASME Section 3 in front of me because you did not indicate you're relying on it. Since I don't, I'm asking you to tell me what portions of Section 3 of ASME which you already indicated relate to nuclear power plants you feel are applicable to this project?**
A. I would have to go back and look at those. Primarily, ASME Section 8 refers to fossil power plants.
**Q. And what portions of Section 8 of ASME are you relying on to form your opinions in this case?**

Page 67

A. Again, I'd have to go back and look at Section 8 and look at those specific areas within the code. Again, Section 8 is about seven or eight volumes thick.
**Q. I'm going to reserve my right to re-question you on any codes upon which you're now saying you're relying that were not referenced in your report because obviously we can't be prepared to address those.**
**So start with ASME. So there's nothing further about -- more specific about Section 8 of ASME which you can tell us today that you relied upon in forming your opinions?**
A. Not as of today, no.
**Q. Now, with respect to the NFPA you have indicated in your report specifically on page one, you indicate in Item 13, NFPA 51B, and I believe that you quote from that on page three of your report in item number eight; is that correct?**
A. That's correct.
**Q. Are there any portions of the NFPA upon which you are relying other than those listed here?**
A. Primarily, those are the sections of the NFPA that I relied upon.

Page 68

**Q. And is it your interpretation of the NFPA sections which you have cited here that management includes Sargent & Lundy?**
A. Absolutely.
**Q. Based on what?**
A. Based upon they were the project engineer on site and they were representing Florida Power & Light. They were the professional engineer responsible for --
**Q. Mr. Plunkett, I understand that.**
MR. MAHONEY: Even though you understand, let him finish.
MS. DAVIS: Jack, he doesn't need to say that any more.
MR. MAHONEY: No. Let him finish. What were you going to say?
A. Sargent & Lundy was the professional engineer on site, and under the purchase order and the professional regulations and codes they were ultimately responsible for their modification and that included the installation of their design.
**Q. Let me ask you my question again. What in NFPA tells you that Sargent & Lundy is management under this section which you've cited?**

A. The National Fire Protection Code doesn't define who is management, who isn't management. I mean, if you go back to the ASME codes, I'm sure that you'll find words to that effect, but the National Fire Protection Code just gives rules and regulations associated with fire protection. They don't define who is management, who is not management.

**Q. Okay. Any other portions of the NFPA upon which you're relying?**

A. I don't believe so.

**Q. What professional regulations are you referring to?**

A. Where are you referring to?

**Q. I'm referring to your prior answer where you said that what makes Sargent & Lundy management is professional regulations and codes. You've also mentioned professional regulations and codes earlier. So I want to know what professional regulations you're talking about.**

A. Again, ASME, Society of Mechanical Engineers, and the National Fire Protection Code.

**Q. The NFPA is a professional regulation in your view?**

A. NFPA is a code very similar to the Society of Mechanical Engineers. It's a document that's



written that defines how power plants are to be designed, built, and constructed. The National Fire Protection Code is a code or regulation that defines its rules and regulations for fire protection.

**Q. Any other professional regulations and codes on which you're relying in forming your opinions?**

A. I don't believe so.

**Q. Now, you also said earlier in one of your answers that you looked or not necessarily you looked at, but in evaluating the responsibility of Sargent & Lundy, that state codes and regulations would apply. What state codes and regulations are you referring to?**

A. Where did I say that?

**Q. You said that when we were talking about the bases for your observations one through eight, and it was -- specifically, it was when we got down towards the end of page two of your report.**

A. I believe I referred to the state regulations when I was referring to Item 7.1 of the terms and conditions.

**Q. Well, that's not when you said it, but that's really irrelevant. The question is are there any**



**state codes or regulations on which you relied in forming your opinions in this case?**

A. Could you state that again, please?

MS. DAVIS: Could you read it back, please.

(LAST QUESTION READ)

A. No, there are no others. There are no state codes that I'm relying upon.

MS. DAVIS: Thank you. That's all I have.

