UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CERTIFIED POWER SYSTEMS, INC. :
Vs. : C.A. NO. 05-066-ML
RHODE ISLAND STATE ENERGY STATUTORY TRUST 200, FPLE RHODE ISLAND STATE ENERGY L.P. AND FPLE RHODE ISLAND STATE ENERGY GP, INC. :
Vs. :
CERTIFIED POWER SYSTEMS, INC. :
Vs. :
ZAMPELL REFRACTORIES, INC. :

VOLUME I
DEPOSITION OF EDWARD ALARCON

produced, sworn and examined on March 6, 2006, at 10:00 A.M. on behalf of Defendant, Zampell Refractories, Inc., before Linda S. Taylor, Notary Public, at the office of Asquith & Mahoney, LLP, 155 South Main Street, Providence, Rhode Island.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RHODE ISLAND 02915
(401)437-3366



APPEARANCES

For the Plaintiff:

VISCONTI & BOREN, LTD.
55 Dorrance Street
Providence, Rhode Island 02903-2219
BY: JESSICA L. PAPAZIAN-ROSS, ESQ.

TRESSLER, SODERSTROM, MALONEY & PRIESS
744 Broad Street
Suite 1510
Newark, New Jersey 07102-3812
BY: MARK ROBERT VESPOLE, ESQ.

For the Defendant:

(Zampell)

ASQUITH & MAHONEY, LLP
155 South Main Street
Providence, Rhode Island 02903
BY: JOHN R. MAHONEY, ESQ.
-and-
JOSEPH J. REALE, JR., ESQ.

(FPLE)

EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, Rhode Island 02903
BY: MARK W. FREEL, ESQ.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RHODE ISLAND 02915
(401)437-3366



APPEARANCES (CONT'D)

For the Fourth Party Defendant:

(Sargent & Lundy)
MECKLER, BULGER & TILSON, LLP
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
BY: GEORGENE M. WILSON, ESQ.

(Premier)
OLIVERIO & MARCACCIO, LLP
55 Dorrance Street, Suite 400
Providence, Rhode Island 02903
BY: MATTHEW T. OLIVERIO, ESQ.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RHODE ISLAND 02915
(401)437-3366



INDEX


| DEPONENT | PAGE |
|---|---|
| EDWARD ALARCON | |
| EXAMINATION BY MR. MAHONEY | 5 |
| EXAMINATION BY MR. VESPOLE | 185 |


EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| ZAMPELL | | |
| O | SECTION 07215 - DUCT WORK INSULATION | 99 |

**Corp. was what?**
A. Basically, I established myself as an independent contractor for companies that own power plant facilities or power generation facilities, basically a temporary employee for a particular project or period of time.
**Q. Would you be retained by a power plant in connection with any number of things or would it generally relate to new construction?**
A. It was a combination of operational support for them. I was always working under their processes and procedures, basically just as a temporary. I also worked some new construction projects and to basically help oversee the construction and commissioning and testing of new installations.
**Q. In the approximate 15 years that Premier Engineering Corporation was active, did you travel throughout the country to various power plants?**
A. Most of it was in the south or southeast. Not a lot of travel to the northeast, for example, or to the west. Most of it was it in the area around the surrounding states of Texas.
**Q. Did you ever work -- well, strike that.**



**I take it that at some point in 2004, you contracted on behalf of Premier Engineering Corporation to do some work at the FPLE plant in Johnston, Rhode Island?**
A. Yes, sir, I got a call. And basically the call was on Friday afternoon, "Can you be at the job site Monday?"
**Q. Okay. Before receiving that call sometime in 2004, had you had occasion to work for FPLE plants in other areas of the country?**
A. I had worked one project. It began around November of 2001 and completed about the end of October 2003, and that was a new construction project in Forney, Texas. It's a suburb of Dallas, southeast Dallas.
**Q. How do you spell it?**
A. F-O-R-N-E-Y.
**Q. Was that a Florida Power plant?**
A. It's what they called FPL Energy which is the nonregulated arm of Florida Power & Light.
**Q. Is that the first time that you had worked for a Florida Power company?**
A. Florida Power & Light, yes, sir.
**Q. And did you deal with representatives of Florida**



