# EXHIBIT A

**THIELSCH ENGINEERING, INC.**
**195 FRANCES AVENUE**
**CRANSTON, RHODE ISLAND 02910**

**PRELIMINARY**

# EVALUATION OF WELDING AND WELDING SAFETY PRACTICES UTILIZED DURING INSULATION OF AIR INLET FILTER HOUSING UNIT NO. 1 RHODE ISLAND STATE ENERGY CENTER FLORIDA POWER & LIGHT COMPANY JOHNSTON, RHODE ISLAND

Florence Cone

July 24, 2006

Report No. 11898

## INTRODUCTION

On December 3, 2004, a fire occurred in Unit No. 1 at the Rhode Island State Energy Center (RISEC), a power plant in Johnston, Rhode Island owned and operated by an affiliate of Florida Power & Light (FP&L). This fire occurred in the air inlet filter housing for Combustion Turbine (CT) No. 101. Thielsch Engineering was requested by FP&L to perform an investigation to determine the cause and origin of the fire. The results of that investigation are presented in Thielsch Engineering Report No. 11346. Summarily, it was concluded that the fire was caused by welding being performed on the exterior of the air inlet filter housing. The heat and/or sparks generated by welding ignited the evaporative cooler media located within the housing.

At a later date, Thielsch Engineering was requested to evaluate the welding and welding safety practices that were utilized during the insulation of the air inlet filter housing for CT No. 101. This evaluation was intended to determine the compliance of the welding and welding safety practices with respect to the contract, the applicable Codes and Standards as well as accepted industry practice. The evaluation of the welding and welding safety practices are the subject of this report.

This report was completed upon the basis of available information. Thielsch Engineering reserves the right to supplement or modify this report if additional facts or data are discovered.

## BACKGROUND INFORMATION

Thielsch Engineering was provided with background information to assist in their investigation. Thielsch Engineering reviewed this information and requested additional information as required. The information reviewed by Thielsch Engineering is listed in Appendix A. The information considered to be pertinent is summarized below.

RISEC is a gas-fired, combined-cycle power plant. It contains two combustion turbines, two Heat Recovery Steam Generators (HRSGs) and one steam turbine. This power plant, which has a rated capacity of 550 MW, was originally commissioned in 2002. It has been operated on demand since that time.

Occasionally, during the winter months, the inlet filters on one of the combustion turbines would ice up, causing the applicable unit to trip. In 2004, FP&L contracted Sargent & Lundy of Chicago, Illinois to develop a solution to this problem. The solution developed by Sargent & Lundy included the installation of a glycol heating system for the air inlet filter housings. It also included partially insulating the exterior of these housings and the associated ductwork.

A drawing illustrating the general arrangement of the air inlet filter housings is provided in Fig. 1. As indicated, these housings enclosed a two stage air filtration system along with an evaporative cooler. For the most part, the housings were constructed of carbon steel plate material. There was a section of each housing that was constructed using stainless steel sheet material. (This section of each housing surrounded the evaporative cooler.

Stainless steel was selected in preference to carbon steel due to its superior corrosion resistance. When the evaporative coolers are in operation, these sections of the housings would be exposed to moisture.)

In July of 2004, Sargent & Lundy requested proposals from a variety of contractors to complete the proposed scope of work. The proposals, including all requests for information, were due by August 9, 2004.

The bid package included a variety of information. This included but was not limited to Instructions to the Bidder, the General Conditions for Contract Work, FPL Energy Projects Contractor Safety Requirements, Specification No. F-6102 (which governed the work to be performed) and a variety of drawings.

In the Instructions to the Bidders, it was stated that:

> "...Bidder shall carefully examine the site of work and shall conduct the necessary investigation to acquaint itself thoroughly with all conditions under which the Work shall be performed."

On July 29, 2004, there was a mandatory on-site pre-bid meeting for those contractors that intended to bid on this project. This pre-bid meeting was attended by representatives of FP&L, Sargent & Lundy and several contractors. This included CPS Construction Company (CPS) of Sandwich, Massachusetts, the contractor that submitted the winning bid for this project.

The original bid package required that the exterior of the air inlet filter housings should be insulated with a 2.5" thick layer of cellular polyisocynurate covered by a layer of 26 gage aluminum lagging. (This is set forth in Section 15210 of Specification F-6102.) The scope of work was defined as:

> "...top, front and side of the clean air plenum, the housing for the Evaporative Coolers and the Droplet Eliminators, and the outdoor portion of the discharge duct."

The contractor was given the option to bid an alternate insulation system as long as it had equal thermal properties.

On August 2, 2004, Sargent & Lundy issued an addendum to Specification F-6102. This addendum, which addressed "Ductwork Insulation", applied to the insulation of the air inlet filter housings. It required the contractor to use 3" thick mineral wool in place of the 2.5" thick cellular polyisocynurate that was originally specified.

On September 1, 2004, the Rhode Island State Energy Statutory Trust issued Purchase Order No. 04-RISECIIPP-05 to CPS. This purchase order identified the terms and conditions governing the completion of work by CPS. At that time, there was still some discussion regarding the method that would be used to insulate the exterior of the air inlet filter housings. The purchase order gave the purchaser the option to eliminate the supply and erection of insulation from the scope of work. By accepting the purchase order, the supplier agreed to "...proceed in good faith and in a timely manner to develop alternate source(s) for the supply and erection of the insulation so as to reduce the overall cost to the purchaser."

CPS subcontracted Zampell Insulation of Newburyport, Massachusetts to perform the insulation work on this project. On October 24, 2004, several weeks after CPS had mobilized, Zampell completed drawings illustrating the method they proposed to attach the insulation (cellular polyisocynurate) and lagging to the exterior of the air inlet filter housings. These drawings are provided in Figs. 2 and 3. The method proposed by Zampell utilized a sub-girt system that would be attached to the exterior of the air inlet filter housings by welding. It also included the use of pins and lock washers.

Sargent & Lundy reviewed and approved these drawings. The contractor was given permission to proceed. Zampell insulated the exterior of the air inlet filter housing for CT No. 201 without incident. They then began work on the air inlet filter housing for CT No. 101.

On the morning of December 3, 2004, the Zampell superintendent, Mr. Bruce Crossman, was welding clips to the exterior of the air inlet filter housing for CT No. 101. These clips were part of the sub-girt system that would be used to attach the insulation and lagging to the exterior of the air inlet filter housing.

Mr. Crossman was welding utilizing the shielded metal arc welding (SMAW) process. He was reported to be using AWS E-6011 welding electrodes (1/8" diameter) to attach the clips to the carbon steel portion of the air inlet filter housing. He was reported to be using AWS E-309L welding electrodes (3/32" diameter) to attach the clips to the stainless steel

portion of the air inlet filter housing. In deposition testimony, he indicated that he did not adjust the settings of his welding machine when he switched between these two different electrodes.

Mr. Crossman had completed welding the fourth course of clips on the south wall of the air inlet filter housing for CT No. 101 and was in the process of erecting a 20 ft. length of angle iron when personnel in the vicinity informed him and the other Zampell employees that there was a fire in the air inlet filter housing. (This was at 9:04 am.) Mr. Crossman then evacuated the plant (along with other non-essential personnel).

At 9:05 am, an unknown person called 911 to report a fire at the plant. At 9:13 am, the Johnston Fire Department arrived on site. At 10:30 am, Mr. Kevin Murphy, a Senior Investigator for the Rhode Island State Fire Marshal, arrived on site. After completing his investigation, he concluded that the most probable cause of the fire was the welding being performed by Zampell on the exterior of the air inlet filter housing.

FP&L contracted Thielsch Engineering to perform an independent investigation to determine the cause and origin of the fire. The results of that investigation are documented in Thielsch Engineering Report No. 11346 dated January 18, 2005. They confirmed that the fire was caused by the welding being performed by Zampell on the exterior of the air inlet filter housing. The welding ignited the evaporative cooler media located within the air inlet filter housing.

The evaporative cooler media, which was manufactured by Munters Corporation, is identified by the trade name of CELdek. It is described as cellulose paper impregnated with insoluble anti-rot salts and rigidifying saturants. An engineering bulletin for this product contains the following caution:

> "Do not expose CELdek evaporative cooling pads to sparks, open flame, welding spatter, temperatures in excess of 350°F, or other sources which may ignite the paper."

After completing their cause and origin investigation of the fire, Thielsch Engineering was requested to evaluate the welding and welding safety practices that were utilized during the insulation of the exterior of the air inlet filter housing for CT No. 101 and determine the compliance of these practices with respect to the contract, the applicable Codes and

Standards and accepted industry practice. The evaluation of the welding and welding safety practices is the subject of this report.

