# EXHIBIT A

party, as stated in these reference documents, for informing the contractor about flammable materials in the inlet structures.

Nevertheless, in the subject construction project, it is clear that all principal parties knew, or should have known, that the evaporative cooling media was flammable well in advance of the loss. On or about 5 November 2004, approximately one month before the fire, S&L sent Aerofin, CPS, FPLE, and Pneumafil a Pneumafil drawing (7-22148-XX-100) that contained an intentionally highlighted, unambiguous warning that the evaporative cooling media and the filter material were flammable. If Zampell was not already aware of the presence of flammable materials inside the inlet structures, CPS, as the entity that contracted with Zampell, should have passed this information to Zampell.

Even in the absence of notification about the presence of flammable materials, the contract and reference documents require the contractor to investigate the site to identify conditions that affect the work and, in particular, conditions that create hazards.

It is clear that neither CPS nor Zampell conducted the required site inspections to identify hazards. Had CPS or Zampell conducted such inspections, they would have easily determined that the flammable evaporative cooling media was essentially in contact with the inside of the exterior walls. At that point, it would have been obvious to them that measures needed to be taken to reduce the risk of a fire, as required under the contract and by reference documents.

Among the precautions that CPS or Zampell could have taken were: 1) remove the evaporative cooling media adjacent to the walls, 2) adjust the bracket attachment locations to eliminate welding at the evaporative cooling media, 3) activate the media wetting system, and 4) station a fire watcher inside the inlet structure.

S&L did not have a role, contractually or by any referenced documents, in the construction administration processes that led to this loss.

## 7. CONCLUSIONS

On the basis of our investigation to date, I have the following conclusions:

- The RISEC agreement with S&L required S&L to design modifications for the air intake system and to provide certain construction phase services.
- S&L's construction phase obligations did not include responsibility for means and methods of construction, including site safety. Indeed, the agreement between RISEC and S&L specifically freed S&L from responsibility for site safety issues, even if S&L failed to alert RISEC to hazards.
- A separate document listing the duties of the S&L site representative did alter S&L's contracted role regarding site safety.
- On issues related to the design of the modifications to the air intake system, the Project Specification prepared by S&L described, in a manner consistent with convention and the standard of care in the construction industry, the technical information required to construct the system modifications and the reference standards that, by the contract

between RISEC and CPS, bound CPS in its work. The Project Specification appropriately did not prescribe means and methods of construction.

- The S&L site representative was not involved, by contract or by practice on the site, in the evaluation of fire hazards related to welding and did not participate in the issuance of hot work permits. Management of those matters remained with RISEC and the contractors.

- The Pneumafil drawing that S&L distributed on 5 November 2004 contained an unambiguous warning about the flammability of the evaporative cooling media. Hence, all principal parties knew or should have known prior to the fire that the inlet structures contained flammable material.

- CPS and Zampell did not perform their contracted obligations to inspect the site sufficiently to identify the fire hazard associated with welding on the outside of the inlet structures with flammable evaporative cooling media inside the structures.

- CPS and Zampell did not take the contractual and industry-standard precautions necessary to prevent ignition of the evaporative cooling media during welding.

- S&L fulfilled its contractual obligations on this project, and conducted itself within the industry standard of care in the execution of its contractual obligations.

Sincerely yours,

Donald O. Dusenberry, Senior Principal
O:\DATEFILE\2006\Dusenberry\DOD37-R-emb.doc

Encls.

# EXHIBIT B

SGH

**Simpson Gumpertz & Heger Inc.**
**Consulting Engineers**

Boston
Los Angeles
New York
San Francisco
Washington, DC

# Donald O. Dusenberry, P.E.

Senior Principal
781-907-9237

## Experience

Simpson Gumpertz & Heger Inc. from 1975 to present.
Other firms from 1974 to 1975.

## Analysis and Design

*Buildings*

- Milwaukee City Hall (analysis and rehabilitation of historic stone tower)
- Hubbard Hall, Bowdoin College, Brunswick, ME (analysis of stone tower)
- Sherman Burbank Memorial Chapel, Williamstown, MA (stone tower monitoring and stabilization design)
- Bowdoin College Chapel, Brunswick, ME (stone tower monitoring and stabilization design)
- First Church in Brookline, Brookline, MA (stone tower stabilization and renovation)
- Amherst Town Hall, Amherst, MA (feasibility study to renovate and add new interior floor level to this 1889 structure)
- Exeter Street Theater, Boston, MA (historic building fire damage investigation and repair)
- Odd Fellows Building, Wakefield, MA (historic building fire damage investigation, building stabilization, and repair)
- Office Building, Portsmouth, NH (blast-resistant design of scanner wing)
- Bennett Federal Building, Salt Lake City, UT (one of several peer reviewers of curtain wall blast design for GSA)
- Regional Biocontainment Laboratory, University of Pittsburgh, PA (blast protection and perimeter site protection)
- Office Building, Boston, MA (perimeter site protection assessment)
- Amherst College Gymnasium, Amherst, MA (fire damage assessment and rehabilitation design for this reinforced concrete and prestressed concrete structure)
- Ritz Carlton Hotel, Boston, MA (façade replacement design and construction platform design)
- Belle Place Middle School, New Iberia, LA (design of structural upgrade)
- Multiple Mirror Telescope, Mt. Hopkins, AZ (design of modifications to rotating building to accommodate enlarged telescope)
- Portland High School, Portland, ME (analysis and repair of structural deficiencies)
- Barnstable County Fire Academy, Barnstable, MA (consulting on design of burn building for firefighter training)
- 470 Atlantic Avenue, Boston, MA (facade evaluation and remedial design)
- Suffolk Street Garage, Holyoke, MA (analysis and remedial design of connections)
- Holyoke Police Station, Holyoke, MA (peer review)
- Amherst College, Life Sciences Building, Amherst, MA (peer review)
- 973/989 Market Street, San Francisco, CA (evaluation of earthquake performance)
- Ohio State University, Sports Arena, Columbus, OH (spectator-induced vibrations of suspended steel frame balcony)
- Ellis Island, NY (main building design of copper spires and stainless steel supporting structures for the domes)
- Reinforced Concrete, Steel, and Wood Buildings.

