# Exhibit C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CERTIFIED POWER SYSTEMS, INC.
Plaintiff,

VS. C.A. NO. 05-066-ML

RHODE ISLAND STATE ENERGY
STATUTORY TRUST 200, FPLE
RHODE ISLAND STATE ENERGY, LP,
and FPLE RHODE ISLAND
STATE ENERGY, GP, INC.,
Defendants,
VS.
CERTIFIED POWER SYSTEMS, INC.,
Defendant on Counterclaim/Third Party
Plaintiff,
VS.
ZAMPELL REFRACTORIES, INC.,
Third-Party Defendants/Fourth Party
Plaintiff,
VS.
SARGENT & LUNDY, LLC and
PREMIER ENGINEERING,
Fourth Party Defendants

DEPOSITION OF ARA NALBANDIAN, a witness in the above-entitled cause, taken on behalf of the DEFENDANT ZAMPELL, before Claudia J. Read, a Notary Public in and for the State of Rhode Island, at the offices of ASQUITH & MAHONEY, 155 South Main Street, Providence, Rhode Island on June 22, 2006 at 9:30 A.M.

RHODE ISLAND COURT REPORTING
25 SEA VIEW AVENUE
EAST PROVIDENCE, RI 02915
(401) 437-3366



PRESENT:

FOR THE PLAINTIFF ..... TRESSLER, SODERSTROM,
MALONEY & PRIESS
744 BROAD STREET
SUITE 1510
NEWARK, NJ 07102
BY: MARK VESPOLE, ESQUIRE

FOR THE DEFENDANT ..... ASQUITH & MAHONEY
(ZAMPELL) 155 SOUTH MAIN STREET
PROVIDENCE, RI 02903
BY: JOHN R. MAHONEY, ESQUIRE
- AND -
JOSEPH REALE, ESQUIRE

FOR THE DEFENDANT ..... EDWARD ANGELL PALMER
(FPLE) & DODGE, LLP
2800 FINANCIAL PLAZA
PROVIDENCE, RI 02903
BY: MARK FREEL, ESQUIRE

FOR THE DEFENDANT ..... MECKLER, BULGER & TILSON
(FP-SARGENT & LUNDY) 123 NORTH WACKER DRIVE
CHICAGO, IL 60606
BY: JANET DAVIS, ESQUIRE

ALSO PRESENT: DAN SHULTZ, FPL GROUP



INDEX


| WITNESS | PAGE |
|---|---|
| ARA NALBANDIAN | |
| Examination By Mr. Mahoney. . . . . | 4 |
| Examination By Mr. Vespole. . . . . | 78 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| | ZAMPELL'S | |
| P | Thielsch report (79pp) . . . . . . . . . | 84 |
| P-1 | Color photographs (36pp) . . . . . . . . | 84 |
| **Q** | **CV of Ara Nalbandian (4PP) . . . . . . .** | **84** |
| **R** | **Mr. Nalbandian's file (retained by Mr. Nalbandian). . . . . . . . . . . . .** | **107** |
| **S** | **Drawing (1p) . . . . . . . . . . . . . .** | **110** |
| **T** | **12/21/05 report (3pp). . . . . . . . . .** | **135** |
| **U** | **12/16/04 report (2pp). . . . . . . . . .** | **135** |




(DEPOSITION COMMENCED AT 9:40 A.M.)

ARA NALBANDIAN

Being duly sworn, deposes and testifies as follows:

THE REPORTER: State your full name for the record, please.

THE WITNESS: Aran Nalbandian.

EXAMINATION BY MR. MAHONEY

**Q. Mr. Nalbandian, you are a professional engineer; is that correct, sir?**
A. Yes.
**Q. What particular area is your speciality?**
A. Professional engineer in Rhode Island does not have a relative categorization that we have.
**Q. I see. In what particular area of engineering are you involved?**
A. Mechanical materials and metallurgy.
**Q. And you have been asked to investigate at least some aspects of the fire that occurred at Florida Power in Johnston on December 3, 2004; is that correct?**
A. Yes.
**Q. What particular subject matter are you applying your expertise to as it relates to the fire?**