EXAMINATION BY MR. BATASTINI

**Q. I just want to make sure we're all on the same page. Mr. Plunkett, my name is Armand Batastini. I represent FPL/RISE entities.**

**Am I to understand the only documents you reviewed are those listed within your report?**

A. I believe so, yes.

**Q. So it's the documents you listed on page one and then the additional documents listed on Attachment A?**

A. There could be others that weren't included in there, but I'm pretty sure those are the bulk of the documents that I relied upon for my opinion. I mean, there may be -- there was a lot of documents



that I looked at, but primarily what I did is I isolated those documents that I really relied upon to arrive at my opinion and that's pretty much what I stated in my report. There could be other documents that I did review that I didn't list there.

**Q. Let me work on that a little bit. You still have those documents in your possession?**

A. Yes.

**Q. Did you maintain a list of all the documents you received relative to your assignment in this matter?**

A. I have a list of all the documents I received, yes.

**Q. Have you taken the time to compare that list with the documents listed in your report to see if this is an exhaustive list of all documents you reviewed or not?**

A. Well, to answer that, again, I had a number of documents I reviewed. I isolated those documents. After reviewing those documents, I isolated those documents that I used to form my opinion. Those are defined in my opinion report. There could well be others that I reviewed that's not listed in

Lundy was the engineer of record.
**Q. What I'm driving at, sir, is you're not offering any opinions regarding the respective responsibilities of other parties in this suit?**
A. No, I'm not.
**Q. You haven't formed an opinion one way or another on that point?**
A. That's correct.
**Q. Now, you've also testified today that you've consulted with NFPA 51B relative to your opinions in this case?**
A. That's correct.
**Q. What training or experience do you have relative to NFPA 51B?**
A. Well, generally, throughout the years I've been involved in fire protection systems in terms of, you know, designing supporting systems, fire protection systems. On my current DOE assignments, I was responsible for reviewing the fire protection code in reference to the design of the vitrification facility in Richland, Washington for DOE.
So over the course of my experience, I've had the responsibility to review those codes and to



assure that the engineer that was designing fire protection systems was designing within the code regulations.
**Q. So your experience with 51B comes in the context of your work as a design professional?**
A. Correct.
**Q. You haven't looked at 51B from the context of welding responsibilities?**
A. No.
**Q. You also talked about hot work permit procedures in this case. Are you offering any opinions relative to hot work permits in this case?**
A. No.
**Q. I'd like to focus for a minute on your opinion, I want to make sure I'm talking about the right opinion, regarding the use of a flame retardant barrier. I believe it's your third expert opinion.**
A. Yes.
**Q. And you talked about a heat transfer coefficient relative to the use of that flame retardant barrier.**
A. Right.
**Q. Do you know what heat transfer coefficient would be the correct coefficient to use with respect to this**



**matter?**
A. I'd have to look at the heat source. It's a function of what the heat source was. It's a function of the distance from the steel plate to the fire -- the flammable material, and I'd have to look at the actual steel. So, no, I do not know. I'd have to look at a lot of parameters to do that analysis.
**Q. And that's not an analysis you've done to date?**
A. I haven't done that analysis to date, no.
**Q. It was not an analysis that was requested of you with respect to your assignment?**
A. No.
**Q. Do you know what the temperature of the subject welding was?**
A. I reviewed it. I can't recall the temperature.
**Q. Do you know the thickness of the steel on which the welding was being conducted?**
A. I can't recall those details.
**Q. Okay. With respect to your opinion that a flame retardant barrier would have been effective in preventing this fire, I think that's your opinion --**