**Power & Light strictly located in Texas or were you dealing with representatives of FPL located in some other state in connection with that November '01 to October '03 job?**
A. Yeah. The organization that I was working with is their new construction organization. Now they have engineers in their home office in Juno Beach, as well as they had a full-time project manager, full-time project engineer at the job site in Forney. My time was spent with the people at Forney. I think I made one trip to Juno Beach. Of course, we had e-mail and people coming to the job site. I did communicate with a lot of the subject matter experts that they had in Juno Beach.
**Q. So I take it then that the job at Forney in Forney, Texas related to the construction of a new FPL plant?**
A. Yes, sir, it was. It was basically a greenfield, new construction site.
**Q. What does that mean, a greenfield, new construction site?**
A. Well, greenfield means that it's a brand new site. It's not an existing site.
**Q. What type of power plant was it?**



A. It was a combined cycle power plant.
**Q. And for those of us who don't know, me in addition to anyone else, what does that mean, a combined cycle power plant?**
MR. OLIVERIO: I object. I think you know by now.
MR. MAHONEY: You don't mean that.
**Q. Go ahead, sir.**
A. A combined cycle power plant is -- it's a technology that was developed in the '70s and early '80s. It had to do with using gas turbines. The gas turbines produced -- are similar to what you see on an aircraft engine. They produce power directly by burning the gas, but you get increased efficiency, thermal efficiency by taking the waste heat coming out of the exhaust and you send it through a unit called a heat recovery steam generator. And that generates steam which drives another generator, a steam turbine generator, and that produces electricity, as well. So you capture the waste heat, and it makes the thermal cycle a lot more thermally efficient.
**Q. Is the Johnston FPL plant considered a combined cycle plant?**

Page 13

A. Yes, it is.
**Q. It is. So were there, and I understand it's a generic term, but were there many similarities between the Forney Texas plant and the Johnston plant?**
A. There were similarities in generic design, generic approach to the power plant cycle and the cooling cycles, but it was a completely different manufacturer and completely different types of equipment.
**Q. I see. Did you have anything to do with the construction of the FPL plant; that is to say, the new construction which took place sometime in '01, '02?**
A. For which?
**Q. Johnston.**
A. Not for the Johnston project, no, sir.
**Q. Okay. I see. When you were involved in the Rhode Island plant, the FPL Johnston plant, did you work with any of the same people from FPL who you worked with when you were in Forney, Texas?**
A. Some of the same people from the fleet team, yes. There was a lot of different people that I did not know, many I did not know.

Page 14

**Q. What people as you came up to Rhode Island in 2004 from Florida Power did you already know?**
A. No, that's not what I said. Let me correct that. I did not know anybody at the Johnston facility, but people that FPL had in Juno Beach, they were some of the subject matter experts, and those were the people that I had met before in dealing with the Forney project.
**Q. In terms of the Forney project in November '01 to October '03, was there, in connection with that project, an air inlet house?**
A. Yes. The Forney project had an air inlet house, but it was a different manufacturer and it was a different configuration.
**Q. I see. But did the air inlet house contain what has been referred to in connection with this case as pre and secondary filters?**
A. No. They used one filter. It was a primary filter, and they're made out of a much different material.
**Q. Okay. Obviously, you're well aware by now of the term evaporative cooler media; is that correct?**
A. Yes, sir.
**Q. Did the plant in Texas have what is known as an evaporative cooler media?**

Page 15

A. The Forney plant in Texas used a different type of cooling, and the evaporative cooler media did not have any evaporative cooling media.
**Q. I see. Were you located in Texas for the better part of November '01 to October '03 in connection with that new construction?**
A. Yes, sir. I spent all my time at the plant site.
**Q. And then when that job was complete in or around October of '03, did you do anything else between October of '03 and approximately March or April of '04 when you became involved in Johnston?**
A. No, I did not. I basically had planned to take some time off. It's a fairly intensive, fairly large project, and my intent was to take time off.
**Q. You indicated at some point in 2004, you were contacted on a Friday by somebody from Florida Power & Light; is that correct?**
A. Yes, I was.
**Q. Do you recall the name of the person who contacted you?**
A. The person that contacted me about the Rhode Island project was Carine Bullock.