## CONTRACTUAL REQUIREMENTS PERTAINING TO WELDING AND WELDING SAFETY

As part of their assignment, Thielsch Engineering reviewed the contract to determine the requirements that pertained to the welding performed by Zampell. In accordance with the purchase order, the work performed by CPS and their subcontractors (including Zampell) was controlled by the following seven items (listed in order of precedence):

1. The purchase order;
2. General Conditions for Contract Work;
3. Supplementary conditions for this project;
4. FPL Energy Projects Contractor Safety Requirements;
5. Specification No. F-6102;
6. Construction Drawing Release Schedule; and
7. Supplier's Proposal.

**Item No. 2**

Item No. 2, the General Conditions for Contract Work, does not address welding specifically, but it does contain provisions that are applicable to welding and welding safety. Paragraph 4.1 states:

> "Supplier hereby represents that it has, by careful examinations, satisfied itself as to the nature and location of the Work, the conformation and configuration of the ground, the character, quality and quantity of the materials to be encountered both above and below ground, environmental conditions including weather, the character of equipment and facilities needed preliminary to and during the prosecution of the Work, the general and local conditions including labor relations and all other matters, including, but not limited to applicable laws which may in any way affect the performance of the Work under this Contract. Supplier shall have no claim for additional compensation or additional time based on a lack of knowledge of such conditions."

Paragraph 4.4 states that:

> "Supplier shall carefully study and review this Contract and related documents, and, prior to commencing any portion of the Work, shall carefully review applicable drawings and specifications and shall immediately provide to the Company Representative Notice of any conflict with applicable laws or of any errors, inconsistencies or omissions it may discover."

Paragraph 12.1 states that:

> "Supplier shall provide a competent Superintendent and adequate supervision on the Jobsite at all times during performance of the Work to ensure that the Work is being performed in accordance with this Contract."

Paragraph 21.11 states that:

> "Work place safety is an integral part of the Supplier's obligations under this Contract....Supplier is solely responsible for, and liable for the safety of, its personnel, equipment, property and Subcontractors...."

**Item No. 4**

Item No. 4, the FPL Energy Projects Contractor Safety Requirements, does address welding specifically. Summarily, it addresses the requirement to obtain a hot work permit when welding is being performed. It states the following:

> "A hot work permit is required when cutting, welding, grinding or doing any other activity or operation in an area that contains flammable materials or liquids or may contain explosive gases that could result in a fire or explosion. Fire prevention measures must be implemented as specified on the Hot Work Permit when carrying out hot work such as cutting and welding. Hot work permits must be coordinated with the FPL Energy project supervisor."

This document also states:

> "The Contractor is responsible for assessing the work scope to ensure it can be performed in a safe manner and/or taking the necessary precautions or compensatory actions to ensure the work can be performed safely."

**Item No. 5**

Item No. 5, Specification No. F-6102, also references welding. This is found in Section 05061 covering "Structural Welding". In accordance with this section, the welding, unless otherwise noted, was to be performed in accordance with the requirements of AWS D1.1. The welding procedures utilized were to be qualified in accordance with AWS D1.1. Moreover, the welders performing the welding were to be certified (qualified) in accordance with AWS D1.1.

Some may argue that the welding being performed by Zampell does not involve structural welding, and, thus, would not be governed by Section 05061. This is not true. The structural work is defined in Section 01010 of Specification No. F-6102. It includes, among other things, "all other related steelwork items, such as cutting, welding, bolting, etc., to properly complete the Work." Moreover, even though Section 07215 (which covers "Ductwork Insulation"), does not contain specific requirements pertaining to welding, Specification No. F-6102 states that:

> "The contract documents are complementary, and what is called for by any one shall be as binding as if called for by all."

Clearly, Section 05061 governed the welding being performed by Zampell. As such, Zampell was required to perform the welding in accordance with the requirements of AWS D1.1. Zampell was supposed to utilize qualified procedures to complete the welding. Moreover, the welders performing the welding were supposed to be qualified and that qualification was to have been validated within the previous six months prior to performing the work.

There is nothing to indicate that Zampell submitted qualified welding procedures to CPS. In fact, in deposition testimony, Mr. Crossman revealed that he did not realize that this was a contractual requirement.

There is also nothing to indicate that Zampell submitted welder certifications (qualifications) to CPS. Mr. Crossman, in deposition testimony, indicated that other than what he referred to as pipe welding, "...most other welding is really not that critical. And being not of a critical nature, the certifications are not really required." Mr. Crossman also indicated that the two other Zampell employees that performed welding on this project were "in training".

AWS D1.1, in addition to detailing the requirements for welding, also addresses welding safety. (Reference Annex J of AWS D1.1.) It states:

> ".....combustibles should be protected with a cover of fire resistant material. All combustible materials should be removed or safely protected within a radius of 35 ft [11 m] around the work area."

**Item No. 7**

Item No. 7, the Supplier's Proposal, included the CPS Safety Program. A copy of the CPS safety manual should have been submitted along with the proposal. It states the following:

> "The welding operation environment shall be free of flammable liquids and vapors. Combustible materials within a radius of 35 feet of the operation will be protected from activity residue (flame, heat, sparks, slag, etc.)."

## ADDITIONAL FP&L REQUIREMENTS REGARDING WELDING SAFETY

In addition to the contractual requirements regarding welding safety, FP&L had in place site-specific procedures regarding welding safety. These requirements are highlighted in the "Contractor Guidelines and Safety Orientation". They are as follow:

> "Prior to any hot work a hot work permit must be obtained through the Production Technician Leader. This permit will authorize hot work for one shift. This permit must be posted at the hot work site and returned to the Production Technician at the end of the shift. Adequate precautions, such as drop cloths, caution tape, etc., shall be taken to guard against hazards such as electric shock, burns, toxic fumes (i.e., vanadium pentoxide, etc.) fires and explosion. Hot material shall be cooled or plainly marked before leaving it unguarded. When welding or cutting in elevated locations, precautions shall be taken to prevent hot metal from falling on personnel or combustible materials. No welding or cutting shall be attempted in dusty or gaseous areas until area has been ventilated sufficiently to eliminate all possibility of fire or explosion. No welding or cutting shall be performed on containers or pipes until verification (by sampling spot or continuous with gas monitoring equipment) that the component is safe to begin work. Safety signs, shields or barricades shall be placed around welding jobs as needed to protect personnel or the public from direct rays of electric arc or welding fumes. A Fire Extinguisher must be positioned at the work area. Electric arc welders shall be grounded properly before use and shut off or leads disconnected if leaving welder for extended periods."

Any contractor working on site would undergo a safety orientation that addressed the topic of welding safety. This included the employees of both CPS and Zampell.

## ACCEPTED INDUSTRY STANDARDS REGARDING WELDING SAFETY

In addition to the contractual and site-specific requirements governing welding safety, there are also a number of accepted industry standards regarding welding safety. This includes regulations promulgated by the Occupational Health and Safety Administration (OSHA). It also includes standards developed by the American National Standards Institute (ANSI) and the National Fire Protection Association (NFPA).

### OSHA

OSHA has provisions regarding welding safety. Those directly applicable to fire prevention can be found in 29 CFR 1910, Subpart Q and 29 CFR 1926, Subpart J. Paragraph 1910.252 (a)(2)(vii) states the following:

> "Where practical, all combustibles shall be relocated at least 35 feet (10.7 m) from the work site. Where relocation is impractical, combustibles shall be protected with flame proofed covers or otherwise shielded with metal or asbestos guards or curtains."

Paragraph 1910.252 (a)(2)(x) states the following:

> "If welding is to be done on a metal wall, partition, ceiling or roof, precautions shall be taken to prevent ignition of combustibles on the other side, due to conduction or radiation, preferably by relocating combustibles. Where combustibles are not relocated, a fire watch on the opposite side from the work shall be provided."

### ANSI

ANSI has provisions regarding welding safety. They are set forth in ANSI Z49.1 which covers "Safety in Welding, Cutting, and Allied Processes". Specific provisions regarding fire prevention can be found in Section 6, entitled "Fire Prevention and Protection". Summarily, fire watches are required where welding or cutting is done and where a large fire might develop, or whenever specific conditions exist. One of these conditions involves combustible materials adjacent to the opposite side of a metal wall on which welding is being performed. Moreover, paragraph 6.2.3 states the following:

> "Where it is necessary to observe areas that are hidden from view of a single fire watcher (other side of partitions, walls, ceilings, etc.) additional fire watchers shall be posted."

**NFPA**

The NFPA has provisions regarding welding safety. They are set forth in NFPA 51B which covers "Standard for Fire Prevention During Welding, Cutting, and Other Hot Work". Chapter 4 of that standard outlines the responsibility for hot work. Specifically, it states that:

> "Management or a designated agent shall be responsible for the safe operations of hot work activity."