*Infrastructure*

- 10-ft-diameter High-pressure Water Distribution Tunnel, for the Washington Suburban Sanitary Commission, Laurel, MD (tunnel liner failure investigation, remedial design of thrust block, design review of other components, development of pressure test procedures)
- Brooklyn Bridge Catwalks, for Nab Construction Corporation, College Point, NY (for work in replacement of suspender cables and for rewrapping the main cables)
- Williamsburg Bridge, NY (consulting on catwalk design)
- Park Avenue Viaduct, NY (structural design of main beam connections)
- 275-ft-diameter storage tank (concrete reinforcement design).

*Components*

- Millstone Hill Ionospheric Antenna (foundation repair design)
- 210-ft Stack at Twin Rivers Technology, Quincy, MA (vortex shedding response analysis and foundation repair)
- 192.5-ft Concrete-lined Steel Chimney, for Aberjona Engineering, Winchester, MA (vortex shedding response analysis)
- Embassy Security Gate, for Catalpa Inc., Brattleboro, VT (dynamic analysis and structural design of the foundation of this movable gate designed to stop a truck traveling at high speed)
- Radiation Protection Structure, for NELCO, Woburn, MA (seismic design of support structure for 26,000-lb door)
- Instrument Racks for Nuclear Power Plant, for Mercury Company of Norwood, Brockton, MA (seismic qualification)
- Steam Piping System, Amherst College, Amherst, MA (design of piping supports)
- Nine-Mile Point Nuclear Power Plant, Oswego, NY (analysis and design of reinforced concrete beams spanning 166 ft and supporting spent fuel pool)
- Large Electrical Conduit Support Brackets (failure investigation and remedial design).

## Failure Investigation

*Buildings*

- World Trade Center Towers, NY (assessment of damage due to collapse)
- Wheelabrator Energy Facility, FL (collapse of large processing vessels)
- Milford Power Project, Milford, CT (building collapse)
- 53 Thomas Park, Boston, MA (wall collapse)
- St. Mary Magdalene Church, Altamonte Springs, FL (ceiling collapse)
- Jackson Landing Skating Rink, Durham, NH (roof collapse)
- L'Ambiance Plaza, Bridgeport, CT (collapse of multistory lift-slab residential building under construction)
- Dartmouth Centre Mall, MA (roof collapse)
- Market Street Garage, Lowell, MA (investigation and repair of failed reinforced concrete columns and beams)
- 1821 Beacon Street, Brookline, MA (failure of three-story porch)
- Kingdome Stadium, Seattle, WA (ceiling failure and partial collapse)
- Westin Hotel, Boston, MA (collapse of suspended concrete ceiling)
- Newmarket Centre, Amherst, MA (investigation of structural damage during construction)
- Construction Accidents.

*Infrastructure*

- I-280 Maumee River Bridge, Toledo, OH (erection crane failure investigation)
- Meadow Pond Dam, Alton, NH (earth dam failure investigation and redesign)
- Interstate 81 Overpass, NY (collapse of 365-ft-long girder during erection)

- 6,600-ft Lacey V. Murrow Floating Concrete Pontoon Bridge, Lake Washington, WA (sinking of 2,800 ft of this fifty-year-old bridge during renovations)
- 6,600-ft Hood Canal Floating Concrete Pontoon Bridge, Port Gamble, WA (sinking of half of this bridge during a storm)
- Rock Creek Storage Facility, MD (leakage through cracks and joints in this 6,000,000-gallon subterranean sewerage storage facility)
- Westborough Compost Facility, Westborough, MA (failure of reinforced concrete piers supporting a partially completed steel frame building)
- Site 2 Compost Facility, for Washington Suburban Sanitary Commission, Laurel, MD (need for and adequacy of remedial design of concrete piers supporting rigid frame structures)
- 120-ft cellular telephone tower, Boston, MA (evaluation of damage to adjacent structure)
- 75-ft stack, St. Thomas, U.S.V.I. (hurricane damage investigation and vortex shedding analysis)
- Preassembled Portions of Power Transmission Tower (causes of toppling before erection).

## Performance Evaluation

- Pentagon, Washington, DC (ASCE post-attack study of response to aircraft crash)
- Portsmouth Naval Yard, Portsmouth, NH (analysis of blast resistance of dry dock)
- Amtrak Northeast Corridor Electrification Project, Old Saybrook, CT (consulting on performance of catenary support structures)
- Trash incinerator building, North Andover, MA (fire damage investigation)
- Keck I Telescope Dome Shutter Drive System (performance evaluation and upgrade design)
- Ocean-front Restaurant and Bulkhead (structural evaluation and long-term field monitoring of structural performance)
- Eight-story Office Building (investigation of potential concrete pile deterioration)
- Willow's Athletic Club, Nashua, NH (fire damage investigation)
- Doctor's Office Building, Boston University Hospital, Boston, MA (fire damage investigation)
- Amherst College Natatorium, Amherst, MA (fire damage to steel frame roof structure)
- Intercity Viaduct, Kansas City, MO (fire damage assessment)
- Main Street and South Street Fire Houses, Holyoke, MA (condition assessment and renovation concept development)
- Elevated Water Storage Tanks, Sturbridge, MA (condition survey for two tanks)
- Graspability of Handrails (research and testing on influence of profile shape on function)
- Braga Bridge, MA (evaluation of expansion joint performance)
- Bay Village Condominiums, Irondequoit Bay, NY (settlement distress in 120-unit condominium project)
- 1501 Mittel Boulevard, Wood Dale, IL (settlement distress in 67,500-sq-ft office building)
- Spaulding Fibre Company, North Rochester, NH (in-situ load tests of precast double tees in advanced state of deterioration)
- Full-scale laboratory testing of water flow through cracked concrete slabs
- Full-scale testing of effects of notches on strength of wood members
- John Hancock Tower, Boston, MA (glass breakage investigation, analyses of structural frame and curtain wall)
- Nicollet Towers, Minneapolis, MN (investigation of brick veneer distress and prestressed concrete slab cracking)
- Mission Park Apartments, Boston, MA; Turtle Creek Apartments, Beverly, MA; Concord Houses, Boston, MA (structural cracks in concrete masonry and precast concrete floor plank buildings)
- Hotel Charles, Springfield, MA (fire damage assessment)
- Masonry Warehouse, Holyoke, MA (fire damage assessment)
- Projects encompassing strength evaluation and remedial design of deteriorated structures, including cast-in-place prestressed concrete and reinforced concrete parking garages, high-rise condominiums, and industrial buildings.