COPY

Page 17

Q. And then it indicates that the engineering bulletin, EB O1511 regarding CELdek, makes certain representation with regard to ignition temperatures; is that correct?
A. It says "temperature not to in excess of 350," yes.
Q. Who provided that engineering bulletin to you?
A. I believe it was provided by the plant.
Q. But do you know specifically the name of the individual?
A. No, I don't.
Q. Was that something that somebody from Thielsch asked about or was that something that was voluntarily produced by someone from Florida Power?
A. No. That was asked by one of the personnel from Thielsch Engineering.
Q. Now, going to the second paragraph, there is reference to the fact there was narrow section, approximately 5 feet in length of the plenum that was fabricated by what I'm referring to as stainless steel sheet metal; is that correct?
A. Correct.
Q. I just want to make sure I understand this. Would

Page 18

that be five feet in width?
A. Correct.
Q. Were the rest of the -- and let's specifically refer to the southerly wall where welding was ongoing on the day of the fire, apparently. If we take the 50 feet in width, was the other 45 feet composed of carbon steel?
A. I believe so.
Q. You indicate that the stainless steel was there for corrosion protection due to frequent exposure to water; is that something that you discerned by simply observing the plenum, or was that information imparted to you by someone else?
A. That was observed by observation results and our knowledge of the material to be more corrosion resistant and that was the thing, that was the conclusion that we had subscribed to.
Q. Now, in the next paragraph it reads, "For a portion of the height of the stainless steel section, a stainless steel channel was located on the inside of the air plenum wall for positioning of the evaporative cooler media." That's a fact, that there was a stainless steel channel inside the plenum to position the evaporative cooler

Page 19

media in place?
A. Yes.
Q. Was the composition of the channel for the evaporative cooler media, otherwise described as stainless steel, was it the same composition as the southerly wall which is also referenced as stainless steel?
A. They are consistent with the same chemistry, yes.
Q. Okay. Now, this particular stainless steel southerly wall we've now discussed has a 5-foot width? In other words, there's 5 feet of stainless steel and 45 feet of carbon steel, correct?
A. Correct.
Q. On the inside of the plenum is there 5 feet of stainless steel evaporative cooler media frame parallel to the stainless steel wall?
A. No.
Q. Okay. On the inside of the plenum, from your investigation, was there any evaporative cooler media that was flush up against the inside of the stainless steel wall?
A. Relatively flush, being in a very proximate

Page 20

close relationship with the inside surface.
Q. Okay. Let me see if I can articulate this well. I'm not confident I will, but let me give it a shot. Do you know, it wasn't just one big piece of evaporative cooler media inside, there were actually pieces of evaporative cooler media; is that correct to say?
A. Correct.
Q. Do you know what the dimensions of the various evaporative cooler media were?
A. Packs, in shapes about 6-inch thick, 12-inch width, and maybe about 5-feet high, so they were stacked up to next to each other across from one side of south wall to the north wall.
Q. All right. And how many -- so would you be able to do this for me? Would you be able to draw, based on your observation, the actual evaporative cooler media and the channel as it abuts the inside of the southerly wall?
A. I guess an illustration of the photograph is going to be a little more descriptive.
Q. All right.
A. On page -- Figure 14. You see a strip, black strip, right in the middle of the right

**the southerly stainless steel wall, correct?**
A. That's basically the condition of the stacking where that inner plenum is stacked up with the evaporating cooling medium, abutting to the outside surface.
**Q. Right. But what I'm getting at, just for clarification, is that the factual -- the facts as set out this in this report, whether they're accurate or not, suggest that at the area where the C-3 weld occurred, there was evaporative cooler media abutting the inside of that stainless steel southerly wall?**
A. It was very close proximity of that weld joint.
**Q. And since we know that the channel in which the evaporative cooler media was located in this location had ended because we know C-3 was above the channel, correct?**
A. Yes.
**Q. It would follow that factually a determination was made one way or another that the evaporative cooler media extended above the channel, abutting the inside of the stainless steel wall?**
A. It was understood that that will be in the close proximity of the evaporative cooling media



that will be ignited by the heat.
**Q. All right. But this sentence, and you may or may not have been the one -- let me ask you, to your knowledge, I know it's a long report, did you compose this particular sentence we're talking about right now?**
A. Well, composition I don't recall, but the understanding was it is close proximity abutting to that area where the media was placed.
**Q. All right. And I just want to -- it's not argumentative as much -- from my standpoint -- as it is clarification. Whoever wrote the sentence that is contained in this report -- and you correct me if I misconstrue the import of this. The C-3 weld was the most important of the three weld samples that were taken; is that correct?**
A. At least relative to the --
**Q. Fire?**
A. Fire, yes.
**Q. And we're not concerned with quality of welds here as much as we are concerned about the fire, so with that in mind, how the fire started, of the three sample welds, C-1, C-2, and C-3, we're really concerned about C-3?**