A. Hm-mmm.
**Q. -- did you take into account whether the weld was properly performed or not?**
A. No. I'm not a welding expert.
**Q. Is it possible that had the weld not been properly performed so that there was burn through or blow through on that weld, this flame retardant barrier might not have been effective in preventing that fire?**
MR. MAHONEY: Objection.
A. No, I don't believe so. As a mechanical engineer, not necessarily a welding expert at all, but as a mechanical engineer, you know, it's pretty clear to me from what I reviewed that blow through or no blow through had no consideration in terms of this accident. Primarily, it was if there was a fire protection -- if there was a fire retardant material in between these barriers, the fire would not have started.
**Q. What's your basis for that?**
A. Well, it's not an expert opinion, by any means. I've been working as a mechanical engineer for 30 years. So my opinion is just based upon my knowledge of welding and my knowledge of heat

transfer. But you should leave that to a welding expert.
**Q. Let me make sure I understand what you're saying, Mr. Plunkett. You're not offering an opinion regarding the efficacy of this flame retardant barrier if, in fact, burn through or blow through occurred?**
A. That's correct. In my opinion, if the flame retardant material was used, it would have prevented this fire.
**Q. That's not quite what you just said. Let's try it one more time.**
A. Okay.
**Q. Have you taken any analysis of the efficacy of the flame retardant barrier if burn through or blow through occurred at the weld?**
A. No, I haven't.
MR. BATASTINI: Okay. Thank you. That's all I have.
MR. VESPOLE: I have a few questions.
EXAMINATION BY MR. VESPOLE
**Q. Why does the American Society of Mechanical Engineers code apply to Sargent & Lundy in this case?**



A. Well, to design any design, any power plant, you're going to go back to ASME. It's the rules and regulations for building a fossil power plant. Section 8 gives you all of the rules and regulations in reference to design manufacturing and inspection of power plants. That's the rule. That's the design rule everyone uses for power plants.
**Q. Is that an industry standard for design engineers?**
A. Yes.
**Q. Is the NFPA an industry standard?**
A. Yes.
**Q. That applies to engineers, as far as you know?**
A. Yes.
**Q. Contractors?**
A. It applies to everyone that's involved in one way or another in that entity, of course.
**Q. Owners of power plants?**
A. Yes.
**Q. By the way, I apologize for being so rude. My name is Mark Vespole and I represent Certified Power Systems.**
A. I think we met before.



**Q. I think we have.**
**Do you have an opinion as to whether or not it would have been effective for the evaporative cooling media to be removed as opposed to have a barrier placed in between it and the heat source?**
A. Again, you're asking me questions associated with a detail analysis that would have to be performed, but, again, my opinion, you know, would be that either one would have worked.
MR. VESPOLE: I have no other questions. Thank you.
MS. DAVIS: I do have a followup.
RE-EXAMINATION BY MS. DAVIS
**Q. We didn't go back to Dr. Eager's report. I asked you to tell me what portions of Dr. Eager's report listed as number 12 on Exhibit 1 in terms of the documents on which you relied, what portions of Dr. Eager's report did you rely on?**
A. I'd have to look at his report.
(RECESS TAKEN)
MS. DAVIS: Back on the record.
**Q. Mr. Plunkett, at my request, you have taken a look at Dr. Eager's report which is identified on page one of your report as one of the key documents used to support your opinion and you have gone through and noted three portions of his report upon which you relied and formed your opinions. Could you for the record read those portions upon which you relied and tell us the significance that those had to you in forming your opinions?**



A. Item 4 on page two, "Given Mr. Crossley's lack of knowledge of the media material as a fire hazard, it was impossible for either CPS or Zampell to know that hazard material was flammable."
And on page four under summary, second sentence, "The cause of the fire was a failure of Florida Power & Light and their engineers to recognize the hazard of welding near the flammable media materials."
And a couple of sentences down (as read), "Given that Mr. Crossley stated repeatedly that he did not know that the media was flammable and he did not know anyone at Florida Power & Light who was aware of the hazard, it was distinguished that Florida Power & Light to suggest that CPS and Zampell should have greater knowledge than Florida Power & Light and does not either Florida Power & Light or their engineers."