Page 16

**Q. Did you say Carine?**
A. Carine Bullock.
**Q. A woman?**
A. Yes. Her name is Carine Bullock.
**Q. That's fine. Was she from Juno?**
A. She's from, yes, Juno Beach. She was manager of the fleet team for the combustion turbines.
**Q. And she called you and asked you to do what?**
A. Basically, she asked if I could be at the Rhode Island facility on Monday.
**Q. Do you recall what time of year that was?**
A. Yes, I do. It was the last weekend in February. And, as a matter of fact, I believe that Monday was March 1.
**Q. So that would be the last weekend in February 2004?**
A. Correct.
**Q. So did you agree -- well, did you ask Ms. Bullock what the purpose of your trip to Johnston, Rhode Island would be?**
A. She indicated that there was a meeting established with Sargent & Lundy and with the plant manager and she would be there, and they wanted me to basically come get familiar with the problem

they were trying to address.
**Q. Did she inform you in that conversation as to what the problem was?**
A. She didn't give me a very good description other than they were having trouble with the air inlets, but I don't recall them specifying exactly what the problem was.
**Q. So did you come to Rhode Island for purposes of that meeting?**
A. Yes, I did.
**Q. Was the meeting to the best of your memory Monday, March 1, 2004?**
A. Yes.
**Q. And Miss Bullock was there?**
A. She arrived about midmorning. I arrived first and I met the plant manager.
**Q. Who was the plant manager at that time?**
A. The plant general manager was his title. Craig Arcari.
**Q. Was that the first day that you had met Mr. Arcari, March 1, 2004?**
A. Yes, it was.
**Q. No familiarity with him before that day?**
A. I had heard the name before because he had



been in charge of one of the fleet teams at one point during my period of time with Forney. I believe I met him on the trip to Juno Beach, but I don't believe I've talked to him in much detail.
**Q. What does that mean, fleet team?**
A. Yes. The concept that FPL uses, and they use this both within their utility power plants and with their nonregulated power plants, all technical decisions are made by their subject matter experts. They have -- those are what they call the fleet teams. For example, there's a subject matter expert for combustion turbines and there's another one for the heat recovery steam generators, and there's one for what's called balance of plant, BOP areas, and then there's electrical and so on.
**Q. Was Carine Bullock the expert from the Juno location for combustion turbines?**
A. She was the manager of those experts.
**Q. I see.**
A. Okay.
**Q. All right. Now, who was the Sargent & Lundy representative who attended this March 1 meeting?**
A. There was -- my recollection, it was Tony Lunardini who was assigned as the Sargent & Lundy



project manager.
**Q. Had you ever -- I'm sorry. Go ahead.**
A. And there was another Sargent & Lundy person. I believe his name was Robert Herbster who I understood to be kind of a vice-president, kind of a project sponsor.
MR. VESPOLE: What was the last name? I'm sorry.
THE WITNESS: I believe his name is Herbster, H-E-R-B-S-T-E-R.
MR. FREEL: First name?
THE WITNESS: Robert. I'm sorry. I'll speak up.
**Q. Had you ever met either Tony Lunardini and/or Robert Herbster before March 1, 2004?**
A. No, sir.
**Q. Had you ever worked with Sargent & Lundy on any project before March 2004?**
A. No, I had not.
**Q. In addition to the four people that you've mentioned, was anyone else at the meeting beside the five of you?**
A. I believe Craig Arcari was there. I believe Carine Bullock was there, and I believe she was the