Management for the purposes of hot work is defined in NFPA 51 B as:

> "...all persons, including owners, contractors, educators, and so on, who are responsible for hot work operations."

NFPA 51B also states that:

> "Management shall advise all contractors about site-specific flammable materials, hazardous process or conditions, or other potential hazards."

NFPA 51B also states that:

> "All combustible materials shall be relocated at least 11 m (35 ft) in all directions from the work site and the following criteria shall also be met:
>
> (a) If relocation is impractical, combustibles shall be protected with fire-retardant covers or otherwise shielded with metal or fire-retardant guards or curtains."

NFPA 51B also states that:

> "If hot work is done on one side of a wall, partition, ceiling, or roof, one of the following criteria shall be met:
>
> (a) Precautions shall be taken to prevent ignition of combustibles on the other side by relocating the combustibles.
>
> (b) If it is impractical to relocate combustibles, a fire watch shall be provided on the side opposite from where the work is being performed."

## DETAILS PERTAINING TO HOT WORK PERMIT NO. 1587

On the morning of December 3, 2004, hot work permit No. 1587 was issued to CPS and their subcontractor, Zampell, for the work scheduled to be performed on the air inlet filter housing for CT No. 101. This was one of 13 hot work permits issued to CPS and their subcontractors that day.

A review of the deposition testimony indicated that Mr. Michael "Mac" Corcoran obtained the permits and filled them out. He identified the locations where the work was to be performed. He also identified the precautions that would be taken to ensure that the work was performed safely, i.e., that it would not result in fires.

On hot work permit No. 1587, Mr. Corcoran identified the following four precautions:

- Appropriate Type of Fire Extinguisher;
- Remove Flammable Material;
- Close Off Area;
- Firewatch Required.

In accordance with the FP&L site-specific procedure, Mr. Corcoran performed a walkdown of the locations with a Production Technician (Mr. Richard A. Crossley). He and Mr. Crossley then returned to the control room to obtain the signature of Mr. Chuck Rowe on hot work permit No. 1587. Mr. Rowe, in his deposition testimony, indicated that before signing a hot work permit, he would confirm with the contractor that the necessary precautions had been taken. Mr. Rowe signed off on hot work permit No. 1587. The hot work permit was then stamped with the signature of Mr. George Burke, the plant leader, authorizing CPS and Zampell to begin work.

## EVALUATION OF WELD QUALITY

Thielsch Engineering has in their possession three sets of welds completed by Zampell. These welds were the ones used to attach the clips to the stainless steel section of the air inlet filter housing for CT No. 101. A review of deposition testimony indicated that some of these welds were made on the day of the fire with one of the welds having been

completed shortly before the fire was first discovered. These welds had previously been subject to detailed visual examination and metallurgical evaluation by Thielsch Engineering. (The results of the visual examination and metallurgical evaluation are documented in Thielsch Engineering Report No. 11346.)

As part of their assignment, Thielsch Engineering evaluated these welds to determine their compliance with the requirements of the applicable Codes. This includes AWS D1.1, which was called out in the contract. It also includes AWS D1.6, which is incorporated by reference into AWS D1.1. (For reference purposes, AWS D1.6 is the "Structural Welding Code - Stainless Steel".)

AWS D1.1 and D1.6 require welds to completed in accordance with Welding Procedures Specifications (WPSs) that are qualified in accordance with AWS D1.1 and/or AWS D1.6. AWS D1.1 and D1.6 also require that the welders performing the welding are qualified in accordance with AWS D1.1 and/or D1.6 and that the qualification testing is done using the essential variables of the specific WPS to be utilized during production welding. Moreover, AWS D1.1 and D1.6 require that the completed welds meet the requirements of the engineering design, the detail drawings and the acceptance criteria set forth in AWS D1.1 and/or D1.6.

With respect to the first requirement, i.e., that the welding be performed in accordance with a qualified WPS, there is no evidence to indicate that this was true of the welding being performed by Zampell. This is based upon a review of the available documents (which did not contain any qualified WPSs). It is also based upon the deposition testimony of Mr. Crossman. When asked if he would have consulted with any written welding procedures in order to determine what settings he would use during welding, he responded, "It wouldn't help you at all."

Thielsch Engineering considered the possibility that there was a pre-qualified WPS for these particular welds. (AWS permits a contractor to use WPSs that are developed and qualified by AWS. The contractor has to pay a small fee for this privilege.)

In this instance, i.e., a dissimilar metal weld, between stainless steel sheet material and carbon steel angle iron, there is no available pre-qualified WPS. As such, the contractor would have to take the necessary steps to qualify his own WPS.

At this point, it should be noted that the purpose of qualifying a WPS is to provide confirmation that the specific welding parameters being utilized are capable of resulting in a weld of good quality. In the absence of a qualified WPS, there is no such assurance.

As it may be argued that a WPS does not have to be qualified to result in welds of good quality, Thielsch Engineering evaluated the specific welding parameters that were being utilized by Zampell to determine the likelihood that they would result in welds of good quality.

As noted previously, Mr. Crossman was reported to be using AWS E-6011 welding electrodes (1/8" diameter) to attach the clips to the carbon steel portion of the air inlet filter housing. He was reported to be using AWS E-309L welding electrodes (3/32" diameter) to attach the clips to the stainless steel portion of the air inlet filter housing. In deposition testimony, he indicated that he did not adjust the settings of his welding machine when he switched between these two different electrodes. He also indicated that he "would probably be in the 50 to 120 range, and somewhere around 50 percent on the percent dial." He did not provide any information pertaining to travel speed, etc.

The welding machine utilized by Mr. Crossman is shown in the overall and close-up photographs provided in Fig. 4. These photographs were taken by Thielsch Engineering personnel on December 9, 2004, six days after the fire. At that time, the welding machine was set at approximately 75 amps. It should be noted that there is no "percent dial" on this machine. It is believed that Mr. Crossman was referring to the arc force dial. (At the time these photographs were taken, this dial was set at five or 50% of the total range.)

Qualified WPSs for AWS E-6011 electrodes in 1/8" diameter would typically call for an amperage range of 80 - 125 amps when welding in the horizontal position. Out of position welding (such as the type being performed on the vertical walls of the air inlet filter housing) would typically involve a 15% reduction in amperage (for an amperage range of 68 - 106 amps).

Qualified WPSs for AWS E-309 electrodes in 3/32" diameter would typically call for and amperage range of 45 - 80 amps when welding in the horizontal position. Again, out of position welding would typically involve a 15% reduction in amperage (for an amperage range of 38 - 68 amps).

While the setting on the machine (approximately 75 amps) would be within or close to the allowable range for the applicable electrodes, it would definitely not be the optimal setting for either electrode. It would involve welding "cold" with the carbon steel electrode, increasing the potential for lack of fusion defects. It would involve welding "hot" with the stainless steel electrode, increasing the potential for burn-through or melt-through of the stainless steel transition section.

With respect to the second requirement, i.e., that the welders should be qualified, there is no evidence to indicate that this was true of the welders employed by Zampell. This is based upon the review of the available documentation (which did not contain any welder qualifications for Zampell employees). It is also based on the deposition testimony of Mr. Crossman.

The purpose of qualifying a welder or a welding operator is to provide assurance that the welder is capable of producing a good quality weld (when following the specific WPS to which he was qualified). In the absence of welder qualification, there is no assurance that the welder is capable of producing a good quality weld.

As it may be argued that the absence of "paperwork" does not necessarily indicate that an individual welder is not capable of producing good quality welds, Thielsch Engineering re-examined the three sets of welds in their possession to determine their compliance with the engineering requirements, the detail drawings, and the applicable Codes.

The engineering requirements for the subject welds are documented in the detail drawings provided previously in Figs. 2 and 3. As indicated, each angle iron clip was supposed to be attached to the stainless steel transition section with four fillet welds. These fillet welds were each supposed to be 1-1/2" in length. Moreover, they were supposed to have leg lengths equal to the thickness of the angle iron clip (approximately 1/8").

The three sets of welds in the possession of Thielsch Engineering are shown in the overall and close-up photographs provided in Figs. 5 to 12. They had been identified previously as Samples Nos. C1, C2 and C3. That identification was maintained for the purposes of this report.

The photographs provided in Figs. 5 to 12 were taken upon initial receipt of Samples Nos. C1, C2 and C3. The current visual examination was performed after these samples had

undergone metallurgical evaluation. As such, some of the welds were no longer available for visual examination. (Regardless, a review of the photographs confirmed that all of the welds were of similar quality.)