## Construction Techniques

- East Tennessee Technology Park, Oak Ridge, TN (consulting on construction claim)
- Miramar Naval Base Dining Facility, San Diego, CA (consulting on construction claim)
- Amtrak Northeast Corridor Electrification Project, Old Saybrook, CT (consulting on construction claim)
- Brooklyn Bridge, for DeFoe/Nab, NY (procedures for inspection and replacement of wires and strands of the main suspension cables)
- Bronx-Whitestone Bridge, New York, NY (consulting for contractor during preparation of bid to reinforce suspension cable main anchorages)
- Statue of Liberty Rehabilitation, NY (consulting on stress-relieving techniques)
- Ouachita River Bridge, Monroe, LA (review of procedures to remove red-lead paint)
- Night Home at Westborough State Hospital, Westborough, MA (consultation on replacement of portions of the foundation of this 100-year-old building)
- Relining of Water Transmission Main between Hull and Georges Island, MA (evaluation of construction techniques and feasibility of rehabilitation)
- Investigations of numerous construction accidents.

## Registration

Professional Engineer: Florida (Lic. No. 57049)
Maine (Lic. No. 8308)
Maryland (Lic. No. 15851)
Massachusetts (Lic. No. 29827)
New York (Lic. No. 072298-1)
Rhode Island (Lic. No. RPE4016)
Washington (Lic. No. 27979)

## Education

Cornell University, Ithaca, NY
B.S. in Civil Engineering (with distinction), 1973
M.E. in Civil Engineering, 1974

## Professional Activities

American Association of State Highway and Transportation Officials (Observer)
American Concrete Institute
ACI Committee 216: Fire Resistance and Fire Protection of Structures
American Concrete Institute, New England Chapter
American Institute of Steel Construction
American Society of Civil Engineers (Fellow)
Standards Committee: Minimum Design Loads for Buildings and Other Structures (Chairman)
Task Committee on General Structural Provisions (member and former Chairman)
Standards Committee: Blast Protection of Buildings (Chairman)
Standards Committee: Design Loads on Construction Related Structures
Task Committee on Environmental Loads (Chairman)
Technical Committee: Performance-based Design and Evaluation of Civil Engineering Facilities (former Vice Chairman)
Technical Committee: Fire Performance of Structures (former member)
Executive Committee: Technical Activities Division (Vice Chairman)
Administrative Committee on Continuing Education
Technical Administrative Committee: Performance of Structures (former Chairman)

Task Committee: Mitigation of the Effects of Urban Terrorism
Task Committee: Post-attack Study of Pentagon (former member)
*Journal of Structural Engineering* (former Associate Editor)
Structures Congress 2005 Committee (former Track Chairman)
Structures Congress 2002 Steering Committee (former member)

Boston Society of Civil Engineers
National Fire Protection Association
Vibration Institute

## Honors and Awards

IMI Golden Trowel Award, 1996
Outstanding Paper Award, *ASCE Journal of Performance of Constructed Facilities*, 1995, for the "Failure of the Lacey V. Murrow Bridge, Seattle, Washington," Donald O. Dusenberry, Mehdi S. Zarghamee, Atis A. Liepins, Rene W. Luft, and Frank W. Kan
Fuertes Medal, Cornell University, 1973
Chi Epsilon
Tau Beta Pi
Phi Kappa Phi

## Publications and Presentations

Dusenberry, D.O., Ellingwood, B.R., and Smilowitz, R., "Best Practices for Designing for Progressive Collapse Resistance," American Society of Civil Engineers Seminars scheduled for New York, Chicago, Denver, and San Francisco, fall 2006.

Gabby, B.A., Dusenberry, D.O., and Junega, G., "Environmental Effects on Historic Masonry Towers," paper in preparation for the *Journal of Progress in Structural Engineering and Materials*.

Dusenberry, D.O., and Hamburger, R.O., "On Practical Means to Analyze for Prevention of Progressive Collapse," paper accepted for publication in *ASCE Journal of Performance of Constructed Facilities*, Nov. 2006.

Dusenberry, D.O., "Practical Energy-based Methods to Analyze Progressive Collapse Potential," accepted for presentation at the World Congress on Computational Mechanics (WCCM VII), Los Angeles, CA, 16 – 22 Jul. 2006.

Dusenberry, D.O., "A New Standard for Blast Protection of Buildings," session approved for Structural Engineers Institute 2006 Structures Congress, May 2006.

Dusenberry, D.O., "Practical Design Procedures," chapter in development for *Best Practices Guide for Fire Design,* to be published by National Institute of Standards and Technology, Gaithersburg, MD, 2006.

Dusenberry, D.O., Aquino, W., and Cagley, J., "Existing Buildings" and "Case Studies," chapters in development for *Best Practices Document on Design for Prevention of Progressive Collapse* to be published by National Institute of Standards and Technology, Gaithersburg, MD, 2006.

Dusenberry, D.O., "Design and Detailing Considerations for New and Retrofit of Structures for Blast Loading," American Concrete Institute Fall Convention, Kansas City, MO, Nov. 2005.

Dusenberry, D.O., "General Considerations for Security Design of Structures," Northeastern University seminar, Boston, MA, Oct. 2005; also presented at Cornell University, Ithaca, NY, Apr. 2006.

Mlakar, P.F., Dusenberry, D.O., Harris, J.R., Haynes, G., Phan, L.T., and Sozen, M.A., "Description of Structural Damage Caused by a Terrorist Attack on the Pentagon," *ASCE Journal of Performance of Constructed Facilities*, Aug. 2005.