A. Correct.
**Q. And for purposes of C-3, the belief is that it was the process of making that weld that caused the fire to start?**
A. Yes.
**Q. But the factual predicate for that determination was, as indicated in the last sentence, that, "The evaporative cooler media would have been in direct contact with the inside surface of the stainless steel plenum wall"?**
A. Yes.
**Q. That's how the sentence reads?**
A. Yes.
**Q. And you don't have facts at your disposal that counter that conclusion, that is to say that the media material actually was in direct contact with the inside of the southerly plenum wall?**
A. It was very close proximity. If there is any space, which is probably small amount, but it will be very close proximity to the inside surface of the southern wall.
**Q. So that are you saying that -- let me take that back. You tell me. C-3 caused the fire, obviously due to the weld, due to what factual**



**circumstances?**
A. The amount of the heat input, which sort of reflects the condition of the material as welded, would generate enough heat to cause the ignition and combustion and burning of the material media.
**Q. Okay. My understanding from the CELdek's material, and it's referenced, I think, on page 2 of your report. Well, I'm not sure it is page 2, but at some point in your report, it is fair to say you make mention of the CELdek literature; is that correct?**
A. Yes.
**Q. I'll find it. Yes, it is on page 2. The CELdek literature indicates that, "CELdek evaporative media should not be exposed to temperatures in excess of 350 degrees Farenheit due to the danger of ignition"?**
A. Correct.
**Q. Now, you're indicating that molten material may have made contact with the evaporative cooler media?**
A. The molten material, which is basically depicted on Figure 53 -- 52, 53, 54, shows the extent of the weld material which has protruded

Page 69

the boundary of the sheet metal that raises the
temperatures in that close vicinity of the medium
where amount of temperature, which reaches to 2400
or 1800, it will cause kindling and ignition of a
material which is susceptible for burning before
350.
**Q. Now, did you or anyone else at Thielsch**
**investigate what internal temperatures, that is to**
**say on the inside portion of the stainless steel**
**would reach when welding took place in a proper**
**fashion?**
A. All depends how much heat input he has and how
well he does as far as the speed. It is very
difficult to foretell what temperatures would
reach, given the type of the welding that is being
done.
**Q. Would there -- would it be anticipated that if**
**welding was done, regardless of how high the**
**welding temperature was or regardless of what type**
**of welding unit was used, that there would be an**
**increase in temperature on the other side of the**
**wall where the welding took place?**
A. It will be a temperature differential, yes.
**Q. All right. And in this particular case, you don't**

Page 70

**need a temperature of 2400 degrees to ignite the**
**evaporative cooler media. CELdek, as I understand**
**it, forewarns that a temperature in excess of 350**
**may cause an igniting of the material?**
A. Correct.
**Q. So that at no time did Thielsch do any type of**
**testing to discern what the temperature would be**
**on the inside of the wall, using the very same**
**welding apparatus that was used at the time of the**
**fire, set at the very same settings?**
A. No. I said I wasn't asked to sort of render
any welding related matters except the causation
as far as dealing with the amount of heat
generated from the burn-through and what will be
the consequences of burn-through at a temperature
which will cause ignition of closely placed
combustible material.
**Q. Okay. And at C-3, was every burn-through as**
**likely to cause the fire? In other words, there**
**were three burn-throughs, if I understand it, at**
**C-3?**
A. Yes.
**Q. Any one or all of which could have resulted in**
**causing the increased heat to the estimated 2400**

Page 71

**level, which would have ignited the evaporative**
**cooler media?**
A. Yes.
**Q. Now, was there any molten material that actually**
**dripped on to evaporative cooler media from your**
**standpoint? Or are we just talking about heat**
**that was generated due to burn-through?**
A. I can't tell from the photographs because once
you have molten metal and if it is drips and some
of the remainder that solidifies and acquires this
form as it is shown on Figure 53, it will be
consistent with the notion that once you have a
burn-through, you have the potential also to drip
or segregate some of the material from the molten
metal that may go dropping from that
configuration.
**Q. Okay. So you can have dripping of molten material**
**from a burn-through, you can also have it from a**
**blow-through?**
A. Sometimes you do.
**Q. And you can have what I refer to as "spattering,"**
**molten material that kind of spatters into the**
**interior of the location where the welding is**
**being done, with a burn-through as well as a**