only one from the fleet team. And there might have been a couple of people from the production staff. I don't recall exactly if it was Tom Williams or Walt Smith, but --
**Q. Do you think --**
A. -- I know somebody showed me around. So I don't remember if they were in the meeting, but I know they showed me around the site.
**Q. All right. Fair enough. How long did the meeting last; do you recall?**
A. A couple of hours.
**Q. Did that provide you with some insight into the general nature of the work that was being proposed?**
A. It was pretty brief, but yes.
**Q. What was your understanding of the work that was proposed?**
A. They had chartered Sergeant & Lundy to deal with the problem. The problem had to do with that during the wintertime and certain wind conditions and also during certain snowing conditions that they had a problem with the inlets, air inlets that were freezing and plugging, and that basically didn't allow the combustion turbines to continue operating.

Page 21

**Q. At time of the meeting, did you come upon any knowledge as to whether Sargent & Lundy had drawn any diagrams or had written any specifications with reference to the proposed construction work concerning the inlets?**
A. I believe they were just becoming aware of this particular problem of the particular scope of work.
**Q. And what were you advised as to what your role would be?**
A. Basically, my role would be to assist with the coordination of the project activities. They didn't have enough resources with their own personnel. And basically coordinate between them and plant staff as far as focusing on the logistics for the project.
**Q. Would that mean that you would be acting in part as an intermediary between the Florida Power people and any contractors and subcontractors who might be involved in the construction?**
A. I would not use the term intermediary. I would term it more of a facilitator to make sure that basically there was a project engineer, for example, from the fleet team that was directly

Page 22

working on the problem for Carine and he would be performing certain technical roles. Of course, there's other fleet team people that would be involved. So it's more of a facilitator than everything has to go through me. I would have to be aware of everything going on, but I didn't orchestrate it all.
**Q. Who ultimately became the project engineer from the fleet team?**
A. Scott Kulwicki was basically the fleet team person that was involved all the way through the project. He worked for Carine Bullock.
**Q. And his last name?**
A. K-U-L-W-I-C-K-I.
**Q. Scott Kulwicki, as far as you knew, was an FPL employee?**
A. Oh, he was.
**Q. Was he ordinarily located in another state other than Rhode Island?**
A. He was based out of their home office in Juno Beach.
**Q. And to your knowledge, was Scott Kulwicki present in Johnston for the most part from March until the end of 2004?**

Page 23

A. No, he was not.
**Q. He was not?**
A. No.
**Q. How often --**
A. He supported all of their Westinghouse turbines basically. That was a Westinghouse turbine.
**Q. How often, if at all, would Scott Kulwicki be at the Johnston plant from March until the end of the year?**
A. Probably once a month or, of course, if they had outages or special work going on, he would definitely be there during the duration of those outages.
**Q. Now, we'll maybe get to some specifics momentarily, but you didn't like the word intermediary which is fine. Your preference was facilitator. But what does that word facilitator mean with regard to your role in connection with this project?**
A. My role was basically I was considered temporary staff to focus on the project, but I was never given any approval authority, for example. All approval authority was retained by FPL. So for any technical reviews, that was not my role. Same

Page 24

thing with any financial commitments or contracts, I never had any approval authority for any of that. Their management and their personnel retained all those authorities.
**Q. At some point during the -- well, strike that.**
**I have an exhibit here that was referenced in another deposition. I'll show it to you. I believe it was Zampell K, and it's the Bates numbers 1366 to 1378. Is that a purchase order up top that was provided to you by Florida Power?**
MR. OLIVERIO: Take your time and look at that.
A. Sure. This particular -- I had seen a draft of this and -- of the, for example, the consulting services agreement that's attached, this part right here, and I had been given a purchase order number, but I had not seen this particular signed purchase order.
**Q. I see.**
A. Okay.
**Q. I don't mean to interrupt you.**
A. No. That's okay.
**Q. So you've made it clear that the top page which is 1366 in Zampell K you had not seen before this**