The visual examination of the remaining welds on Samples Nos. C1, C2 and C3 confirmed that they were all rejectable. They did not meet the engineering requirements outlined on the detail drawing or the requirements of AWS D1.6. Specifically, a large percentage of these welds were significantly shorter than 1-1/2". In addition, most of these welds exhibited an unacceptable profile. Moreover, most of these welds exhibited unacceptable levels of undercut. Several of these welds also exhibited piping porosity. (The results of the visual examination are documented in Appendix B.)

A number of these welds had also melted through the substrate, resulting in root penetration on the opposite side of the stainless steel sheet material. While AWS D1.6 does not specifically prohibit melt-through of fillet welds, this is due to the fact that a fillet weld, by definition, is not expected to penetrate through the full thickness of the base material. (Welds that penetrate intentionally through the base material or for an appreciable distance into the base material are classified as groove welds or partial penetration groove welds. These welds are made using WPSs that are different than those used for fillet welds. Moreover, the requirements for welder qualification for these types of welds are more rigorous than those for fillet welds.) On that basis, melt-through or burn-through, even though not specifically prohibited in AWS D1.6, would also be considered rejectable.

Summarily, the welds made by Zampell were made without benefit of a qualified WPS by a non-qualified welder and were not of acceptable quality.

## DISCUSSION

Thielsch Engineering was requested to evaluate the welding and welding safety practices utilized by CPS and their subcontractor, Zampell, in the work they performed in insulating the exterior of the air inlet filter housing for CT No. 101. This evaluation was performed to determine the compliance of the welding and welding safety practices with respect to the contract, the applicable Codes and Standards and accepted industry practice.

**Welding**

In accordance with the contract, the welding on the air inlet filter housing was supposed to be performed in accordance with AWS D1.1. The welding on the stainless steel transition section was supposed to be performed in accordance with AWS D.1.6 (which is incorporated by reference into AWS D1.1).

It is clear from a review of the available documentation that the welding being performed by Zampell on the air inlet filter housing did not comply with AWS D1.1 or AWS D1.6 and thus, did not comply with the contract. Specifically, the welding performed on the air inlet filter housing was performed without benefit of a qualified WPS. Moreover, the welding was performed by non-qualified welders including welders characterized as being "in training". Finally, the completed welds were of unacceptable quality.

Zampell was a subcontractor to CPS. As such, CPS had the responsibility to ensure that the work being performed by Zampell complied with the contract, the applicable Codes and Standards as well as accepted industry practice. CPS failed to fulfill this responsibility.

**Welding Safety**

As noted previously, the evaluation by Thielsch Engineering of the welding practices being used by Zampell on the air inlet filter housing for CT No. 101 also addressed welding safety. On a contractual basis, CPS was solely responsible for the safety of its personnel, equipment, property and subcontractors. This is set forth in Paragraph 21.11 of the General Conditions for Contract Work. Moreover, CPS was responsible for assessing the work scope to ensure that it could be performed in a safe manner and/or taking the necessary precautions to ensure that the work could be performed safely. (This is set forth in the FPL Energy Projects Contractor Safety Requirements.)

The contract language is such that CPS was solely responsible for their safety and the safety of their subcontractors. (This would include welding safety.) FP&L did not have any responsibility with respect to the welding safety of CPS or of subcontractors to CPS.

On a contractual basis, CPS and their subcontractors were also required to adhere to FP&L contractor guidelines which required them to obtain permits for any hot work being performed. While CPS did obtain a permit for the welding being performed on the air inlet filter housing on December 3, 2003, they and Zampell failed to follow the precautions listed

on the hot work permit. Specifically, they failed to remove flammable material (the evaporative cooler media) from the area in which welding was being performed.

On a contractual basis, CPS was also required to adhere to their own safety program. This safety program called for all flammable materials to be removed within a 35 ft. radius of any hot work. (Again, in failing to remove the evaporative cooler media from the air inlet filter housing or failing to take some precautionary measure to prevent this evaporative cooler media from igniting, they failed to fulfill their contractual obligation.)

With respect to the applicable Codes, AWS D1.1 contains guidelines with respect to welding safety. They are similar to the CPS safety program in that they require removal of flammable material within a 35 ft. radius of any hot work. As such, by failing to remove the evaporative cooler media (or protect it from ignition sources in some manner) CPS and their subcontractor Zampell did not comply with the guidelines set forth in the applicable Codes.

CPS and their subcontractor Zampell also failed to meet accepted industry practice. Specifically, they did not comply with OSHA regulations regarding removal of flammable material and/or placing a second fire watch in the air inlet filter housing. Similarly, they did not comply with guidelines offered by AWS or standards promulgated by ANSI and NFPA.

CPS and Zampell may argue that they had no way of knowing that there was evaporative cooler media in the air inlet filter housing or that the evaporative cooler media was flammable. With respect to the first argument, i.e., that CPS and Zampell had no way of knowing that there was evaporative cooler media in the air inlet filter housing, it should be recognized that CPS had a contractual responsibility to perform careful examinations to satisfy itself regarding the character of materials to be encountered in the work. This is set forth in Paragraph 4.1 of the General Conditions for Contract Work. This paragraph, which was referenced previously, states:

> "Supplier hereby represents that it has, by careful examinations, satisfied itself as to the nature and location of the Work, the conformation and configuration of the ground, the character, quality and quantity of the materials to be encountered both above and below ground, environmental conditions including weather, the character of equipment and facilities needed preliminary to and during the prosecution of the Work, the general and local conditions including labor relations and all other matters, including, but not limited to applicable laws which may in any way affect the performance of the Work under this Contract.

Supplier shall have no claim for additional compensation or additional time based on a lack of knowledge of such conditions."

In addition, there is deposition testimony indicating that an FP&L representative (Mr. Edward Alarcon), specifically advised CPS during the pre-bid meeting that there was evaporative cooler media in the air inlet filter housing.

Moreover, CPS employees, including Mr. Corcoran, were in sections of the air inlet filter housing performing work during the course of this project. Moreover, in July of 2004, CPS employees replaced one of the pumps in the evaporative cooler system. As such, they should have been aware of the presence of the evaporative cooler media.

With respect to Zampell, Mr. Crossman, in his deposition testimony, indicated that he had seen the drawing shown previously as Fig. 1. This drawing clearly indicated the presence of "EC Media".

While Mr. Crossman, the Zampell superintendent/welder, indicated that he had not entered the air inlet filter housing, he was well aware that the stainless steel transition section upon which he was welding was of limited thickness. He confirmed this by "hammer testing". Mr. Crossman, having been a welder for many years, should have been aware of the potential for burn-through or melt-through of the stainless steel sheet material. Even in the absence of burn-through or melt-through, he should have been aware that the side of the stainless steel sheet material opposite which he was welding would get extremely hot. Based upon that, he should have requested permission from FP&L to enter the air inlet filter housing and confirm that there was no flammable material inside the housing in the area in which he was welding. The air inlet filter housing is not a confined space and CT No. 101 was off line on this day. As such, entry into the air inlet housing would not have been problematic.

Thus, even though CPS and Zampell may argue that they had no way of knowing that there was evaporative cooler media in the air inlet housing, this position cannot be supported. CPS had a contractual responsibility to identify the presence of evaporative cooler media in the air inlet filter housing. Moreover, an FP&L representative advised CPS before the project started that the air inlet filter housing contained evaporative cooler media. Finally, even if CPS ignored their contractual responsibility and the advance notification provided to them, CPS should have become aware of the presence of the

evaporative cooler media when they performed work in the air inlet filter housing. CPS had a responsibility to inform their subcontractor (Zampell) that there was evaporative cooler media in the air inlet filter housing. Zampell, even if they were unaware that there was evaporative cooler media inside the air inlet filter housing, should have inspected the interior of the air inlet filter housing to confirm that there were no flammable materials inside the housing in the area where the welding was being performed.

With respect to the second argument, that CPS and Zampell had no way of knowing that the evaporative cooler media was flammable, the contract clearly states that CPS had a responsibility to perform careful examinations to satisfy itself regarding the character of materials to be encountered in the work. (Again, this is set forth in Paragraph 4.1 of the General Conditions for Contract Work.) Further language to this effect is set forth in Section 2.1 of Specification No. F-6102 which states:

> "...Bidder shall carefully examine the site of work and shall conduct the necessary investigation to acquaint itself thoroughly with all conditions under which the Work shall be performed."

A similar provision can be found in Section 103.1 of Specification No. F-6102. It states:

> "Prior to performing any work,....the contractor shall make a thorough field check at the Project Site for the purposes of verifying existing conditions that may affect the Work."