Mlakar, P.F., Dusenberry, D.O., Harris, J.R., Haynes, G., Phan, L.T., and Sozen, M.A., "Findings and Recommendations from the Pentagon Crash," *ASCE Journal of Performance of Constructed Facilities*, Aug. 2005.

Mlakar, P.F., Dusenberry, D.O., Harris, J.R., Haynes, G., Phan, L.T., and Sozen, M.A., "On the Toughness of the Pentagon Structure," *ASCE Journal of Performance of Constructed Facilities*, Aug. 2005.

Mlakar, P.F., Dusenberry, D.O., Harris, J.R., Haynes, G., Phan, L.T., and Sozen, M.A., "September 11 Airliner Crash into the Pentagon," *ASCE Journal of Performance of Constructed Facilities*, Aug. 2005.

Mlakar, P.F., Dusenberry, D.O., Harris, J.R., Haynes, G., Phan, L.T., and Sozen, M.A., "Thermal Response of the Pentagon Structural Elements," *ASCE Journal of Performance of Constructed Facilities*, Aug. 2005.

Ellingwood, B.R., and Dusenberry, D.O., "Building Design for Abnormal Loads and Progressive Collapse," *Journal of Computer-Aided Civil and Infrastructure Engineering*, 20(3): 194-205, May 2005.

Dusenberry, D.O., "A New Standard for Blast Protection of Buildings," *Proceedings of the ASCE 2005 Structures Congress*, April 2005.

Hamburger, R.O., and Dusenberry, D.O., "An Energy-based Push-down Analysis Procedure for Evaluating Progressive Collapse Resistance," 2005 National Steel Construction Conference, Montreal, Quebec, Canada, April 2005.

Dusenberry, D.O., "On the Practicality of Designing to Resist Progressive Collapse and Blast," 2005 American Society of Civil Engineers Indiana Section Annual Meeting, Notre Dame, Indiana, March 2005.

Dusenberry, D.O., "Field Load Testing," a chapter in *Structural Condition Assessment Handbook*, Ratay, R., Ed., John Wiley & Sons, Hoboken, NJ, January 2005.

Simpson, H., Dusenberry, D.O., Cooper, D., "Safety and Aesthetics in the Design of Stairways and Handrails," Presented at BuildBoston, Boston, MA, 17 November 2004

Dusenberry, D.O., "The Direction of SEI / ASCE 7, One Person's View," American Society of Civil Engineers Security Engineering Workshop, Norfolk, VA, June 2004.

Dusenberry, D.O., "Attack on the Pentagon," Build Boston Exposition, Boston, MA, Nov. 2003 (also presented numerous times at colleges and professional meetings).

Dusenberry, D.O., "Environmental Loads in SEI/ASCE 37-02," *Proceedings of the 3rd Forensic Conference*, San Diego, CA, Oct. 2003.

Mlakar, P.F., Dusenberry, D.O., Harris, J.R., Haynes, G.A., Phan, L.T., and Sozen, M.A., "The Pentagon Crash of September 11," *Proceedings of the 3rd Forensic Conference*, San Diego, CA, Oct. 2003.

Mlakar, P.F., Dusenberry, D.O., Harris, J.R., Haynes, G.A., Phan, L.T., and Sozen, M.A., "Structural Damage Induced by a Terrorist Attack on the Pentagon," *Proceedings of the 3rd Forensic Conference*, San Diego, CA, Oct. 2003.

Mlakar, P.F., Dusenberry, D.O., Harris, J.R., Haynes, G.A., Phan, L.T., and Sozen, M.A., "Structural Analysis of the Damaged Structure of the Pentagon," *Proceedings of the 3rd Forensic Conference*, San Diego, CA, Oct. 2003.

Mlakar, P.F., Dusenberry, D.O., Harris, J.R., Haynes, G.A., Phan, L.T., and Sozen, M.A., "Thermal Response of the Pentagon Structural Elements," *Proceedings of the 3rd Forensic Conference*, San Diego, CA, Oct. 2003.

Mlakar, P.F., Dusenberry, D.O., Harris, J.R., Haynes, G.A., Phan, L.T., and Sozen, M.A., "Findings and Recommendations from the Pentagon Crash Investigation," *Proceedings of the 3rd Forensic Conference*, San Diego, CA, Oct. 2003.

Dusenberry, D.O., "A New Blast Design Standard," *Second Annual TISP Congress Infrastructure Security for the Built Environment (ISBE II)*, Washington, DC, Sept. 2003.

Dusenberry, D.O., "Learning from Design Mistakes; Transforming Bad Experiences into Good Practice," *Proceedings of the 2003 Forensic Engineering Seminar, Forensic Engineer's Role in the Determination and Resolution of Design Deficiencies*, ASCE Metropolitan Section Forensic Committee, June 2003.

Dusenberry, D.O., "Attack on the Pentagon," American Society of Civil Engineers Metropolitan Section Seminar Series, Apr. 2003.

Dusenberry, D.O., "Environmental Loads in SEI/ASCE 37-02," *Proceedings of the ASCE Structures Congress*, Apr. 2003.

Dusenberry, D.O., "General Considerations for Blast-resistant Design of Facilities," *Proceedings of the ASCE Structures Congress,* Apr. 2003.

Dusenberry, D.O., "Blast-resistant Design of Buildings and Other Structures," session at *ASCE Structures Congress,* Apr. 2003.

Mlakar, P.F., Dusenberry, D.O., Harris, J.R., Haynes, G., Phan, L.T., and Sozen, M.A., *The Pentagon Building Performance Report*, American Society of Civil Engineers, Reston, VA, Jan. 2003.

Dusenberry, D.O., and Juneja, G., "Review of Existing Guidelines and Provisions Related to Progressive Collapse," *National Institute of Building Sciences Workshop on Prevention of Progressive Collapse*, Rosemont, IL, July 2002.

Roberge, C.P., Dusenberry, D.O., Liepins, A.A., and Zagajeski, S.W., "Restoration of the Exeter Street Theater," *Proceedings of AISI Conference,* Seattle, WA, Apr. 2002.

Dusenberry, D.O., and Roberge, C.P., "Restoring Fire Damage to the Exeter Street Theater," a case study for *Structural Renovation of Buildings*, Newman, A., Ed., McGraw-Hill, 2001.