Page 72

**blow-through?**
A. Well, there are many circumstances where you
have splatters for a variety of reasons.
**Q. And are there any of those reasons under**
**conditions where the welding is being done**
**properly?**
A. I don't know.
**Q. Did you get involved at all in your analysis in**
**looking at any rules, regulations that apply to**
**removal of flammable material when welding?**
A. There are basic industry practices that you
take precautions in order to alleviate fires
during the welding process that should be taken
care of.
**Q. Do you know what any of those specific regulations**
**are?**
A. Well, again, those are some of the areas which
I wasn't asked to sort of address.
**Q. All right. Do you have an opinion or have you**
**formulated one in your investigation and analysis**
**of this fire as to whether the fire would have**
**occurred had the evaporative cooling media**
**material been isolated or moistened prior to the**
**welding?**

**Q. And in Figure 21, top photograph?**
A. Yes.
**Q. Do you know what happened to the perpendicular part of the angle clip that seems to be missing from the top photograph, but is present in the other two photographs of C-2 and C-1?**
A. With the angle?
**Q. Well, if you look at the two bottom photographs, C-2 and C-1, you can see the two sides of the angle clip, do you not?**
A. Yes.
**Q. But in the top photograph of C-3, you don't see the two sides, you only see one, I think, unless I'm visually challenged?**
A. Frankly, you know, visually challenged is sometimes when you look at it, oblique, that view takes you to horizontal. I can't tell from this view either.
**Q. You can't tell from this view that one of the angle pieces for the angle clip in C-3 is not in that photograph?**
A. It appears as if there is a line rather than a angle like you see in the lower photographs, that's true.



**Q. Okay. Do you know if and why that piece is missing?**
A. I don't know.
MR. VESPOLE: Off the record.
(OFF THE RECORD)
**Q. On page 13 of your report in the second paragraph, the last sentence, there's the following statement. I'll read it. It says, "The visual examination of the damaged structure and components reveal that the fire had originated in the southeast section of the air inlet plenum where the evaporative cooling media were installed and propagated from the southeast section to the north and upward, the second and third level"; do you see that sentence that I read?**
A. In the second paragraph, the last three lines.
**Q. Actually, it's the last four lines, but yes. Five lines to be exact.**
A. Yes.
**Q. Who made the visual examination of the damaged structure and components to lead to that conclusion?**
A. Both Mike, Bob Basile, and myself.
**Q. Okay. What was it about the visual examination**



**that lead you to the conclusion as stated in that passage we just read?**
A. Basically, when you look at the profile on the external surface, you can see discoloration on the surface on the outside that shows relative areas of discoloration on the stainless steel where the effectiveness of the heat can show different tints. And that gives you a location where the discoloration would be related to the location of the fire which had originated and expanded from there on.
**Q. How was it determined for the purpose of inclusion of this report that the temperature in the area of the inside surface of the plenum would have reached at least 2800 degrees during the welding process?**
A. Well, basically, that relates to the melting of the metal; that it is generally, if it is molten, the temperature of molten stainless steel would be 2650 to 2800, 2750 degrees.
**Q. The temperature at which stainless steel becomes molten?**
A. Molten metal, yes.
**Q. What is the temperature at which welding metal**



**mixes with the base metal in order to do a proper weld?**
A. Basically, you melt it.
**Q. What's the temperature?**
A. That would be basically 2600, 2700 degrees.
**Q. The same, isn't it?**
A. Yes.
**Q. Are you familiar with a report dated December 16, 2004, that Mr. Basile sent to Peter Holzapfel?**
A. I believe I have read it, yes.
**Q. And in that -- I didn't bring an extra copy with me. You don't happen to have a copy in front of you? Do you have a copy in your file; do you know?**
A. I don't believe so.
MR. FREEL: What is the date, Mark?
MR. VESPOLE: December 16, 2004. Two pages.
MS. DAVIS: I have Jack's, but his is marked up, too.
MR. FREEL: December 16, 2004. I'll let him look, but I don't think it's in here.
MR. VESPOLE: We're going to put a