A similar provision is found in the FPL Energy Projects Contractor Project Safety Requirements. This provision, which was referenced previously, is as follows:

> "The Contractor is responsible for assessing the work scope to ensure it can be performed in a safe manner and/or taking the necessary precautions or compensatory actions to ensure the work can be performed safely."

Even if CPS and Zampell failed to fulfill their contractual obligation to identify the character of the materials to be encountered during the work and to assess the work scope to ensure that it could be performed safely, CPS and Zampell were well aware that there was flammable material in the air inlet filter housings. Deposition testimony indicates that there was some discussion between FP&L and CPS that the air inlet filter housing contained flammable materials. (This included the primary and secondary air filters as well as the evaporative cooler media.) The deposition testimony also indicated that there was some

discussion between FP&L and CPS that special precautions had to be taken during hot work performed in and around the air inlet filter housing.

CPS was also provided with written notice that the evaporative cooler media was flammable. Specifically, on November 5, 2004, Mr. Thomas Lipinski of CPS was provided with a drawing that indicated as much. A copy of this drawing is provided as Fig. 13. On November 17, 2004, Mr. Lipinski was provided with a revised copy of this drawing, Fig. 14. It still contained the warning regarding the flammability of the evaporative cooler media. CPS had a responsibility to inform their subcontractor of the fact that the evaporative cooler media was flammable.

It should also be noted that there is also deposition testimony indicating that the evaporative cooler media looks like cardboard. Cardboard is clearly flammable. As such, when CPS employees were in the air inlet filter housing performing work on the pump, they had an opportunity to discern its flammable nature.

Thus, even though CPS and Zampell may argue that they had no way of knowing that the evaporative cooler media was flammable, this position cannot be supported. CPS had a contractual responsibility to determine the character (including the flammability) of the evaporative cooler media. Moreover, there is deposition testimony to indicate that CPS was advised in the pre-bid meeting that the evaporative cooler media was flammable. CPS was provided with written notice on two separate occasions that the evaporative cooler media was flammable. CPS had a responsibility to inform their subcontractor (Zampell) that the evaporative cooler media was flammable.

## CONCLUSIONS

Thielsch Engineering evaluated the welding and welding safety practices utilized by CPS and their subcontractor Zampell in the work they performed in insulating the exterior of the air inlet filter housing of CT No. 101 at the RISEC in Johnston, Rhode Island. On the basis of this evaluation, Thielsch Engineering reached the following conclusions:

- The welding performed by Zampell did not comply with the requirements of the contract.
- The welding performed by Zampell did not comply with the requirements of the applicable Codes. This included AWS D1.1 and AWS D1.6. Specifically, the welding was performed without benefit of a qualified WPS by a non-qualified welder and resulted in welds of unacceptable quality.
- CPS and Zampell were aware that there was flammable material within the air inlet filter housing.
- CPS and Zampell should have been aware that there was evaporative cooler media contained within the air inlet filter housing.
- CPS was informed that the evaporative cooler media was flammable.
- CPS had a responsibility to inform their subcontractor that the evaporative cooler media was flammable.
- CPS was solely responsible for the safety of its personnel, equipment, property and subcontractors.
- CPS was responsible for assessing the work scope to ensure that it could be performed in a safe manner and/or taking the necessary precautions to ensure that the work could be performed safely.
- CPS was solely responsible for their own safety and the safety of their subcontractors. (This would include welding safety.)
- FP&L did not have any responsibility with respect to the welding safety of CPS or of subcontractors to CPS.
- The welding safety practices utilized by CPS and Zampell on the day on which the fire occurred did not comply with the requirements of the contract. While CPS obtained a hot work permit for the work being performed by Zampell on the air inlet filter housing, they did not take all of the precautions required by that hot work permit. Specifically, they did not remove the flammable material from the area in which the work was being performed.
- The welding safety practices utilized by CPS and Zampell did not comply with the requirements of the CPS safety program. Specifically, neither CPS nor Zampell removed material from within a radius 35 ft. from where the welding was being performed.

- The welding safety practices utilized by CPS and Zampell did not comply with the guidelines set forth in the applicable Code. Specifically, AWS D1.1 recommends that flammable material be removed from within a radius of 35 ft. from where the welding was being performed
- The welding safety practices utilized by CPS and Zampell did not comply with accepted industry practice. Specifically, they did not comply with the requirements of OSHA, ANSI or NFPA.

# EXHIBIT B

# THIELSCH ENGINEERING, INC.

## FLORENCE CONE

Ms. Florence Cone is a Principal Engineer responsible for a broad range of Metallurgical, Materials and Welding Engineering projects at Thielsch Engineering, Inc.. She has been involved extensively in the performance of metallurgical examinations and failure analyses of equipment, pressure vessels, tanks, piping, turbines, generators, compressors, and other components in power plants, chemical plants, refineries, pulp and paper mills, and other industrial plants. Specific failure investigations have included turbines, pumps, valves, shafts, bearings, fans, medical implants and devices, and various types of commercial and industrial vehicles. Many weldment failure analyses of equipment, structures and machinery have also been performed by Ms. Cone. Other projects have involved the assessment of cause and origin on damage by fires and explosions to industrial, commercial and residential facilities including the piping, pressure vessels and other equipment. Other evaluations have included failures in sprinkler and other fire protection piping systems where failures occurred in mechanical, welded and threaded joints, in sprinkler heads, and in other components.

As part of her broad failure analyses experiences, Ms. Cone is familiar with ferrous and non-ferrous metals and alloys, stainless steels, high alloy materials, composites, low-temperature babbitt and solder materials, and many other materials used in industrial and commercial applications. She has been involved with ceramics, rubber and elastomer products, wood products, concrete, composites and other combinations of materials.

She has extensive experience in the fabrication, forming, welding, heat treating, and inspection of piping, pressure vessels, and other pressure parts and components. She has prepared repair procedures for, and has supervised various successful repair welding projects, including turbine casings, boiler drums and headers, piping, press cylinders, dryers, tanks, and other industrial equipment. In some instances, she has determined by etching, replication, and other techniques the causes responsible for the prior cracking, and has modified the final repair procedure to effect improvements, where applicable or possible. Considerable experiences have been gained also in determining the effects on metallurgical and mechanical properties of carbon and alloy steels, stainless steels, and some non-ferrous materials of various fabricating, welding, and heat treating operations and procedures.

Ms. Cone has extensive experience and familiarity with the interpretation and utilization of the major Codes and Standards as issued by the ASME, ASTM, API, AWS, NACE, and other professional organizations. On nuclear projects she has also been involved with the various regulatory requirements issued by the NRC, AECB, and other governmental bodies.

On many condition and damage assessment projects, and welding and repair projects, she has served as project manager responsible for the planning, staffing, scheduling, and performance of the projects.

In addition, she has nearly 15 years of field experiences in the fabrication, welding, heat treating and nondestructive examinations of piping, pressure vessels, turbines, boilers, tanks, hydraulic presses, and other equipment.

Ms. Cone has prepared welding procedures and welding programs, and has developed special welding techniques involving various manual and automatic types of equipment. She is qualified to perform nondestructive examinations as a Level II Examiner in: (1) Liquid Penetrant Examination, (2) Magnetic Particle Examination, and (3) Visual Examination.

Ms. Cone's nondestructive examination experiences involve the examination of ferrous and non-ferrous castings and forgings, piping, pressure vessels, turbines, and other components and weldments to qualify and determine acceptance of the materials, parts and components to the requirements of various Codes, Standards and Specifications. This includes the Standards of the ASME, ASTM, API, AWS, ABS, etc.

Ms. Cone also has participated in condition assessments, integrity analyses and fitness-for-purpose determinations of high pressure vessels, piping, boilers, and related power plant, chemical plant, pulp and paper mill and other industrial plant components and equipment in which various nondestructive examination techniques, borescopic examinations and metallurgical replication techniques are utilized. She is experienced in the removal of weld probe, plug and other samples from piping, pressure vessels, weldments, etc.

She performs metallographic examination techniques, such as foil replication of polished and etched metal surfaces, and has developed procedures for seam weld verification, and various videoborescopic procedures for internal pipe, vessel and equipment inspections and magnetic particle examinations of headers, boiler components, small diameter piping and turbines.

Ms. Cone is a graduate of Carnegie Mellon University, receiving a Bachelor of Science degree in Metallurgical Engineering. She is a member of the American Society for Metals (ASM) and the Technical Association of the Pulp and Paper Industry (TAPPI).

Florence Cone has been the author or co-author of over 15 articles covering failures, weld repairs and inspection of equipment installed in chemical plants, pulp and paper mills, power plants, and other industrial plants. She has given expert testimony in depositions, trials and at arbitration hearings.