Dusenberry, D.O., "Loads and Hazards: Their Nature, Magnitude, and Consequences," a chapter for *Forensic Structural Engineering Handbook*, Ratay, R., Ed., McGraw-Hill, New York, NY, 2000.

Dusenberry, D.O., "Effects of Fire on Buildings," *AISC Conference,* Las Vegas, NV, Feb. 2000.

Dusenberry, D.O., "Blast-Resistant Design," *Build Boston Convention,* Nov. 1999.

Dusenberry, D.O., Simpson, H., DelloRusso, S.J., Rao, R.S., "Evaluation of Graspability of Handrails During Falls on Stairs," *Proceedings of the ASCE Engineering Mechanics Conference*, Baltimore, MD, June 13-16, 1999, and Ft. Lauderdale, FL, May 1996.

Dusenberry, D.O., Simpson, H., DelloRusso, S.J., and Rao, R.S., "Progress toward Safer Handrails," submitted for publication, *BOCA Magazine*, Building Officials and Code Administrators International.

Dusenberry, D.O., and Davie, J.R., Eds., "Effects of Construction of Structures," *Geotechnical Special Publication*, American Society of Civil Engineers, Oct. 1998.

Dusenberry, D.O., "Performance of Structures Located near Excavations," session at *ASCE Geo-Congress 98*, Boston, MA, Oct. 1998.

Roberge, C.P., Dusenberry, D.O., Zagajeski, S.W., Liepins, A.A., "Heavy Wood Trusses Strengthened with Structural Steel," *Modern Steel Construction*, American Institute of Steel Construction, Jul. 1998.

Dusenberry, D.O., "Increasing the Fire Robustness in Modern Building Projects," *Structures*, a special section of *Banker & Tradesman*, summer 1998.

Dusenberry, D.O., "Walls of Defense," *Civil Engineering*, Mar. 1998.

Antebi, J., Dusenberry, D.O., and Liepins, A.A., "Conversion of the MMT to a 6.5-m Telescope: the Optics Support Structure and the Enclosure," Advanced Technology Optical/IR Telescopes VI, 23-25 Mar. 1998, *SPIE Proceedings*, Vol. 3352.

Dusenberry, D.O., Barrie, R., Hicks, R., "Before Disaster Strikes: Crisis Management Planning," *Build Boston Convention*, Nov. 1997.

Dusenberry, D.O., "Seminar on Building Design for Structural Integrity," *Building Officials and Code Administrators 82nd Annual Conference*, Norfolk, VA, Sept. 1997.

Dusenberry, D.O., "Environmental Loads on Structures during Construction," *ASCE Structures Congress*, Portland, OR, Apr. 1997.

Dusenberry, D.O., "Curtain Wall Design for Blast Effects," *ASCE Mitigation of the Effects of Terrorist Violence – A Research Planning Conference*, Newark, NJ, Mar. 1997.

Smilowitz, R., Dusenberry, D.O., "Blast Load Testing for Newark Housing Structures," *ASCE Mitigation of the Effects of Terrorist Violence – A Planning Conference*, Newark, NJ, Mar. 1997.

Dusenberry, D.O., Hicks, R.A., Nakhoul, S., Barrie, R., Potter, D., and Miller, H., "Reconstructing the Exeter Street Theater," *Build Boston Convention*, Nov. 1996.

Dusenberry, D.O., "Environmental Loads on Temporary Structures and Structures during Construction," *ASCE Annual Convention*, Washington, DC, Nov. 1996.

Dusenberry, D.O., Hicks, R.A., Nakhoul, S., Barrie, R., and Potter, D., "Every Owner's Worst Nightmare, The Fall and Rise of Exeter Street Theater," BOMA meeting, Boston, MA, Oct. 1996.

Dusenberry, D.O., "The Inflammable Lightness of Buildings," *Progressive Architecture*, June 1995.

Dusenberry, D.O., Liepins, A.A., and Vossoughi, H., "Operation of Multiple Hearth Furnaces with Deficient Center Shafts," *Proceedings of the 49th Meeting of the Society for Machinery Failure Prevention Technology*, Virginia Beach, VA, Apr. 1995.

Dusenberry, D.O., Zarghamee, M.S., Liepins, A.A., Luft, R.W., and Kan, F.W., "Failure of the Lacey V. Murrow Bridge, Seattle, Washington," *ASCE Journal for Performance of Constructed Facilities*, Feb. 1995.

Dusenberry, D.O., "The Engineer's Role When Things Go Wrong," Graduate Seminar, Cornell University, Nov. 1994.

Dusenberry, D.O., "Consequential Fire Loads on Structures," *ASCE Proceedings of Structures Congress*, XII, Atlanta, GA, Apr. 1994.

Zarghamee, M.S., Antebi, J., Ojdrovic, R.P., Dusenberry, D.O., and Kan, F.W., "Monolithic Integrated Concerns for Muon Subsystem Structure," *GEM-TN-519*, 9 Feb. 1994.

Dusenberry, D.O., and Lwin, M., "Responding to a Floating Bridge Failure," *Public Works*, Jan. 1994.

Dusenberry, D.O., "What Sank the Lacey Murrow? The State's Case," *Civil Engineering*, Nov. 1993.

Dusenberry, D.O., and DelloRusso, S.J., "Water Leakage through Cracks in Reinforced Concrete," *Proceedings of the International Conference on Hydropower*, Waterpower '93, Nashville, TN, Aug. 1993.

Dusenberry, D.O., Zarghamee, M.S., Liepins, A.A., Luft, R.W., and Kan, F.W., "Investigation of the Lacey V. Murrow Bridge Failure," *Proceedings of the 10th Annual International Bridge Conference*, Pittsburgh, PA, June 1993.

Brenner, M.J., Antebi, J., and Dusenberry, D.O., "The Design and Structural Analysis of a Large Outdoor Compact Range Reflector," *Twelfth Annual Symposium, Antenna Measurements Technique Association*, Philadelphia, 1990.