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CERTIFIED POWER SYSTEMS, INC.
Plaintiff,

VS. C.A. NO. 05-066-ML

RHODE ISLAND STATE ENERGY STATUTORY TRUST 200, FPLE RHODE ISLAND STATE ENERGY, LP, and FPLE RHODE ISLAND STATE ENERGY, GP, INC.,
Defendants,
VS.
CERTIFIED POWER SYSTEMS, INC.,
Defendant on Counterclaim/Third Party Plaintiff,
VS.
ZAMPELL REFRACTORIES, INC.,
Third-Party Defendants/Fourth Party Plaintiff,
VS.
SARGENT & LUNDY, LLC and PREMIER ENGINEERING,
Fourth Party Defendants

DEPOSITION OF FLORENCE CONE, a witness in the above-entitled cause, taken on behalf of the PLAINTIFF, before Claudia J. Read, a Notary Public in and for the State of Rhode Island, at the offices of ASQUITH & MAHONEY, 155 South Main Street, Providence, Rhode Island on August 24, 2006 at 9:30 A.M.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RI 02915
(401) 437-3366



PRESENT:

FOR THE PLAINTIFF . . . . . TRESSLER, SODERSTROM, MALONEY & PRIESS
744 BROAD STREET
SUITE 1510
NEWARK, NJ 07102
BY: MARK VESPOLE, ESQUIRE

FOR THE DEFENDANT (ZAMPELL) . . . . . ASQUITH & MAHONEY
155 SOUTH MAIN STREET
PROVIDENCE, RI 02903
BY: JOHN R. MAHONEY, ESQUIRE
- AND -
JOSEPH REALE, ESQUIRE

FOR THE DEFENDANT (FPLE) . . . . . EDWARD ANGELL PALMER & DODGE, LLP
2800 FINANCIAL PLAZA
PROVIDENCE, RI 02903
BY: MARK FREEL, ESQUIRE

FOR THE DEFENDANT (FP-SARGENT & LUNDY) . . . . . MECKLER, BULGER & TILSON
123 NORTH WACKER DRIVE
CHICAGO, IL 60606
BY: JANET DAVIS, ESQUIRE
- AND -
HIGGINS, CAVANAGH& COONEY
123 DYER STREET
PROVIDENCE, RI 20903
BY: STEPHEN LANG, ESQUIRE



INDEX


| WITNESS | PAGE |
|---|---|
| FLORENCE CONE | |
| Examination By Mr. Vespole. . . . . | 4 |
| Examination By Mr. Mahoney. . . . . | 108 |
| Further Examination By Mr. Vespole. | 164 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| | CONE'S | |
| 1 | Resume (2pp) . . . . . . . . . . . . . . | 56 |
| 2 | Article listing (6pp). . . . . . . . . . | 106 |




(DEPOSITION COMMENCED AT 9:40 A.M.)

FLORENCE CONE

Being duly sworn, deposes and testifies as follows:

THE REPORTER: State your full name for the record, please.

THE WITNESS: Florence Marie Cone.

EXAMINATION BY MR. VESPOLE

**Q. Good morning, Ms. Cone. My name is Mark Vespole. I'm the attorney for CPS in this lawsuit in which you and the company that you work for, Thielsch Engineering, have given expert opinions.**

**I know you've given depositions before and have been an expert witness before, so I'll try to give you the Reader's Digest version of the instructions. We can't talk at the same time. All your answers have to be verbal. If you don't understand my question, tell me and I'll repeat it so that you do, because if you answer a question and don't express any difficulty having understood the question, we'll assume that the answer that you gave is truthful, accurate, and responsive.**

**And as you know, a transcript of your testimony, sworn testimony, is made here today,**

COPY

**the purpose of which would be to compare what you say here today with something you may have said in the past in your report or something you might say in the future, for example at the trial, if there happened to be one.**

**And we could point out any inconsistencies between today's proceeding and prior and subsequent statements to a jury for the purpose of telling them that you shouldn't be deemed credible on an issue where there's an inconsistency or with the entirety of your testimony; do you understand all that?**

A. Yes, sir.

**Q. Do you have any questions before we get started?**

A. No, sir.

**Q. Okay. What's your current occupation?**

A. I am a principal engineer with Thielsch Engineering.

**Q. How long have you been a principal with Thielsch Engineering?**

A. I don't recall exactly, but I would say somewhere between three and five years.

**Q. How long have you been with Thielsch Engineering, all told?**



A. Twenty years.

**Q. And what does being a principal with Thielsch Engineering entail?**

A. Specifically, when I first started out with Thielsch Engineering, I was a metallurgical engineer, and then I became a senior metallurgical engineer, and then I became a principal engineer.

And the primary difference is that the scope of jobs I worked on became larger, my responsibilities became more varied. It's just a title, I guess, indicating the amount of experience I have.

**Q. This principal, the term "principal," have anything to do with ownership of the company?**

A. No, sir.

**Q. Did you work in engineering, any engineering job, before Thielsch?**

A. No, sir.

**Q. Can you give me the benefit of your educational experience?**

A. Yes. I went to Carnegie Mellon University in Pittsburgh, Pennsylvania. I have a Bachelor of Science degree in Metallurgical Engineering and Material Science.



**Q. What year was that?**

A. I graduated in 1985.

**Q. Did you go right from high school to college?**

A. Yes, sir.

**Q. Do you have any continuing education after you graduated from Carnegie Mellon?**

A. Just on-the-job training, sir.

**Q. No formal university level?**

A. No, sir.

**Q. Do you have any professional designations?**

A. What do you mean by that?

**Q. "Professional engineer" is one of them, I guess.**

A. No, sir. I'm not a professional engineer. I do have ASNT Level II inspector qualifications for liquid penetrant and magnetic particle examination.

MR. LANG: I'll bite. Can you read that back?

(PREVIOUS ANSWER IS READ BACK)

**Q. Just tell us, what is the ASNT Level II inspector --**

A. American Society of Nondestructive Testing.

**Q. You have to let me finish my question. The acronym "ASNT," what does that stand for?**



A. I'm sorry. The American Society of Nondestructive Testing.

**Q. What does it mean to be a Level II -- instructor, you said?**

A. Inspector.

**Q. Inspector, I'm sorry.**

A. Basically, it means that I have the ability to inspect without supervision and evaluate the results of the inspection.

**Q. That pertains to what? You said liquid particles or something like that?**

A. Liquid penetrant. It's a type of nondestructive testing.

**Q. Okay, that's testing. Just say what it is again, liquid?**

A. Liquid penetrant.

**Q. Is there any other part of that?**

A. Magnetic particle.

**Q. What type of testing is liquid penetrant, magnetic particle?**

A. They are surface examination techniques.

**Q. Of metals, I assume?**

A. It can be of metals. It can be of plastics. The actual component has to be magnetic for

**Q. Are you involved in any of those aspects of Thielsch's business at all?**

A. To the extent that sometimes I may have them do testing for me, yes. Other than that, no.

**Q. And typically, how would you characterize Thielsch's clients for which Thielsch has done field inspections over the years, what types of companies are they?**

A. If you're referring to what I will call Thielsch proper, meaning the company that specializes in heavy equipment --

**Q. Right.**

A. -- our client typically involve utilities, pulp and paper companies, chemical companies, cement plants. We also do litigation support. We also do insurance work.

**Q. When you say "litigation support," what does that mean to you?**

A. Meaning that if somebody was involved in a lawsuit and they needed some assistance in evaluating the claim, then they would come to us.

**Q. And how do you distinguish that from insurance work?**

A. To me, insurance work is done directly for an



insurance company. It may or may not lead to litigation.

**Q. If I understand your testimony correctly, you never worked for any of the types of companies which Thielsch has as clients that you just described, like utilities, pulp and paper companies, crane companies and things like that?**

A. If you mean employed directly by, no, sir.

**Q. That's what I mean, working directly for them?**

A. No, sir.

**Q. Do you have an understanding of whether or not Florida Power & Light has been a client of Thielsch over any period of years?**

A. I know I personally have done at least two jobs for Florida Power & Light.

**Q. You have?**

A. Yes.

**Q. Is that exclusive of this assignment?**

A. Yes, sir.

**Q. Tell me what they were and when they were?**

A. It was evaluation of boat samples from a main steam piping system in Jamaica, and that was probably about five to ten years ago. And there was also an evaluation of a bellows which failed



in service somewhere in Florida, I forget the details, and that was probably about three to five years ago.

**Q. Is it your understanding that there are other engineers at Thielsch who do work for Florida Power besides yourself?**

A. I know that other engineers have done work for Florida Power & Light, for instance, this particular job. I'm not aware of specific occasions beyond this particular matter.