Antebi, J., Dusenberry, D.O., and Liepins, A.A., "Conversion of the MMT to a 6.5 m Telescope – The Optics Support Structure," Advances in Optical Structure Systems, 16-19 Apr. 1990, *SPIE Proceedings*, Vol. 1303.

Ozol, M.A., and Dusenberry, D.O., "Deterioration of Precast Concrete Panels with Crushed Quartz Coarse Aggregate Due to Alkali-Silica Reaction," *Durability of Concrete, G.M. Idorn International Symposium*, American Concrete Institute Special Publication 131, ACI Spring Convention, Toronto, Canada, 22 Mar. 1990.

Dusenberry, D.O., "L'Ambiance Plaza – Many Questions Still Unanswered," Speaker at meeting of the New England Chapter of the American Concrete Institute, Framingham, MA, 13 Sept. 1989.

Dusenberry, D.O., "Investigative Studies of Ceiling Collapses," discussion of paper by F.C. Hadipriono, *ASCE Journal of Performance of Constructed Facilities*, Vol. 3, No. 2, May 1989.

Dusenberry, D.O., "Trial by Fire – Structural Investigations of Fire Damage," Course 1.962, *Failures – A Perspective for Assessing the Design and Construction Process*, graduate program created by Simpson Gumpertz & Heger Inc. for the Department of Civil Engineering, MIT, 1989.

Dusenberry, D.O., "Evaluation and Repair of Fire Damage to Amherst College Gymnasium," *Proceedings, International Symposium on Re-Evaluation of Concrete Structures*, Danish Concrete Institute, Copenhagen-Lyngby, Denmark, 1988.

Antebi, J., Luft, R.W., Simpson, H., Smith, H.D., and Dusenberry, D.O., "Pointing Bias Model for a 40-ft Diameter Radar Antenna," *IEEE Publication 77 CH 1250-0 AES,* 1977.

DOD (04/06)

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CERTIFIED POWER SYSTEMS, INC. :
:
vs. : C.A. NO. 05-066-ML
:
RHODE ISLAND STATE ENERGY STATUTORY TRUST 200, FPLE RHODE ISLAND STATE ENERGY L.P. AND FPLE RHODE ISLAND STATE ENERGY GP, INC. :
:
vs. :
:
CERTIFIED POWER SYSTEMS, INC. :
:
vs. :
:
ZAMPELL REFRACTORIES, INC. :

DEPOSITION OF DONALD O. DUSENBERRY produced, sworn and examined on September 12, 2006, at 9:30 A.M. on behalf of Defendant, Zampell Refractories, Inc., before Linda S. Taylor, Notary Public, at the office of Asquith & Mahoney, LLP, 155 South Main Street, Providence, Rhode Island.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RHODE ISLAND 02915
(401)437-3366



DONALD O. DUSENBERRY

INDEX


| DEPONENT | PAGE |
|---|---|
| DONALD O. DUSENBERRY | |
| EXAMINATION BY MR. MAHONEY | 4 |
| EXAMINATION BY MR. VESPOLE | 89 |
| RE-EXAMINATION BY MR. MAHONEY | 100 |


EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| DEFENDANT'S (Zampell) | | |
| 1 | 8/30/06 REPORT OF D. DUSENBERRY | 88 |
| 2 | RESUME OF D. DUSENBERRY | 88 |
| 3 | DOCUMENT ENTITLED D.O. DUSENBERRY TESTIFYING EXPERIENCE SINCE LATE 1993 | 88 |
| 4 | QUOTES FROM REFERENCE STANDARDS | 88 |
| 5 | QUOTES FROM REFERENCE PROJECT DOCUMENTS | 104 |




APPEARANCES

For the Plaintiff:
TRESSLER, SODERSTROM, MALONEY & PRIESS
744 Broad Street
Suite 1510
Newark, New Jersey 07102-3812
BY: MARK ROBERT VESPOLE, ESQ.

For the Defendant:
(Zampell)
ASQUITH & MAHONEY, LLP
155 South Main Street
Providence, Rhode Island 02903
BY: JOHN R. MAHONEY, ESQ.
-and-
JOSEPH J. REALE, JR., ESQ.
(FPL/RISE)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, Rhode Island 02903
BY: ARMANDO E. BATASTINI, ESQ.

For the Fourth Party Defendant:
(Sargent & Lundy)
MECKLER, BULGER & TILSON, LLP
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
BY: JANET R. DAVIS, ESQ.
HIGGINS, CAVANAGH & COONEY
123 Dyer Street
Providence, Rhode Island 02903
BY: STEPHEN B. LANG, ESQ.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RHODE ISLAND 02915
(401)437-3366





(COMMENCED AT 9:40 A.M.)
DONALD O. DUSENBERRY
Being duly sworn, deposes and testifies as follows:
THE REPORTER: Would you state your full name for the record, please.
THE WITNESS: Donald Owen Dusenberry.
EXAMINATION BY MR. MAHONEY
**Q. Mr. Dusenberry, I'm Jack Mahoney. I represent Zampell with Joe Reale. I'm going to ask you some questions. If you don't understand my question, just let me know and I'll repeat it.**
**I want to go right to your report, if you would, to page two. And looking at the fourth full paragraph, in the second sentence, it starts with the words, "However, the wall panels around the location of the evaporative cooling media were stainless steel, apparently to reduce the potential for corrosion where the original designers anticipated that the housing would be wet from the cascading water of the cooling system."**
**The word "apparently" there, is that something you knew to be true or was that a conclusion you drew from something you had read?**



COPY

A. And by relevant, you mean binding or do you mean something else? What do you mean by relevant?

**Q. Yeah. Are they binding?**

MR. BATASTINI: Objection.

A. I don't think they are binding on Florida Power & Light.

**Q. Are these standards incorporated within OSHA? And I'm referring now to the -- going back to the NFPA 51B, 1962 edition, Section 4, Fire Prevention Precautions, are those -- is that section NFPA 1962 incorporated within OSHA?**

A. It is referenced in 29 CFR Part 1910 of OSHA which refers to standards for general industry.

**Q. All right. And is OSHA federal law?**

A. I believe it is, yes.

**Q. And you've already told us you don't know whether OSHA is incorporated within state law?**

A. That is correct.

**Q. And does federal law have priority over contract terms?**

MR. BATASTINI: Objection.