**Q. Was Florida Power & Light a client of Thielsch when you joined the firm, as far as you knew?**

A. It may have been. I don't recall.

**Q. You said one of the jobs you did was a bellows failure about three to five years ago in Florida somewhere?**

A. Yes, sir.

**Q. The other one was something to do with five to ten years ago in Jamaica. I forget, you said a boat something or other?**

A. Yes, sir. A main steam piping system. They were trying to evaluate whether it was graphitized or not.

**Q. As a metallurgist, you've been involved in welding**



**over years?**

A. Yes, sir.

**Q. Could you describe what your experience and exposure to welding has been?**

A. When I first started working for Thielsch Engineering, during the five years where I traveled heavily in the field, we did a number of repairs of piping, turbine casings, pressure vessels, et cetera.

So, I would have supervised those repairs, prepared the procedures for those repairs, supervised the stress relieving of the repairs, and then evaluated the adequacy of the repairs.

More recently, I still regularly get involved with repair welding of speciality equipment, either writing procedures, actually going out in the field and supervising the repairs, inspecting the repairs, et cetera.

In addition to that, I also on a regular week-in and week-out basis, evaluate weld quality as part of either condition assessment or failure analysis work that I'm doing.

**Q. I take it you've never actually done welding**

**yourself, or have you?**
A. I have.
**Q. Did you ever receive any welding qualifications?**
A. No, sir.
**Q. In what capacity have you done welding?**
A. Just to see what it was like.
**Q. And could you quantify the number of occasions that you've done that?**
A. Probably on 10 or 15 different occasions. I've tried welding with sub arc equipment. I've tried welding with stick equipment. I've tried welding with gas metal arc welding equipment, as well as welding with flux cored.
**Q. In the early part of your career at Thielsch when you were doing more field inspection work, what types of failure analysis of heavy equipment were you involved in?**
A. In the early years, my involvement with failure analysis was relatively limited. I would think that I can recall specific instances where I looked at boiler tubes to figure out why they failed. I looked at -- no. Sorry. I'm trying to do the timing.
I know for a fact that I've looked at



boiler tubes during that five-year period, but other than that, I can't think of a specific example of other equipment that I may have looked at for purposes of failure analysis.
**Q. Just describe what boiler tubes are, if you would?**
A. Tubes from a boiler. Meaning that -- I wasn't trying to be sarcastic. Meaning in a boiler using heat to generate steam, and you have tubing which contains the water that's being turned into steam.
**Q. And what types of failures, material failures, are you talking about, material failures?**
A. Yes, sir.
**Q. Material failures that comprise the substance that the tubes are made out of?**
A. Meaning that the boiler tube ruptured or leaked and they had to determine why it ruptured or leaked.
**Q. Metallurgical analysis of some kind?**
A. Yes, sir.
**Q. Some of these boilers were at power plants?**
A. Some of them were, yes, sir.
**Q. Have you ever prepared expert reports for cases in litigation?**
A. Yes, sir.



**Q. And what type of frequency do you do it over the past, say, three to five years?**
A. Probably more than five times a year and not more than ten times a year.
**Q. For the past five years?**
A. Yes, sir.
**Q. So would that be true of the entire span of your career at Thielsch, or has it increased?**
A. I would say it's increased.
**Q. And when I ask you how many times you've given an expert opinion, do you include that to mean expert opinions for either insurance companies, private client and cases in litigation, or is this just cases in litigation?**
A. I was referring to reports that I've prepared for lawyers.
**Q. Okay. Do you also prepare expert reports for clients occasionally for cases, or insurance companies for cases that may not yet be in litigation?**
A. I prepare reports on pretty much every job I work on. When you said "expert," I assumed you were talking about expert witness litigation type.
**Q. Right. Okay. And do you consider reports that**



**you prepare for insurance companies to be expert reports for litigation?**
A. They're not intended. If they're for an insurance company, it may be in anticipation of litigation, but it's not -- litigation hasn't resulted yet.
**Q. How do these assignments come you to, is it directly or do they come through?**
A. It depends.
**Q. Is there someone who is in charge, specifically, of forensic litigation work?**
A. Ara Nalbandian is the manager of that department.
**Q. What expertise have you brought to any of the cases in which you've given expert opinions?**
A. Welding codes, welding, failure analysis, corrosion, industry practice. Those are the ones that come to mind off the top of my head.
**Q. When you say "industry practice," what are you referring to, what industry?**
A. What I would characterize as the construction industry, but you may not characterize it as such. Meaning, for instance, you have a contractor working in a boiler, he's engaging in certain

section.
**Q. Well, the changing of the inside of the base metal was not the cause of the fire? That's potentially a structural issue, may or may not be, but that in itself would not cause the fire. The fact that the structural -- the fact that the structural material on the backside of the stainless steel was altered?**
MR. FREEL: Objection to the form of the question. You can answer.
A. If your question is, is the fact that the microstructure of the stainless steel transition section gets hot enough to be transformed and that caused the fire, then yes.
**Q. That's a separate question. Mine is simply the fact that the microstructure changed, that in itself is not a cause of the fire?**
A. My response would be that the microstructure could not have changed without the introduction of significant heat input.
**Q. Do you have an opinion as to whether or not without these criticisms of the welds that Zampell did that we've just been talking about, there otherwise would have been ignition of evaporative**



**cooling media or other material as a result of the welding process?**
THE WITNESS: I'm sorry. Can you repeat your question?
(PENDING QUESTION IS READ BACK)
MR. FREEL: Objection to form. You may answer.
A. There may have been.
**Q. You can't say one way or the other?**
A. It would depend on the amount of heat input and the temperature on the backside of the transition section and the proximity between the transition section and the evaporative cooling media.
What I would say is that the burn-through significantly increased the potential for ignition because you had metal at 26, 2700 degrees Farenheit, molten metal on that backside, as opposed to just heat transfer and potentially sparks.
**Q. You don't have an opinion in this case as to whether or not there were actually sparks, do you?**
A. There may have been. I don't know. I know that there was molten metal on the backside of that transition section.



**Q. And you know that because why?**
A. Because I looked at the metallurgical mount.
**Q. And it showed?**
A. It showed that there was weld penetration through the transition section.
**Q. Is that the photograph that Mr. Cooney took, the blowup photograph of the backside of the metal?**
A. I actually looked at the mount.
**Q. With a microscope?**
A. Yes.
**Q. Just so I'm clear, you don't have an opinion in this case as to whether or not if the welds were done properly, without all these criticisms and problems that you've pointed out, there would have been a fire or not?**
MR. FREEL: Objection. You may answer.
A. My response would be that the quality of the welds, the extent of the burn-through, the location of the welds significantly increased the potential for ignition of the evaporative cooling media.
**Q. That wasn't my question. My question is can you give an opinion in this case as to whether or not**



**if the welds were done properly in accordance with all the codes and without any of the criticisms that you've mentioned, there still would have been a fire or not?**
A. There may not, there may have.
**Q. So you don't know?**
A. Don't know.
**Q. Do you know if anybody at Thielsch has given an opinion with regard to that?**
A. No, sir, I don't know.
**Q. You've read over all the reports, have you not?**
A. Yes, sir.
**Q. Have you spoken to anyone at Thielsch at any time during the period of time that you prepared your report or prior to this deposition?**
MR. FREEL: About anything?
MR. VESPOLE: About the issues in the case.
A. I may have spoken to Ara Nalbandian in passing. I talked to Mike Cooney just to ask him how his deposition went. That was about it.
**Q. So there is no source of information from which you can ascertain whether or not somebody from Thielsch will address the issue of whether or not**

Page 93

**there.**
A. Anyhow, my recollection from his deposition testimony was at one point he indicated or he asked either CPS or Zampell specifically about the welding on the electrical work, would that be done to AWS D1.1, and he was given every assurance that it would be.
**Q. You've gone through great pains in your report to point out contractual provisions, several contractural provisions in the contract between CPS and Florida Power & Light, have you not? You've cited maybe three or four of them?**
A. I may have cited more than that.
**Q. Did you do the same type of analysis with the contract between Florida Power & Light and Sargent & Lundy?**
A. No, sir. I did not have that contract.
**Q. Do the same type of analysis with regard to the contract between Florida Power & Light and Premier Engineering?**
A. My understanding is that there's a purchase order. I don't know that there's a contract.
**Q. Did you see --**
A. A purchase order. I don't believe I saw a