MR. LANG: Objection.

A. I don't know.

**Q. And is that something you would want to know before**



**you determined what regulations, if any, governed the parties conduct in this case?**

MR. LANG: Objection.

A. Well, to the extent that I am reviewing available reference documents, no.

**Q. What does that mean, to the extent you're reviewing -- what documents? What you're reviewing, I understood, was the conduct of the particular parties in this case, Florida Power, CPS, Zampell, Sargent & Lundy. Is that right or wrong?**

A. I was asked to review the role of Sargent & Lundy and determine whether or not in my opinion they have responsibility for this loss.

**Q. Well, you ended up doing more than that, did you not?**

A. Well, in the context of making that determination, I reviewed their role with respect to other parties --

**Q. Right.**

A. -- in this contract -- in this project.

**Q. And you ended up rendering opinions that pertained to parties other than Sargent & Lundy, correct?**

A. To the extent that it clarifies the role of



Sargent & Lundy, yes.

**Q. Okay. And in so doing, is it not important to know whether federal and/or state law governs the conduct of the parties? Is that something that you would want to know?**

A. Well, I believe that OSHA as a federal regulation governs, to the extent that it's applicable, the conduct of the parties, yes.

**Q. And do you have an opinion in light of that whether the parties by contract can circumvent or avoid the federal law?**

MR. LANG: Objection.

MR. BATASTINI: Objection.

A. I don't believe that they could circumvent the federal law by contract, but I'm not a lawyer.

**Q. Let me just -- the last bullet point you write on page nine, "S&L fulfilled its contractual obligations on this project and conducted itself within the industry standard of care in the execution of its contractual obligations."**

**Did I read that correctly?**

A. Yes.

**Q. Now, what is the particular industry standard of care you were making reference to in that**



**paragraph?**

A. The industry standard of care as I understand it based on the contract, the reference documents, my 30 years of experience in the industry, and my review of the project documents.

**Q. So on page six, actually five and six of your report, we've gone through it, you have addressed a number of different standards, whether they be AWS, whether they be ANSI, whether they be National Fire Protection Association regulations; is that correct?**

A. I have referenced a number of standards, yes.

**Q. So there are no standards published by any authority that relates directly to the conduct of engineers that would be applicable to this case?**

MR. LANG: Objection.

A. I'm not -- are there no standards that relate to the engineer?

**Q. Yeah. In other words, what type of engineer is Sargent & Lundy? What is their particular area of expertise?**

A. They're structural engineers and mechanical engineers. I imagine they have other disciplines, as well.

**Q. So now with regard to structural and mechanical engineers, are there any industry standards of which you are aware that engineers and those disciplines have to comport themselves with?**
A. Yes.
**Q. What are those standards?**
A. Well, a structural engineer would need to develop designs that were in compliance with building codes, accepted methods of analyses.
**Q. What do you mean accepted methods of analyses? Is that a standard?**
A. Well, it's a standard in the industry in the sense that there are approaches to doing the necessary analyses that result in a design, and there are approaches that are generally accepted in the industry, and one would expect engineers would follow those approaches.
**Q. All right.**
A. There are also standards that relate to materials properties and product performance that an engineer would need to be aware of and comply with in developing designs and others, I assume.
**Q. So when you've made reference in that last bullet point to the industry standard of care, what**



**particular industry standard of care were you talking about?**
A. Industry standard of care refers, in addition to those matters, what is conventionally performed as the engineer's role in a project.
**Q. And where can they be found?**
A. An industry standard of care can refer to the practice in the industry in addition to written standards.
**Q. What written standards are there? You mentioned building codes. You mentioned general accepted methods of analysis. What written standards that may apply to this particular case and Sargent & Lundy's role exist?**
A. Well, for instance, there are -- there's a Construction Standards Institute which prepares model specifications for technical work and general provisions and whatnot for specifications that engineers develop. And to the extent that I reviewed those parts as they relate to this matter, I am convinced that Sargent & Lundy's work was performed in accordance with those standards of care.
**Q. Did you specify what they were in your report?**



A. I did not, no.
**Q. What are they?**
A. Well, specifically I can't cite them now, but in general, the content and layout and information contained in the project specifications is as I would expect it to be for a project of this type.
**Q. Yeah, but are you saying there are some written standards which you did review and felt S&L complied with, but you didn't reference them in your report?**
A. Well, they represented a body of knowledge of my experience from 30 years in the practice. I didn't specifically pull them out to review them for this case, but those standards and many other documents, references, and books constitute the body of my knowledge which I've applied on this case.
**Q. In your conclusions, fair to say that you do find fault with CPS and Zampell in terms of this fire?**
A. I believe ultimately they have responsibility for prevention of fires. So yes.
**Q. Fair to say in this -- in the conclusions, you did not criticize Florida Power & Light?**
A. I do not specifically list a criticism of



them, no.
**Q. Why is that?**
MR. LANG: Objection. Go ahead.
A. At the time, I was listing the conclusions that I had drawn that were relevant to me as I was assessing S&L's role in this case.
**Q. And as you assessed S&L's role, Florida Power & Light had no involvement?**
MR. LANG: Objection.
A. Well, they had a contract together. So certainly there was an involvement, yes.
**Q. So back to my question. Why is it that you found no fault with Florida Power & Light in your conclusions?**
A. Because I believe that CPS and Zampell ultimately had responsibility for prevention of fires in this instance.
**Q. Based on what?**
A. Based on what contractor's responsibilities are on a project, what their contractual obligations were under this case in this project.
**Q. And in order to draw that conclusion, would it not be imperative to know whether there were any laws that took priority over contract terms?**

**Q. So I think I've gone through all of the written standards that you have referenced in your report. Is there anyone that you can think of that I left out?**

A. Not as I sit here right now. We could take a look at the report, but I don't believe so.

**Q. Okay. And none of those standards then that you've cited in your report apply specifically to the conduct of Sargent & Lundy in its role as either designer, preparer of the specifications or field engineer?**

A. As I sit here right now, I think that is an accurate statement, yes.

**Q. And if that is an accurate statement, then there is no written standard in your report that specifically applies to the conduct of Sargent & Lundy; would that be correct?**

A. Well, the conduct of Sargent & Lundy was determined by a written document which would be the contract between Sargent & Lundy and FPL.