Page 94

contract. And I saw a draft agreement.
**Q. You did see a draft agreement?**
A. Yes, sir.
**Q. You read Mr. Alarcon's testimony?**
A. Yes, sir.
**Q. And you didn't think it was part of your engagement to assess the conduct of Premier Engineering, Mr. Alarcon, with regard to --**
A. Again, my primary focus was the people who were actively engaged in welding.
**Q. Do you know if the National Fire Protection Association Codes you've cited somewhere places any obligations on an owner of property, such as FPL, with regard to hot work permits?**
A. My understanding is that the NFPA addresses the issue of management, and with respect to hot work permits. They don't specifically -- I don't think they specifically refer to owners, per se.
**Q. Do you know if an owner is considered management?**
A. An owner of property can be considered management, as can a contractor, as can an educator.
**Q. My question is do you know if the NFPA applies to Florida Power & Light's role as the owner of the**

Page 95

**power plant in Johnston in this case?**
A. The NFPA would apply to Florida Power & Light to the extent that it wasn't obscured by or -- I don't want to say obliterated, that's not the word, the contractual language would have relieved them of that obligation, but to that extent, NFPA would have applied.
**Q. So it is your understanding that the contracts between owners and contractors can relieve owners of their obligations under standards, codes, and regulations?**
A. Not all, but if the owner sets up a project such that he's telling the contractor and the contractor is representing by signing the contract that he has identified all the various materials that would be encountered, the contractor is responsible for identifying the means and measures of performing the work in such a manner that it will be performed safely. The contractor is wholly responsible for his own safety and the safety of his subcontractors. Then, there is some relief of NFPA in that respect.
**Q. I'm not just talking about NFPA. I'm talking about all the codes you cited. On what do you**

Page 96

**base your opinion that a contract between an owner and a contractor can absolve an owner of a duty imposed by a standard or a code or a regulation?**
MR. FREEL: Objection to the extent that calls for a conclusion.
MR. VESPOLE: That's precisely my point. You can answer the question.
A. Again, my response would be Florida Power & Light had set up this project so that the onus for all aspects of the projects are on CPS and Zampell to get the work done and to get the work done safely. To that extent then I'm not saying that OSHA and NFPA would not apply to FPL, but the onus is definitely on CPS and Zampell.
**Q. And my question is what are you drawing from to support that? Is there a publication someplace, is there an engineering standard, is there something, or is that just your own opinion?**
A. That's been my experience of how it works. The way the contract documents are written make it clear what's going to happen in terms of indemnity and safety and what-have-you.
**Q. So do you consider yourself an expert in the interpretation of contract documents as it**

**Q. pertains to construction projects, such as the one that's at issue in this case?**
A. No. I'm just saying that's been my experience. I'm not an expert in the interpretation of -- I've reviewed a number of contract documents. I have an understanding of the way that they're set up and what your responsibilities as the contractor would be.
**Q. Are you giving an expert opinion in this case as to whether or not any of the codes you cited in your report, NFPA, ANSI, or any other, apply to Florida Power & Light, Premiere Engineering, or Sargent & Lundy?**
A. I haven't specifically addressed those in my report. However, I would say that OSHA would apply to FPL, that it would apply to Premiere Engineering, and that it would apply to Sargent & Lundy to the extent that they were doing work on the site.
**Q. Are these opinions that you're planning on giving at the trial, or are you just giving me these as part of this colloquy during this deposition?**
MR. FREEL: Objection.
A. You're asking me a question. I'm trying to



respond as best I can.
**Q. But I'm asking you, are these opinions that you're prepared to give at the time of trial because they're not in your report, as you pointed out, or are these just opinions that you're giving me here, off-the-cuff, as part of this deposition because I've asked you that question?**
A. To the extent if you were to ask me or if my lawyer were to ask me those questions at trial, then yes, but my intent is to limit myself primarily to what's given in my report.
**Q. Have you ever given an opinion in any other case in which you have discussed a contract or an owner's relief from a code obligation by virtue of contractual language?**
A. No, sir.
**Q. You've given an opinion in this case, or a conclusion at least, that both Zampell and Certified Power Systems were aware of the presence of flammable evaporative cooling media prior to the fire?**
A. Yes, sir.
**Q. On what do you base those opinions?**
A. I base the opinion on the fact that with



respect to CPS, that in the prebid meeting there is indication that Mr. Alarcon informed them that there was flammable material in the air inlet filter housing, including the evaporative cooling media.
I base it on the fact that they were provided reference drawings that indicated the presence of evaporative cooling media. I base it on the fact that Mr. Corcoran was in Door No. 2, and had the opportunity to actually see evaporative cooling media when the pump was being repaired on June or July of 2004.
I base it on the fact that Mr. Lapinski was provided copies on two separate occasions of the drawing, referencing the fact that evaporative cooling media is flammable and welding should not be performed on it.
With respect to Zampell, I'm basing it on the fact that Mr. Crossman in his deposition indicated he had seen the drawing that I've referenced as Figure 1 in my report, which clearly indicates the presence of EC media in that location, which would be evaporative cooling media.



And I'm also basing it on the fact that CPS had an obligation to inform Zampell that the evaporative cooling media was there and was flammable.
**Q. Do you understand that these issues are contested?**
A. I understand that some of these issues are contested.
**Q. Which issues do you think are not contested?**
A. Well, my understanding, again, is that there's some conflict about what was actually discussed in the prebid meeting which happened on July 29, 2004.
I don't think there's any question that there was discussion that there was flammable material in the air inlet filter housing and that special precautions had to be taken during welding in and around the air inlet filter housing. The question is whether evaporative cooling media was mentioned specifically at that time.
With respect to the drawings that were provided to Tom Lapinski, it's my understanding that there's some question as to whether or not he actually received them, although there's every indication that he couldn't do the job without having received them. There may have been other

welded on?
A. In one instance I did look at the discoloration in an effort to identify the amount of heat, and this is where it had not burned through obviously.
Q. And where it hadn't burned through, what did looking at this discoloration tell you?
A. That at that particular weld, it was probably running around 1400 degrees Farenheit on the backside.
Q. And was that with or without a burn-through?
A. That was without a burn-through, but with the effort of making a burn-through.
Q. But there was no burn-through?
A. Correct.
Q. And there was still a -- you felt there was still a temperature of 1400 degrees on the backside of the stainless steel?
A. Based on the discoloration.
Q. Did you have any appreciation as to what the temperature was that would ignite the evaporative cooling media?
A. My understanding is that it has an ignition temperature of 350 degrees Fahrenheit.
Q. And earlier I know Mr. Vespole asked you questions



about whether you had an opinion as to whether welding that was properly undertaken in this instance would have ignited the evaporative cooler media; your answer to that question is you do not know?
A. My answer to that question is it would depend.
Q. Depend on what?
A. A variety of different factors.
Q. What are they?
A. It would depend where the weld was in relationship to the evaporative cooling media.
Q. You're talking about C-1, C-2 and C-3. I think someone from Thielsch specifically referenced the fact that coupon C-3, immediately above the evaporative cooler media is the precise weld that was taking place that caused the fire. So with that in mind, someone from your company, C-3, would the temperature, if the weld was properly undertaken, be below, at, or in excess of 350 degrees?
A. I'm sorry.
Q. Taking coupon C-3, which someone from your concern has already testified was, in fact, the weld that ignited the fire, my question is at that very



location if the welding process was properly undertaken, whatever that means in your professional opinion, given what was being welded to what, would the temperature appreciated on the side of the stainless steel plate reach or exceed 350 degrees?
MR. FREEL: Objection. You may answer.
A. The question is if the weld had been properly undertaken --
Q. At C-3?
A. -- would a fire have resulted, I do not know. It may, it may not have. If your question is did the temperature at C-3, if the weld had been properly undertaken and the fact that the stainless steel transition section is approximately less than an eighth of an inch thick have reached 350 degrees Farenheit, yes.
(ANSWER IS READ BACK)
Q. Let me pick it up and just try to ask a question. Are you saying that at C-3, coupon C-3, at its location on that stainless steel section, if the welding in your opinion had been properly undertaken, that the heat generated by that



properly undertaken weld on the underside of the stainless steel channel would be in excess of 350 degrees?
A. The temperature of the metal on the side of the transition section, opposite from which welding was being done at C-3, if C-3 was done properly, would have been in excess of 350 degrees Fahrenheit.
Q. So does it follow that if there was evaporative cooler media present at that location on the underside of the stainless steel, that it would ignite?
A. Not necessarily.
Q. Okay. What factors or variables would you need to know to answer that yes or no?
A. I think it would be a statistical issue, meaning I could take this evaporative cooling media and put it in contact with something that was at 350 or close to 350 or slightly away from, depending upon the spacing. Sometimes it may ignite, sometimes it may not ignite.
For instance, I read Dr. Eager's testimony. He indicated initially that he got it to ignite at one point and then he tried it three