**Q. Let me ask my question again. There is no written standard that you specifically state in your report which governs the conduct of Sargent & Lundy in this case by your analysis?**



MR. LANG: Objection. Go ahead.

A. Nothing outside of the contract documents have I cited in this report.

**Q. Okay. So it's only the contract between Sargent & Lundy and Florida Power & Light that in your opinion governs the conduct of Sargent & Lundy in this case?**

MR. LANG: Objection.

A. And the standard of care in the industry which has written components in a number of practices and standards, but not anything that specifically relates to the cause of this loss.

**Q. Okay. But the contract is referenced -- the contract between Sargent & Lundy and Florida Power is referenced in your report, is it not?**

A. I believe it is, yes.

**Q. And the industry standards, the general industry standards that you accumulated during your 30 years of experience as an engineer, those are not specifically referenced in the report, are they?**

A. Well, some reference standards are in my report. Others are not.

**Q. Which reference standards that apply to Sargent & Lundy are specifically referenced in your report?**



A. Oh, that apply to --

**Q. Sargent & Lundy, yes.**

A. Okay. I'm sorry. I don't believe that any I specifically cited other than the contract documents.

**Q. And that's the contract that -- well, the contract documents that you've acknowledged to Mr. Mahoney, you don't know how they are -- how they relate to, for example, the State of Rhode Island's adoption of either OSHA or the NFPA; is that correct?**

MR. LANG: Objection.

A. Could you repeat that?

**Q. Sure. Mr. Mahoney asked you a series of questions before about whether or not, I think the word he used, the contract documents can trump OSHA or NFPA assuming those apply.**

**And my question is the contract that you're referring to as part of the standards that you utilized in assessing Sargent & Lundy's conduct are those very same contracts that you don't know if they're trumped by OSHA or NFPA? Is that the same contracts you were referring to in your answer?**

MR. LANG: Objection.

**Q. It's kind of a convoluted question. Let me ask you**



**this.**

**You referred to contracts that you've relied upon to determine Sargent & Lundy's responsibilities and conduct in this case; is that right?**

A. Yes.

**Q. Are those the same contracts which in response to a question from Mr. Mahoney you weren't sure were trumped by OSHA or NFPA?**

MR. LANG: Objection.

**Q. You can answer.**

A. Well, I'm rather certain that OSHA regulations would apply in spite of whatever contract language there is. So I would -- I guess the answer to that question is I'm aware it is possible that OSHA would trump the contract if it was applicable in this particular case.

**Q. Would you say the same about NFPA if it were applicable under Rhode Island law?**

MR. LANG: Objection.

A. I would have to know under what context NFPA was mandated by Rhode Island law.

**Q. And you don't know that?**

A. As I sit here right now, I don't. That's

correct.
**Q. You've provided us with a list of cases in which you've testified since late 1993; is that correct?**
A. Yes.
**Q. Did any of those cases involve welding specifically?**
A. Well, at least two of them have welding aspects to them.
**Q. In the same sense that this case has welding aspects to it?**
A. The case involving United States Department of Justice, fifth one up from the bottom on the last page, is a case involving fire protection during construction activities, in particular was demolition activities, and some of those activities were hot work, including welding.
**Q. Is that something about which you specifically gave an opinion?**
A. I specifically gave an opinion related to fire protection requirements during that construction activity in that case, yes.
**Q. And that was the construction of what?**
A. It was the decommissioning and decontamination of a nuclear fuel processing plant in Tennessee.



**Q. You said that there was a second case?**
A. There was a second case that involved welding issues.
**Q. And which one was that?**
A. That's the top one on the last page, the National Railroad Passenger Corporation.
**Q. And what was the welding issue in that case?**
A. It was a design related issue about alleged defects in construction and some of those allegations related to welding.
**Q. In any of these cases, did you ever give testimony about the relative rights and responsibility or, excuse me, the relative responsibilities and obligations of owners or contractors under NFPA 51B?**
A. I don't recall specifically. The subject matter on the Department of Justice case involved that issue. I don't remember specifically whether NFPA 51B was a document that came up or not.
**Q. Do you remember if 51B of NFPA was a document or an issue that came up in any of the other cases in which you were retained as expert?**
A. Well, I don't know about cases in which I was retained as an expert. These are cases listed here



which relate to times that I've actually given testimony. But for this list, I don't believe that it did.
**Q. Do you have any recollection of cases that are on this list for which you didn't give testimony but for which you gave opinions about NFPA 51B?**
A. Not as I sit here right now. There may be instances, but I can't think of any.
**Q. So this could be the first case in which you've given an opinion specifically about 51B of the NFPA?**
A. Not likely, but it could be.
**Q. You're not sure?**
A. As I sit here right now, I don't remember the details of cases that are not active.
MR. VESPOLE: Off the record.
(OFF THE RECORD)
MR. MAHONEY: Mr. Dusenberry, do you have any other documents you brought with you -- I apologize. I'm out of turn.
MR. BATASTINI: No questions.
MR. LANG: I have no questions, do we?
MS. DAVIS: No.



MR. LANG: Okay. So now it's your turn.
RE-EXAMINATION BY MR. MAHONEY
**Q. Do you have any other documents you brought with you today other than your report and the quotes from reference standards?**
A. Yes. I have one other.
**Q. I'm sorry?**
A. I have one other, yes.
**Q. What is that?**
A. It's another typewritten document that I prepared that is quotes from reference project documents.
MR. MAHONEY: All right. I'll take a look at that. Should I have a copy made?
MR. LANG: If you're going to make it an exhibit or have him testify, you probably should because I didn't bring any of those.
**Q. Mr. Dusenberry, this document, Quotes from Reference Project Documents, these would have been what you thought were pertinent sections of various contracts and purchase orders and safety requirements that applied to the subject at hand?**
A. Well, as with the other document that is